**McGLINCHEY STAFFORD**
Brian A. Paino (SBN 251243)
Helen Mosothoane (SBN 254511)
18201 Von Karman Avenue, Suite 350
Irvine, California 92612
Telephone:   (949) 381-5900
Facsimile:   (949) 271-4040
Email:       bpaino@mcglinchey.com
             hmosothoane@mcglinchey.com

Attorneys for *Defendant* PNC Bank, N.A., sued erroneously as THE PNC FINANCIAL SERVICES GROUP, INC. a Pennsylvania Corporation, successor by merger to NATIONAL CITY BANK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| STEPHEN AND MELINDA DREHER,<br><br>                Plaintiffs,<br><br>    v.<br><br>THE PNC FINANCIAL SERVICES GROUP, INC. a Pennsylvania Corporation, successor by merger to/with NATIONAL CITY BANK; DREAMBUILDER INVESTMENTS, LLC, A New York Limited Liability Company; and DOES 1-50,<br><br>                Defendants. | Case No.: 2:18-cv-07827-MWF-FFM<br><br>**DECLARATION OF PNC BANK, N.A IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing**:<br>Date:    December 16, 2019<br>Time:    10:00 a.m.<br>Judge:  Hon. Michael W. Fitzgerald<br><br>Filed concurrently with:<br>Notice of Motion and Motion for Summary Judgment<br>Statement of Uncontroverted Facts<br>Request for Judicial Notice<br>Declaration of Helen Mosothoane<br>[Proposed] Judgment |

I, Thomas W. Morris, declare as follows:

1.    I am over 18 years of age and am employed as an Officer by PNC Bank, N.A. ("PNC").   In this capacity, I am authorized to sign this declaration on PNC's behalf.

2.    I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, could and would competently testify thereto.

3.    As part of my job responsibilities for PNC, I have personal knowledge of and am familiar with the types of records maintained by PNC and the procedures for creating and maintaining those records, including the procedures for integrating records from prior loan servicers or lenders.  I have access to and have reviewed the books, records and files of PNC that pertain to the loan (the "<u>Loan</u>") given to Stephen Dreher ("<u>Mr. Dreher</u>").

4.    The information in this declaration is taken from PNC's business records regarding the Loan. The records are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; (b) kept in the course of PNC's regularly conducted business activities; and (c) it is the regular practice of PNC to make such records.

## THE LOAN

5.    On or about April 17, 2007, Mr. Dreher entered into a non-purchase money mortgage Loan with National City Bank, in the original principal sum of $350,000.00, which was reflected in a promissory note (the "<u>Note</u>") secured by a deed of trust (the "<u>Deed of Trust</u>") executed by Mr. Dreher and Melinda Dreher (the "<u>Plaintiffs</u>").  True and correct copies of the Note and Deed of Trust are attached hereto as **Exhibits 1 and 2**, respectively.

6.    The Deed of Trust encumbers and established a lien (the "<u>Lien</u>") against the real property located at 546 N. Highland Avenue, Los Angeles, California ("<u>Property</u>"). *See* **Exhibit 2**.

7.    PNC is the successor by merger to National City Bank, which merger took place on or about November 6, 2009.  A true and correct copy of the Office of the Comptroller of the Currency's final certification dated November 6, 2009 (approving the merger) is attached hereto as **Exhibit 3**.  The relevant merger documents are also available to the general public at the Office of the Comptroller of Currency's website: www.occ.gov.

### THE TRANSFER OF THE LOAN

8.    National City Bank was both the servicer and owner of the Loan until it merged with PNC, at which point PNC became the owner and servicer of the Loan.

9.    On or about July 30, 2010, PNC and American Servicing and Recovery Group, LLC ("ASRG") entered into a "Non-Performing" Loan Purchase and Interim Servicing Agreement (the "Purchase Agreement") whereby PNC sold, for valuable consideration, a pool of loans (the "Pool"), including the Loan, to ASRG.   The Loan is identified as loan number ******9653 in a Closing Loan Schedule annexed to the Purchase Agreement.[1] A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit 4**.

10.    Under the Purchase Agreement, PNC agreed to serve as an "Interim Servicer" of the Loan until September 1, 2010 (the "Interim Servicing Period"). *See* **Exhibit 4**, ¶¶ 4.2 ["Appointment"]; 1.1(v) ["Interim Servicing Period"], 1.1(kk) ["Servicing Transfer Date"].

11.    At the request of ASRG, on or about August 12, 2010, PNC executed an Assignment of Deed of Trust (the "Assignment") to Dreambuilder Investments, LLC ("DBI"). A true and correct copy of the Assignment is attached hereto as **Exhibit 5**.

12.    Pursuant to DBI's instructions, within 30 days of the July 30, 2010 closing date of the Purchase Agreement, on or about August 25, 2010, PNC sent the original collateral file for the Loan, which included the original Note and Deed of Trust, to DBI's custodian, U.S. Bank.

13.    PNC maintained a spreadsheet (the "Manifest") identifying the recipients of the collateral files of loans within the Pool. The Manifest identified U.S. Bank as the recipient of the collateral file for the subject Loan. A true and correct copy of the Manifest is attached hereto as **Exhibit 6**.[2]

14.    After the sale of the Loan pursuant to the Purchase Agreement, PNC no

---

[1] Due to privacy concerns, PNC has redacted all but the last four-digits of the Loan number.
[2] Non-relevant portions of the Manifest and the last four-digits of the Loan nunber have been redacted due to privacy concerns.

**DECL. OF PNC BANK, N.A. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

2539611.1

longer held any ownership or other interest in the Loan, with the exception of the servicing rights during the Interim Servicing Period. Following the conclusion of the Interim Servicing Period, PNC had no remaining right, title, or interest in the Loan.

### THE POST-SALE EVENTS

15.     On September 1, 2010, PNC mailed a "goodbye letter" (the "Goodbye Letter") to Mr. Dreher wherein it gave notice of the transfer of servicing rights to the Loan from PNC to DBI. The letter was mailed to Mr. Dreher's address at 23210 S. Cave Bay Rd., P.O. Box 400, Worley, Idaho, 83876 (the "Worley Idaho Address").

16.     Because the Loan was sold as part of a bulk-loan sale to the same purchaser (ASRG), PNC did not retain original copies of the Goodbye Letters for all of the loans that were included in the Pool. Instead, PNC retained a sample copy of the letter it sent to borrowers within the Pool. A true and correct copy of the sample letter that PNC used for loans included in the Pool, including the Loan, is attached hereto as **Exhibit 7**.

17.     PNC maintained a spreadsheet (the "Spreadsheet") that identifies the borrowers within the Pool (together with their addresses) to whom it mailed Goodbye Letters. Mr. Dreher is included on the Spreadsheet and his address is identified as the Worley Idaho Address. Mr. Dreher's inclusion on the Spreadsheet evidences that he was sent a Goodbye Letter at the Worley Idaho Address. A true and correct copy of the Spreadsheet is attached hereto as **Exhibit 8**.[3]

18.     PNC did not receive notice of Plaintiffs' Chapter 11 bankruptcy petition filed in U.S. Bankruptcy Court for the District of Idaho under Case No. 10-21037-TLM (the "Bankruptcy"), or any filings in the Bankruptcy. PNC did not file a Proof of Claim in the Bankruptcy or authorize any person or entity to file a Proof of Claim in the Bankruptcy on its behalf. At no point in time did PNC authorize Green Tree to act as its agent with respect to the Loan. Nor did PNC authorize Green Tree to file that

---

[3] For the protection of private information, non-relevant portions of the Spreadsheet have been redacted.

**DECL. OF PNC BANK, N.A. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
2539611.1

certain Proof of Claim ("POC") filed in the Bankruptcy on October 26, 2010.

19.    PNC took no affirmative steps during the Bankruptcy to assert an ownership or any other interest in the Loan.

20.    PNC did not solicit payments from Plaintiffs during the bankruptcy.

21.    PNC never informed Plaintiffs that Green Tree was its servicing agent.

22.    Plaintiffs sent monthly payments of $360.26 each to PNC in February, March, April and May of 2013 (the "Checks"). True and correct copies of the Checks PNC received are collectively attached hereto as **Exhibit 9**.

23.    PNC, unaware that Green Tree was the servicer of the Loan, cashed the Checks and reissued payments to DBI (the "Reissued Checks"). PNC then received the cancelled Reissued Checks reflecting that they were negotiated by DBI. True and correct copies of the Reissued Checks that PNC sent to DBI are collectively attached hereto as **Exhibit 10**.

24.    Since PNC had sold its interest in the Loan in 2010, PNC was unaware of the recorded Assignment until Plaintiffs filed this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __13th__ day of November, 2019, at _Perth Ridgeville_, Ohio.

_____
Thomas W. Morris

5      Case No. 2:14-cv-09917-BRO-MRW
**DECL. OF PNC BANK, N.A. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
2539611.1

# EXHIBIT "1"

National City®

## FIXED RATE CONSUMER NOTE AND SECURITY AGREEMENT – National Home Equity
(Not to be Used for Texas Homestead Loans Unless Purchase Money or Refinance of Purchase Money)

Date _____4/17/2007_____

**1   DEBTOR(S)**      STEPHEN C DREHER

Address          **546 N HIGHLAND AVE**
                 **LOS ANGELES, California 90036**

**2.   DEFINITIONS AND GENERAL TERMS.** "You" or "your" means the undersigned Debtors. "We", "our" or "us" means National City Bank, 6750 Miller Road, Brecksville, Ohio 44141, and its successors and assigns. "Note" means this promissory note and security agreement and all related attachments and addenda. "Loan" means the loan evidenced by this Note. Property means the real estate securing the payment of this Note described in Section 4. "Disclosure Statement" means the separate federal truth-in-lending disclosure statement of even date provided to you, the terms of which are incorporated by reference in this Note. Disclosures in the Disclosure Statement are contract terms. You agree that we are making this Loan directly to you. The Section headings of this Note are a table of contents and not contract terms.

**3.   PROMISSORY NOTE.** For value received, you, intending to be legally bound, jointly and severally promise to pay to our order the principal sum of $ ____350,000.00____, which includes a prepaid finance charge of $ ___7253.00___, plus interest from the date of this Note on the principal sum outstanding and other sums owed under this Note at the per annum rate of ___9.250___ %, payable as described in the payment schedule in the Disclosure Statement. You agree that all past due and unpaid charges owed, including past due interest, may be capitalized and earn interest by adding them to the principal balance of this Note. Interest will be computed on a simple interest basis based upon a 365-day year, but calculated on actual days. Accordingly, your payment history could affect the amount you will pay under this Note.

**4.   PROPERTY** ____546 N HIGHLAND AVE____
       ____LOS ANGELES , California 90036____

**5.   DISBURSEMENT OF PROCEEDS.** You authorize us to disburse all proceeds of this Loan by check, draft, electronic transfer or in such other form or manner as we choose in our sole discretion.

**6.   LATE CHARGE; RETURNED INSTRUMENT CHARGE; DEFFERAL CHARGE; DOCUMENT REQUEST CHARGE.** If all or any portion of any monthly payment is not received within 10 days after it is due and we do not accelerate the entire balance owing under this Note, you agree to pay a late charge. This late charge will be the greater of 10% of the unpaid monthly payment or $40. If any check, draft, negotiable order of withdrawal, or other similar instrument is returned to us unpaid for any reason, you agree to pay a returned instrument charge. This returned instrument charge will be $25. If we, in our sole discretion, permit you to defer any payment(s) you agree to pay a deferral charge for each payment deferred. If you request copies of any documents related to this Loan, you agree to pay a document request charge for the service of providing copies. This document request charge will be $6 per copy. We will not charge you for documents we are required to provide you by law.

**7.   INSURANCE.** You are required to insure the Property until this Loan is paid in full or we sell the Property. You have the risk of loss of the Property and will be responsible for its loss or damage. You agree to obtain insurance coverage (including furnishing existing coverage) from any insurer you want that is acceptable to us, provided that the insurer is authorized to do business in the state or jurisdiction where the Property is located or is an eligible surplus lines carrier, in the following types and amounts with us listed as loss payee: (a) fire, "all risk" perils and flood insurance required by law; and (b) all other insurance required by applicable law. You must keep the Property fully insured against loss or damage on terms which are acceptable to us to the extent permitted by law. All insurance proceeds we receive (including a refund of premium) may at our option reduce the indebtedness of this Note or be used to repair or replace the Property. If the Property is destroyed, you must still pay us whatever you owe under this Note. If you fail to maintain the required insurance, we may at our sole option obtain coverages at your expense which we believe are necessary to protect our interests in the Property. You agree to pay the expense of such insurance on demand or agree that we may add such expense to this Loan. You acknowledge that insurance we purchase may cost substantially more than insurance you could purchase. Failure of your insurer to pay a claim, or any part of a claim, will mean you do not have the insurance required by this Note. You also assign to us any other insurance proceeds related to the Note or our interest in the Property. You must promptly provide us with evidence of insurance and proof of payment of insurance premiums upon our request, and all policies must provide us with a minimum of 10 days prior notice of cancellation or material change in coverage. Our mailing address for purposes of this Section is P.O. Box 91596, Cleveland, OH 44101-0351. You irrevocably authorize us as your agent and on your behalf, which authorization will survive your incompetence, to negotiate, settle and release any claim under your insurance or under any insurance with a third party insurer related to the Property, and to receive and sign all related papers and documents on your behalf including, checks, drafts and other items payable to you.

**8.   PREPAYMENT.** You may voluntarily prepay the principal sum of this Note in part at any time. If you voluntarily prepay the principal sum of this Note in full, you agree to pay a voluntary prepayment charge which will be equal to the greater of ___0___ % of the principal balance at the time of prepayment or $ ___0.00___. You will only be charged this voluntary prepayment charge during the first ___0___ months of this Note. If we accelerate the entire balance owing under this Note due to your default, you agree to pay an involuntary prepayment charge which will be equal to $ ___150.00___. No portion of the prepaid finance charge described in Section 3 will be refunded. Subject to Section 3, you authorize us to apply all prepaid sums to the indebtedness of this Note in any manner we elect.

**9.   SECURITY AGREEMENT.** To the extent permitted by law you grant us a security interest and waive all applicable property exemptions and homestead rights (unless the Property is located in Texas) in the following property to secure performance of your obligations under this Note and (except for the Property if it is a principal residence) your obligations under any other agreement with us or our affiliates. (a) the Property including all equipment, parts, accessories and personal property which is a fixture of the Property except 'household goods" as defined by 12 C.F.R. 227.12(d) unless purchased with the proceeds of this Loan. If we have a prior lien on your principal residence as security for future obligations, we waive such security as to this Note only; (b) proceeds and unearned premiums of any Property insurance; (c) all of your deposit accounts with us or our affiliates (except individual retirement accounts), and (d) substitutions, replacements, products and proceeds of the foregoing. Our security interest will be a purchase money security interest if any of the foregoing are purchased with the proceeds of this Loan. You agree that we are not a fiduciary with respect to our security interest. You further agree that we may at any time apply proceeds and unearned premiums and refunds of any Property insurance to reduce the indebtedness of this Note, even if you are not in default. Upon our request, you will deliver any documents that are necessary for us to perfect our security interest. You will defend at your expense our security interest in the Property. To the extent permitted by law, you agree to pay all actual costs imposed to release our interests in the Property.

**10.   PROPERTY MAINTENANCE AND USE.** You will promptly pay all fees, fines, and taxes related to this Loan and the Property. You will maintain the Property in good condition except for ordinary wear and tear, and keep it free from all liens, encumbrances, fines and adverse claims. You will make all needed repairs. You will not make any changes to the Property that will decrease its value or decrease its functionality without our prior written consent. You will permit us to inspect the Property at a time which is reasonably convenient. If you do not do any of the foregoing, we may do so at our sole option and add the costs to this Loan or require you to provide us with additional collateral. You will not use, or permit others to use, the Property (a) in violation of any law; (b) contrary to the provisions of any insurance policies covering the Property or in a manner that would invalidate any warranty or (c) for any business, commercial or agricultural purpose unless this Loan is explicitly for such a purpose.

NHEFRN1 (07/03)



FRNOTE-MULTI-V1_1

**PNC Dreher 000088**

11.   **DEFAULT AND REMEDIES.** You will be in default under this Note if: (a) you fail to make any payment or pay other amount owing under this Note when due, (b) you fail to keep any of your agreements under this Note or under any other agreement with us or our affiliates, (c) a bankruptcy petition is filed by or against you, (d) you have provided false or misleading information to us, (e) you die or are declared incompetent or incapacitated (f) the Property or any other property for which we or our affiliates possess a security interest is lost, stolen, destroyed, determined by us to be uninsurable for use, seized, impounded or threatened with, or subject to, levy, attachment, condemnation, forfeiture or other administrative or judicial proceedings, or (g) you are in default on any obligation that is secured by a lien on the Property. If you are in default, in addition to any other rights and remedies we have under law and subject to any right you may have to cure your default, we may do any of the following. (aa) accelerate the entire balance owing under this Note after any demand or notice which is required by law, which entire balance will be immediately due and payable. You will pay us interest on this balance at the rate set forth in this Note including after default and acceleration and after any judgment, (bb) demand that you vacate the Property and make it available to us at a time which is reasonably convenient. You agree to comply with such demand, (cc) sell, lease, or otherwise dispose of the Property. Our disposal of the Property will not release you from any of your obligations and you will pay us any balance owing under this Note, (dd) recover all expenses related to retaking, holding, preparing for sale and selling the Property and reasonable collection costs, attorneys' fees (unless you are a resident of New Hampshire, in which case we may not recover our attorneys' fees from you) and legal expenses as permitted by 11 U.S.C. 506 and applicable state law; and/or (ee) setoff any of your deposit accounts with us or our affiliates (except individual retirement accounts) without demand or notice.

12.   **PROPERTY CONDITION.** You agree that with respect to any Property (a) it is free from all material defects, in proper operating order and fit for all intended purposes, (b) that our making this Loan was based in part upon the value and condition of them as represented by you, (c) we did not directly or indirectly offer, sell or provide it to you, and (e) we are not a seller, supplier, merchant or warrantor. Accordingly, except for specific rights afforded by state law, **any claims relating to the Property, including any defect or warranty related to it, are not our responsibility.**

13.   **ADDITIONAL AGREEMENTS.** You agree that. (a) you may not sell or assign this Note, the Property or any of its benefits or obligations without our prior written consent. We own this Note and may assign this Note or any of its benefits or obligations at any time without your consent, (b) this Note is between you and us and except for successors or assigns as provided by this Note, this Note will not confer any rights upon any third party, (c) our rights and remedies in this Note are not exclusive; (d) we may waive or delay the enforcement of our rights under this Note without waiving or otherwise affecting such rights. (e) the provisions of this Note are only to the extent permitted by applicable law. Any part of this Note which cannot be enforced will be void, but the remaining parts will remain in effect, (f) you waive notice of dishonor, protest, presentment, demand for payment (subject to any right you may have to cure your default), waiver, delay and all other notices or demands in connection with this Note, (g) you waive all defenses relating to impairment of recourse or collateral, and we can change any term of this Note, release any collateral or release any obligor by agreeing with any one party without notifying or releasing any other party, (h) we can correct errors in this Note as provided in 15 U.S.C. 1640 upon notice to you even if they are contract terms and you agree to be bound by such corrections. Upon our request, you will promptly re-execute this Note to correct errors in the Note. You can change any term of this Note only in a writing signed by us, (i) the Bank is a national bank located in Ohio and Bank's decision to make this Loan to you was made in Ohio. Therefore, this Note shall be governed by and construed in accordance with (i) Federal laws and regulations including but not limited to 12 USC § 85 and (ii) the laws of Ohio, to the extent Ohio laws are not preempted by federal laws or regulations, and without regard to conflict of law principles, (j) this Note describes all agreements between you and us with respect to the Loan and there are no other agreements. An electronic or optically imaged reproduction of this Note or any other document related to your Loan constitutes an original document and may be relied on in full by all parties to the same extent as an original, (k) except as otherwise required by law, we are authorized to mail any notice or other correspondence to you by first class mail to your last known address indicated on our records, (l) you will provide us with 10 days prior written notice of any change in any information contained in your application including a change in your name or address. Except as otherwise specified, all notices and payments to us must be sent to P.O. Box 5700, Cleveland, OH 44101-0570, or such other place as we may designate. Our failure or delay in providing you billing statements or other payment instructions will not relieve you of your obligations under this Note, (m) all payments must be in lawful money of the United States, (n) if you are a natural person you are competent to enter into this Note and if you are other than a natural person, the person signing on behalf of you represents that they are authorized to enter into and execute this Note, (o) we will not be responsible for any personal items in or on vacated Property. We will make a reasonable effort to return such items to you or have you reclaim them from us provided you notify us within 5 business days of our taking possession and itemize such items. Even if you notify us, you abandon to us any personal items not reclaimed from us within 10 business days of our taking repossession, (p) we may accept late payments or partial payments without losing any of our rights. **If your payment is marked with the words "Paid in Full" or similar language, you must send your payment to National City, 6750 Miller Road, Brecksville, Ohio 44141, Locator No. 7107.** If your payment is made to any other address, we may accept the payment without losing any of our rights, (q) our application of your payments or other proceeds will be deemed reasonable unless another method is required by law, in which case that method will be deemed reasonable; (r) this Note will be binding and inure to the benefit of you and us and our respective successors and assigns, (s) except as otherwise prohibited by law, Bank may provide to others, **including but not limited to, consumer credit reporting agencies, information about our transactions and experiences with you.** Also, Bank and its affiliates (collectively "National City") may share with each other all information about you for the purposes, among other things, of evaluating credit applications or offering products and services that National City believes may be of interest to you. Under the Fair Credit Reporting Act there is certain credit information that cannot be shared about you (unless you are a business) if you tell National City by writing to National City Corporation, Attention. Office of Consumer Privacy, P.O. Box 4068, Kalamazoo, MI 49009. You must include your name, address, account number and social security number; (t) the annual IRS Form 1098 will be issued only to the first borrower listed on this Note at origination and the designation of a borrower as first cannot be changed subsequently, (u) we are authorized to sign on your behalf any document required to enforce our interests under this Note, (v) disclosures included in this Note but not required by law are not an admission or waiver of rights by us, (w) all actions under this Note requiring our consent are at our sole discretion, and such consent may be withheld for any reason, (x) our typewritten name in Section 2 will constitute our signature for purposes of this Note, (y) we have an established business relationship with you, and unless otherwise prohibited by law, National City may contact you to offer you products and services that National City thinks may be of interest to you. Such contacts are not unsolicited, and National City may contact you with an automated dialing and announcing device or by fax, email or other form of electronic communication and we may monitor telephone calls with you to assure quality service; (z) you will pay all fees we charge you in connection with this Loan including those indicated on any Good Faith Estimate or HUD1/HUD1A provided in connection with this Loan, which will be nonrefundable to the extent permitted by law; (aa) all amounts owed under this Note will be without relief from valuation and appraisement laws, (bb) if this Loan is not for a consumer purpose or you are not a natural person, you are not entitled to any rights afforded consumers under applicable law or regulations, and (cc) In this Note, the term "affiliates" means current and future affiliates of National City Bank, including, but not limited to, the following National City Corporation subsidiaries. National City Home Loan Services, Inc., First Franklin Financial Corporation, Madison Bank and Trust Company and National City Mortgage Co.

14.   **ADDITIONAL NOTICES.** The following notices are given by Bank only to the extent not inconsistent with 12 U.S.C. Section 85 and related regulations and opinions, and/or the choice of law provision set forth herein (with respect to which Bank expressly reserves all rights). You acknowledge receipt of the following notices before becoming obligated. For purposes of the immediately following *Notice to Cosigner,* "bank" means us.

NHEFRN2A (06/06)

FRNOTE-MULTI-V1_2

**PNC Dreher 000089**

## NOTICE TO COSIGNER

You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount. The bank can collect this debt from you without first trying to collect from the borrower (and after proper notice to you if you are a "cosigner" as defined by Illinois or Michigan law). The bank can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages (unless you receive wages in North Carolina, Pennsylvania, South Carolina or Texas) etc. If this debt is ever in default, that fact may become a part of *your* credit record. This notice is not the contract that makes you liable for the debt.

## NOTICE TO ALL SIGNERS

You are hereby notified that a negative credit report reflecting on your credit record may be submitted to a consumer (credit) reporting agency if you fail to fulfill the terms of your credit obligations. If you believe that we have information about you that is inaccurate or that we have reported or may report to a credit reporting agency information about you that is inaccurate, please notify us of the specific information that you believe is inaccurate by writing to National City, P.O. Box 94982, Cleveland, Ohio 44101, Attn: Credit Bureau Disputes, Locator 7113.

If the Property is located in California. Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property

If the Property is located in Colorado. The dollar amount of the finance charge disclosed to you for this credit transaction is based upon your payments being received by us on the date payments are due. If your payments are received after the due date, even if received before the date a late fee applies, you may owe additional and substantial money at the end of the credit transaction and there may be little or no reduction of principal. This is due to the accrual of daily interest until a payment is received

If the Property is located in Florida: Florida Documentary Stamp Tax in the amount required by law has been paid or will be paid directly to the Department of Revenue, and Florida Documentary Stamps have been placed on the taxable instruments as required by Chapter 201, Florida Statutes.

If the Property is located in Iowa (this is a consumer credit transaction) or Kansas: NOTICE TO CONSUMER. 1 Do not sign this paper (agreement) before you read it. 2. You are entitled to a copy of this paper (agreement). 3 You may prepay the unpaid balance at any time and in accordance with law you will not be entitled to receive a refund of unearned charges 4 If you prepay the unpaid balance, you may have to pay a prepayment penalty

If the Property is located in Iowa and the principal amount of this Loan exceeds $20,000: IMPORTANT: READ BEFORE SIGNING THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT

If the Property is located in Maryland: We elect Subtitle 10, Credit Grantor Closed End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland

If the Property is located in Minnesota: If the amount of this Loan is $100,000 or more, we elect Minn. Stat § 334.01

If the Property is located in Missouri. Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

If the Property is located in New York: YOU SHOULD CHECK WITH YOUR LEGAL ADVISOR AND WITH OTHER MORTGAGE LIEN HOLDERS AS TO WHETHER ANY PRIOR LIENS CONTAIN ACCELERATION CLAUSES WHICH WOULD BE ACTIVATED BY A JUNIOR ENCUMBRANCE.

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT

If the Property is located in North Dakota: THIS OBLIGATION MAY BE THE BASIS FOR A PERSONAL ACTION AGAINST THE PROMISOR OR PROMISORS IN ADDITION TO OTHER REMEDIES ALLOWED BY LAW.

If the Property is located in Oregon: NOTICE TO THE BORROWER: Do not sign this loan agreement before you read it. The loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.

If the Property is located in Texas: THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

If the Property is located in Vermont: NOTICE TO CO-SIGNER. YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU

If the Property is located in Wisconsin: NOTICE TO CUSTOMER. (a) DO NOT SIGN THIS BEFORE YOU READ THE WRITING ON THE REVERSE SIDE, EVEN IF OTHERWISE ADVISED. (b) DO NOT SIGN THIS IF IT CONTAINS ANY BLANK SPACES. (c) YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN (d) YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE DUE UNDER THIS AGREEMENT AND YOU WILL NOT BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

NHEFRN3 (07/04)

FRNOTE-MULTI-V1_3

**PNC Dreher 000090**

**15  SIGNATURES.** YOU HAVE READ AND AGREE TO ALL PROVISIONS OF THIS NOTE INCLUDING THOSE ON PAGES 1 THROUGH 3 AND IN THE DISCLOSURE STATEMENT WHICH IS INCORPORATED HEREIN BY REFERENCE.  (1) DO NOT SIGN THIS NOTE BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES TO BE FILLED IN    (2) YOU ARE ENTITLED TO A COMPLETELY FILLED-IN COPY OF THIS NOTE BEFORE YOU SIGN IT  BY SIGNING THIS NOTE, YOU ACKNOWLEDGE THAT YOU HAVE READ AND RECEIVED A COMPLETED COPY OF THIS ENTIRE NOTE BEFORE SIGNING IT ON THE DATE SHOWN ON PAGE 1  SEE PAGES 1, 2 AND 3 AND THE DISCLOSURE STATEMENT FOR ADDITIONAL IMPORTANT TERMS AND CONDITIONS.

<br>

STEPHEN C DREHER
_____
Type or print name of Debtor

X _____
Debtor's signature

<br>

_____
Type or print name of Debtor

X _____
Debtor's signature

<br>

_____
Type or print name of Debtor

X _____
Debtor's signature

<br>

_____
Type or print name of Debtor

X _____
Debtor's signature

<br>

**FOR MICHIGAN GUARANTORS ONLY  Guaranty Agreement.**  For value received, you the undersigned guarantors jointly, severally and unconditionally guarantee the payment of all sums owing under this Note when due and the performance by the Debtors of all promises contained in this Note. Upon default, we may proceed against any of you without first proceeding against any Debtor  The liability of each of you will be primary and will not be affected by any settlement, release, extension, renewal or modification of this Note whether or not by operation of law    Each of you voluntarily and knowingly waives all rights to any demands, presentments, notices and defenses of any kind or nature you might have in connection with this Guaranty  Each of you agrees to pay all expenses including reasonable attorneys' fees incurred by us if we have to enforce this Guaranty  Each of you acknowledges that you have read and agree to all terms of this Guaranty, Note and Disclosure Statement prior to signing below

<br>

_____
Type or print name of Guarantor

X _____
Guarantor's signature

<br>

_____
Type or print name of Guarantor

X _____
Guarantor's signature

<br>

®2004 National City Corporation

FRNOTE-MULTI-V1_4

PNC Dreher 000091

# EXHIBIT "2"

This document was prepared by PATRICIA RODGERS National City Bank

6750 Miller Road Brecksville, OH 44141

Please return this document after recording to:

NCB, CLS BRECKSVILLE
DOCUMENTATION, LOCATOR 7120
6750 MILLER ROAD
BRECKSVILLE, OH 44141

04/25/07



**20070996104**

APN# 5524-025-001

———— State of California ————          Space Above This Line For Recording Data ————

# DEED OF TRUST
(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Deed of Trust (Security Instrument) is April 17, 2007 .......................
The parties and their addresses are:
TRUSTOR:   **STEPHEN C DREHER** and Melinda Dreher, Husband and Wife as joint tenants

   **23210 S CAVE BAY RD WORLEY, Idaho 83876**

   [X] If checked, refer to the attached Addendum incorporated herein, for additional Trustors, their signatures and acknowledgments.
   TRUSTEE:   **National City Bank**

   LENDER:   **NATIONAL CITY BANK**

   DREHER
   MORTGAGEDEED

   013964586109653   XLLH13F

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Trustor's performance under this Security Instrument, Trustor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of Lender, with power of sale, the following described property:
   **SEE ATTACHED EXHIBIT A**

   The property is located in Los Angeles ............................................................ at ...........................................
   (County)

   546 N HIGHLAND AVE .............. , ......... LOS ANGELES .......................... , California 90036 ........
   (Address)                                            (City)                                              (ZIP Code)
   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ ......... 350,000.00 .... This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(Include items such as borrowers' names, note or contract amounts, interest rates (whether variable), maturity dates, etc.)*

   Maturity Date: 4/17/2022




**This page is part of your document - DO NOT DISCARD**



**20070996104**  Pages: 009

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

04/25/07 AT 08:00AM

Fee:  46.00
Tax:  0.00
Other: 0.00
Total: 46.00

Modify

**TITLE(S) :**



L E A D   S H E E T

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.    **Number of AIN's Shown**

**PNC Dreher 000094**


THIS FORM IS NOT TO BE DUPLICATED


**WHEN RECORDED MAIL TO:**

NCB, CLS BRECKSVILLE
DOCUMENTATION, LOC 7120
6750 MILLER RD
BRECKSVILLE, OH 44141

07- 0996104

# DEED OF TRUST

**PNC Dreher 000095**

B. All future advances from Lender to Trustor or other future obligations of Trustor to Lender under any promissory note, contract or guaranty, or other evidence of debt executed by Trustor in favor of Lender after this Security Instrument if this Security Instrument is specifically referenced on the evidence of other debt. If more than one person signs this Security Instrument, each Trustor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Trustor, or any one or more Trustor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

D. Performance of every obligation in this Security Instrument (including any subsequent instrument amending this Security Instrument) and any instrument now or later evidencing or securing any indebtedness secured by this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Trustor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Trustor warrants that Trustor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Trustor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Trustor agrees:
   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Trustor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Trustor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Trustor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Trustor's payment. Trustor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Trustor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Trustor may have against parties who supply labor or materials to maintain or improve the Property.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Trustor will keep the Property in good condition and make all repairs that are reasonably necessary. Trustor shall not commit or allow any waste, impairment, or deterioration of the Property. Trustor will keep the Property free of noxious weeds and grasses. Trustor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Trustor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Trustor will notify Lender of all demands, proceedings, claims, and actions against Trustor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Trustor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Trustor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Trustor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Trustor appoints Lender as attorney in fact to sign Trustor's name or pay any amount necessary for performance. Lender's right to perform for Trustor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's

*(page 2 of 6)*

© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc.,  Form RE-DT-CA  2/9/2006
VMP®-C165(CA) (0605)

PNC Dreher 000096

other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Trustor irrevocably assigns, grants, and conveys, to Trustee, in trust for the benefit of Lender as additional security all the right, title and interest in the following (all referred to as Property): existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including any extensions, renewals, modifications or replacements (all referred to as Leases); and rents, issues and profits (all referred to as Rents). In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Trustor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Trustor may collect, receive, enjoy and use the Rents so long as Trustor is not in default.

Upon default, Trustor will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Trustor agrees that this Security Instrument is immediately effective between Trustor and Lender and effective as to third parties on the recording of this Assignment. This Security Instrument will remain effective during any statutory redemption period until the Secured Debts are satisfied. As long as this Assignment is in effect, Trustor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Trustor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Trustor will perform all of Trustor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **DEFAULT.** Trustor will be in default if any party obligated on the Secured Debt fails to make payment when due. Trustor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Trustor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Trustor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents, including without limitation, the power to sell the Property.

If Lender elects to foreclose by exercise of the power of sale, Lender will declare the entire Secured Debts due and payable by delivering to Trustee in this Security Instrument and any evidence of the Secured Debts, receipts and evidence of expenditures made and secured, as Trustee requires. When the legally prescribed time passes after Trustee or Lender duly records a notice of default, the Trustee, Lender or other person authorized to take the sale will give a notice of sale as required by law and will cause the Property to be sold at the time and place fixed in the notice of sale. Lender may rescind any notice of default at any time before the Property's sale. Rescission will occur when Lender executes and records a notice of rescission that cancels any prior notice of default and any related acceleration of the Secured Debts. Lender's rescission will not waive any default then existing or subsequently occurring or preclude Lender exercising its remedies, including the power of sale, at another time.

The Property can be sold as a whole or in separate parcels and in any order that Trustee decides. The Property will be sold to the highest bidder for cash in lawful money of the United States, payable at sale time. The Property can be sold to anyone, including Trustor, Trustee or Lender. Trustee may postpone the sale of any part of the Property by public announcement at the time and place of this sale and afterwards at the time fixed by the preceding postponement. Upon any sale of the Property, Trustee will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Trustee will covenant that Trustee has not caused or allowed a lien or an encumbrance to burden the Property and that Trustee will specially warrant and defend the Property's title to the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Trustee. The deed's recital of facts will be conclusive proof of the truthfulness of these facts.

© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc., Form RE-DT-CA 2/9/2006
VMP®-C165(CA) (0605)

*(page 3 of 6)*

PNC Dreher 000097

The proceeds from the Property's sale will be applied to the sale expenses, Trustee's expenses, Lender's attorneys' fees due on Trustor's default, sums that Trustee or Lender paid for procuring a title search of the Property's title subsequent to the execution of this Security Instrument, all outstanding amounts due under this Security Instrument and the remainder to anyone legally entitled to the remaining amounts due.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Trustor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Trustor agrees to pay all of Lender's expenses if Trustor breaches any covenant (including, but not limited to, advances and expenses as described in the AUTHORITY TO PERFORM and INSURANCE sections) in this Security Instrument. Trustor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Trustor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Trustor agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Trustor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

B. Except as previously disclosed and acknowledged in writing to Lender, Trustor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

C. Trustor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Trustor shall take all necessary remedial action in accordance with any Environmental Law.

D. Trustor shall immediately notify Lender in writing as soon as Trustor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

18. **CONDEMNATION.** Trustor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Trustor authorizes Lender to intervene in Trustor's name in any of the above described actions or claims. Trustor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Trustor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Trustor subject to Lender's approval, which shall not be unreasonably withheld. If Trustor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Trustor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Trustor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Trustor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Trustor.

© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc., Form RE-DT-CA 2/9/2006
VMP®-C165(CA) (0605)

**PNC Dreher-000098**

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Trustor. If the Property is acquired by Lender, Trustor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Trustor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Trustor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Trustor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Trustor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Trustor signs this Security Instrument but does not sign an evidence of debt, Trustor does so only to mortgage Trustor's interest in the Property to secure payment of the Secured Debt and Trustor does not agree to be personally liable on the Secured Debt. Trustor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Trustor's consent. Such a change will not release Trustor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Trustor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. **SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

25. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one trustor will be deemed to be notice to all trustors. Lender and Trustor request that copies of any notice of default or notice of sale under a superior instrument be sent to Lender and Trustor at the addresses listed in the DATE AND PARTIES section.

26. **WAIVERS.** Except to the extent prohibited by law, Trustor waives all appraisement or marshalling of assets relating to the Property.

27. **STATEMENT OF OBLIGATION.** Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the Civil Code of California.

28. **SPOUSE'S SEPARATE PROPERTY.** Any Trustor who is a married person or registered domestic partner expressly agrees that recourse may be had against his or her separate property.

**29. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

☐ **Fixture Filing.** Trustor grants to Lender a security interest in all goods that Trustor owns now or in the future and that are or will become fixtures related to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

☐ **Riders.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes] *SIGNATURE ADDENDUM*

☐ Condominium Rider  ☐ Planned Unit Development Rider  ☒ Other *SIGNATURE ADDENDUM*

☐ **Additional Terms.**

**SIGNATURES:** By signing below, Trustor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Trustor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

*[signature]* 4/19/07

(Signature)                                    (Date)           (Signature)                                    (Date)

**STEPHEN C DREHER**

**ACKNOWLEDGMENT:**

(Individual) STATE OF ...Ca.li.forni.a.............. , COUNTY OF ...Ala.me.da............. } ss

On this ...19............... day of ...April...2007...... before me ...D.L.Manuel-Miller

a notary public, personally appeared ...Stephen.C.Dreher...............................

~~personally known to me (or~~ proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) ~~is/are~~ subscribed to the within instrument and acknowledged to me that ~~he/she/they~~ executed the same in ~~his/her/their~~ authorized capacity(ies), and that by ~~his/her/their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

D. L. MANUEL-MILLER
Commission # 1596256
Notary Public - California
(Seal) Alameda County
My Comm. Expires Jul 30, 2009

Signature *D.L.Manuel-Miller*

Name (typed or printed)

*D.L. Manuel-Miller*

My commission expires: 3 July 2009

---

**REQUEST FOR FULL RECONVEYANCE**

To Trustee:

The undersigned is the holder of the note or notes secured by this Deed of Trust, which was recorded in the office of the Recorder of ............................ County, State of California, in book ...................... , page ..........
of official records. Said note or notes, together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.

Dated: ....................................     ................................................................

Assessor's Identification Number ................ - ................ - ..................

© 1994 Wolters Kluwer Financial Services · Bankers Systems, Inc., Form RE-DT-CA 2/9/2006

VMP®-C165(CA) (0605)

*(page 6 of 6)*

# SIGNATURE ADDENDUM TO SECURITY INSTRUMENT

Definition: "Security Instrument." The Deed of Trust, Mortgage, Trust Deed, Deed to Secure Debt or Security Deed given to secure the debt to the Lender of the same date.

Mortgagor(s)/Borrower(s) on Security Instrument:

**STEPHEN C DREHER**

Property Address:

**546 N HIGHLAND AVE**
**LOS ANGELES California 90036**

Lender:          National City Bank

Lender Reference Number:

**ADDITIONAL SIGNATURES:** By signing below, Grantor(s) / Mortgagor(s) / Trustor(s) / Settlor(s) agrees to the terms and covenants contained in the Security Instrument and in any attachments. Grantors(s) / Mortgagor(s) / Trustor(s) / Settlor(s) also acknowledges receipt of a copy of the Security Instrument.

NON-APPLICANT SPOUSE, OR NON-APPLICANT
INDIVIDUAL WITH OWNERSHIP INTEREST IN PROPERTY: ADDITIONAL BORROWERS

_Melinda Dreher_     4-18-07
MELINDA DREHER                    Date                                              Date

_____          _____
                    Date                                              Date

_____
                    Date

**ACKNOWLEDGMENT:**
STATE OF _Idaho_ , COUNTY OF _Benewah_ }ss.
On this _18th_ day of _April 2007_ before me _Ronald V Osmonson, Notary_ a notary public, personally appeared _Melinda Dreher_

_____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Ronald V Osmonson_

Name (typed or printed): _Ronald V Osmonson_

My commission expires: _02 - 20 - 09_

RONALD V. OSMONSON
Notary Public
State of Idaho

SIGNADD1 (4/2006)

YOUR REFERENCE: 1127764-LA   ORDER NO.: 549867-20

# EXHIBIT "A"

LOT(S) 9 OF TRACT NO. 6849, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 76, PAGE(S) 85 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

MORTGAGEDEED_A

013964586109653

Form PR-S

PNC Dreher 000102

# EXHIBIT "3"


**PNC BANK**

### CERTIFICATE

The undersigned, George P. Long, III, Secretary of PNC Bank, National Association, does hereby certify as follows:

1. Effective December 31, 2008, National City Corporation merged with and into The PNC Financial Services Group, Inc. and National City Bank became a wholly owned subsidiary of The PNC Financial Services Group, Inc. Prior to this merger, National City Bank was a wholly owned subsidiary of National City Corporation.

2. Effective as of November 6, 2009, National City Bank and pursuant to approval granted by the United States Office of the Comptroller of the Currency (as evidenced by the official certification dated November 6, 2009 attached hereto as Exhibit "A"), was merged with and into PNC Bank, National Association and National City Real Estate Services LLC became a wholly owned subsidiary of PNC Bank, National Association. Prior to this merger, National City Real Estate Services LLC was a wholly owned subsidiary of National City Bank.

3. Effective November 7, 2009 a Certificate of Dissolution to dissolve National City Real Estate Services LLC was filed with the State of Ohio.

4. PNC Bank, National Association is a duly organized and existing national banking association (Charter Number 1316) and wholly owned subsidiary of PNC Bancorp, Inc. (a wholly owned subsidiary of The PNC Financial Services Group, Inc.), having its main office located at 222 Delaware Avenue, Wilmington, Delaware 19801 and using federal Employer Identification Number 22-1146430.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and affixed the seal of this Association this 3rd day of February, 2010.

_George P. Long, III_

**PNC BANK NATIONAL ASSOCIATION**
**SEAL**

Member of The PNC Financial Services Group

One PNC Plaza 249 Fifth Avenue Pittsburgh Pennsylvania 15222 2707
M:\LGL\BOARD\CERT\CERTS BY ENTITY\NATIONAL CITY\NATIONAL CITY REAL ESTATE SERVICES LLC.doc

**EXHIBIT A**



Comptroller of the Currency
Administrator of National Banks

Northeastern District Office                                    Licensing Division
340 Madison Avenue, 5ᵗʰ Floor                        Telephone: (212) 790-4055
New York, New York 10173-0002                                  Fax: (301) 333-7015

November 6, 2009

James S. Keller
Chief Regulatory Counsel
The PNC Financial Services Group, Inc.
249 Fifth Avenue
One PNC Plaza, 21ˢᵗ Floor
Pittsburgh, Pennsylvania 15222-2707

Re:  Application to merge National City Bank, Cleveland, Ohio, with and into PNC Bank,
     National Association, Wilmington, Delaware under the charter and title of the latter.
     Control No:  2009 NE 02 0017                          Charter No: 1316

Dear Mr. Keller:

This letter is the official certification of the Comptroller of the Currency to merge National City
Bank, Cleveland, Ohio ("NCB"), with and into PNC Bank, National Association, Wilmington,
Delaware ("PNC Bank"), effective as of close of business on November 6, 2009.  The resulting
bank's title is PNC Bank, National Association, charter number 1316.

This is also the official authorization given to PNC Bank, the resulting bank, to operate branches
of NCB as branches of the resulting bank.  Branches of a national bank target are automatically
carried over to the resulting bank and retain their current OCC branch numbers.

We understand that upon consummation, the capital surplus of PNC Bank will increase.  Within
30 days following consummation, please provide this office with the exact dollar amount of the
capital change so that we may issue our letter certificating the capital increase.

If the combination does not occur as represented in your letter of October 26, 2009, this
certification must be returned to the OCC.  Following consummation of the merger, please return
the charter certificate for NCB so that we may properly close our files for this bank.

Sincerely,

Sandya Reddy
Acting Director for District Licensing

# EXHIBIT "4"



EXECUTION VERSION

**"NON-PERFORMING" LOAN PURCHASE AND INTERIM SERVICING AGREEMENT**

Between

**PNC BANK, NATIONAL ASSOCIATION,**
Seller and Interim Servicer
and

**AMERICAN SERVICING AND RECOVERY GROUP, LLC,**
Purchaser

Dated as of July 30, 2010

"Non-Performing" Loans

**PNC Dreher 000273**



## TABLE OF CONTENTS

**Page**

ARTICLE 1
DEFINITIONS

Section 1.1     Certain Definitions..................................................................................... 1
Section 1.2     Other Terms ............................................................................................... 5

ARTICLE 2
SALE AND CONVEYANCE OF LOANS.

Section 2.1     Sale and Conveyance of Loans; Payment of Aggregate Purchase Price ........ 6
Section 2.2     Closing and Subsequent Deliveries; Post-Closing Adjustment. .................... 6
Section 2.3     Recordation of Assignments of Mortgage ................................................... 7
Section 2.4     Representations and Warranties for a Loan. ................................................ 7
Section 2.5     Remedy for Breach of Loan Representation and Warranty. .......................... 9
Section 2.6     Record Retention ..................................................................................... 11

ARTICLE 3
REPRESENTATIONS AND WARRANTIES AS TO EACH PARTY.

Section 3.1     Representations and Warranties as to Seller .............................................. 12
Section 3.2     Representations and Warranties as to Purchaser ....................................... 13

ARTICLE 4
INTERIM SERVICING.

Section 4.1     General ...................................................................................................... 14
Section 4.2     Appointment ............................................................................................. 14
Section 4.3     Interim Services ........................................................................................ 14
Section 4.4     Reimbursement of Out-of-Pocket Expenses ............................................. 16
Section 4.5     Withdrawals from Custodial Account ........................................................ 16
Section 4.6     Reporting................................................................................................... 17
Section 4.7     Transfer of Servicing; Limitation of Liability; Indemnification.................. 17
Section 4.8     Confidential Information. .......................................................................... 19

ARTICLE 5
MISCELLANEOUS.

Section 5.1     Notices ...................................................................................................... 20
Section 5.2     Severability ............................................................................................... 21
Section 5.3     Governing Law; Waiver Of Trial By Jury................................................... 21
Section 5.4     Jurisdiction ............................................................................................... 21
Section 5.5     Successors and Assigns.............................................................................. 21
Section 5.6     Waivers ..................................................................................................... 22
Section 5.7     Exhibits and Schedules ............................................................................. 22
Section 5.8     General Interpretive Principles ................................................................. 22
Section 5.9     Reproduction of Documents ..................................................................... 22
Section 5.10    No Third Party Beneficiary....................................................................... 22
Section 5.11    Further Agreements .................................................................................. 23

**PNC Dreher 000274**

| Section 5.12 | Entire Agreement | 23 |
| Section 5.13 | Amendment | 23 |
| Section 5.14 | Effect of Headings | 23 |
| Section 5.15 | Media Releases | 23 |
| Section 5.16 | Relationship of Parties | 23 |
| Section 5.17 | Expenses | 23 |
| Section 5.18 | Tax Treatment | 23 |
| Section 5.19 | Counterparts | 23 |

### EXHIBITS

| EXHIBIT A-Form Of Assignment And Conveyance | A-1 |
| EXHIBIT B-Form Of Lost Note Affidavit | B-1 |

### SCHEDULES

| SCHEDULE A Closing Loan Schedule | SA-1 |
| SCHEDULE B Purchaser's And Seller's Relationship Managers | SB-1 |
| SCHEDULE C Data Fields | SC-1 |
| SCHEDULE 5.1-Addresses Of The Parties Pursuant To Subsection 5.1 (*Notices*) | S5.5-1 |

**PNC Dreher 000275**

## "NON-PERFORMING" LOAN PURCHASE AND INTERIM SERVICING AGREEMENT

This "NON-PERFORMING" LOAN PURCHASE AND INTERIM SERVICING AGREEMENT (this "*Agreement*") dated as of July 30, 2010 is made by and between PNC BANK, NATIONAL ASSOCIATION, a national banking association ("*Seller*" and "*Interim Servicer*") and AMERICAN SERVICING AND RECOVERY GROUP, LLC, a limited liability company organized under the laws of the State of Delaware ("*Purchaser*" and "*Successor Servicer*"). Seller and Purchaser are sometimes referred to herein together as the "*Parties*" and each as a "*Party*".

### RECITALS

A.      Seller is the owner of the non-performing loans (each, a "Loan" and collectively, the "Loans") identified on the Closing Loan Schedule (as defined below).

B.      Seller desires to sell to Purchaser and Purchaser desires to purchase from Seller its rights, title and interests in the Loans, including the Servicing Rights (as defined below) under the express terms, provisions, conditions and limitations as set forth in this Agreement (the "Transaction").

C.      The Purchaser desires to retain the Seller as servicer of such Loans during the Interim Servicing Period (as defined below).

**NOW, THEREFORE**, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1

### DEFINITIONS

Section 1.1    Certain Definitions.   In addition to the other capitalized terms specifically defined herein, for the purposes of this Agreement, the following capitalized terms shall mean the following:

(a)      *Action*.  Any claim, action, suit, proceeding or investigation by or before any Governmental Authority.

(b)      *Aggregate Purchase Price.*  The sum of each Purchase Price for all of the Loans.

(c)      *Affiliate*.  With respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management

**PNC Dreher 000276**

and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

(d)     ***Assignment of Mortgage***.   An assignment of a Mortgage, notice of transfer or equivalent instrument in recordable form, which, when completed with the name and other information identifying the assignee, will reflect the transfer of the Mortgage to the assignee named therein.

(e)     ***Borrower***.   The obligor(s) of a Loan.

(f)     ***Business Day***.   Any day other than (1) a Saturday or Sunday or (2) a day on which banking and savings and loan institutions in the State of Ohio or the State of New York are authorized or obligated by law or executive order to be closed.

(g)     ***Charge-off Date***.   The date Seller charged-off the Loan, as reflected on Seller's servicing system.

(h)     ***Charge-off Date Balance***.   As to a Loan, an amount equal to the sum of the following, as reflected on Seller's servicing system as of the Charge-off Date for the Loan: (A) unpaid principal balance, <u>plus</u> (B) accrued unpaid interest, <u>plus</u> (iii) accrued unpaid fees charged to the Loan.

(i)     ***Closing***.   The consummation of the sale of the Loans by Seller to Purchaser as provided in this Agreement, which shall occur contemporaneously with the execution of this Agreement subject to the terms hereof.

(j)     ***Closing Date***.   The date of this Agreement.

(k)     ***Closing Loan Schedule***.   The schedule, attached hereto as <u>Schedule A</u>, that identifies each Loan and its corresponding (i) Purchase Price Percentage, (ii) Cut-Off Date Balance, (iii) Purchase Price, (iv) the Charge-off Date, (v) the Charge-off Date Balance, (F) the unpaid principal balance at the Charge-off date, (vi) the accrued but unpaid interest at the Charge-off Date, (vii) any unpaid fees at the Charge-off Date, (viii) the date of the last payment posted on Seller's RMS system, (ix) the sum of all payments posted to the Loan from the Charge-off Date to the Cut-Off Date, and (x) priority.

(l)     ***Collateral Loan File***.   A file that contains: (i) either the original Mortgage or an imaged copy of the Mortgage, certified by Seller to be a true and complete copy of the original Mortgage and (ii) either the original Note or a Lost Note Affidavit and an imaged copy of the Note certified by Seller to be a true and complete copy of the original Note.   The original or imaged copy of the Note shall be endorsed, including on an allonge, to "blank", without recourse.

(m)     ***Confidential Information***.   All information relating to the Transaction, (whether in written, oral or graphic form, electronically stored or otherwise) that is confidential or otherwise not generally available to the public to the extent related to the terms of this Agreement, including Customer Information, except to the extent (i) in the public domain through no fault of a receiving Party or its Representatives in breach of this Agreement, (ii) later

**PNC Dreher 000277**

lawfully acquired by the receiving Party or its Affiliates or Representatives from sources other than the disclosing Party or its Affiliates, or (iii) the disclosing Party agrees in advance in writing does not constitute Confidential Information.

(n)     **Custodial Account**.   The deposit account or accounts, which may be interest bearing, created and maintained by Interim Servicer with the Qualified Depository, into which Interim Servicer deposits Custodial Funds collected and received by the Interim Servicer for a Loan as contemplated by Subsection 4.3 below (*Interim Services*).

(o)     **Custodial Funds**.  As to a Loan, the sum of (i) any and all payments of (A) principal and interest (including any balloon payment) for the Loan, (B) any and all awards, compensation and settlements in respect of the taking of all or a part of the Mortgage Property of the Loan, each of which is collected by Interim Servicer and deposited into the Custodial Account during the Interim Servicing Period for the Loan and (ii) any interest earned on the deposits described in clause (i) of this definition.

(p)     **Customer Information**.  Any and all personal information relating to a Borrower, including addresses, telephone numbers, e-mail addresses, credit scores and social security numbers, and all nonpublic personal information related to a Borrower and protected by applicable federal or state privacy laws and regulations, including the Gramm-Leach Bliley Act and its implementing regulations.

(q)     **Cut-off Date**.  July 29, 2010.

(r)     **Cut-off Date Balance**.  As to a Loan, an amount equal to the following, as reflected on Seller's servicing system as of the Cut-off Date for the Loan:  (i) the Charge-off Balance for the Loan minus (ii) the sum of all payments posted to the Loan from the Charge-off Date to the Cut-off Date.

(s)     **Governmental Authority**.  Any federal, state, local or foreign government (including any political or other subdivision or judicial, legislative, executive or administrative branch, agency, commission, authority or other body of any of the foregoing).

(t)     **Guidelines**.   Collectively, the Interagency Guidelines Establishing Standards for Safeguarding Customer Information published in final form on February 1, 2001, 66 Fed. Reg. 8616, and the rules promulgated thereunder, as amended from time to time the Interagency Guidance on Response Programs for Unauthorized Access to Customer Information and Customer Notice issued in March 2005.

(u)     **Interim Servicing File**.  The information of a Loan (whether in physical form or System Records) in Interim Servicer's actual possession that documents the Interim Servicing of the Loans during the related Interim Servicing Period.

(v)     **Interim Servicing Period**.  A period commencing on the Closing Date expiring on the Servicing Transfer Date.

(w)     **Loan File**.   The following: (i) electronic images evidencing the origination of the Loan and the servicing notes relating to the Loan for the period prior to the

**PNC Dreher 000278**

Closing Date, that does not include the Loan's payment history, and (ii) to the extent in the Seller's actual possession in its warehouse location in Miamisburg, Ohio as of the Closing Date, documents evidencing the origination of the Loan.

(x)    **_Lost Note Affidavit_**. With respect to any Loan as to which the original Note is not in the Seller's actual possession on the Closing Date, an affidavit from the Seller in the form of Exhibit B attached hereto, certifying that the original Note cannot be located, together with an imaged copy of the related Note.

(y)    **_Mortgage_**. A mortgage, deed of trust, deed to secure debt, trust deed or other instrument creating a first or junior lien on real property including any riders, addenda, assumption agreements, or modifications relating thereto.

(z)    **_Mortgaged Property_**. The underlying real property securing a Note pursuant to the related Mortgage.

(aa)    **_Note_**. The note, credit agreement or other evidence of the indebtedness of a Borrower, including any riders, addenda, assumption agreements, or modifications relating thereto.

(bb)    **_Person_**. Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

(cc)    **_Purchase Price_**. With respect to each Loan, the product of (i) the unpaid principal balance of the Loan at the Cut-off Date, multiplied by (ii) the Purchase Price Percentage for the Loan.

(dd)    **_Purchase Price Percentage_**. With respect to each Loan, the amount specified as the "**_Purchase Price Percentage_**" in the Closing Loan Schedule.

(ee)    **_Qualified Depository_**. PNC Bank, National Association, a national banking association.

(ff)    **_Relationship Manager_**. A Person designated by either the Purchaser or Seller as a Relationship Manager on Schedule C attached to this Agreement who will provide or receive notification, as the context so requires, of any action described in Subsection 4.3 (_Interim Services_) on behalf of either the Purchaser or the Seller with respect to the interim servicing of the Loan during the Interim Servicing Period.

(gg)    **_Representative_**. With respect to a Party hereto, such Party's officer, director, employee, accountant, counsel, consultant, advisor, representative or agent.

(hh)    **_Repurchase Price_**. With respect to a Repurchased Loan, an amount equal to the Purchase Price for the Loan less any payments of principal received with respect to such Loan by the Purchaser since the Cut-Off Date and any unpaid Interim Servicer costs and expenses with respect to such Loan.

**PNC Dreher 000279**

(ii)     **Repurchased Loan.**   A Loan subject to be purchased pursuant to Subsection 2.5 (Remedy for Breach of Loan Representation and Warranty).

(jj)     **Servicing Rights.**  All rights to service a Loan.

(kk)     **Servicing Transfer Date.**  September 1, 2010.

(ll)     **System Records.**  The accounting information, reports, records, statements and data of a Loan regularly maintained by Interim Servicer during the Interim Servicing Period for the Loan, on electronic information and accounting systems or electronic storage media, separately specifying or accounting for the Loan.

(mm)   **Written or Writing.**  Unless another method of transmission is required by this Agreement, a communication that is transmitted by electronic mail, overnight courier, or U.S. Mail to the Person identified in the applicable section of this Agreement; provided, however, that any Written communication from or to a Relationship Manager under this Agreement shall be transmitted by facsimile or electronic mail.

Section 1.2     Other Terms.  The following terms shall have the meanings defined in the Section indicated:

| | |
|---|---|
| Aggregate Purchase Price Exception Threshold | Subsection 2.2(c) |
| Agreement | Preamble |
| Collateral Loan File Deficiency | Subsection 2.2(c) |
| Collateral Loan File Deficiency Cure Period | Subsection 2.2(c) |
| Collateral Loan File Deficiency Notice | Subsection 2.2(c) |
| Cure Period | Subsection 2.5(b)(v) |
| Discovered Cut-off Date Balance | Subsection 2.2(d)(i) |
| Dispute Resolution Period | Subsection 2.2(d)(iii) |
| General Enforceability Exceptions | Subsection 3.1(b) |
| Interim Servicer | Preamble |
| Interim Services | Subsection 4.3 |
| Loan | Recital A |
| Party or Parties | Preamble |
| Purchase Price Adjustment | Subsection 2.2(d)(i) |
| Purchase Price Adjustment Schedule | Subsection 2.2(d)(ii) |
| Purchase Price Exception Threshold | Subsection 2.2(d)(i) |
| Purchaser | Preamble |
| Repurchase Claim | Subsection 2.5(b)(i) |
| Repurchase Claim Review Period | Subsection 2.5(b)(ii) |
| Repurchase Date | Subsection 2.5(c)(i) |
| Repurchase Loan File | Subsection 2.5(c)(ii) |
| Repurchase Objection Notice | Subsection 2.5(b)(ii) |
| Repurchase Period | Subsection 2.4(c) |
| Review Period | Subsection 2.2(d)(ii) |
| Seller | Preamble |
| Seller's Objection Notice | Subsection 2.2(d)(ii) |
| Successor Servicer | Preamble |
| Transaction | Recital B |

**PNC Dreher 000280**



## ARTICLE 2

## SALE AND CONVEYANCE OF LOANS.

Section 2.1 <u>Sale and Conveyance of Loans; Payment of Aggregate Purchase Price</u>. Subject to the terms hereof, (a) the Seller hereby sells, conveys and transfers to Purchaser, without recourse (except as otherwise provided in this Agreement) on a servicing-released basis (except for the Interim Servicing Period as provided herein), and Purchaser hereby purchases from Seller, with respect to each Loan, all of Seller's right, title and interest in, to and under (i) the Note, (ii) the Mortgage, (iii) any flood insurance policy for the Loan, (iv) the Collateral Loan File, (v) the Loan File, (vi) the Servicing Rights (other than the right to perform the Interim Services), (vii) all insurance proceeds related to the Loan and liquidation proceeds arising after the Cut-Off Date with respect to the Mortgaged Property, (viii) all payments of principal and interest received after the Cut-Off Date, (ix) all fees or other amounts owing under the Loan received after the Cut-Off Date, and (x) the Interim Servicing File, and (b) Purchaser hereby assumes and agrees to perform and discharge any and all obligations of Seller with respect to each Loan arising on or after the Closing Date.  Purchaser acknowledges and agrees that Seller makes no representation or warranty, express or implied, as to any Loan, each of which is sold on an "AS IS" basis without recourse and with all faults, without any obligation on the part of Seller except as expressly provided in Subsection 2.4 (*Representations and Warranties for a Loan*).

Notwithstanding anything herein to the contrary, in no event shall the conveyance include any Loans which were discharged in bankruptcy prior to the Closing and any such Loans shall not be sold or transferred to the Purchaser.  Seller shall immediately notify the Purchaser upon becoming aware that any such Loan was included on the Closing Loan Schedule.  Any such Loans shall be removed from the Closing Loan Schedule and the Aggregate Purchase Price shall be reduced by the Purchase Price attributable to any such Loans.

**Section 2.2** <u>Closing and Subsequent Deliveries; Post-Closing Adjustment</u>.

(a) <u>Closing Deliveries</u>.  Purchaser acknowledges delivery of the following on the Closing Date:

(i) The Assignment and Conveyance of the Loans in the form of <u>Exhibit A</u> attached hereto;

(ii) The Closing Loan Schedule;

(iii) Purchaser shall pay to Seller the Aggregate Purchase Price for the Loans as provided in <u>Subsection 2.1</u> above (*Sale and Conveyance of Loans; Payment of Aggregate Purchase Price*).

**PNC Dreher 000281**



(b)    Post-Closing Deliveries.  Seller shall deliver to Purchaser the following on the date(s) set forth in this Subsection:

(i)    Seller shall deliver to Purchaser, by overnight courier, the Collateral Loan Files and Loan Files (A) for each Loan identified as "high" priority on the Closing Loan Schedule, no later than thirty (30) calendar days after the Closing Date, and (B) for all other Loans, no later than sixty (60) calendar days after the Closing Date. Notwithstanding the foregoing, the Interim Servicer may keep a copy of the Collateral Loan Files, or any portion thereof, during the Interim Servicing Period, and provided further, that after the Interim Servicing Period, Seller shall destroy any copy of the Collateral Loan File or Loan File, provided that it may maintain an imaged copy of documents required to be maintained by law; and

(ii)    No later than forty-five (45) calendar days after the Closing Date, Seller shall deliver to Purchaser any Assignments of Mortgage, to "blank" provided that, in the event that a recorder's office does not accept such Assignment of Mortgage solely due to its form, upon transmission of such rejected Assignment of Mortgage to Seller, Seller shall promptly resubmit an Assignment of Mortgage to Purchaser.

(c)    Exclusive Remedy for Collateral Loan File Deficiency.   In the event that Seller fails to deliver the Collateral Loan File for the Loan within the time period provided in Subsection 2.2(b)(i) above (*Post-Closing Deliveries*), Purchaser must promptly notify Seller in Writing (such failure, a "***Collateral Loan File Deficiency***" and such notice, a "***Collateral Loan File Deficiency Notice***").  Seller shall have the right to cure such Collateral Loan File Deficiency by providing the original or imaged copy, or, with respect to a Collateral Loan File Deficiency that is a missing original or imaged copy of the Mortgage, by providing Written notice of the Mortgage's recording information (Recorder's Office, Deed Book Volume and Page or Instrument Number), as applicable, within thirty (30) days after receipt of such Collateral Loan File Deficiency Notice, which period may be extended at the sole option of Purchaser, as long as Seller is diligently pursuing cure (the "***Collateral Loan File Deficiency Cure Period***").  If Seller provides the related document or recording information for a Mortgage within the Collateral File Deficiency Cure Period, the related Loan shall not be subject to repurchase pursuant to the Collateral Loan File Deficiency.  If Seller is unable to cure the Collateral Loan File Deficiency by providing the related document within the Collateral Loan File Deficiency Cure Period, the Loan shall be deemed a "Repurchased Loan", whereupon the provisions of Subsection 2.5(c) below (*Repurchase Closing Procedures*) shall apply.  Purchaser shall not be able to assert any remedy for the Collateral Loan File Deficiency after the expiration of ninety (90) days after the date the Collateral Loan Files are delivered to Purchaser.  Notwithstanding any contrary provision in this Agreement, Purchaser acknowledges and agrees that the only remedy it shall have for a Collateral Loan File Deficiency shall be pursuant to this Subsection 2.2(c).

(d)    Post-Closing Purchase Price Adjustment.

(i)    Adjustments to Purchase Price.

**PNC Dreher 000282**

(ii)   Review.  At ninety (90) and one hundred eighty days (180) days after the Servicing Transfer Date, Purchaser will provide to Seller, in the manner provided in Subsection 5.1 (Notices) a schedule setting forth the following information for each Loan where Purchaser claims a Purchase Price Adjustment, as applicable:  (A) the Purchase Price, (B) the Discovered Cut-off Date Balance, (C) the basis and reasonable detail for the Discovered Cut-off Date Balance and (D) Purchase Price Adjustment, together with documentation supporting Purchaser's claim to a Purchase Price Adjustment (the "Purchase Price Adjustment Schedule").  Unless a Loan is on a Purchase Price Adjustment Schedule, its Purchase Price will be deemed to be binding on the Parties hereto and shall be deemed to be final.  Seller shall have a fifteen (15) day period  following receipt of the Purchase Price Adjustment Schedule (the "Review Period") to review such schedule and to request additional documentation reasonably required to complete its review.  Purchaser shall promptly provide such additional documentation.  Unless Seller gives Purchaser a Written objection setting forth the reasons for Seller's claim that the Purchase Price Adjustment for a Loan is not warranted (the "Seller's Objection Notice") within the Review Period, Seller will remit the Purchase Price Adjustment to Purchaser within thirty (30) days.  In no event shall Purchaser claim a Purchase Price Adjustment after one hundred and eighty (180) days following the Servicing Transfer Date.

(iii)   Disputes; Exclusive Remedy.  If Seller provides a Seller's Objection Notice, Purchaser and Seller will work in good faith to reconcile their differences within twenty (20) days after Purchaser's receipt of Seller's Objection Notice (the "Dispute Resolution Period").  If Seller agrees to any Purchase Price Adjustment, it will remit said Purchase Price Adjustment within thirty (30) days after the conclusion of the Dispute Resolution Period.  If Seller and Purchaser are unable to reach resolution within the Dispute Resolution Period, then Purchaser and Seller agree to submit the items remaining in dispute for resolution to arbitration by a mutually acceptable arbitrator with a nationally recognized arbitration organization.   The arbitration decision will be rendered in writing.  The Parties agree to accept the arbitrator's decision as final and binding on the Parties.  The Parties agree that the venue of the arbitration shall be in New York, New York. Purchaser acknowledges and agrees that this Subsection 2.2(d) shall be the exclusive remedy with respect to any claim arising out of or relating to the Cut-off Date Balance or the Purchase Price for a Loan.

Section 2.3   Recordation of Assignments of Mortgage.  Within sixty (60) days of the Closing Date, Purchaser shall complete and submit each Assignment of Mortgage related to a secured lien provided by Seller to the proper recording authority to be recorded.  Purchaser shall bear any and all costs for recording any individual Assignment of Mortgage for a Loan.  Seller shall prepare and deliver the notice of transfer to the Borrower in compliance with the Helping Families Save Their Homes Act of 2009, at Purchaser's cost.

**PNC Dreher 000283**

**Section 2.4**   Representations and Warranties for a Loan.

(a)   Seller hereby represents and warrants to Purchaser as of the Closing Date that Seller is the sole owner of the Loan, including the Servicing Rights, and the related Note, Mortgage, Loan File and Servicing Rights are not assigned or pledged to any Person, and Seller has good and marketable title to the Loan free and clear of any and all liens, claims, encumbrances, participation interests, equities, pledges, charges, mortgages or security interests of any Person not a Party to this Agreement.

(b)   No action has been served on and is pending against Seller with respect to the origination or servicing of the Loan.

(c)   If the loan is a home equity line of credit, Seller has properly notified borrower of the suspension of credit.

(d)   AS-IS.   Purchaser acknowledges that except for the representations and warranties of Seller set forth in Subsection 2.4(a) above, all Loans sold to Purchaser under this Agreement are sold and transferred without recourse, and neither Seller nor any other Person makes any other express or implied representation or warranty on behalf of Seller or any of its Affiliates with respect to a Loan, and (b) each Loan is being purchased by the Purchaser on an "AS-IS" and "WITH ALL FAULTS" basis.   The representations and warranties made in Subsection 2.4(a) above with respect to each Loan are in lieu of all other representations and warranties Seller might have given Purchaser, including as to collectability, enforceability, value of collateral, ability of any obligor to repay, condition, fitness for any particular purpose, whether express or implied or by operation of law, by any person, including the Seller or any of its employees, directors, officers, agents or contractors.   The Seller expressly disclaims any warranty, guaranty or representation, oral or written, past or present, express or implied, concerning the Loans, the Loan File or the underlying collateral except as set forth in Subsection 2.4(a) above.   Purchaser acknowledges that all other warranties that any Seller or anyone purporting to represent any Seller gave or might have given, or which might be provided or implied by applicable law or commercial practice, with respect to the individual Loans are hereby expressly excluded.   Purchaser acknowledges that neither the Seller nor any other Person will have or be subject to any liability or obligation to Purchaser or any other Person resulting from the distribution in written or oral communication to Purchaser, or use by Purchaser of, any information, documents, or other material made available to Purchaser in any data room, confidential information memoranda or presentations in expectation of the transactions contemplated by this Agreement except as expressly provided in this Agreement.

(e)   Survival.   Purchaser further acknowledges that the representations set forth in Subsection 2.4(a) above shall only survive the Closing relating to the subject Loan for a period of 180 calendar days following the Closing Date relating to such Loan (as to a Loan, the "***Repurchase Period***").

Section 2.5   Remedy for Breach of Loan Representation and Warranty.

(a)   Repurchase Events.   Purchaser shall have the right to require Seller to repurchase a Loan to the extent there has been a breach of a representation or warranty in

**PNC Dreher 000284**

Subsection 2.4(a) above (*Representations and Warranties For a Loan*) with respect to the Loan that materially and adversely affects the value of the Loan that has not been cured by Seller to the reasonable satisfaction of Purchaser within the relevant time period set forth in Subsection 2.5(b) below (*Procedures Relating to Repurchase Claims*) (and unless such cure period is extended pursuant to Subsection 2.5(b)(v) below); provided, however, if the breach is of a nature that cannot be cured no cure period shall be required or provided for hereunder. Purchaser shall not be entitled to assert any repurchase claim pursuant to this Subsection 2.5 after the expiration of the Repurchase Period; provided, however, that if, on or prior to the expiration of the Repurchase Period, a Repurchase Claim shall have been delivered by Purchaser to Seller in accordance with Subsection 2.5(b) below (*Procedures Relating to Repurchase Claims)* for such Loan, Purchaser shall continue to have the right to cause Seller to cure or repurchase the Loan until the Repurchase Claim has been satisfied or otherwise resolved as provided in this Subsection 2.5.

(b)    Procedures Relating to Repurchase Claims.

(i)    In order for Purchaser to be entitled to any repurchase provided for under this Subsection 2.5, Purchaser must notify Seller in writing (a "***Repurchase Claim***") within thirty (30) days of its discovery of the breach giving rise to the Repurchase Claim. The Repurchase Claim shall specify in reasonable detail the basis for the Repurchase Claim and include copies of any relevant notices, documents or instruments that are the basis of such Repurchase Claim.

(ii)    The Repurchase Claim shall be subject to review by Seller for a thirty (30) day period following Seller's receipt from Purchaser of such Repurchase Claim (the "***Repurchase Claim Review Period***"). Unless Seller delivers to Purchaser a Written objection to Purchaser's determination that the Loan should be repurchased (a "***Repurchase Objection Notice***") by the end of the Repurchase Claim Review Period, the Loan shall either be cured pursuant to Subsection 2.5(b)(v) below (*Procedures Relating to Repurchase Claims*) or, if not cured or if the breach is of a nature that cannot be cured, the Loan shall be deemed a "Repurchased Loan", whereupon the provisions of Subsection 2.5(c) below (*Repurchase Closing Procedures*) shall apply.

(iii)    If Seller timely delivers a Repurchase Objection Notice to Purchaser, for thirty (30) days after Purchaser's receipt of a Repurchase Objection Notice, the Parties shall endeavor in good faith to resolve by mutual agreement all matters included in the Repurchase Objection Notice.

(iv)    If the Parties are unable to resolve any matter included in the Repurchase Objection Notice within such thirty (30) day period, either Party may seek to bring an action to resolve the dispute as set forth in Subsection 5.4 below (*Jurisdiction*).

(v)    If Purchaser timely and adequately delivers a Repurchase Claim and Seller agrees a representation and warranty in Subsection 2.4(a) above (*Representations and Warranties For a Loan*) for the Loan has been breached and that such breach materially and adversely affects the value of the Loan, Seller shall have the right to cure the applicable breach within thirty (30) days after the expiration of the

**PNC Dreher 000285**

Repurchase Claim Review Period which period may be extended at the sole option of the Purchaser, as long as Seller is diligently pursuing cure (the "*Cure Period*"). If Seller cures the applicable breach within the Cure Period, the Loan shall not be subject to repurchase pursuant to the related Repurchase Claim. If Seller is unable to cure the applicable breach with the Cure Period, the Loan shall be deemed a "Repurchased Loan", whereupon the provisions of Subsection 2.5(c) below (*Repurchase Closing Procedures*) shall apply.

      (c)    Repurchase Closing Procedures.

      (i)    The closing for the repurchase of a Repurchased Loan by Seller in accordance with this Subsection 2.5 shall be consummated on a date (the "*Repurchase Date*") mutually agreeable to the Parties that is the last Business Day of the month following the month in which the Loan is finally deemed a "Repurchased Loan" pursuant to Subsection 2.5(b) above (*Procedures Relating to Repurchase Claims*).

      (ii)    On the Repurchase Date, Purchaser shall sell, convey, and transfer to Seller, on a servicing-released basis, and Seller shall purchase from Seller, with respect to the Repurchased Loan, all of Purchaser's right, title and interest, free and clear of the claims or interests of any Person claiming under the Purchaser, any related (A) Mortgage Note, (B) Mortgage, (C) any flood, hazard, title or mortgage insurance policy for the Loan, (D) Loan File, (E) Collateral Loan File, (F) Interim Servicing File, (G) all records, in physical form or electronic form, relating to the servicing of the Loan after the Servicing Transfer Date (as to items (A) through (G), the ("*Repurchase Loan File*"), (H) Servicing Rights, (I) all insurance proceeds related to the Loan and liquidation proceeds arising after the Repurchase Date with respect to the Mortgaged Property, and (J) all payments of principal, interest, fees and other amounts owing under the Loan received after the Repurchase Date. On the Repurchase Date, Seller shall assume and agree to perform and discharge any and all liabilities and obligations of Purchaser with respect to the Repurchased Loan.

      (iii)    On the Repurchase Date, (A) Seller shall pay the Repurchase Price for the Repurchased Loan by wire transfer of immediately available funds to such account as Purchaser shall designate in writing to Seller and (B) Seller and Purchaser shall execute and deliver such reasonable and appropriate documents, instruments or agreements, including any Assignment of Mortgage to Seller in recordable form, necessary to effectuate the repurchase of the Repurchased Loan. Seller shall pay all costs and expenses reasonably incurred in connection with the delivery of the Repurchase Loan File for the Repurchased Loan.

      (d)    Exclusive Remedy. Notwithstanding any contrary provision in this Agreement, Purchaser acknowledges and agrees that the only remedy it shall have for breach of a representation or warranty in Subsection 2.4(a) above (*Representations and Warranties For a Loan*) for a Loan shall be limited to the repurchase rights under this Subsection 2.5.

      Section 2.6    Record Retention. From and after the Closing Date, Purchaser shall make available to Seller for its inspection, copying and reproduction any Loan Files containing

**PNC Dreher 000286**

information provided by Seller to Purchaser prior to and including the Servicing Transfer Date to the extent such access is permitted by applicable law for any proper business purpose. Seller shall request such access in advance and shall be responsible for any copying fees.

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES AS TO EACH PARTY.

Section 3.1    Representations and Warranties as to Seller.    Seller makes the following representations and warranties with respect to Seller as of the Closing Date:

(a)    Organization.    Seller is a duly organized and validly existing national banking association established under the laws of the United States and is in good standing and has all corporate powers and all governmental licenses, authorizations, consents and approvals required to carry out its business as now conducted. Seller holds all requisite licenses, permits and/or other governmental authorizations required by law to engage in the business of servicing the Loans and selling the Loans to Purchaser in accordance with the terms of this Agreement or is exempt from such requirements as a national banking association.

(b)    Enforceable Agreement.    The execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated hereby, have been duly and validly authorized and this Agreement has been validly executed by Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement evidences the valid, binding and enforceable obligations of Seller, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditor's rights generally, general equitable principles, whether considered in equity or at law and public policy consideration limiting the enforceability of provisions of this Agreement (the "*General Enforceability Exceptions*"). All requisite corporate action has been taken by Seller to make the Agreement valid and binding upon Seller in accordance with its terms.

(c)    Litigation.    There is no Action or arbitration pending, or threatened in writing, to Seller's knowledge after reasonable due inquiry, against Seller which, if determined adversely to Seller, would materially affect its ability to perform its obligations under this Agreement.

(d)    No Conflict.    The execution and delivery of this Agreement by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's organizational documents or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Seller is a party or which may be applicable to the Seller or its assets that would reasonably be expected to materially adversely affect the performance of its obligations and duties under this Agreement.

(e)    No Required Consents.    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement or the consummation of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the date of this

**PNC Dreher 000287**

Agreement or that would not materially affect its ability to perform its obligations under this Agreement.

(f)      No Broker.  Seller has not incurred any obligation, made any commitment or taken any action that might result in a claim against Purchaser or an obligation of Purchaser to pay a brokerage commission, finder's fee or similar fee or commission to a broker, finder or investment banker with respect to the sale of the Loan.

The representations and warranties of Seller in this Subsection 3.1 shall survive the related Closing Date indefinitely.

Section 3.2      Representations and Warranties as to Purchaser.  Purchaser makes the following representations and warranties with respect to Purchaser as of the Closing Date:

(a)      Organization.  Purchaser is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Delaware.  Purchaser holds all requisite licenses, permits and/or other governmental authorizations required by law to purchase and hold the related Loan and to service the related Loan in accordance with the terms of this Agreement, or is not required to obtain any such license, permit or governmental authorization or is exempt from such requirements under applicable law.

(b)      Enforceable Agreement.  The execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby have been duly and validly authorized and this Agreement has been validly executed by Purchaser.  Assuming due authorization, execution and delivery by Seller, this Agreement evidences the valid, binding and enforceable obligation of Purchaser, subject to General Enforceability Exceptions.  All requisite corporate action has been taken by Purchaser to make this Agreement valid and binding upon Purchaser in accordance with its terms.

(c)      Litigation.  There is no Action or arbitration pending, or threatened in writing, to Purchaser's knowledge after reasonable due inquiry, against Purchaser which, if determined adversely to Purchaser, would materially affect its ability to perform its obligations under the Agreement.

(d)      No Conflict.  The execution and delivery of this Agreement by the Purchaser and the performance of and compliance with the terms of this Agreement will not violate the Purchaser's organizational documents or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Purchaser is a party or which may be applicable to the Purchaser or its assets that would reasonably be expected to materially adversely affect the performance of its obligations and duties under this Agreement.

(e)      No Required Consents.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Purchaser of, or compliance by the Purchaser with, this Agreement or the consummation of the transaction contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the date of this

13

**PNC Dreher 000288**

Agreement or that would not materially affect its ability to perform its obligations under this Agreement.

(f)  <u>No Broker</u>.  Purchaser has not incurred any obligation, made any commitment or taken any action that might result in a claim against Seller or an obligation of Seller to pay a brokerage commission, finder's fee or similar fee or commission to a broker, finder or investment banker with respect to the sale of the Loan.

The representations and warranties of Purchaser in this <u>Subsection 3.2</u> shall survive the related Closing Date indefinitely.

## ARTICLE 4

## INTERIM SERVICING.

Section 4.1   <u>General</u>.  The Parties acknowledge and agree that as of the Closing Date, the Loans have been purchased by Purchaser and sold by Seller on a servicing-released basis and the purchase of each Loan by Purchaser includes any and all rights in the Servicing Rights relating thereto and the assumption by Purchaser as "principal" of any and all obligations relating to or arising from the Servicing Rights on and after the Closing Date.  This Agreement shall govern the respective rights and obligations of each Party with respect to the servicing of the Loans during the Interim Servicing Period for the Loan.

Section 4.2   <u>Appointment</u>.  During the Interim Servicing Period for a Loan, Purchaser hereby appoints Seller as "Interim Servicer", and Seller hereby accepts such appointment, to service the Loans during the related Interim Servicing Period subject to the terms and provisions of this Agreement for the Loans.  Seller in its capacity as Interim Servicer shall be deemed an independent contractor and agent of Purchaser solely in the provision of the Interim Services.

Section 4.3   <u>Interim Services</u>.  Subject to the terms of this Agreement, during the Interim Servicing Period for a Loan, Seller in its capacity as Interim Servicer shall perform the services set forth in this <u>Subsection 4.3</u> (collectively, the "***Interim Services***"):

(a)  <u>Loan Modifications</u>.   Neither Interim Servicer nor any of its Representatives shall take any action to renew, modify, waive or alter the terms of the Loan (including a suspension or termination) or commence any judicial or non-judicial action to collect the Loan.  If Interim Servicer receives a Written request from the Borrower requesting a renewal, modification, waiver or alteration proposal, Interim Servicer shall notify the Purchaser's applicable Relationship Manager of the request in Writing, including a reasonable fee for Interim Servicer's efforts and out-of-pocket costs for Interim Servicer to provide documentation with respect to the Borrower's request on Purchaser's behalf.  Purchaser shall provide Written direction to the Interim Servicer's applicable Relationship Manager regarding the response to the Borrower's proposal.  Interim Servicer shall take no action regarding the Borrower's request unless directed in Writing and provided that Purchaser agrees to pay the Interim Servicer's fees and costs associated with such action, <u>provided that</u>, if Purchaser directs Interim Servicer in Writing to deny the Borrower's request, Interim Servicer will verbally so inform Borrower, and no fee payment shall be required.  If Purchaser agrees to pay the Interim Servicer's fee,

**PNC Dreher 000289**

Purchaser shall pay such fee within fifteen (15) days of Seller's Written request for payment to Purchaser's applicable Relationship Manager.

(b)    <u>Collection of Payments</u>. The Servicer shall deposit any Custodial Funds for the Loan received in the Custodial Account within two (2) Business Days of receipt. Interim Servicer shall not take any action to collect any amounts. Subject to Section 4.2 above, Purchaser shall take any action that it deems appropriate in its name and through its counsel or agent to collect past due or delinquent amounts.

(c)    <u>Interim Servicing File</u>. Interim Servicer shall hold and maintain an Interim Servicing File for the Loan.

(d)    <u>Bankruptcy</u>. If Interim Servicer receives a Written notice of a bankruptcy proceeding filed by or against the Borrower or involving the Mortgaged Property, the Interim Servicer shall notify Purchaser's applicable Relationship Manager in Writing including a reasonable fee for Servicer's efforts and the out-of-pocket costs for Interim Servicer to retain counsel, if required. Purchaser shall provide Written direction to the Interim Servicer's applicable Relationship Manager regarding any action Purchaser desires to take in the bankruptcy proceeding. Interim Servicer shall take no action with respect to the bankruptcy proceeding unless directed in Writing and provided that Purchaser agrees to pay the Interim Servicer's fees and costs. If Purchaser agrees to pay the Interim Servicer's fees and costs, Purchaser shall pay the Interim Servicer's fee and any bills for counsel within fifteen (15) days of Seller's Written request to Purchaser's applicable Relationship Manager.

(e)    <u>Short Sale</u>. If Interim Servicer receives a Written request to approve a short sale of the Mortgaged Property, Seller shall transmit the request in Writing to Purchaser's applicable Relationship Manager, including a reasonable fee for Interim Servicer's efforts and out-of-pocket costs for Interim Servicer to provide documentation with respect to the Borrower's request on Purchaser's behalf. Purchaser shall provide Written direction to the Interim Servicer's applicable Relationship Manager regarding the response to the Borrower's short sale proposal. Purchaser shall take no action regarding the Borrower's request unless directed in Writing provided Purchaser agrees to pay the Interim Servicer's fee and costs, <u>provided that</u>, if Purchaser directs Interim Servicer in Writing to deny the Borrower's short sale request, Interim Servicer will verbally so inform Borrower, and no fee payment shall be required. If Purchaser agrees to pay the Interim Servicer's fee, Purchaser shall pay such fee within fifteen (15) days of Seller's Written request for payment to Purchaser's applicable Relationship Manager.

(f)    <u>Third Party Foreclosure</u>. If Interim Servicer receives Written notice that a foreclosure or other Action has been commenced by the holder of a lien or by a Governmental Authority, Interim Servicer shall notify the Purchaser's applicable Relationship Manager in Writing including a reasonable fee for Interim Servicer's efforts and out-of-pocket costs for Interim Servicer to retain counsel, if required. Purchaser shall provide Written direction to the Interim Servicer's applicable Relationship Manager regarding the action Purchaser desires to take with respect to the third-party foreclosure. Interim Servicer shall take no action with respect to the third-party foreclosure unless directed in Writing and provided that Purchaser agrees to pay the Interim Servicer's fee and costs. If Purchaser agrees to pay the Interim Servicer's fees

**PNC Dreher 000290**



and costs, Purchaser shall pay the Interim Servicer's fee and any bills for counsel within fifteen (15) days of Seller's Written request to Purchaser's applicable Relationship Manager.

(g)   <u>Environmental</u>.   If Interim Servicer receives Written notice that the Mortgaged Property securing a Loan is contaminated by hazardous or toxic substances or wastes, Interim Servicer shall promptly provide such notice or information it receives to Purchaser's applicable Relationship Manager in Writing.   Interim Servicer shall not take any action surrounding the contamination.   Subject to Section 4.2 above, Purchaser shall take any action that it deems appropriate in its name and through its counsel or agent to address the contamination.

(h)   <u>Partial Release</u>.   If the Borrower requests a partial release of Mortgage, Interim Servicer shall give Written notice of the request to the Purchaser's Relationship Manager for Administration.   Interim Servicer shall not take any action surrounding the approval, denial or documentation of the request for partial release.   Subject to Section 4.2 above, Purchaser shall take any action that it deems appropriate in its name and through its counsel or agent to communicate to the Borrower the acceptance or denial of the partial release request and the preparation, negotiation and filing of any partial release.

(i)   <u>Release or Satisfaction of Mortgage</u>.   In the event of payment in full of the Loan during the related Interim Servicing Period, Interim Servicer shall notify the applicable Relationship Manager in Writing and Purchaser shall promptly prepare and record a release or satisfaction of the Mortgage, at Purchaser's sole cost and expense.   Interim Servicer shall provide Purchaser with a power of attorney if required.   Interim Servicer shall not prepare or record a release or satisfaction of Mortgage.

(j)   <u>Notification of Sale</u>.   Purchaser acknowledges that Interim Servicer can notify any Borrower and/or Borrower's attorney or authorized representative that (i) the Loan was sold to the Purchaser, (ii) the Successor Servicer is authorized to contact the Borrower and discuss the Loan, and (iii) that any request submitted by the Borrower to Interim Servicer, including a request for approval of a loan modification or short sale has been submitted to the Purchaser for decision.   Interim Servicer is authorized to provide Written confirmation of any of the foregoing to Borrower's attorney or authorized representative.

Section 4.4   <u>Reimbursement of Out-of-Pocket Expenses</u>.   Any out-of-pocket expenses for a Loan made by Interim Servicer during the Interim Servicing Period will be reimbursed by the Purchaser by no later the Servicing Transfer Date, provided Interim Servicer makes a Written request to Purchaser's applicable Relationship Manager for approval to incur such expense in advance and Purchaser provides Written approval to Interim Servicer by notifying the Interim Servicer's applicable Relationship Manager.   If the out-of-pocket expense is billed to the Seller after the Servicing Transfer Date, Seller shall submit a request to Purchaser for reimbursement with supporting documentation.   Purchaser shall reimburse such out-of-pocket expense within thirty (30) days of Seller's request for payment. Purchaser shall have no obligation to reimburse Seller or Interim Servicer for any out-of-pocket expenses incurred by either of them in connection with the Loans, other than out-of-pocket expenses incurred by Interim Servicer during the Interim Servicing Period after receiving Purchaser's prior Written consent thereto. Withdrawals from Custodial Account.   Interim Servicer may, from time to time, make

**PNC Dreher 000291**

withdrawals from the Custodial Account for the following purposes: (i) to withdraw funds deposited into the Custodial Account any unpaid Interim Servicer's fees and costs in error; (ii) to withdraw funds deposited into the Custodial Account in error; and (iii) to make payment on the Servicing Transfer Date to Purchaser, of the remaining amounts in the Custodial Account that relate to the Loan after withdrawals made pursuant to sub clause (i) and (ii) above.

Section 4.5     Reporting.   On the Servicing Transfer Date for a Loan, Interim Servicer shall provide to Purchaser any data as provided in Subsection 4.7(b) below (*Obligations on and after the Servicing Transfer Date*).  Interim Servicer shall not be obligated to prepare or provide any other reports for a Loan.

Section 4.6     Transfer of Servicing; Limitation of Liability; Indemnification.     The Parties, (as applicable) shall take, or cause to be taken commercially reasonable efforts, at such Party's own expense, to complete the servicing transfer by the Servicing Transfer Date. The Parties (as applicable) shall take, or cause to be taken, the following actions, at its own expense, with respect to the Loan prior to the Servicing Transfer Date (or within such time as may otherwise be specified below) in order to effect the transfer of the Servicing of the Loan to Purchaser:

(a)     Obligations Prior to the Servicing Transfer Date.    The Parties (as applicable) shall take, or cause to be taken, the following actions with respect to the Loan prior to the Servicing Transfer Date (or within such time as may otherwise be specified below):

(i)     Information Protection.   Interim Servicer shall implement and maintain commercially reasonable information security measures consistent with industry standards to protect against unauthorized access to or use of Customer Information as required by the privacy provisions of the Gramm-Leach-Bliley Act of 1999, applicable state law and the Guidelines.

(ii)     Notice to Borrowers.   Purchaser shall, no later than fifteen (15) days prior to the Servicing Transfer Date, inform in writing the Borrower of a Loan of the transfer of servicing to Purchaser as the Successor Servicer.  Purchaser shall bear any and all costs of such notification.  Purchaser will submit the form letter to Seller for approval prior to issuing to Borrowers.  Purchaser shall provide Seller with an affidavit confirming such notices were sent upon Seller's request.

(b)     Obligations on and after the Servicing Transfer Date.   The Parties agree that on and after the Servicing Transfer Date:

(i)     Information Protection.   Purchaser shall be solely responsible for the data security and confidentiality of the Customer Information relating to the Borrowers pursuant to the privacy provisions of the Gramm-Leach-Bliley Act of 1999, applicable state law and regulations applicable to Purchaser.

(ii)     Interim Servicing File.   Interim Servicer shall forward to Purchaser the Interim Servicing File for the Loan within ten (10) Business Days of the Servicing Transfer Date, provided, however, that Interim Servicer may retain an imaged copy of the Interim Servicing File to the extent, and only to the extent, required by applicable law.

PNC Dreher 000292

(iii)    Payments Received After the Servicing Transfer Date.    Any payments for a Loan received by Interim Servicer after the Servicing Transfer Date shall be returned to Borrower with a notice that Borrower must send payments to Purchaser. All other Loan correspondence or documentation received by Interim Servicer during the six (6) month period following the Servicing Transfer Date shall be forwarded to Purchaser's applicable Relationship Manager no later than five (5)-Business Days after receipt by Interim Servicer.

(iv)    Year-End Tax Reporting.  Interim Servicer shall be responsible for providing the Internal Revenue Service and Borrowers with all appropriate tax forms and information for transactions affecting the Loan during the period in which Interim Servicer or Seller, as the case may be, serviced the Loan.

(v)    Actions After the Servicing Transfer Date.  Purchaser agrees that it will not use or permit the use by its agents, successors or assigns of any name similar to the name of the Seller or its predecessors or assigns nor will it institute any Action in the name of Seller after the Servicing Transfer Date.

(vi)    Data File.  Within five (5) Business Days of the Servicing Transfer Date, Interim Servicer shall provide the data fields for the Loan that are set forth on Schedule C and are reflected on Interim Servicer's servicing system as of the Servicing Transfer Date in Excel format.

(c)    Litigation.  Within thirty (30) Business Days after the Purchaser's receipt of Written notification that a Loan is subject to litigation, Purchaser shall notify the clerk of the court or other appropriate official and all counsel of record that ownership of the Loans was transferred from the Seller to the Purchaser.   The Purchaser shall have its attorney file appropriate pleadings and other documents and instruments with the court or other appropriate body within such thirty (30) Business Day period, substituting Purchaser's attorney for Seller's attorney, removing the Seller as a party to the litigation and substituting the Purchaser as the real party in interest.

(d)    Bankruptcy Proceedings.  In accordance with Bankruptcy Rule 3001 and 3002, Purchaser agrees to take all actions necessary to file, within 30 Business Days after the Closing Date, (i) proofs of claims in pending bankruptcy proceedings involving any Loan for which the Seller has not already filed a proof of claim and (ii) all documents required by Rule 3001 of the Federal Rules of Bankruptcy Procedure and to take all such similar actions as may be required in any relevant jurisdiction in any pending bankruptcy or insolvency case or proceeding in such jurisdiction involving any Loan in order to evidence and assert the Purchaser's rights.

(e)    Limitation on Liability.    Neither Interim Servicer nor any of its Representatives shall be under any liability to Purchaser for any action taken or for refraining from the taking of any action in connection with providing Interim Services of a Loan during the related Interim Servicing Period, except to the extent that a court of competent jurisdiction determines that Interim Servicer's gross negligence or willful misconduct was the primary cause of any loss to Purchaser. Interim Servicer and any officer, employee or agent of Interim Servicer may rely in good faith on any Written direction (which, for the avoidance of doubt, may be in

PNC Dreher 000293

email form) in any form provided by any officer or employee of Purchaser or in any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. Interim Servicer shall have no obligation to appear in, prosecute or defend any Action relating to a Loan during the related Interim Servicing Period. Interim Servicer undertakes to perform only such duties as Interim Servicer as are expressly set forth in this Section 4 and no duties shall be implied or otherwise imposed upon or against Interim Servicer, and Interim Servicer shall not be liable except for the performance of such duties and obligations as are specifically set out in this Section 4.

(f)    <u>Recoverable Damages</u>. NEITHER SELLER IN ITS CAPACITY AS INTERIM SERVICER NOR ANY OF SELLER'S REPRESENTATIVES SHALL BE LIABLE FOR ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR SIMILAR DAMAGES, INCLUDING ANY DAMAGES FOR LOST PROFITS OR DIMINUTION IN VALUE, EVEN IF THE SELLER OR SUCH OTHER PERSON HAS BEEN ADVISED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES.

(g)    <u>Indemnification</u>. Purchaser shall indemnify, defend and hold harmless Seller and its Representatives from and against any and all costs, damages, disbursements, obligations, penalties, liabilities, losses, expenses, assessments, judgments, settlements or deficiencies (including any interest, penalties, investigation, legal, accounting and other costs and expenses reasonably incurred in the investigation, collection, prosecution and defense of any Action and amounts paid in settlement) actually paid or incurred by Seller and/or its Representatives relating to or arising out of the ownership or servicing of the Loan after the Closing Date, including the Interim Services. Purchaser shall reimburse such Person for all reasonable costs and expenses as they are incurred in investigating, preparing, pursuing or defending any such Action, claim, investigation or proceeding. Purchaser shall promptly notify Seller if a claim is made by a third party with respect to this Agreement or any Loan that may result in any such liability, loss or obligation to Seller or its Representatives and Purchaser shall assume (with the prior Written consent of Seller, not to be unreasonably withheld) the defense of such claim and pay all expenses in connection therewith, including counsel fees, promptly pay, discharge and satisfy any judgment or decree that may be entered against Seller and/or its Representatives in respect of such claim and follow any reasonable Written instructions received from the Seller in connection with such claim. Notwithstanding anything in this <u>Subsection 4.7(e)</u> to the contrary, however, Purchaser shall not be required to indemnify any Person against any damages that shall have resulted from the gross negligence or willful misconduct of such Person or any other Person involved at the Seller's behest in the provision of the Interim Services.

Section 4.7    <u>Confidential Information</u>.

(a)    <u>Confidentiality with Respect to the Loan</u>. Interim Servicer agrees that during the Interim Servicing Period of a Loan(i) it shall hold in confidence all Confidential Information and Customer Information with the same care as it takes to preserve the confidentiality of its own similar information in the ordinary course of business, (ii) it shall use the Confidential Information and Customer Information only for the purposes of in connection with performing the related Interim Services, (iii) it shall only disclose such Confidential Information and Customer Information to its Representatives in connection with performing the

PNC Dreher 000294

related Interim Services so long as the Representatives are informed by Interim Servicer of the nature of such Confidential Information, and each Party shall be responsible for any breach of the confidentiality provisions of this Subsection 4.8(a) by its Representatives.

(b)    Confidentiality with Respect to Each Party's Business and this Agreement. Each Party agrees (i) it shall hold in confidence all Confidential Information with the same care as it takes to preserve the confidentiality of its own similar information in the ordinary course of business, (ii) it shall use such Confidential Information only for purposes related to this Agreement, (iii) it shall only disclose such Confidential Information to its Representatives involved in the purchase or servicing of the Loans so long as the Representatives are informed by such Party of the nature of such Confidential Information, and each Party shall be responsible for any breach of the confidentiality provisions of this Subsection 4.8(b) by its Representatives.

(c)    Legal Process Disclosure.  If at any time Seller, including in its capacity as Interim Servicer, Purchaser or their respective Representative is required (whether by law, regulation or legal process) to disclose any Confidential Information of a Loan or the other Party's business operations, Seller or Purchaser, as applicable shall (to the extent practicable and legally permissible) (A) to promptly notify Purchaser or Interim Servicer as applicable to permit Purchaser or Interim Servicer, at such Party's expense, to seek a protective order or to take appropriate action and (B) to cooperate as reasonably requested by Purchaser or Interim Servicer, as applicable, in such Party's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be accorded such Confidential Information, but only in such Party's name and at such Party's sole cost and expense.  If in the absence of a protective order, Seller, Purchaser or any of their respective Representatives is compelled as a matter of law, regulation or legal process to disclose Confidential Information of a Loan or Confidential Information with respect to either Party's business operations to a third party, Seller, Purchaser and their respective Representatives, as applicable, may disclose to the third party compelling disclosure only the part of such Confidential Information as is required by law, regulation or legal process to be disclosed.

(d)    Injunctive Relief.  In the event of any breach of this Subsection 4.8, Purchaser or Seller, as applicable will suffer irreparable harm and the total amount of monetary damages for any injury to Purchaser or Seller from any violation of this Subsection 4.8 will be impossible to calculate and will therefore be an inadequate remedy.  Accordingly, Purchaser or Seller, as applicable shall, in addition to the other rights and remedies to which Purchaser or Seller may be entitled hereunder, be entitled to temporary and permanent injunctive relief against Interim Servicer or Purchaser for any violation of this Subsection 4.8, without proof of irreparable harm.

## ARTICLE 5

## MISCELLANEOUS.

Section 5.1    Notices.    All demands, notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given upon receipt by the Party if personally delivered or sent by facsimile, e-mail, mailed by registered mail, postage prepaid or delivered by a nationally recognized overnight courier to the address set

PNC Dreher 000295

CONFIDENTIAL

forth opposite the Party on Schedule 5.1 attached hereto, or such other address as may hereafter be furnished to a Party in Writing by the other Party.  All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.  Notwithstanding the foregoing, any demand, notice, consent, waiver or communication may be given by any other means if the Parties agree to such alternative means in Writing.

Section 5.2   Severability.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other covenants, agreements, provisions or terms of this Agreement or the rights of the Parties hereunder.  If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any Party of the economic benefit intended to be conferred by this Agreement, the Parties shall negotiate in good faith to develop a structure the economic effect of which is as nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

Section 5.3   Governing Law; Waiver Of Trial By Jury.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York and the obligations, rights and, to the extent applicable, remedies of the Parties hereunder shall be determined in accordance with such laws without giving effect to conflict of laws principles and except to the extent preempted by Federal law.  EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO TRIAL BY JURY IN RESPECT OR ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF SELLER OR PURCHASER.

Section 5.4   Jurisdiction.  Each of the Parties hereto (i) consents to submit itself to the personal jurisdiction of the courts of the State of New York (and, with respect to claims in which the exclusive subject matter jurisdiction of such claims is federal, any federal district court located in the State of New York) in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from such court, (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any other court, and (iv) to the fullest extent permitted by law, consents to service being made through the notice procedures set forth in Subsection 5.1 above (Notices).

Section 5.5   Successors and Assigns.  This Agreement shall bind and inure to the benefit of and be enforceable by Seller and Purchaser and the respective successors and permitted assigns of Seller and Purchaser.  This Agreement may not be assigned by the Purchaser without the prior written consent of the Seller, which consent shall not be unreasonably withheld.

**PNC Dreher 000296**

Section 5.6    <u>Waivers</u>.  No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the Party against whom such waiver or modification is sought to be enforced.

Section 5.7    <u>Exhibits and Schedules</u>.  The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof as though included in the body of this Agreement.

Section 5.8    <u>General Interpretive Principles</u>.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires (i) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender; (ii) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles; (iii) references herein to "Sections," "Subsections" and other subdivisions without reference to a document are to designated Sections, Subsections and other subdivisions of this Agreement; (iv) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions; (v) the words "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular provision; (vi) the term "include" or 'including" shall mean without limitation by reason of enumeration; and (vii) any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws; (viii) references to a Person are also to its permitted successors and assigns; (ix) the use of "or" means "either or both" unless expressly indicated otherwise; and (x) unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars; (xi) "writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring a Party by virtue of the authorship of any of the provisions of this Agreement.

Section 5.9    <u>Reproduction of Documents</u>.  This Agreement and all documents relating hereto, including (i) consents, waivers and modifications which may hereafter be executed, (ii) any other documents received by a Party at a Closing, and (iii) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, microcard, miniature photographic or other similar process.  The Parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a Party in the regular course of business, and that any enlargement, facsimile, or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 5.10    <u>No Third Party Beneficiary</u>.  Except for Seller's Representative's rights to indemnification pursuant to <u>Subsection 4.7(e)</u> above *(Indemnification)* no Person shall be a third party beneficiary of this Agreement.

PNC Dreher 000297

Section 5.11    Further Agreements.  Each Party agrees to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 5.12    Entire Agreement.  This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof and constitutes the entire agreement of the Parties with respect to the subject matter.

Section 5.13    Amendment.  This Agreement may be amended from time to time by Seller and Purchaser solely by written agreement signed by Seller and Purchaser.

Section 5.14    Effect of Headings.  The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

Section 5.15    Media Releases.  Neither Seller nor Purchaser shall disclose the existence or terms of this Agreement or use any trade name, trademark, service mark, or any other information which identifies the other in Purchaser's of Seller's, as the case may be, sales, marketing, or publicity activities, including press releases, interviews with representatives of any written publication, television station or network, or radio station or network, without the prior written consent of the other Party.  Notwithstanding anything to the contrary in the foregoing, neither Party shall be restrained, after consultation with the other Party, from making such disclosure as it shall be advised by counsel is required by law or by the applicable regulations of any regulatory body or securities exchange to be made.

Section 5.16    Relationship of Parties.  Except as otherwise specifically set forth in this Agreement, this Agreement shall not be construed as authority for either Party to act for the other in any partnership or joint venture or any other capacity or to make commitments of any kind for the account of or on behalf of the other.

Section 5.17    Expenses.  Except as otherwise provided herein, each Party shall bear the costs and expenses incurred in entering into and performing this Agreement, including any legal fees.

Section 5.18    Tax Treatment.  It is the intention of the Parties that Purchaser is purchasing, and Seller is selling, the Loans and not a debt instrument of Seller or a security.  Accordingly, the Parties agree to treat the transactions contemplated hereunder for federal tax purposes as a sale by Seller, and a purchase by Purchaser, of the Loans.

Section 5.19    Counterparts.  This Agreement may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

*The remainder of this page has been left intentionally blank.  Signature page follows.*

**PNC Dreher 000298**


**"NON-PERFORMING" LOAN PURCHASE AND INTERIM SERVICING AGREEMENT**
**SIGNATURE PAGE**

    **IN WITNESS WHEREOF,** Seller and Purchaser have caused their names to be signed to this "Non-Performing" Loan Purchase and Interim Servicing Agreement by their duly authorized respective officers as of the day and year first above written.

PNC BANK, NATIONAL ASSOCIATION
as Seller and Interim Servicer

By: _____
Name:   Peter J. McCarthy
Title:   Executive Vice President

AMERICAN SERVICING AND
  RECOVERY GROUP, LLC
as Purchaser

By: _____
Name:   Gregory E. Palmer
Title:   Vice President

**PNC Dreher 000299**

## GUARANTEE

DBI/ASG Mortgage Acquisition Fund I, LP ("*Guarantor*") irrevocably guarantees, on a joint and several basis, each and every monetary obligation of American Servicing and Recovery Group, LLC, ("*Purchaser*), and/or any of its permitted assigns, under Subsection 4.7(g) (*Indemnification*) of that certain Non-Performing Loan Purchase and Interim Servicing Agreement, dated as of July 30, 2010 by and between PNC Bank, National Association ("*Seller*") and Purchaser (the "*Agreement*").  Guarantor acknowledges that it is making this guarantee to induce Seller to enter into the Agreement and that Guarantor is making this guarantee in consideration of Seller so entering into the Agreement.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Agreement.

If Purchaser fails to pay any monetary obligation owing to Seller pursuant to Subsection 4.7(g) (*Indemnification*) of the Agreement, Guarantor agrees to pay the amount of such obligation to Seller within fifteen (15) calendar days of the Purchaser's receipt, pursuant to Subsection 5.1 (*Notices*) of Written notice of such failure and demand for payment.  This is a guarantee of payment, and not of collection, and the Guarantor acknowledges and agrees that this guarantee is full and unconditional, and no release or extinguishment of Purchaser's obligations or liabilities (other than in accordance with the terms of the Agreement), whether by decree in any bankruptcy proceeding or otherwise, shall affect the continuing validity and enforceability of this guarantee, as well as any provision requiring or contemplating payment by the Guarantor.

The Guarantor hereby waives, for the benefit of Seller, to the fullest extent permitted by law, any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, except to the extent that any such defense is available to Purchaser.

The provisions of Section 5 of the Agreement are incorporated herein, *mutatis mutandis*, except that notices and other communications hereunder to the Guarantor shall be delivered to DBI/ASG Mortgage Acquisition Fund, LP, 4144 N. Central Expressway, Suite 900, Dallas, TX 75204 Attn: William S. Buchanan (with a copy to Purchaser as provided therefor in Section 5.1 (*Notices*).

**IN WITNESS WHEREOF**, Guarantor has caused its name to be signed to this Guarantee by its duly authorized respective officer as of the day and year first above written.

DBI/ASG Mortgage Acquisition Fund I, LP,
as Guarantor

By:_____
Name:
Title:

25

**PNC Dreher 000300**

CONFIDENTIAL

**EXHIBIT A**

**FORM OF
ASSIGNMENT AND CONVEYANCE**

On this 2nd day of August, 2010, **PNC Bank, National Association** ("*Seller*") as the Seller under that certain Non-Performing Loan Purchase and Interim Servicing Agreement dated as of July 30, 2010 (the "*Purchase Agreement*"), does hereby sell, convey and transfer to **AMERICAN SERVICING AND RECOVERY GROUP, LLC** as Purchaser under the Purchase Agreement, without recourse, but subject to the terms of the Purchase Agreement, with respect to each Loan listed on <u>Schedule A-1</u> attached hereto, all of Seller's right, title and interest in, to and under the (i) Note, (ii) Mortgage, (iii) Loan File, (iv) Collateral Loan File, (v) Servicing Rights, (vi) all insurance proceeds related to the Loan and liquidation proceeds arising after the Cut-Off Date with respect to the Mortgaged Property, (vii) all payments of principal and interest received after the Cut-Off Date, and (viii) all fees or other amounts owing under the Loan received after the Cut-Off Date, together with all obligations arising under the Loan after the Closing Date. Pursuant to the Purchase Agreement, Seller will deliver the Collateral Loan File and Loan File for such Loan to Purchaser.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

**PNC BANK, NATIONAL ASSOCIATION**
(Seller)

By:_____
      Name:  Peter McCarthy
      Title:   Executive Vice President

**PNC Dreher 000301**



**SCHEDULE A-1**
**TO FORM OF ASSIGNMENT AND CONVEYANCE**

**LIST OF LOANS**

**(To be Attached)**

**PNC Dreher 000302**

**EXHIBIT B**

**FORM OF**
**LOST NOTE AFFIDAVIT**

I, _____, being duly sworn, do hereby state under oath that:

I, _____, as the _____ (title) of PNC Bank, National Association.  I am authorized to make this Affidavit on behalf of the Seller .

The Seller is the lawful owner of amounts payable under the following described note or credit agreement (the "Note"):

     Date:
     Loan No.
     Borrower(s):
     Original Principal Amount or Credit Limit:

The Seller is the lawful owner of the Note, and the Seller has not assigned or hypothecated the Note.

The original Note was not located after a thorough and diligent search.

Attached hereto is a true and correct copy of the Note, endorsed, on an allonge, "Pay to the order of_____, without recourse".

This Affidavit is intended to be relied on by _____.

     EXECUTED THIS _____ day of _____,_____.

By: _____
Name: _____
Title: _____
Date: _____

     On this _____ day of _____, _____, before me appeared _____, to me personally known, who being duly sworn did say that she/he is the _____ of the Seller, and that said Lost Note Affidavit was signed and sealed on behalf of the institution defined in this document as the Seller, and said _____ acknowledged this instrument to be the free act and deed of said Seller.

Notary Public in and for the State of _____
My Commission expires: _____

**PNC Dreher 000303**

**SCHEDULE A**

**CLOSING LOAN SCHEDULE**
(To Be Attached)

**PNC Dreher 000304**



CONFIDENTIAL

REDACTED

**PNC Dreher 000305**



REDACTED

**SCHEDULE B**

**PURCHASER'S RELATIONSHIP MANAGER**

| Relationship Manager: | Name and Title | Facsimile | E-Mail |
|---|---|---|---|
| | Jonathan Snyder | ██████ | ████@dreambuilder.net |

**SELLER'S RELATIONSHIP MANAGER**

| Relationship Manager: | Name and Title | Facsimile | E-Mail |
|---|---|---|---|
| | Justin Flack | ██████ | ████████ |

REDACTED

SB-1

**PNC Dreher 000307**

**SCHEDULE C**

**DATA FIELDS**
**(To be Attached)**

SC-1

With a copy to:

DBI/ASG Mortgage Acquisition Fund, LP
4144 N. Central Expressway
Suite 900
Dallas, TX 75204
Attn: William S. Buchanan
Email: REDACTED

REDACTED

**PNC Dreher 000308**

## SCHEDULE 5.1

### Addresses of the Parties Pursuant to Subsection 5.1 (*Notices*)

As to Seller and Interim Servicer:

PNC Capital Markets, LLC
340 Madison Avenue,
New York, NY 10173
Attn: Peter McCarthy
E-mail: ███████████████

With a copy to:

The PNC Financial Services Group, Inc.
One PNC Plaza, 249 Fifth Avenue
Pittsburgh, PA 15222
Attn: Randal D. Shields
E-mail: ███████████████

As to Purchaser:

American Servicing and Recovery Group, LLC
4144 N. Central Expressway
Suite 900
Dallas, TX 75204
Attn: William S. Buchanan
Email: ███████████████

With a copy to:

DBI/ASG Mortgage Acquisition Fund, LP
4144 N. Central Expressway
Suite 900
Dallas, TX 75204
Attn: William S. Buchanan
Email: ███████████████

REDACTED

PNC Dreher 000309

# EXHIBIT "5"

**This page is part of your document - DO NOT DISCARD**



# 20170333743



**Pages: 0002**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**03/24/17 AT 10:44AM**

| | |
|---|---:|
| FEES: | 18.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 18.00 |



**L E A D S H E E T**



201703242850008

**00013510211**



008223281

**SEQ:
01**

.

**DAR - Mail (Intake)**

**THIS FORM IS NOT TO BE DUPLICATED**

E492350

Recording Requested By:
*Dreambulder Investments, LLC*
Prepared By:  PNC Bank N.A.

When Recorded Return To:
Dreambuilder Investments, LLC/Leah Whitworth
PO Box 458
Kimberling City, MO 65686
Ref#: 0000570000005761 / DBI-296712

CaseNbr:   11133576
Ref Number:
Property Address:
546 N HIGHLAND AVE
LOS ANGELES, CA 90036
CA0-ADT                              8/12/2010
NCC ID# 3858  DBI ID# 117541

Document Number: 13510211

Batch Number: 8223281

This space for Recorder's use

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is **6750 Miller Road, Brecksville OH 44141** does hereby grant, sell, assign, transfer and convey unto *Dreambuilder Investments, LLC* whose address is *30 Wall Street, 8th Floor, New York, NY 10005* all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

| | |
|---|---|
| Original Lender: | **NATIONAL CITY BANK** |
| Original Borrower(s): | **STEPHEN C DREHER AND MELINDA DREHER, HUSBAND AND WIFE AS JOINT TENANTS** |
| Original Trustee: | **National City Bank** |
| Date of Deed of Trust: | **4/17/2007** |
| Original Loan Amount: | **$350,000.00** |

Recorded in Los Angeles County, CA on: 4/25/2007, book N/A, page N/A and instrument number 20070996104

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on 8/12/2010

PNC BANK, N.A. SUCCESSOR BY MERGER TO NATIONAL CITY BANK

By: _____
Ronald E. Rooney, President

State of SC, County of **Lexington**

The foregoing instrument was acknowledged before me, a Notary Public, on 8/12/2010 by **Ronald E. Rooney, President** of PNC BANK, N.A. SUCCESSOR BY MERGER TO NATIONAL CITY BANK on behalf of the corporation.

Notary Public: Frances Y King
My Commission Expires: 5/26/2020

FRANCES Y KING
Notary Public
State of South Carolina
My Commission Expires 05/26/2020

P000028

# EXHIBIT "6"

| ACCT NUMBER | FDR CROSS REF 1 | POOL # | CUSTOMER NAME | FIRST NAME | LAST NAME | HIGH PRIORITY | 7-28-10 POOL SPLIT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| 9653 | | 1 | DREHER, STEPHEN | STEPHEN | DREHER | YES | POOL A |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| DBI Loan No | DBI Opportunity # | Collateral Ship Group # | Collateral Ship Address | SETTLE DATE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| DBI-117541 | DBO-10533 | 4 | Christina Richie, US Bank, 1133 Rankin St., Suite 100, St Paul, MN 55116 | 02-Aug-10 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| FINAL SECURED INDICATOR | TEMP SECURED INDICATOR | DATE SHIPPED TO BUYER |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Secured | Secured | 8/25/2010 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# EXHIBIT "7"

 **PNC BANK**

23000 Mill Creek Blvd., B7-YB72-03-5
Highland Hills, OH 44122

August 20, 2010

Jonathan Snyder
123 Elm Street
Brooklyn, NY 11216

RE: PNC Bank Loan or Home Equity Line of Credit Account Ending in 1234.

**Important information about your loan or home equity line of credit account**

Effective September 1, 2010, PNC Bank* is transferring the servicing of the loan or line of credit account referenced above to DBI Fund Holdings, LLC. This transfer does not change the terms or conditions of your note or home equity line of credit agreement or any mortgage, other than certain terms relating to their servicing.

All payments made on or after September 1, 2010, should be made payable to and sent to:

> DBI Fund Holdings, LLC
> P.O. Box 975485
> Dallas, TX 75397-5485

However, until that time, please continue to remit your payments to PNC Bank.

INQUIRIES. Any questions you have on or after September 1, 2010, should be referred to DBI Fund Holdings, LLC's Customer Service Department at the following address:

> DBI Fund Holdings, LLC
> 30 Wall Street
> New York, NY 10005

The toll-free telephone number is 866-561-5600 between 9:00 a.m. and 5 p.m. Eastern Standard Time.

YEAR END. Prior to January 31, 2011, we will send you a statement reflecting the amount of any mortgage interest and, if applicable, real estate property taxes paid from January 1, 2010 through September 1, 2010. DBI Fund Holdings, LLC will provide similar information for the period from September 1, 2010, until year end.

We appreciate the opportunity to have been of service to you. If you have any questions prior to September 1, 2010, please contact the Customer Service Department at 1-800-788-9350 between 8:00 a.m. and 7:00 p.m., Monday through Friday, Eastern Standard Time.

PNC BANK

**The separate laws of Connecticut, the District of Columbia, New York City, North Carolina and Vermont each require that their respective residents be furnished with this notice:**

This is an attempt to collect a debt. Any information obtained will be used for that purpose.

*PNC Bank is successor by merger to National City Bank

**This paragraph is a special notice to our customers who have filed a petition for protection under the United States Bankruptcy Code. Unless you have signed a reaffirmation agreement with PNC Bank, and that agreement has been filed with the bankruptcy court (and not subsequently rescinded or disallowed in accordance with the Bankruptcy Code), you should disregard all portions of this letter which state or suggest that you still have a personal liability to pay PNC Bank. You may wish to consult with an attorney regarding this letter, your bankruptcy and the ability of PNC Bank to enforce its lien on collateral, if any. If you have obtained a discharge under the Bankruptcy Code this letter is tor informational purposes or to protect our interests in any collateral.**

PNC is a registered trademark of The PNC Financial Services Group, Inc.

**PNC Dreher 000272**

# EXHIBIT "8"



Printed: 8/22/2019  10:31 AM

NOLADB-#2467059-v1-Dreher_-_DBI_Pool_A_Mail_File_20100816.XLS

**PNC Dreher 000269**

Page 1 of 47

**PNC Bank**
DBI Pool A Mail File - data as of 8/16/2010





# EXHIBIT "9"



| | |
|---|---|
| **Posting Date** | 2013 May 13 |
| **Account Number** | 0 |
| **Dollar Amount** | $ 360.26 |
| **Check/Serial Number** | 3063 |
| **Routing Transit Number** | ▆▆▆▆▆ |
| **Posting Sequence Number** | 12158157 |
| **Paper Sequence Number** | 0012158157 |
| **Capture** | 70 |

**PNC Dreher 000236**



| | |
|---|---|
| **Posting Date** | 2013 Jun 07 |
| **Account Number** | 0 |
| **Dollar Amount** | $ 360.26 |
| **Check/Serial Number** | 3068 |
| **Routing Transit Number** | |
| **Posting Sequence Number** | 15416115 |
| **Paper Sequence Number** | 0015416115 |
| **Capture** | 70 |

**PNC Dreher 000244**



| | |
|---|---|
| **Posting Date** | 2013 Mar 01 |
| **Account Number** | 0 |
| **Dollar Amount** | $ 360.26 |
| **Check/Serial Number** | 3110 |
| **Routing Transit Number** | ▆▆▆▆ |
| **Posting Sequence Number** | 12790080 |
| **Paper Sequence Number** | 0012790080 |
| **Capture Bank Number** | 70 |

**PNC Dreher 000249**



| | |
|---|---|
| **Posting Date** | 2013 Apr 19 |
| **Account Number** | 0 |
| **Dollar Amount** | $ 360.26 |
| **Check/Serial Number** | 3115 |
| **Routing Transit Number** | |
| **Posting Sequence Number** | 14591628 |
| **Paper Sequence Number** | 0014591628 |
| **Capture** | 70 |

**PNC Dreher 000257**

# EXHIBIT "10"



**Posting Date** 2013 Jul 25

**Account Number**

**Dollar Amount** $ 360.26

**Check/Serial Number** 2634475

**Routing Transit Number**

**Posting Sequence Number** 73209913

**Paper Sequence Number** 0073209913

**Capture Bank Number** 1

**PNC Dreher 000233**



**Posting Date** 2013 Jul 25

**Account Number** ▓▓▓▓

**Dollar Amount** $ 360.26

**Check/Serial
Number** 2616359

**Routing
Transit Number** ▓▓▓▓

**Posting Sequence
Number** 73209901

**Paper Sequence
Number** 0073209901

**Capture
Bank Number** 1

**PNC Dreher 000241**





| | |
|---|---|
| **Posting Date** | 2013 Jul 25 |
| **Account Number** | |
| **Dollar Amount** | $ 360.26 |
| **Check/Serial Number** | 2602136 |
| **Routing Transit Number** | |
| **Posting Sequence Number** | 73209912 |
| **Paper Sequence Number** | 0073209912 |
| **Capture Bank Number** | 1 |

**PNC Dreher 000266**