# EXHIBIT A

THOMAS MORRIS                                    January 07, 2020

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4  STEPHEN and MELINDA DREHER,  )    CERTIFIED COPY
                                 )
 5              Plaintiffs,      )
                                 )
 6       vs.                     )  CASE NO. 2:18-cv-07827
                                 )
 7  THE PNC FINANCIAL SERVICES   )
    GROUP, INC., a Pennsylvania  )
 8  corporation, successor by    )
    merger to/with NATIONAL CITY )
 9  BANK; DREAMBUILDER           )
    INVESTMENTS, LLC, a New York )
10  limited liability company;   )
    and DOES 1-50,               )
11                               )
                Defendants.      )
12  _____)

13

14

15        DEPOSITION OF PERSON MOST KNOWLEDGEABLE OF

16                    PNC BANK, N.A.

17                    THOMAS MORRIS

18        TUESDAY, JANUARY 7, 2020, 10:15 A.M.

19              COSTA MESA, CALIFORNIA

20

21

22        Reported by Traci K. Turner, CSR No. 7123
                   CLS Job No. 118343
23

24        CENTEXTLEGAL.COM - 855.CENTEXT

25
```

THOMAS MORRIS                                    January 07, 2020

1      A.   That would be Stephen Dreher in this case we're

2  involved with.

3      Q.   Are you speculating it could be Stephen Dreher

4  or is Stephen Dreher definitely one of the borrowers

5  covered by the use of this term in that paragraph?

6      A.   Stephen Dreher is the borrower that is involved

7  in the transaction that caused this deposition.

8      Q.   What is the Helping Families Save Their Homes

9  Act of 2009?

10      MR. PAINO:   Objection; calls for a legal

11  conclusion.

12      THE WITNESS:   I'm -- I'm not familiar with that

13  act sufficiently to describe it in any more detail than

14  is described in the document itself.

15  BY MR. KENNEDY:

16      Q.   Focusing in a little more specifically, what

17  exactly -- what notice of transfer duties did PNC owe to

18  Stephen Dreher under that act with regard to the

19  purchase of his loan as evidenced in this exhibit?

20      MR. PAINO:   Objection; calls for a legal

21  conclusion.

22      THE WITNESS:   I believe we had an obligation to

23  send a, quote, "goodbye letter," close quote.

24  BY MR. KENNEDY:

25      Q.   Is that term, "goodbye letter," used in the

1    Helping Families Save Their Homes Act of 2009?

2         MR. PAINO:  Objection; calls for a legal

3    conclusion.

4         THE WITNESS:  I do not know.

5    BY MR. KENNEDY:

6    Q.  Is there any specific information that's

7    required to be in the goodbye letter under that act?

8         MR. PAINO:  Objection; calls for a legal

9    conclusion.

10        THE WITNESS:  I do not know.

11   BY MR. KENNEDY:

12   Q.  Let's turn back to Exhibit 1 for a second.

13   It's this document here (indicating).

14        And on the second page of that, item number 9

15   describes one of the topics of examination for today as

16   being the procedures for selling Stephen Dreher's loan,

17   number ending in 9653 to, American Servicing and

18   Recovery Group, LLC; is that correct?

19   A.  Yes.

20   Q.  And you are the person most knowledgeable at

21   PNC regarding those procedures?

22   A.  To the extent those procedures exist, yes.

23   Q.  Is one of those procedures compliance with this

24   loan purchase agreement between PNC and American

25   Servicing and Recovery Group?

1           Purchaser is used here as ASRG; correct?

2     A.   That's my belief, yes.

3     Q.   And interim servicer is PNC; correct?

4     A.   Yes.

5     Q.   Do you know whether PNC did, in fact, give

6  notice to the Drehers of the sale of this loan and the

7  other topics described under this subsection?

8     A.   Only to the extent indicated in my

9  certification, yes.

10     Q.   And where exactly in your -- When you say

11  "certification," do you mean the declaration?

12     A.   Declaration, not certification, yes; thank you.

13     Q.   And what specifically were -- Which paragraph

14  were you referring to just now?

15     A.   Section 15, Post-Sale Events and mailed the

16  goodbye letter --

17     Q.   Okay.

18     A.   -- to Mr. Dreher at the Worley, Idaho, address.

19     Q.   Okay.

20           We'll get to that, but I'm going to resist the

21  temptation to jump around too much because I tend --

22  that's one of my bad habits anyway.

23     A.   Okay.

24     Q.   And I want to make sure that we have the

25  timeline of who owned and who serviced the loan when

THOMAS MORRIS                                    January 07, 2020

1          The last page -- Sorry.

2          Exhibit 5 is an Assignment of Deed of Trust

3   from National City Bank to Dreambuilder Investments; am

4   I understanding that correctly?

5          MR. PAINO:  Objection as to form.

6          THE WITNESS:  Yes.

7   BY MR. KENNEDY:

8     Q.  What was the date that this deed of --

9   Assignment of Deed of Trust was to be executed?

10         MR. PAINO:  Objection as to form.

11         THE WITNESS:  This Assignment of Deed of Trust

12  was executed on August the 12th of 2010.

13  BY MR. KENNEDY:

14    Q.  By the summer of 2010, PNC had acquired

15  National City Bank; correct?

16    A.  Yes.

17    Q.  And under -- And by August the 12th, 2010, PNC

18  was not the owner of the loan, correct, the Dreher loan?

19    A.  Can I have that date again?

20    Q.  August 12th, 2010.

21    A.  I think we were interim servicer at that point

22  in time.

23    Q.  Correct.

24         And not the owner; correct?

25    A.  That, I believe, calls for a legal conclusion,

THOMAS MORRIS                                    January 07, 2020

```
 1   but I would -- my conclusion -- my layperson's
 2   conclusion would be yes.
 3        Q.  It didn't call for a legal conclusion earlier
 4   when we were going over who owned the loan when, and I
 5   believe your testimony was that PNC was the owner of the
 6   loan from November 6th, 2009 to July 30th, 2010.
 7            Did I understand that correctly?
 8        A.  That was my testimony, yes.
 9        Q.  And on August 12th, 2010, ASRG was the owner of
10   the Dreher loan; correct?
11        A.  Yes.
12        Q.  Is there anything specifically in Exhibit 5,
13   this Assignment of the Deed of Trust, that indicates
14   that ASRG assigned the deed of trust to Dreambuilder
15   Investments, LLC?
16        A.  Not that I see.
17        Q.  Okay.
18            Have you seen an Assignment of Deed of Trust
19   that does specifically say ASRG assigns the deed of
20   trust to Dreambuilder Investments, LLC, at any time?
21        A.  Not that I recall.
22        Q.  Returning to your declaration, and specifically
23   on page 3 of that declaration at paragraph 12, you
24   declare that "Pursuant to DBI's instructions" -- and
25   DBI's Dreambuilder Investments, LLC; correct?
```

THOMAS MORRIS                                          January 07, 2020

1          Those checks were sent to PNC, and PNC then
2    transferred those funds to DBI?
3         A.   That's correct.   That is my understanding, yes.
4         Q.   Were those the only four payments made by the
5    Drehers to PNC after PNC stopped being servicer of the
6    loan in 2010?
7         A.   Yes.
8         Q.   Do you have any understanding why PNC suddenly
9    starts receiving payment on this loan from the Drehers
10   in 2013?
11        A.   I would have no idea why the Drehers decided to
12   send payments to PNC.
13        Q.   Okay.
14             And do you see each of the checks -- well, the
15   checks dated April 15th, 2013 and May 15th, 2013 are
16   actually made out to PLC/National City.
17             Do you see that?
18        A.   I see that; thank you.   Good eye.
19        Q.   And I just want to make sure that I'm
20   understanding correctly.
21             Those checks, the ones made out to PLC/National
22   City, were negotiated by PNC; correct?
23        A.   Yes.
24        Q.   Okay.
25             And at the risk of inviting us both to

THOMAS MORRIS                                    January 07, 2020

1   document?

2          MR. PAINO:  Objection; asked and answered.

3          THE WITNESS:  No.

4   BY MR. KENNEDY:

5      Q.  "No," you don't know or "no," it didn't receive

6   one?

7      A.  You asked if I knew, so I answered "no."

8      Q.  You don't know whether it received one?

9      A.  I don't know.

10     Q.  Okay.

11         Would you please turn -- well, have you seen

12  other voluntary bankruptcy petitions, not regarding the

13  Drehers, during the course of your work for National

14  City and/or PNC?

15     A.  Yes.

16     Q.  You're generally familiar with the document --

17  the type of document?

18     A.  Generally, yes.

19     Q.  Okay.

20         Would you please turn to the page number -- as

21  we talked earlier that's marked in blue in the upper

22  right corner -- number 978 of this document?

23     A.  Okay.

24     Q.  And do you see where it says, "The above-named

25  Debtors hereby verify that the attached list of

THOMAS MORRIS                                    January 07, 2020

```
 1    creditors is true and correct to the best of their
 2    knowledge"?
 3         A.  Yes.
 4         Q.  And if you -- Beginning on the next page is the
 5    list referred to; correct?
 6              MR. PAINO:  Objection; calls for speculation.
 7              THE WITNESS:  That's how I interpret it, yes.
 8    BY MR. KENNEDY:
 9         Q.  Could you go a few pages back to page
10    number 983 using the same page numbering system that we
11    talked about earlier?
12         A.  Okay.  I'm there.
13         Q.  And you see, second from the top, is listed PNC
14    Bank at P.O. Box 5570 in Brecksville, Ohio?
15         A.  Yes.
16         Q.  That was the P.O. box that you mentioned as one
17    of PNC Bank's mailing addresses that you recognized when
18    we talked about that this morning; true?
19         A.  Yes.
20              MR. PAINO:  Objection; mischaracterizes prior
21    testimony.
22    BY MR. KENNEDY:
23         Q.  Now, at the time this document was apparently
24    filed on August 5th, 2010, PNC had just sold the loan,
25    but it was still the servicer.
```

THOMAS MORRIS                                    January 07, 2020

1      And my question is, had PNC given notice to the

2  Drehers of the sale of the loan as of August 5th, 2010?

3      A.  Yes.

4      Q.  How so?

5      A.  It's based upon the evidence in my

6  certification.

7      Q.  What evidence specifically?

8      And I don't -- You know, I don't mean to be

9  tricky.  We talked about the goodbye letter earlier, but

10  I believe -- and correct me if I'm wrong -- that your

11  testimony was that the goodbye letters were sent

12  September 1st, 2010.

13      So going back to August 5th at the time this

14  petition was apparently filed, had the Drehers received

15  notice of the sale of the loan?

16      A.  Well, I would imagine that they did not.

17      Q.  Okay.

18      Your testimony earlier was that they had

19  received this goodbye letter.

20      And you agree that it's true that there was

21  definitely no notice to the Drehers prior to

22  September 1st, 2010?

23      A.  My testimony was that they were sent the

24  goodbye letter.  I don't know whether they received the

25  goodbye letter or not.

THOMAS MORRIS                                    January 07, 2020

1        And on September 1st, or thereabouts, you say

2   that they were sent a goodbye letter that no one's ever

3   seen.  And even if they did get it, before that, there

4   was no notice to them; correct?

5        A.  Correct.

6        Q.  Okay.

7        Did PNC provide any notice to the bankruptcy

8   court in Idaho in the Dreher bankruptcy matter of the

9   sale of the loan?

10       A.  No.

11       Q.  Why not?

12       A.  We did not believe we had any obligation to do

13  so.

14       Q.  Okay.

15       What did you do to determine whether or not

16  there was an obligation to provide notice to the

17  bankruptcy court of the sale of the loan after having

18  been listed as a secured creditor?

19       A.  I'm drawing my testimony based upon processes

20  that are in place within the consumer-default department

21  and the oversight by our audit group and our legal group

22  to make certain that we're always in compliance with all

23  applicable laws and regulations.

24       Q.  And do you know what was involved in ensuring

25  compliance with all applicable laws and regulations in

THOMAS MORRIS                                    January 07, 2020

```
 1   BY MR. KENNEDY:

 2       Q.  Would you please turn to the second page of

 3   this document?  And do you see at the bottom where it

 4   says, "Date Prepared:  October 26th, 2010"?

 5       A.  Yes.

 6       Q.  As of October 26th, 2010, PNC was no longer the

 7   owner of this loan; correct?

 8       A.  Correct.

 9       Q.  And as of October 26, 2010, PNC was no longer

10   the servicer of this loan; correct?

11       A.  Correct.

12       Q.  Do you know who the servicer of this loan was

13   on October 26th, 2010?

14           MR. PAINO:  Objection; lacks foundation, calls

15   for speculation.

16           THE WITNESS:  No.

17   BY MR. KENNEDY:

18       Q.  After this document was filed, did PNC then

19   file anything in the bankruptcy court in the district of

20   Ohio (sic) to clarify that it was not, in fact, a

21   secured creditor of the Drehers at that time?

22       A.  In Ohio?

23       Q.  Idaho.

24       A.  Oh, Idaho; okay.

25           No.
```

THOMAS MORRIS                           January 07, 2020

1        Q.   What additional pages did you determine that it
2    had?
3        A.   Well, the first one ends with the signatures of
4    the Drehers.  And the second one, after the signatures
5    of the Drehers, has one, two -- some additional
6    documentation.
7        Q.   I noticed that, too.
8             Would you please turn, on the new exhibit, to
9    the -- using the Bates number in the lower right
10   corner --
11       A.   Uh-huh.
12       Q.   -- page P000031?
13       A.   Okay.
14       Q.   And do you see in the center top of the page,
15   in bold black print, it says, "Notice Recipients"?
16       A.   Yes.
17       Q.   Would you please look at the next page,
18   page -000032?
19       A.   Okay.
20       Q.   Do you see PNC Bank listed about the middle of
21   the page?
22       A.   Yes.
23       Q.   That P.O. Box 5570, Brecksville, Ohio, is the
24   correct address for PNC Bank, according to your
25   testimony this morning; correct?

THOMAS MORRIS                                    January 07, 2020

1          MR. PAINO:  Objection; mischaracterizes prior

2    testimony.

3          THE WITNESS:  Did I say Brecksville during my

4    testimony earlier or did I say Cleveland?  Because the

5    box number and the ZIP code 44101 generally go back to a

6    Cleveland state address -- or city address, I'm sorry,

7    versus a Brecksville address.  Not that it necessarily

8    makes any difference, but I may have said that during my

9    testimony this morning.

10   BY MR. KENNEDY:

11        Q.  Is the address listed on this page a correct

12   address for PNC Bank?

13        A.  Yes.

14        Q.  And PNC Bank would receive mail sent to it at

15   that address?

16        A.  We have and do, yes.

17        Q.  And mail sent to that address would be saved

18   into the appropriate file, scanned in and so forth,

19   according to the processes you described earlier?

20        A.  Yes.

21        Q.  Would you please turn to the next page,

22   page -000033 of Exhibit 4?

23        A.  The Order Closing Case?

24        Q.  Yes.

25            Have you seen that document before?

THOMAS MORRIS                                        January 07, 2020

1                     REPORTER'S CERTIFICATION

2

3          I, Traci K. Turner, Certified Shorthand Reporter,

4     in and for the State of California, do hereby certify:

5

6          That the foregoing witness was by me duly sworn;

7     that the deposition was then taken before me at the time

8     and place herein set forth; that the testimony and

9     proceedings were reported stenographically by me and

10    later transcript into typewriting under my direction;

11    that the foregoing is a true record of the testimony and

12    proceedings taken at that time.

13         Further, that if the foregoing pertains to the

14    original transcript of a deposition in a Federal Case,

15    before completion of the proceedings, review of the

16    transcript { X } was {  } was not required.

17         I further certify I an neither financially

18    interested in the action nor a relative or employee of

19    any attorney or party to this action.

20         IN WITNESS HEREOF, I have this date subscribed my

21    name.

22         Dated:  January 10, 2020

23                              _Traci K. Turner_

24         _____

25                              Traci K. Turner
                                CSR No. 7123

# EXHIBIT B

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3

4  STEPHEN and MELINDA DREHER, )    CERTIFIED COPY
           Plaintiffs, )

5                )
    vs.          )  Case No.:  2:18-CV-07827

6                )          MWF (FFM)
               )

7  THE PNC FINANCIAL SERVICES, )
  GROUP, INC., a Pennsylvania )

8  Corporation, successor by  )
  merger to/with NATIONAL CITY)

9  BANK; et al.,        )
          Defendants.  )

10 _____)

11

12

13

14       DEPOSITION OF WILLIAM BUCHANAN

15     Friday, November 6, 2020, 9:16 a.m.

16      CONDUCTED REMOTELY VIA ZOOM

17

18

19

20

21  Reported by:  Heidi Belton, CSR, RMR, CRR, CCRR, CRC

22            CSR No. 12885
           Job No. 684106

23

24

25

WILLIAM BUCHANAN - 11/06/2020

1      A.    Greg Palmer was an officer of various

2   DreamBuilder entities.  And for a period of time he was

3   a vice president of ASRG.

4      Q.    Do you remember when he was the vice president

5   of ASRG?

6      A.    He was the vice president of ASRG from

7   sometime around April 2009 until the separation

8   agreement in 2010.

9      Q.    Is that the separation agreement you told me

10  you had reviewed previously?  Is that the same one?

11     A.    Yes, I did review the separation agreement.

12     Q.    Okay.  Are the -- is there -- I just want to

13  make sure when you said there was a separation

14  agreement, previously when you said "I reviewed

15  documents," is there just one separation agreement or

16  more than one that you reviewed?

17     A.    There's one.  It's a letter agreement.  It's a

18  separation agreement.  It's a letter agreement.  There's

19  just one.

20     Q.    Okay.  And who were the parties to the

21  separation agreement?

22     A.    I don't recall.  There are numerous parties.

23     Q.    Okay.  Was it a separation -- what was the

24  topic of the separation agreement?

25     A.    The separation agreement was designed to

WILLIAM BUCHANAN - 11/06/2020

1   remove DreamBuilders from any authority it held at ASRG

2   or any of the other affiliated entities.

3        Q.   And what was the reason for that separation?

4        A.   DreamBuilders violated -- to the best of my

5   knowledge, amongst other reasons, DreamBuilders executed

6   a purchase agreement without consent.

7        Q.   Okay.  Thank you.  What type of purchase

8   agreement?

9        A.   A purchase -- a purchase agreement for

10  distressed residential second liens.

11       Q.   And what do you mean by "without consent"?

12       A.   DreamBuilder functioned as an agent for

13  DBI/ASG Mortgage Acquisition Fund.  There was an

14  established process for the fund to give permission for

15  an acquisition to be made.  DreamBuilder violated the

16  process.

17       Q.   Okay.  And what was the name -- was there more

18  than one fund or --

19       A.   No.

20       Q.   Okay.  And what was the name of the fund that

21  you're referring to?

22       A.   Well, no.  Okay.  Of the entities I listed,

23  DBI/ASG Mortgage Acquisition Fund I was the principal

24  entity.  Subsequent to its formation, Co-Investor 1, 2,

25  and 3 were also formed.

WILLIAM BUCHANAN - 11/06/2020

1    litigation, no knowledge of any requests or -- I have no

2    knowledge at all of any aspect of the Dreher loan up

3    until this litigation.

4         Q.   Okay.  In paragraph 12 you referred to a

5    settlement agreement and release.

6              Could we go to page 3 of the declaration.

7              Do you see that?  You refer to the settlement

8    agreement and release.

9         A.   Yes.

10        Q.   Okay.  And did you review a copy of that to

11   prepare for your deposition today?

12        A.   Very, very quickly.

13        Q.   Okay.  And did you provide a copy to your

14   counsel?

15        A.   Yes.

16             MR. HAGEN:  So that's one of the documents I'm

17   going to ask your counsel to produce.

18             So, Molly, are you willing to do that?

19             MS. MADDEN:  We can talk offline about the

20   relevance.  And I believe there's a confidentiality

21   provision in there.  It's 2013.  Far after the loan

22   transactions.  I don't think any of the RFPs get at it,

23   but we can discuss later.

24   BY MR. HAGEN:

25        Q.   Okay.  And if you look to paragraph 13 at the

WILLIAM BUCHANAN - 11/06/2020

1    bottom of the page.

2        A.    Fred, let me be clear about something to help

3    you with this.

4        Q.    Okay.

5        A.    We began to terminate our relationship with

6    DreamBuilder in 2010 with the separation agreement.  And

7    then again in 2013 we completely cut it off.  That's

8    what happened in those agreements.  None of those

9    agreements have anything to do with this trade.

10       Q.    Also in paragraph 12 you say, "Greg Palmer was

11   removed as an officer on or about November 8, 2010."

12       A.    Yes, pursuant to the separation agreement.

13       Q.    Do you remember why he was removed?

14       A.    I believe I've answered that question already.

15       Q.    You may have, but -- can you remind me of your

16   answer?

17       A.    I believe Greg Palmer entered into an

18   unauthorized transaction.

19       Q.    Okay.  And at the bottom you say, "With the

20   exception of the ongoing nature of the settlement, ASRG

21   has not had any business relationship with DBI since

22   that point."

23       A.    Correct.

24       Q.    What is the "ongoing nature of the

25   settlement"?

WILLIAM BUCHANAN - 11/06/2020

1    A.    DBI assigned its interest in the general

2  partnership and to the fund to the limited partners of

3  the fund as part of the agreements.  Technically they

4  are still a limited partner of the general partner, but

5  they have no economic interest.  And technically I

6  believe they are still an affiliate of DBI, is still a

7  partner of the fund, but that economic interest has been

8  assigned to the other limited partners.

9         That is the extent of it.

10    Q.    And when you say "DBI," you're referring to

11  DreamBuilders Investments, LLC?

12    A.    Not necessarily.  I'm referring to

13  DreamBuilders or any of its affiliates.

14    Q.    So you just described the ongoing nature of

15  the relationship between DreamBuilders Investment, LLC

16  and ASRG?

17    A.    Well, ASRG doesn't exist anymore.

18    Q.    Okay.  Fair enough.

19    A.    Right?  The sole -- the sole relationship with

20  DreamBuilder or any -- any of its affiliates is that

21  they are limited partners in either the general partner

22  or the fund whose economic interests have been stripped

23  from them.

24    Q.    Okay.  So if I can just make sure I understand

25  what you're saying.  DBI -- DBI is still a member -- a

WILLIAM BUCHANAN - 11/06/2020

1  limited partner of the general partnership in the fund,

2  but their economic interests have been stripped?

3       A.   That is my recollection.

4       Q.   Okay.  And when you say "DBI," that includes

5  DreamBuilders Investments, LLC?

6       A.   Fred, I don't -- I can't keep track of all

7  their entities.

8       Q.   Okay.  But the settlement agreement would

9  answer that question for me; wouldn't it?

10      A.   Yeah, no, it would.  I mean --

11      Q.   Okay.

12      A.   -- they are gone.

13      Q.   What does that mean?

14      A.   We don't deal with them.

15      Q.   Okay.

16      A.   They have no economic interest, we do not deal

17 with them.  We do not communicate with them except on

18 exceptionally rare occasions; we may ask them a question

19 about whether or not they had a file or something like

20 that.  But if -- I may have asked them that two or three

21 times in the last five years.

22      Q.   Okay.

23      A.   We do not talk to these people.

24      Q.   And did you -- when you were searching for

25 documents in response to your notice of deposition --

WILLIAM BUCHANAN - 11/06/2020

1    A.   Yes.

2    Q.   -- did you contact DBI --

3    A.   Absolutely not.

4    Q.   -- to --

5         Why not?

6    A.   I do not feel a need to discuss this case with

7    DBI.

8    Q.   Request for production of documents number 3

9    asked for any and all documents or communications

10   related to DreamBuilders Investment, LLC regarding the

11   assignment of trust.  So --

12   A.   There is none.

13   Q.   Well, you -- did you contact DreamBuilders

14   Investment, LLC?

15   A.   About the Dreher loan?

16   Q.   Yeah.

17   A.   No.

18   Q.   Okay.  And what prevented you from doing that?

19   A.   Nothing.

20        MR. HAGEN:  Okay.  This is a good time for me

21   to take a break.  So -- let's see.  What time -- well,

22   it's 11:30 here, so why don't we go ahead and take a

23   lunch break?

24        MS. MOSOTHOANE:  How long will the lunch break

25   be?  This is Helen.  I'm just clarifying.  I'm okay with

WILLIAM BUCHANAN - 11/06/2020

1   talked about contacting DBI to obtain documents.  And

2   you said you didn't want to do that.  But my question is

3   if you were going to do that, who would you contact at

4   DBI?

5        A.   Peter Andrews.

6        Q.   Okay.  And is Peter Andrews still involved in

7   any of the fund?

8             MS. MADDEN:  Sorry.  Fred, I didn't hear us go

9   back on the record and I only heard part of the last

10  question.  Is it possible to read back from the start of

11  when we went back on the record?

12            MR. HAGEN:  Sure.

13            MS. MADDEN:  Thank you.

14                      (Record read.)

15            MS. MADDEN:  Thank you.

16            THE WITNESS:  Peter Andrews is the founder of

17  DBI.

18  BY MR. HAGEN:

19       Q.   Okay.  Was he --

20       A.   The answer for Peter is the same for Greg.

21       Q.   And can you please remind me what that is?

22       A.   DBI or one of its affiliates and a general

23  partner of the fund -- a limited partner of the general

24  partner of the fund.  DBI or one of its affiliates is a

25  limited partner -- is also a limited partner in the fund

WILLIAM BUCHANAN - 11/06/2020

1  itself.  Both of those economic interests have been

2  assigned to the limited partners of the fund.  Peter

3  Andrews was a member of the investment committee and was

4  removed as a member of the investment committee at the

5  same time that Greg Palmer was removed.

6      Q.   November 2010?  Is that --

7      A.   No.

8      Q.   -- no?  Okay.

9      A.   December 2010.

10      Q.   And when is the last time you've spoken to

11  Peter Andrews?

12      A.   I've not spoken to Peter Andrews for many,

13  many years.

14      Q.   Okay.  Was he involved in the March 7, 2013

15  settlement?

16      A.   Yes.

17      Q.   Okay.  Referring back to the purchase

18  agreement.  That's the agreement between PNC and ASRG.

19           Do you know, the portfolio of loans subject to

20  that agreement, were they all from California?

21      A.   I have no idea.

22      Q.   And the sale agreement between ASRG and

23  US Bank, do you know whether those loans were all in

24  California?

25      A.   I have no idea.

WILLIAM BUCHANAN - 11/06/2020

1       Q.    Okay.  Okay.  If you could look at the bottom

2   of page 3, paragraph 13 of your declaration, Exhibit 2.

3       A.    Yes.

4       Q.    It says, "ASRG owned the loan for less than a

5   day."

6             Do you see that?

7       A.    Yes.

8       Q.    And then a couple of lines down it says, "ASRG

9   sold, for valuable consideration, a pool of loans

10  including the loan" -- referring to Mr. Dreher's loan --

11      A.    Yes.

12      Q.    -- "to US Bank" --

13      A.    Yes.

14            MR. HAGEN:  I'm sorry.  You got to let me

15  finish.

16            Did you get all that, Madam Court Reporter?

17            THE REPORTER:  Yes.

18  BY MR. HAGEN:

19      Q.    And what was the valuable consideration?

20      A.    Cash.

21      Q.    Okay.  And what was the approximate amount?

22      A.    For the entire pool?

23      Q.    Yes.

24      A.    To the best of my recollection, it was 900-ish

25  thousand dollars.

WILLIAM BUCHANAN - 11/06/2020

1   send the loans to GreenTree, not me.

2       Q.   Okay.  Yeah, that's -- you talk about that in

3   paragraph 18 on page 5.

4       A.   Well, you have to look at all the dates

5   together.

6       Q.   Okay.  Okay.  So if I look at the dates

7   together, what will that show me?

8       A.   ASRG never serviced the loans.

9       Q.   Oh, okay.  Okay.  Can we look at page 6,

10  paragraph 23, please.  Paragraph 23 says, "At

11  no point in time did ASRG authorize GreenTree Servicing

12  to act as its agent with respect to the loan."

13           That's -- that's what you've been telling me;

14  right?

15      A.   No.  That's different than what I just said.

16      Q.   Oh, okay.  How so?

17      A.   I said that ASRG never serviced the loan.  I

18  said that in the escrow agreement PNC was directed to

19  send the loans to GreenTree for servicing.  This

20  paragraph explicitly states that I had nothing to do

21  with that.

22      Q.   Okay.  Okay.  So PNC was ASRG's agent under

23  the purchase agreement; right?

24      A.   I don't know.

25      Q.   As the interim servicer?

WILLIAM BUCHANAN - 11/06/2020

```
 1        A.    I don't know the answer, Fred.  The closing
 2   was simultaneous.  PNC was directed to send the loans to
 3   GreenTree for servicing directly from PNC.
 4        Q.    Okay.  And as the interim servicer, is it one
 5   of PNC's jobs to notify the owner of the loan if there's
 6   a bankruptcy filing?
 7             MS. MADDEN:  Objection; calls for a legal
 8   conclusion.
 9             MS. MOSOTHOANE:  I'll join in that objection.
10             THE WITNESS:  I'm not familiar with the terms
11   and conditions under which PNC services or GreenTree.
12   BY MR. HAGEN:
13        Q.    Well, I'm just asking your general
14   understanding of what the -- what the service -- loan
15   servicer does.
16        A.    If the loan servicer -- if my loan servicer
17   was notified of a bankruptcy by delivery of a notice
18   from the bankruptcy court, they would in fact have told
19   me that that happened.
20        Q.    Okay.
21        A.    My servicer would have.
22        Q.    Right.
23        A.    I do not know how PNC or GreenTree services,
24   nor the scope, scale, or type of servicing agreement
25   they had.
```

WILLIAM BUCHANAN - 11/06/2020

1    Q.    That would be great.  I appreciate it.

2          Okay.  So then moving on.  I'm sorry.  I'm

3    just going through your -- the declaration and the

4    portions I highlighted.

5    A.    Yup.  That's okay.

6    Q.    And was PNC a party to the escrow agreement?

7    A.    Okay.  I'm not trying to be a smart alec.

8    PNC -- so WMD authorized the release of cash to PNC;

9    right?  So you asked me are they a party to it.  I don't

10   know the legal answer to the word "party."  They're not

11   a signatory.  But they got the cash.

12   Q.    I understand your distinction.  Thank you.

13         And, Mr. Court Reporter [sic], would you be

14   able to find the escrow agreement that's part of the

15   declaration?  I believe it's page 74.  It starts on page

16   74, I should say.

17         THE REPORTER:  I believe you mean Richie.

18         MS. MOSOTHOANE:  Oh, yes.  Richie.  Thanks.

19         Right.  So can we go to page -- on top it

20   says -- it would say 76 of 85.

21         There we go.  This is it.

22   Q.    So, Mr. Buchanan, at the top it has the wire

23   instruction details that you referenced; right?  Because

24   PNC was paid via a wire transfer?  And so do you see in

25   the center there it -- well, more at the top -- it says,

WILLIAM BUCHANAN - 11/06/2020

1    "The description should state 'For purchase of charged

2    off BHE loans by DBI.'"

3            Why does this escrow agreement mention that

4    loans were purchased by DBI?

5        A.   That's a good question; let me just -- okay.

6    So let me give you some context here.

7        Q.   Sure.

8        A.   DBI negotiated this deal.

9        Q.   And by "this deal," you mean --

10       A.   The purchase from PNC and the sale to the

11   bank.  DBI acting on behalf of the fund negotiated this

12   deal and the documents.  There are many more documents

13   associated with this transaction than would be normal

14   and I don't know why it says that.

15       Q.   Okay.  So to clarify.  Are you saying that DBI

16   negotiated the sale of the loans from ASRG to US Bank?

17       A.   Yes.  It was -- they arranged -- if -- let's

18   euphemistically call this a trade; right?

19       Q.   Yes.

20       A.   Or just in jargon.  It's a trade.

21       Q.   Yes.

22       A.   They negotiated the whole trade.  They

23   negotiated for the acquisition of the loans and they

24   negotiated for the disposition of the loans.  They

25   negotiated for the escrow agreement.  And they

WILLIAM BUCHANAN - 11/06/2020

1    negotiated for the -- for the funds to be crossed.

2        Q.   Okay.  I think I understand.  And -- so you

3    mentioned that DBI negotiated for the acquisition of the

4    loans.  In other words DBI negotiated for the purchase

5    by ASRG from PNC?

6        A.   Yes.  They did that because they were part of

7    the team of the fund.  That was their job.

8        Q.   And do you know who at DBI negotiated the

9    purchase of the loans from PNC on behalf of ASRG?

10       A.   It would have been a combination of Peter

11   Andrews and Greg Palmer.  They would have been assisted

12   by various lower-level people who were doing the

13   underwriting.  But if they were talking to Peter

14   McCarthy, it was probably Peter.  Andrews.  Sorry --

15       Q.   Okay.  I understand.

16       A.   -- two Peters.

17       Q.   I'm sorry.  I interrupted.

18       A.   No, it's all right.  But it would have been

19   Peter and Greg.

20       Q.   Okay.  And so -- and if DBI had this role of

21   negotiating, was that with ASRG's authority?

22       A.   Yes.

23       Q.   And so then -- so any communications relating

24   to the transfer of loan files or the assignments would

25   have been between PNC and DBI; is that correct?  By DBI.

WILLIAM BUCHANAN - 11/06/2020

```
 1   would be -- I can't speak for the whole industry.  It is
 2   not an unusual thing at all.
 3        Q.   Okay.  Great.  In the, what we've been
 4   referring to as the purchase agreement, which is the
 5   agreement between ASRG and PNC, can we go to -- there's
 6   a Schedule 5.1, and it has the addresses for the
 7   parties.  So can we find that page, Richie?  That would
 8   be I think 42.  Page 42 or 46; it's not clear at the
 9   top.
10        A.   Are you talking about the "Notices" page?
11        Q.   Yes.  It says, "Schedule 5.1, Addresses of the
12   parties pursuant to subsection 5.1 notices."  Yeah, it
13   would be like maybe four pages after that.  It's
14   actually --
15        A.   It would be before this.
16        Q.   Well, according to the printout that I have,
17   it's -- at the bottom it says PNC_Dreher_000309
18        A.   Okay.
19        Q.   Which would be five pages after.
20        A.   Okay.
21        Q.   I'm just curious here because this is a --
22   this is a copy that we produced and we redacted
23   information for privacy reasons.  As you can see, we
24   redacted your e-mail address for privacy reasons.  But
25   I'm curious as to why notices would be sent to -- it
```

WILLIAM BUCHANAN - 11/06/2020

1  says as to purchaser American Servicing and Recovery

2  Group, LLC, with a copy to DBI/ASG Mortgage Acquisition

3  Fund.   Why would a copy be sent to DBI/ASG Mortgage

4  Acquisition Fund?

5        A.   Well, because DBI/ASG Mortgage Acquisition

6  Fund held 100 percent of the economic interest in these

7  loans.   They were owned by ASRG.

8        Q.   Okay.   And -- and under this "Notices" page,

9  you were supposed to receive notice on behalf of both

10  ASRG and the fund; is that correct?

11        A.   Yes.

12        Q.   Mr. Hagen asked you about Greg Palmer.   Do you

13  happen to have Mr. Palmer's contact details?

14        A.   I -- I don't know.

15        Q.   Okay.   No.   Fair enough.   You did say you

16  haven't talked to him in a long time.

17        A.   Years.

18        Q.   Right.   Now, a guarantee was signed by Rick

19  O'Brien --

20        A.   Yes.

21        Q.   -- as a member of DBI/ASG Mortgage Acquisition

22  Fund.

23        A.   Yes.

24        Q.   Mr. O'Brien, did he hold any positions with

25  ASRG?

WILLIAM BUCHANAN - 11/06/2020

```
1              CERTIFICATE OF REPORTER
2         I, HEIDI BELTON, a Certified Shorthand
3   Reporter, hereby certify that the witness in the
4   foregoing deposition was by me duly sworn to tell the
5   truth, the whole truth, and nothing but the truth in the
6   within-entitled cause;
7         That said deposition was taken down in
8   shorthand by me, a disinterested person, at the time and
9   place therein stated, and that the testimony of the said
10  witness was thereafter reduced to typewriting, by
11  computer, under my direction and supervision;
12        That before completion of the deposition
13  review of the transcript was note requested.
14        I further certify that I am not of counsel or
15  attorney for either or any of the parties to the said
16  deposition, nor in any way interested in the event of
17  this cause, and that I am not related to any of the
18  parties thereto.
19  DATED:  11/9/20
20                _____
21              HEIDI BELTON, CSR, RMR, CRR, CCRR, CRC
22              CSR NO. 12885
23
24
25
```

# EXHIBIT C

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4  STEPHEN and MELINDA DREHER,      )     **CERTIFIED COPY**
                            )

5               Plaintiffs,  )
                            )

6    vs.                    )      Case No.
                            )      2:18-cv-07827-

7  THE PNC FINANCIAL SERVICES GROUP,  )      MWF(FFM)
  INC., a Pennsylvania Corporation,  )

8  successor by merger to/with       )
  NATIONAL CITY BANK; et al.,        )

9                            )
               Defendants.  )

10                            )

11

12

13

14              DEPOSITION OF MICHAEL WANG

15       FRIDAY, NOVEMBER 13, 2020, 10:08 A.M.

16          VIA ZOOM VIDEOCONFERENCE

17

18

19

20

21

22      Reported by Janell Sokol, CSR No. 3443
             Job. No. 684107

23

24

25

MICHAEL WANG - 11/13/2020

1           Go ahead, Mr. Wang.

2           THE WITNESS:  That the trust that is involved in

3   this particular litigation terminated in early 2014.  I

4   don't recall learning any new information from my

5   conversation with Ms. Schulz-Fugh.

6           MR. HAGEN:

7      Q.   And what trust terminated in early 2014?

8      A.   Grand New Start LLC.

9      Q.   And when that trust was terminated, what was the

10  successor entity for the trust?

11     A.   I don't understand the question.

12     Q.   Okay.  Was U.S. Bank the trustee for the Grand New

13  Start LLC trust that you spoke of?

14     A.   Yes.

15     Q.   Okay.  And when you say the trust was terminated,

16  what exactly did you mean by that?

17     A.   I mean that it no longer exists.

18     Q.   Okay.  And what was the purpose of the trust?

19     A.   Well, the purpose of the trust is like that of any

20  other RMBS trust, which is to aggregate the grouping of

21  loans into one trust that has beneficial owners that we

22  refer to as the certificate holders who would be entitled

23  to any income that would come in as a result of the

24  underlying mortgage loans.

25     Q.   Are the certificates then marketable?

MICHAEL WANG - 11/13/2020

1   it doesn't include any type of controlling the servicer or
2   anything like that.
3       Q.   Is there any policy to retain emails at U.S. Bank
4   after the 90-day period you talked about?
5       A.   If it's subject to a legal record hold.
6       Q.   Okay.  Any other instances that emails are
7   retained by U.S. Bank besides a legal hold?
8       A.   Not that I'm aware of.
9       Q.   And what is your position at U.S. Bank now?
10      A.   My title is SMBS research manager.
11      Q.   And what does SMBS stand for?
12      A.   Structured mortgage-backed securities.
13      Q.   And did you hold a position at U.S. Bank in the
14   2010 period?
15      A.   No.
16      Q.   When did you first hold a position at U.S. Bank?
17      A.   I started at U.S. Bank November 4 of 2013.
18      Q.   And what was your position in November 4, 2013?
19      A.   I don't remember what my title was.  It was on the
20   same team that I manage now.
21      Q.   And what do you do as an SMBS research manager?
22   What are your duties?
23      A.   The primary function of my team is to provide
24   litigation-related support to servicers when they are
25   requesting it.  My team is set up to be somewhat of a

MICHAEL WANG - 11/13/2020

1  catchall for issues that don't necessarily fit all that

2  well in other teams, but when we receive notice of

3  litigation impacting an RMBS trust, one of the paralegals

4  on my team is responsible for the tendering process, which

5  is sending out the formal notice to the servicer that a

6  matter exists that they're required to defend.  So that's

7  one big part of it.

8        Another part of it is when there are curative

9  title requests coming in, my team handles that on the

10  trustee side and that typically involves sending the matter

11  to the servicer for handling.

12     Q.  Okay.  Does that include bankruptcy litigation?

13     A.  It would.

14     Q.  So if there's a bankruptcy involved in one of the

15  loans in an RMBS, your group would be notified?

16     A.  No, that's not -- that's not necessarily the case.

17     Q.  Is it ever the case?

18     A.  Sometimes, yes.

19     Q.  Do you know if U.S. Bank was ever notified that

20  Steve Dreher's loan was subject to a bankruptcy filing?

21     A.  U.S. Bank as trustee was not notified.

22     Q.  And how do you know that?

23     A.  Because we have no record of being notified, which

24  would be in my team's system of record.

25     Q.  And how do you know it would be in your team's

MICHAEL WANG - 11/13/2020

1  system of record?

2      A.   Well, assuming that the records are being kept in

3  accordance to how we keep the records, our standard process

4  is to save the litigation documents that we receive as well

5  as the email that goes out to the servicer notifying them

6  of the action that they are obligated to resolve.

7          However, I'll say also to that point, it would

8  have to be a litigation matter.  A simple bankruptcy filing

9  would not come to my team.

10     Q.   How about a bankruptcy order discharging a loan;

11  would that come to your team?

12     A.   No.  The normal process -- again, that's because

13  the servicer is the party making any necessary claim,

14  filing any type of interest there.  The servicer should be

15  the party that receives any notice.

16     Q.   And then what is the servicer's duty after

17  receiving a notice of bankruptcy discharge of a loan, like

18  for example regarding the trust we're talking about today?

19  What would the servicer do with that information?

20     A.   You would have to ask the servicer that question.

21     Q.   Does part of your function in the group that

22  you're managing involve reconveyance of deeds of trust?

23     A.   In extremely, extremely limited circumstances.

24     Q.   Can you give me an example of those circumstances?

25     A.   For example, if a loan is vested in the name of

MICHAEL WANG - 11/13/2020

1   any mortgage loan file materials that come into seller's

2   possession after the closing date.

3       Q.   So do you know whether U.S. Bank received any

4   documents related to Stephen Dreher's loan?

5       A.   U.S. Bank's Document Custody Services group, which

6   is separate from the trustee group, does have a record of

7   the Dreher loan, yes.

8       Q.   And what documents were received?

9       A.   I don't have that information in front of me.

10      Q.   Do you recall any of the documents that were

11  received by U.S. Bank?

12      A.   The document Custodial Services Records made note

13  of a deed of trust and a note and assignment in blank.

14      Q.   And what is an assignment in blank?

15      A.   That's an assignment of a security instrument that

16  is made out to blank.

17      Q.   And so in this case would it be an assignment of

18  the deed of trust?

19      A.   Presumably.

20      Q.   Did you see a copy of the assignment in blank?

21      A.   No.

22      Q.   Is that listed as number five of the mortgage loan

23  documents?

24      A.   Number five states the original assignment to

25  mortgage and blank for each mortgage and loan not

MICHAEL WANG - 11/13/2020

1   registered on MERS in form and substance acceptable for

2   recording.

3       Q.    And what does MERS stand for?

4       A.    Mortgage Electronic Registration System.

5       Q.    So the document group at U.S. Bank received an

6   assignment of mortgage in blank for the Stephen Dreher

7   loan?

8       A.    Correct.

9       Q.    And then what is typically done with the

10  assignment of mortgage in blank in these types of

11  transactions?

12      A.    So typically the Document Custody Services group

13  will receive -- they call it a collateral file referred to

14  as a mortgage loan file, and it just is a grouping of all

15  of the documents related to a particular loan together.

16          So it would depend on -- it depends on the trust

17  and I'm not familiar with the specific requirements here,

18  but with any trust -- or not any trust, any loan where our

19  Document Custodial Services group, which I refer to as

20  DCS --

21      Q.    Yes.

22      A.    What they'll do is categorize -- sorry.  That's

23  not quite the right term.

24          They'll put it into one of our vaults.  In this

25  case they did make a note of at least some of the documents

MICHAEL WANG - 11/13/2020

 1  that are held in the mortgage loan file, which is why I

 2  know that there was at least a security instrument, a note

 3  and the assignment in blank.

 4      Q.   Okay.  The security instrument is the deed of

 5  trust?

 6      A.   Presumably.  So we don't make copies of the

 7  documents that are held in the collateral file.

 8      Q.   Is it your understanding that in the case of

 9  Stephen Dreher's loan, the security instrument was a deed

10  of trust?

11      A.   I mean that's my understanding, yes, based off of

12  the DCS records.  The DCS records just simply refer to it

13  as a security instrument.

14      Q.   And then you refer to the note as one of the

15  documents DCS had custody of?

16      A.   Right.  I believe the file also included a note.

17      Q.   Okay.  Would that be the note with a wet

18  signature?

19      A.   Presumably.  I'm not familiar with what type of

20  review was required for this particular trust.

21      Q.   And then DCS puts the note in the vault, you said?

22      A.   Correct.

23      Q.   Okay.  Do you know, did you see any records

24  regarding what happened to the note subsequently to being

25  put in the vault, if anything?

MICHAEL WANG - 11/13/2020

1       A.    I remember what happened at the end.  Prior to the

2   trust termination, if I'm recalling correctly, the

3   collateral file, which would have included all of the loan

4   documents in DCS's possession, was released to Green Tree

5   and subsequently returned to the vault and re-added to its

6   location within the vault.

7           And then the last that U.S. Bank in its capacity

8   of custodian possessed the collateral file was April 18 of

9   2014, at which point the DCS records reflect that the

10  collateral file was released to Wells Fargo at the

11  direction of Green Tree.

12      Q.    Okay.  And is there any record of the assignment

13  of the mortgage in blank being used to assign the deed of

14  trust in the Stephen Dreher loan?

15      A.    I'm sorry, can you rephrase that question.  I

16  don't quite understand.

17      Q.    Sure.  That was not a good question, so fair

18  enough.

19          So I'm going to ask you a question about the

20  assignment of mortgage in blank related to Stephen Dreher's

21  loan.

22          Do you understand that?

23      A.    I do.

24      Q.    Okay.  Which we understand to be the deed of

25  trust, correct?  That's the security that's being assigned

MICHAEL WANG - 11/13/2020

1    reviewed?

2        A.    The only notation that I can recall was an

3    assignment in blank.

4        Q.    And you're familiar with the assignment of Stephen

5    Dreher's deed of trust to Dreambuilders Investments?

6        A.    Can you rephrase that?  I'm not sure what you

7    mean.

8        Q.    Are you aware that Stephen Dreher's deed of trust

9    was assigned by PNC Bank to Dreambuilder Investments, LLC?

10       A.    I have received a copy of that through this

11   litigation.

12       Q.    Okay.  And separate from receiving a copy of it in

13   the litigation, have you seen any notation in U.S. Bank

14   records of receiving that assignment?

15       A.    No.  The only notation about an assignment was the

16   assignment in blank.

17       Q.    And Green Tree was servicing the Stephen Dreher

18   loan on behalf of U.S. Bank, correct?

19       A.    Our records show that Green Tree was servicing

20   this loan on behalf of U.S. Bank National Association, not

21   in its individual capacity, but solely as trustee under

22   pass-through trust agreement dated as of July 26, 2010.

23           MR. HAGEN:  Can we take a look at Exhibit 3, which

24   is the several-page document next in order.

25           MS. SIMONETTI:  Is it Exhibit C, Fred?

MICHAEL WANG - 11/13/2020

1          The lender is National City Bank and the borrowers

2     are Steve Dreher and Linda Dreher, so that information

3     matches up to what I believe is the subject of this

4     litigation.

5          Q.   And their address is listed as an Idaho address.

6               Do you see that?

7          A.   I do.

8          Q.   And then can we go to the next exhibit.  It's a

9     PNC March 2010 letter.  This is another document obtained

10    from the Green Tree file on Mr. Dreher's loan.  It's from

11    PNC Bank to Stephen Dreher dated March 5, 2010.  It's

12    regarding the account number ending in 9653 and it's mailed

13    to Idaho, correct?

14         A.   That's the address that's listed on the top of

15    this document, towards the top of this document.

16                              (The above-described document was

17                              marked Exhibit 4 for identification.)

18         MR. HAGEN:

19         Q.   And then could we go to the next exhibit which

20    will be marked as Exhibit 5.

21              Have you seen Exhibit 5 before?

22         A.   Not that I recall.

23         Q.   Okay.  It appears to be a letter from Green Tree

24    dated October 12, 2010, and the reference line lists the

25    creditor as U.S. Bank National Association, not in its

MICHAEL WANG - 11/13/2020

1   individual capacity, but solely as trustee under the Grand

2   New Start pass-through trust agreement.

3          Do you see that?

4   A.   I do.

5                         (The above-described document was

6                         marked Exhibit 5 for identification.)

7          MR. HAGEN:

8   Q.   Is that the same as the buyer under the agreement

9   with ASRG that we just talked about that's attached to your

10  declaration?

11  A.   Yes.

12  Q.   Okay.  And is this -- do you understand this to be

13  what's called a hello letter?

14  A.   I do.

15  Q.   And this notice is being sent to the property

16  subject to the deed of trust, do you see that, the address?

17  A.   I do.

18  Q.   So at this time of October 12, 2010, the U.S. Bank

19  National Association was the creditor on Stephen Dreher's

20  loan, correct?

21         MS. SIMONETTI:  Objection.  You're using the word

22  "creditor" in a legal sense, but go ahead, Mr. Wang.

23         THE WITNESS:  Okay.  And again I would have to say

24  that you're again shortening the name of the party in

25  interest.  It would be U.S. Bank National Association, not

MICHAEL WANG - 11/13/2020

1   in its individual capacity, but solely as trustee.

2        They've worded it slightly different there, but

3   solely as trustee under the pass-through agreement dated

4   July 26, 2010.

5        MR. HAGEN:

6    Q.   So if the Drehers wanted to contact a creditor,

7   that's who they would contact, correct?

8    A.   No, not at all.  They would contact the servicer.

9    Q.   If the Drehers wanted to contact the creditor, so

10  you're saying they would first have to contact the

11  servicer?

12   A.   I'm saying that the servicer is their point of

13  contact for all matters.  They should be going to the

14  servicer.

15   Q.   If the Drehers wanted to directly contact the

16  creditor, they would need to contact U.S. Bank National

17  Association, correct?

18   A.   Anytime that happens we tell the borrowers that

19  they need to contact their servicer.  The trustee does not

20  play a role in the servicing of any individual loans.

21   Q.   So you're saying if the Drehers somehow contacted

22  U.S. Bank National Association directly, they would be

23  referred back to the servicer?

24   A.   Correct.

25        MR. HAGEN:  Okay.  I have another thing that I

MICHAEL WANG - 11/13/2020

1      Q.   What's a flow loan servicing agreement?  I mean,
2  sorry, what is a flow loan?
3      A.   I don't know.
4      Q.   Below that it says "nonperforming second lien
5  mortgage loan."
6           Do you see that?
7      A.   Yes.
8      Q.   What are nonperforming second lien mortgage loans?
9      A.   I guess I have a hard time describing that other
10 than the words that were just used.  It's a second lien on
11 a property that borrowers haven't been paying on.
12     Q.   And would you agree with me that this agreement is
13 U.S. Bank National Association hiring Green Tree Services
14 to be the servicers of the loan subject to a trust,
15 correct?
16     A.   No.  I think that's an inaccurate
17 characterization.
18     Q.   Why is that?
19     A.   Because that's not what occurs in a
20 securitization.
21     Q.   Could you look at page 8 of Exhibit C.  Are you
22 there with me?
23     A.   I'm on page 8.
24     Q.   Okay.  If you look at section 2.2(A) it says, "The
25 servicer agrees to service and administer the mortgage

MICHAEL WANG - 11/13/2020

1    loans on the owner's behalf."

2          Do you see that?

3    A.    I do.

4    Q.    And the owner is U.S. Bank National Association.

5    A.    I feel like a broken record on this point, but

6    again you've shortened U.S. Bank.  You've shortened the

7    name of the owner.  The name of the owner is as on the

8    front page of this document.

9    Q.    Okay.  Well, why don't we just agree that when I

10   refer to U.S. Bank, I'm referring to U.S. Bank individually

11   and as trustee?

12   A.    I'm not able to proceed on that because they are

13   different roles.

14         MS. SIMONETTI:  Right.

15         MR. HAGEN:  Okay.

16   Q.    So at U.S. Bank there's a trustee department,

17   correct?

18   A.    Correct.

19   Q.    And so the trustee department performs the trustee

20   role at U.S. Bank, correct?

21   A.    Correct.

22   Q.    But the trustee department is a part of U.S. Bank

23   National Association, right?

24   A.    Correct.

25   Q.    Why is it difficult for you to talk about U.S.

MICHAEL WANG - 11/13/2020

1    It's page 85 of 85.

2           Are you there on that page, the last page?

3    A.    I am.

4    Q.    And it's a document called "Trust Receipt."

5           Are you familiar with that document?

6    A.    No, I'm not.

7    Q.    And do you know why that's not part of the

8    agreement attached to your declaration?

9    A.    No.  I would again defer to counsel on that.

10   Q.    Did you draft your declaration personally or was

11   that provided to you by counsel to sign?

12   A.    It was provided by counsel.

13   Q.    Okay.  And what did you do before you signed the

14   declaration?  Did you make any changes to the text of the

15   declaration?

16   A.    I did not.

17   Q.    Did you review the documents attached to the

18   declaration?

19          I'm sorry.  Were the documents attached to the

20   declaration when you signed it?

21   A.    I don't recall.

22   Q.    Okay.  Did you review the documents referred to in

23   your declaration before you signed your declaration?

24   A.    Yes.  I provided the documents to counsel from the

25   records that we have.

MICHAEL WANG - 11/13/2020

1    A.    My assumption is yes, the entire collateral file

2  was released, which should include all the documents that

3  were listed in the system of record, which it was stated

4  that there was an assignment in blank.

5    Q.    I think you looked at the second amended complaint

6  before.  Have you had a chance to review the proof of claim

7  that was filed by Green Tree and that is attached to the

8  second amended complaint?

9    A.    I have.

10    Q.    Okay.  The proof of claim was filed on or about

11  October 26, 2010.

12         Did Green Tree file this proof of claim as the

13  servicer for U.S. Bank National Association, not in its

14  individual capacity, but solely as trustee under

15  pass-through trust agreement dated as of July 26, 2010?

16         Mr. Wang, do you want me to repeat that or did

17  that confuse you?

18    A.    No.  I've got it.

19         You know, again as I testified earlier, we don't

20  oversee the servicer undertaking the servicing role.  We're

21  not always aware of what they're doing.  But since our

22  records reflect that this loan was held in that trust and

23  that Green Tree was the servicer of that loan for that

24  trust, I think it's fair to infer that they would file a

25  claim on behalf of U.S. Bank as trustee for the trust.

MICHAEL WANG - 11/13/2020

1   without some kind of proactive action on behalf of U.S.

2   Bank?

3       A.    Correct.  Any kind of reporting that we would get

4   would be on a trust like basis.  So we could see the number

5   of loans held within the trust might be going down, but I

6   mean say we had received notice of this litigation back

7   prior to Ditech filing for bankruptcy and the trust

8   terminating, had it hypothetically been sold to a different

9   entity, I still wouldn't know to go anywhere except to

10  Ditech and I would be relying on them to tell me, you know,

11  by the way, this isn't actually in the trust anymore.  It

12  was sold on so and so date.

13      Q.    Okay.  And then Green Tree, was it the servicer of

14  the loan on behalf of U.S. Bank as trustee for the trust

15  from mid 2010 to early 2014 when the trust was terminated?

16      A.    Yes.  I believe that PNC was the intern servicer

17  from July 30 until September 1, at which point servicing

18  transferred to Green Tree and stayed there until the

19  termination of the trust.

20      Q.    Okay.  And are you aware of whether the transfer

21  of servicing from PNC as interim servicer to Green Tree was

22  delayed beyond what was contemplated in the relevant

23  agreement?

24      A.    Not that I know of.

25      Q.    Would U.S. Bank as trustee know if there was a

MICHAEL WANG - 11/13/2020

 1  bit about what you had said about some of the document

 2  retention and the files that you looked at.

 3          Can you give me some sort of global categories of

 4  documents that are in the three boxes that you said you

 5  looked at in the electronic file that you searched?

 6  A.    Sure.  There was surprisingly little for this

 7  trust.  I felt like there was less here than there are with

 8  most.  But generally we don't have any servicing

 9  information.  We don't have any kind of payment history or

10  anything like that.

11          We have the governing documents, so the documents

12  that go into the creation of the trust.  Everything was

13  sent over to our counsel in this matter.

14          From my perspective I didn't really see anything

15  that was all that interesting.  I see primarily the trust

16  creation documents that are in there.  I don't recall

17  seeing any custodial certifications.

18          I'm sorry, I can't be a lot more specific than

19  that.  I just don't recall.  Nothing is really sticking out

20  to me.

21  Q.    Okay.  You also mentioned the vault in connection

22  with DCS.  Can you elaborate on what the vault is?

23  A.    Sure.  The vault generally -- we have several

24  throughout the country and I don't recall which vault this

25  loan was assigned to, and I don't think that it matters

MICHAEL WANG - 11/13/2020

1   because the procedures are the same anyway.

2        But it's essentially just a large warehousing

3   building that is used primarily or perhaps even solely for

4   the storage of collateral documents.  So there are

5   mortgages, deeds of trust, notes, and everything that would

6   have been -- that would be with the origination documents.

7        The title policy would typically be included

8   there, assignments to the extent that they exist.

9        And so they'll all get put into a folder and they

10  are stored away in the vault and usually they stay there

11  for months, if not years untouched, and they're given a

12  code on them that corresponds to their actual physical

13  location; and upon receipt almost all trusts will involve a

14  certification of some sort, which is where an employee at

15  the vault will physically open up the file on receipt and

16  make a note of what documents are inside.

17       Q.   Okay.  And that code is loan specific?

18       A.   I'm sorry.  Which code are you referring to?

19       Q.   Oh, you said that there was a code for the

20  physical location.  I guess what I'm wondering really is

21  the folders are loan specific, right?

22       A.   The folders are loan specific, and so say you've

23  got a loan held in the vault.  There will be some lengthy

24  code and, you know, that will tell you where it is exactly.

25  It's in, you know, well 45, shelf 14, aisle, you know,

MICHAEL WANG - 11/13/2020

1            Is there any kind of information that you could

2   look at to determine when that release occurred and why?

3       A.   E&B Trust would have a release code listed on it,

4   and the reason why it's released, like as far as what that

5   release code is for, we don't have anything to go off of

6   other than the code that the servicer selected.

7            So I mean our code -- they may select a

8   foreclosure code even if that's not really what's

9   happening, but that's what ends up getting logged because

10  that's what the servicer selected.

11      Q.   Okay.  And so you mentioned that U.S. Bank as

12  custodian last possessed the collateral file on April 18,

13  2014, at which point DCS records show it was released to

14  Wells Fargo at the direction of Green Tree; is that

15  accurate?

16      A.   That's what I recall, yes.

17      Q.   Okay.  And the DCS records, again we're talking

18  about E&B Trust?

19      A.   Correct.

20      Q.   And do you know what Wells Fargo entity it was

21  released to?

22      A.   I do not.

23      Q.   And do you know in what capacity Wells Fargo

24  accepted the collateral file?

25      A.   I do not.

MICHAEL WANG - 11/13/2020

REPORTER'S CERTIFICATION

1

2

3        I, Janell Sokol, Certified Shorthand Reporter in

4   and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn;

7   that the deposition was then taken before me at the time

8   and place herein set forth; that the testimony and

9   proceedings were reported stenographically by me and later

10  transcribed into typewriting under my direction; that the

11  foregoing is a true record of the testimony and proceedings

12  taken at that time.

13

14       IN WITNESS WHEREOF, I have subscribed my name on

15  this date: November 16, 2020.

16

17

18

19   _____

20        Janell Sokol, CSR No. 3443

21

22

23

24

25

# EXHIBIT D

## Yesennia Alarcon

| | |
|---|---|
| **From:** | Greg Palmer <gpalmer@dreambuilder.net> |
| **Sent:** | Monday, August 2, 2010 6:15 AM |
| **To:** | Andrea Dennis |
| **Cc:** | Rick J. Obrien; William S. Buchanan; Peter Andrews |
| **Subject:** | PNC Funding |
| **Attachments:** | DBI- Non-Performing LPAExecutionVersion.pdf; Executed Sig Page 073010.pdf; Guarantee Sig Pag 073010.pdf; Funding Schedule-Charge Offs (Pool A).xls; PNC Trade A - Investment Summary; PNC Wire; RE: Final Purchase Agreement and Escrow Agreement |

Andrea,

All of the relevant docs for funding are attached.   This must fund asap this morning, and we require the wire confirmation as a condition of the escrow funds being released from WMD.  If there is ANYTHING in the way of this, please let me know asap.

Bill,  Please provide note and assignment of bene interest.

Attached are the following:

·    Final version of Contract

·    Signature pages of contract

·    Guarantee Sig page executed by Rick

·    Funding Schedule (Mortgage Loan Schedule)

·    Investment Summary

o   This is 100% DBI serviced. There are unsecured loans, but they have been pre-sold by DBI.

I sent the wire request last evening to Helix to be set up for immediate release this morning (attached).

$4,326,690.99 – to seller  (original instructions from seller attached)

$289,904  -  servicing fees to DBI  against $527,479.61 due (detail in funding request attached)

1

## CONFIDENTIAL

ASRG00001

$5,274,796.05  - full purchase price

$4,326,690.99  - wire from fund

$948,105.06   -  Escrowed funds to be sent directly (Purchase and Escrow agreement attached)


gp

# CONFIDENTIAL

ASRG00002

**EXECUTION VERSION**

# "NON-PERFORMING" LOAN PURCHASE AND INTERIM SERVICING AGREEMENT

Between

## PNC BANK, NATIONAL ASSOCIATION,
Seller and Interim Servicer
and

## AMERICAN SERVICING AND RECOVERY GROUP, LLC,
Purchaser

Dated as of July 30, 2010

"Non-Performing" Loans

**CONFIDENTIAL**

ASRG00003

# EXHIBIT E

**Yesennia Alarcon**

| | |
|---|---|
| **From:** | Lee, Andrew <andrew.lee@leonard.com> |
| **Sent:** | Friday, July 30, 2010 2:31 PM |
| **To:** | Greg Palmer |
| **Cc:** | dsolomon@wmdcapital.com; William Daugherty; Mick Thomas; Dennis E. Carlton; Nicholas.Smith@greentreecreditsolutions.com; Craig.Opp@greentreecreditsolutions.com; katie.thomas@gt-cs.com; pslagowitz@spurscapital.com; Matt Rosen; Michael.Braun@bingham.com; TAMARA.SCHULTZ-FUGH@usbank.com; Peter Andrews; ikameros@nixonpeabody.com; Peter Andrews; Peter Andrews; Peter Andrews; Lee, Andrew |
| **Subject:** | RE: Final Purchase Agreement and Escrow Agreement |
| **Attachments:** | Scan001.PDF; Scan001.PDF |

Attached are the fully executed Purchase Agreement and Escrow Agreement.

We will watch for the balance of the Escrow Agreement materials on Monday morning.

Andrew P. Lee
Leonard, Street and Deinard
Professional Association
150 S. Fifth Street, Minneapolis, MN 55402
Tel: (612) 335-1881/Fax: (612) 335-1657
www.leonard.com  - andrew.lee@leonard.com
Assistant: Laura Moross (612) 335-1661

Disclaimer under Treasury Department Circular 230: Unless we otherwise expressly state in this message, nothing contained in this message is intended or written to be used, nor may it be used or relied upon (1) by any taxpayer for the purposes of avoiding tax-related penalties under the Internal Revenue Code or (2) by any person to promote, market, or to recommend any federal tax transaction or position or any other matter addressed in this message.

From: Greg Palmer [mailto:gpalmer@dreambuilder.net]
Sent: Friday, July 30, 2010 4:25 PM
To: Lee, Andrew
Cc: dsolomon@wmdcapital.com; William Daugherty; Mick Thomas; Dennis E. Carlton;
Nicholas.Smith@greentreecreditsolutions.com; Craig.Opp@greentreecreditsolutions.com; katie.thomas@gt-cs.com;
pslagowitz@spurscapital.com; Matt Rosen; Michael.Braun@bingham.com; TAMARA.SCHULTZ-FUGH@usbank.com; Peter Andrews;
ikameros@nixonpeabody.com; Peter Andrews; Peter Andrews; Peter Andrews
Subject: RE: Final Purchase Agreement and Escrow Agreement

Condition 1 and 2 below  are confirmed.

From: Lee, Andrew [mailto:andrew.lee@leonard.com]
Sent: Friday, July 30, 2010 5:24 PM

1

CONFIDENTIAL

ASRG00055

To: Greg Palmer
Cc: dsolomon@wmdcapital.com; William Daugherty; Mick Thomas; Dennis E. Carlton;
Nicholas.Smith@greentreecreditsolutions.com; Craig.Opp@greentreecreditsolutions.com; katie.thomas@gt-cs.com;
pslagowitz@spurscapital.com; Matt Rosen; Michael.Braun@bingham.com; TAMARA.SCHULTZ-FUGH@usbank.com; Peter Andrews;
ikameros@nixonpeabody.com; Peter Andrews; Peter Andrews; Lee, Andrew
Subject: RE: Final Purchase Agreement and Escrow Agreement

Please confirm when you send them that:

1.   PNC has released its signature page to you (in other words, you aren't just holding it pending some other condition).

2.   There are no material changes to the PNC contract from what was sent to me.  In particular, no change to the Servicing Transfer Date.

If you do that and send the signature pages, I can release our Purchase Agreement and Escrow Agreement.  We can't fund until the rest of the conditions in the Escrow Agreement are satisified.

Andrew P. Lee
Leonard, Street and Deinard
Professional Association
150 S. Fifth Street, Minneapolis, MN 55402
Tel: (612) 335-1881/Fax: (612) 335-1657
www.leonard.com  - andrew.lee@leonard.com
Assistant: Laura Moross (612) 335-1661

Disclaimer under Treasury Department Circular 230: Unless we otherwise expressly state in this message, nothing contained in this message is intended or written to be used, nor may it be used or relied upon (1) by any taxpayer for the purposes of avoiding tax-related penalties under the Internal Revenue Code or (2) by any person to promote, market, or to recommend any federal tax transaction or position or any other matter addressed in this message.

From: Greg Palmer [mailto:gpalmer@dreambuilder.net]
Sent: Friday, July 30, 2010 4:16 PM
To: Lee, Andrew
Cc: dsolomon@wmdcapital.com; William Daugherty; Mick Thomas; Dennis E. Carlton;

CONFIDENTIAL

ASRG00056

Nicholas.Smith@greentreecreditsolutions.com; Craig.Opp@greentreecreditsolutions.com; katie.thomas@gt-cs.com;
pslagowitz@spurscapital.com; Matt Rosen; Michael.Braun@bingham.com; TAMARA.SCHULTZ-FUGH@usbank.com; Peter Andrews;
ikameros@nixonpeabody.com; Peter Andrews; Peter Andrews
Subject: RE: Final Purchase Agreement and Escrow Agreement

Andrew,  signature pages are forthcoming.   Funding on Monday morning is fine, but we would like executed contracts released
once PNC sig page is provided.


Please confirm.


Rgds,


Greg


From: Lee, Andrew [mailto:andrew.lee@leonard.com]
Sent: Friday, July 30, 2010 5:02 PM
To: Greg Palmer
Cc: dsolomon@wmdcapital.com; William Daugherty; Mick Thomas; Dennis E. Carlton;
Nicholas.Smith@greentreecreditsolutions.com; Craig.Opp@greentreecreditsolutions.com; katie.thomas@gt-cs.com;
pslagowitz@spurscapital.com; Matt Rosen; Michael.Braun@bingham.com; TAMARA.SCHULTZ-FUGH@usbank.com; Peter Andrews;
ikameros@nixonpeabody.com; Lee, Andrew
Subject: RE: Final Purchase Agreement and Escrow Agreement


I understand that there is a hold-up at PNC.  We are past our ability to close today.


Andrew P. Lee
Leonard, Street and Deinard
Professional Association
150 S. Fifth Street, Minneapolis, MN 55402
Tel: (612) 335-1881/Fax: (612) 335-1657
www.leonard.com  - andrew.lee@leonard.com
Assistant: Laura Moross (612) 335-1661


-----------------------------------------------------------------
CONFIDENTIALITY NOTICE: The information contained in this e-mail is
confidential, may be legally privileged, and is intended only for the
use of the party named above. If the reader of this e-mail is not the intended
recipient, you are advised that any dissemination, distribution, or

3

CONFIDENTIAL

ASRG00057

copying of this e-mail is strictly prohibited. If you have received this
e-mail in error, please immediately notify us by telephone at
612.335.1500 and destroy this e-mail.
-----------------------------------------------------------------


-----------------------------------------------------------------
CONFIDENTIALITY NOTICE: The information contained in this e-mail is
confidential, may be legally privileged, and is intended only for the
use of the party named above. If the reader of this e-mail is not the intended
recipient, you are advised that any dissemination, distribution, or
copying of this e-mail is strictly prohibited. If you have received this
e-mail in error, please immediately notify us by telephone at
612.335.1500 and destroy this e-mail.
-----------------------------------------------------------------


-----------------------------------------------------------------
CONFIDENTIALITY NOTICE: The information contained in this e-mail is
confidential, may be legally privileged, and is intended only for the
use of the party named above. If the reader of this e-mail is not the intended
recipient, you are advised that any dissemination, distribution, or
copying of this e-mail is strictly prohibited. If you have received this
e-mail in error, please immediately notify us by telephone at
612.335.1500 and destroy this e-mail.
-----------------------------------------------------------------

4

CONFIDENTIAL

ASRG00058

# MORTGAGE LOAN SALE AGREEMENT

EFFECTIVE AS OF JULY 30, 2010

by and between

## American Servicing and Recovery Group, LLC
Seller

and

## U.S. Bank National Association, not in its individual capacity, but solely as Trustee under Pass-Through Trust Agreement dated as of July 26, 2010
Buyer

CONFIDENTIAL

# EXHIBIT F

# American Servicing And Recovery Group, LLC
## Written Consent Of The Managers
### Effective November 8, 2010

Pursuant to Section 18-302 of the Delaware Limited Liability Company Act (the "Act") and Section 5.12 of the Limited Liability Company Agreement of American Servicing and Recovery Group, LLC (the "Company") the Managers hereby adopt the following resolutions effective November 8, 2010.

*Removal of Officers*

RESOLVED, that Gregory Palmer be, and hereby is, removed to serve as officer of the Company in the capacity of Vice President - Operations.  He is removed from any and all authorities granted by the June 15, 2010 resolutions including Banking Matters, Qualification in Foreign Jurisdiction, and Further Authorizations

IN WITNESS WHEREOF, the undersigned has executed this consent as of the date first written above.

Managers:

_____
Rick J. O'Brien

_____
William S. Buchanan

_____
Kenneth Murchison

DAL02:421421

CONFIDENTIAL

ASRG00105

# EXHIBIT G

**Yesennia Alarcon**

| | |
|---|---|
| **From:** | Greg Palmer <gpalmer@dreambuilder.net> |
| **Sent:** | Friday, February 18, 2011 2:09 PM |
| **To:** | Andrea Dennis |
| **Cc:** | Peter Andrews |
| **Subject:** | FW: Mortgage Loan Sale Agreement dated July 30, 2010 |
| **Attachments:** | 20101130164059486.pdf |

Here is the formal written request made by purchaser.

From: Matt Rosen
Sent: Friday, February 18, 2011 5:07 PM
To: Greg Palmer
Subject: FW: Mortgage Loan Sale Agreement dated July 30, 2010

From: Peter Andrews
Sent: Wednesday, December 01, 2010 11:44 AM
To: Matt Rosen; Jonathan Snyder
Subject: FW: Mortgage Loan Sale Agreement dated July 30, 2010

Please let them know I am not the point person and please handle.

From: TAMARA.SCHULTZ-FUGH@usbank.com
[mailto:TAMARA.SCHULTZ-FUGH@usbank.com]
Sent: Tuesday, November 30, 2010 5:59 PM
To: Peter Andrews
Cc: Craig.Opp@greentreecreditsolutions.com
Subject: Mortgage Loan Sale Agreement dated July 30, 2010

Mr. Andrews,

Please see the attached repurchase request related to the above
referenced transaction.  Please contact Chip Hidinger at Green Tree
(480-333-6060) if you should have any questions.  Thank you.

Tammy Schultz-Fugh
U.S. Bank Corporate Trust Services

1

# CONFIDENTIAL

ASRG00097

60 Livingston Avenue
EP-MN-WS3D
St. Paul, MN  55107-2292
(651) 495-3880  ph
(651) 495-8090  fax

Investor Reporting Website:  www.usbank.com/abs


----- Forwarded by Tamara M Schultz-Fugh/MN/USB on 11/30/2010 04:42 PM -----

From:

PRTMN14H703-62@usbank.com

To:

"T. Schultz-Fugh" <tamara.schultz-fugh@usbank.com>

Date:

11/30/2010 04:41 PM

Subject:


--------------------------------------------


This E-mail was sent from "PRTMN14H703-62" (MP 5000/LD050).

Scan Date: 11.30.2010 16:40:59 (-0600)
Queries to: PRTMN14H703-62@usbank.com

U.S. BANCORP made the following annotations
-----------------------------------------------------------------
Electronic Privacy Notice. This e-mail, and any attachments, contains
information that is, or may be, covered by electronic communications
privacy laws, and is also confidential and proprietary in nature. If you
are not the intended recipient, please be advised that you are legally
prohibited from retaining, using, copying, distributing, or otherwise
disclosing this information in any manner. Instead, please reply to the
sender that you have received this communication in error, and then
immediately delete it. Thank you in advance for your cooperation.


-----------------------------------------------------------------

2

# CONFIDENTIAL

ASRG00098

VIA EMAIL: PAndrews@dreambuilder.net
November 29, 2010

Mr. Peter Andrews
Mr. William Buchanan
American Servicing and Recovery Group, LLC
4144 N. Central Expressway, Suite 900
Dallas, TX 75204

RE:   Mortgage Loan Sale Agreement Dated July 30, 2010, By and Between American Servicing and Recovery Group, LLC (the "Seller") and U.S. Bank National Association, not in its individual capacity, but solely as Trustee under Pass-Through Trust Agreement dated July 26, 2010 (the "Buyer") (the "MLSA"): Repurchase and Refund Claim

Dear Mr. Andrews and Mr. Buchanan:

Based on Green Tree Servicing LLC's ("Green Tree") review of the final Mortgage Loan data file, the Buyer has determined that the Mortgage Loans identified on Schedule A attached hereto were  transferred by the Seller to the Buyer with a  zero balance (the "Zero Balance Loans").  Based upon the loan level information currently in its possession, Green Tree is unable to determine the settlement date for the Zero Balance Loans.  Pursuant to Section 3.2(ii) of the MLSA, the Buyer hereby requests that Seller provide Green Tree with satisfactory documentation to determine the settlement date for each Zero Balance Loan.  For any Zero Balance Loan which settled after the Cut-off Date, any proceeds received in connection with such settlement are required to be remitted to the Buyer.  For any Zero Balance Loans which settled prior to the Cut-off Date, Seller should have removed those Mortgage Loans from the final Mortgage Loan pool.  For those Zero Balance Loans which settled prior to the Cut-off Date (if any), the Buyer hereby requests Seller to repurchase those Zero Balance Loans at the applicable repurchase price.

Green Tree also determined that the final Mortgage Loan data file provided by Seller did not include final loan level data for the Mortgage Loans identified on Schedule B attached hereto.  As a result, Buyer has not been able to determine whether a breach exists under Section 6(f)(iii) of the MLSA.  In order to determine whether a breach of Section 6(f)(iii) exists, the Buyer hereby requests that Seller promptly provide Buyer with the missing loan level data.  Until it can be determined whether a breach of Section 6(f)(iii) exists, the Buyer hereby reserves its rights to seek a repurchase of the Mortgage Loans identified on Schedule B attached hereto.

In addition, based on its review of the final loan level tape provided by Seller, Green Tree determined that the Purchase Price was calculated incorrectly.  The Purchase Price was incorrectly calculated based on a principal balance of $42,515,921.  The Purchase Price should have been calculated based on a principal balance of $40,795,086.  This resulted in a variance

CONFIDENTIAL

ASRG00099

totaling $38,374.63 (based on the agreed upon purchase price percentage of 2.23%). The Buyer, therefore, requests Seller to reimburse Buyer for foregoing variance amount.

Pursuant to Section 3.1 of the MLSA, this letter will also serve as notice to Seller that the Mortgage Loans identified on Schedule C attached hereto are missing the Mortgage Loan Documents identified on Schedule C. The Buyer hereby requests that Seller deliver to Buyer the Mortgage Loan Documents identified on Schedule C within the timeframe prescribed in Section 3.1 of the MLSA.

The original Servicing Transfer Date of August 22, 2010 was unilaterally changed by PNC Bank to September 1, 2010. The Mortgage Loans identified on Schedule D attached hereto (the "Unsecured Mortgage Loans") became unsecured during the time delay of transfer of servicing. The Buyer accepted in good faith the delay in servicing transfer and respectfully requests the Seller exercise similar good faith by repurchasing the Unsecured Mortgage Loans.

If you have any questions, please feel free to call Chip Hidinger at Green Tree (480-333-6060).

Sincerely,

U.S. Bank National Association,
not in its individual capacity, but solely
as Trustee under Pass-Through Trust Agreement
dated July 26, 2010

By: _Tamara Schultz_

Name: _Tamara Schultz-Fugh_

Title: _Vice President_

CONFIDENTIAL

ASRG00100

# EXHIBIT H

# Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,
### Dreambuilder Investments, LLC and the other parties hereto


**DBI/ASG Advisors, LP**
4144 North Central Expressway
Suite 900
Dallas, Texas 75204


December 29, 2010


**ASG Mortgage Investors, LLC**
4144 North Central Expressway
Suite 900
Dallas, Texas 75204

**Dreambuilder Investments, LLC**
**DBI Fund Holdings, LLC**
30 Wall Street
6th Floor
New York, NY  10005


Ladies and Gentlemen:

DBI/ASG Advisors, LP ("Advisors"); ASG Mortgage Investors, LLC ("ASGMI");
Dreambuilder Investments, LLC (together with its successors, "DBI") and the other parties
hereto have on the terms set forth in this letter agreement (this "Letter Agreement") agreed to
terminate the Reinvestment Period (as hereinafter defined) of DBI/ASG Mortgage Acquisition
Fund I, LP (the "Fund").  In connection with the termination of the Reinvestment Period and in
consideration of mutual covenants and other terms and conditions contained herein, Advisors,
ASGMI, and DBI hereby agree as follows:

1. **Termination of Reinvestment Period**

   Advisors, in its capacity as the general partner of the Fund, hereby terminates the
   Reinvestment Period, effective as of the date hereof, in accordance with Section 10.2 of the
   Amended and Restated Limited Partnership Agreement of the Fund, dated as of April 9, 2009
   (the "Fund Partnership Agreement"), among Advisors, as general partner of the Fund, and the
   limited partners of the Fund named therein.  By executing this Letter Agreement, each
   member of the Executive Committee (as defined below) of Advisors hereby approves the
   termination by Advisors of the Reinvestment Period.  As used in this Letter Agreement, the
   term "Reinvestment Period" has the meaning set forth in Section 10.2 of the Fund
   Partnership Agreement.

# Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,
### Dreambuilder Investments, LLC and the other parties hereto

**2.  Rights Of First Refusal**

Paragraph 5 of the side letter agreement, dated April 9, 2009 (the "Sammons Side Letter"), between Advisors and 1900 Capital Inc. (a subsidiary of Sammons Enterprises) and Paragraph 6 of the side letter agreement, dated April 9, 2009 (the "Murchison Side Letter"), between Advisors and various members of the Murchison family or their affiliates (the "Murchison Investors") provide that, if Advisors or any of its Affiliates (as defined in the Fund Partnership Agreement) elect to organize or sponsor certain funds, investment vehicles or programs at any time prior to the end of the eighteenth month following the expiration of the Exclusivity Period (as defined in the Fund Partnership Agreement), Advisors will offer 1900 Capital Inc. or the Murchison Investors, as applicable, the opportunity to acquire interests in the general partner or other manager of such funds, investment vehicles or programs upon the terms described in the Sammons Side Letter and the Murchison Side Letter.  In addition, the Amended and Restated Partnership Agreement of Advisors, dated as of March 30, 2009 (the "Advisors Partnership Agreement") provides that, (i) if DBI Fund Holdings, LLC ("DBI Fund Holdings") or any of its Affiliates (as defined in the Advisors Partnership Agreement) elects to organize certain funds or vehicles at any time prior to the end of the eighteenth month following the expiration of the Exclusivity Period, DBI Fund Holdings will offer ASGMI the opportunity to acquire interests in the general partner or other manager of such funds or investment vehicles and participate as a co-sponsor thereof upon the terms described in Section 6.3(a) of the Advisors Partnership Agreement (the "ASGMI Right of First Refusal") and (ii) if American Servicing Group, Inc. ("ASG") or any of its Affiliates (as defined in the Advisors Partnership Agreement) elects to organize certain funds or vehicles at any time prior to the end of the eighteenth month following the expiration of the Exclusivity Period, ASG will offer DBI Fund Holdings the opportunity to acquire interests in the general partner or other manager of such funds or investment vehicles and participate as a co-sponsor thereof upon the terms described in Section 6.2.(a) of the Advisors Partnership Agreement (the "DBI Fund Holdings Right of First Refusal").  The parties agree as follows with respect to these contractual provisions:

    a.  The parties agree that each of them is, and will be deemed at all times until the end of the eighteenth month after the expiration of the Exclusivity Period, an Affiliate (as defined in the Fund Partnership Agreement) of Advisors and will be subject to and will comply with the covenants and agreements contained in Paragraph 5 of the Sammons Side Letter and Paragraph 6 of the Murchison Side Letter.

    b.  The parties agree that the DBI Fund Holdings Right of First Refusal is hereby terminated and shall cease to be of any further force or effect.

Concurrently with the execution of this Letter Agreement, the partners of Advisors shall enter into the Second Amended and Restated Limited Partnership Agreement of Advisors, dated as of the date hereof (the "Second Amended Advisors Partnership Agreement"), in

# Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,
### Dreambuilder Investments, LLC and the other parties hereto

order to amend and restate the Advisors Partnership Agreement in order to reflect these
amendments and the other amendments thereto described in this Letter Agreement

The parties agree that the ASGMI Right of First Refusal shall remain in effect, and DBI Fund
Holdings is subject to and shall comply with the provisions of Section 6.2(a) of the Second
Amended Advisors Partnership Agreement.

## 3. Line of Credit Waiver and Payments; Permitted Indemnities and Guarantees

Capitalized terms used herein shall have the meaning set forth in the Loan Documents. Advisors
and DBI agree, without waiving any of their rights under the DBI Loan Documents, dated April
2, 2009, by and between DBI Fund Holdings, as borrower (the "Borrower") and Advisors, as
lender (the "Lender"), to the following:

- o Interest will accrue and be paid at the Default Rate. If the payment schedule
  presented herein is met Lender will rebate the Default Interest paid and waive
  payment of the Exit Fee.
- o The following is the required payment schedule:

  - $350,000      upon execution of the this Agreement .
  - $150,000      on February 28th, 2011 and
  - $100,000      monthly thereafter on the last business day of the month until
    the loan, including any accrued and unpaid Interest and
    Default Interest, is paid.
  - Cash received will be applied in accordance with the Loan Documents
  - A payment will be considered to be missed if it is not received by midnight
    CST of the 5th business day following the scheduled payment date.

Lender herein grants to Dreambuilder Investments, LLC, a Guarantor under the Loan
Documents, the right to enter into enter into an indemnity in form and substance to the
indemnities presented herein as Exhibit A-1 (the "Permitted Indemnities") pursuant to its
execution of any Loan Purchase Agreement or Loan Sale Agreement. Lender must be presented
with the executed contract within 48 hours of execution. If, in the Lenders reasonable discretion,
the indemnity does not conform to the Permitted Indemnity the Borrower shall be deemed to be
in default under the Loan Documents and this Letter Agreement and Lender's agreement to
waive Default Interest and the Exit Fee shall be terminated.

Lender herein grants to Dreambuilder Residential, LLC, a Guarantor under the Loan Documents,
the right to enter into enter into a Guarantee in form and substance to the Guarantee presented
herein as Exhibit A-2 (the "Permitted Guarantee") pursuant to its execution of any Loan Purchase
Agreement. Lender must be presented with the form of contract and allowed 24 hours to review
its terms for compliance. If, in the Lenders reasonable discretion, the Guarantee does not conform
to the Permitted Guarantee it shall have the authority to waive this consent and Borrower shall
have no recourse.

## CONFIDENTIAL

# Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,
### Dreambuilder Investments, LLC and the other parties hereto

**4.  Allocation Of Side Letter Make Whole Amounts**

Paragraph 2 of each of the side letter agreements, dated September 28, 2009 (the "Make-Whole Side Letters"), among Advisors, each of the original limited partners of the Fund, ASG Partners I, LLC ("ASG Partners I") and DBI Fund Holdings provides that certain amounts that would otherwise be distributable to ASG Partners I and DBI Fund Holdings by Advisors will be deposited into a Reserve Account (as defined in the Make-Whole Side Letters) until such time as each of the original limited partners of the Fund have received distributions from the Fund equal to 2.5x of their capital commitments to the Fund, as calculated in accordance with the terms of the Make-Whole Side Letters.  As used herein, the term "Make-Whole Amounts" means any amounts withheld and deposited in the Reserve Account that would otherwise have been available for distribution by Advisors to ASG Partners I and DBI Fund Holdings pursuant to the Advisors Partnership Agreement.

The parties hereto agree that, notwithstanding anything to the contrary in the Advisors Partnership Agreement or the Make-Whole Side Letters, as between DBI Fund Holdings and ASG Partners I, all Make-Whole Amounts shall be borne by and reduce amounts distributable by Advisors to DBI Fund Holdings and ASG Partners I in the same proportion as the Servicing Fees (both acquisition fees and collateral maintenance fees as described in the Acquisition and Custodial Services Agreement and the Collateral Guidelines Agreement dated April 1, 2009 (the "Servicing Agreement")) paid to each of DBI and American Servicing and Recovery Group, LLC ("ASRG") bears to the total Servicing Fees (as defined in the Servicing Agreement) paid to DBI and ASRG pursuant to the Servicing Agreement.  Any Make-Whole Amounts that are subsequently released to Advisors from the Reserve Account pursuant to Paragraph 2(a) or (b) of the Make-Whole Side Letters shall be distributed by Advisors to DBI Fund Holdings and ASG Partners I in the same proportions as the amounts distributable to them by Advisers were reduced in accordance with the immediately preceding sentence.

**5.  ASRG Servicing Secured Loans**

DBI will continue to service all secured loans less $3,000,000 of underwritten revenue, which ASRG will service.  In addition, DBI will transfer for service a pool of loans (currently categorized as secured, secured BK, unsecured and unsecured BK and which aggregate to approximately $3.5 million of underwritten revenue) which is currently serviced by DBI.  In the event DBI arranges the sale of any transferred loans, and ASRG consents to such sale, DBI will be entitled to 75% of the net collection fees on any loans sold.  ASRG will be responsible for liquidating all other Fund loans.  ASRG and DBI will design a solution that meets the compliance threshold and maintains servicing platform integrity.  The letter agreement between ASRG and DBI dated March 30, 2009 and relating to the payment of fees to DBI will be amended accordingly.

**6.  Co-Investor Fund III**

CONFIDENTIAL

# Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,
### Dreambuilder Investments, LLC and the other parties hereto

Concurrently with the execution of this Letter Agreement, all rights of the general partner or manager to any distributions of any kind from DBI/ASG Coinvestor Fund III, LLC, DBI Coinvestment JV1a, LLC and DBI Coinvestment JV 1b, LLC will be allocated 50% to the Fund and 50% to Advisors. The documentation providing for this allocation shall be in form and substance substantially the same as the documentation used for the same purposes in DBI/ASG Co-Investor Funds I and II.

The Guaranty, dated as of October 9, 2010, entered into by DBI Residential, LLC in favor of PNC Bank, National Association ("PNC") in connection with the acquisition of loans from PNC shall be terminated (subject to obtaining agreement to such termination from PNC) and an identical guaranty issued by the Fund shall be substituted therefor.

## 7. Management of Advisors

By executing this Letter Agreement, each of Peter Andrews and Greg Palmer hereby resign as members of the Executive Committee (as defined in the Advisors Partnership Agreement) of Advisors, effective as of the date hereof.  In addition, concurrently with the execution of this Letter Agreement, the partners of Advisors shall enter into the Second Amended Advisors Partnership Agreement.

## 8. Allocation of DBI share of Advisors to Fund Limited Partners

Advisors and DBI Fund Holdings will enter into a letter agreement pursuant to which they will agree that, in the case of any distributions to be made by Advisors to its partners, (i) the portion of such distributions that would be made by Advisors to DBI Fund Holdings shall be reduced to the amount that would be distributed to DBI Fund Holdings if its Partnership Percentage (as defined in the Advisors Partnership Agreement) were 55% (rather than 60%) and (ii) the reduction in the amount distributable to DBI Fund Holdings as a result of clause (i) above shall refunded by Advisors to the Fund. The arrangements described in this paragraph may be implemented by Advisors in any reasonable manner that reflects the adjusted economic interests of the partners of Advisors described herein. For example, Advisors may implement such arrangements by waiving a portion of the distributions payable by the Fund to Advisors, and adjusting the distributions to be made by Advisors to its partners to reflect that DBI Fund Holdings is the only partner who bears the cost of such waiver of distributions.  The arrangement implemented will be clearly outlined to DBI, such that the effect is clearly understandable.

## 9. Licensing Expenses

ASRG shall invoice DBI quarterly for expenses incurred in maintaining its licenses and the invoiced amount shall be withheld from the subsequent servicing fee payments made to DBI until such time as the invoice is satisfied; provided, that if there are insufficient servicing fees to cover the expenses reflected on any invoice, DBI shall pay the balance of such invoice within 30 days.

CONFIDENTIAL

# Separation Agreement

**between**

**DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,
Dreambuilder Investments, LLC and the other parties hereto**

# Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,
### Dreambuilder Investments, LLC and the other parties hereto

### 10. Administrative Services Reimbursement

Pursuant to that certain Administrative Services Agreement, dated April 9, 2009, DBI will make the following payments to ASRG in order to satisfy its obligations:

| | |
|---|---|
| Upon Execution | $50,000 |
| January 31, 2010: | $80,000 |
| February 28, 2010 | $103,234 |

In addition beginning on the last business day of January 2011 ASRG will be entitled to a sum equal to a) $11,078 per month payable on the last business day of the month. This amount shall be deducted from the servicing fee payments made to DBI; provided, that, there are insufficient serving fees to cover such amount, DBI shall be invoiced and payment shall be made within 30 days.

### 11. Rolodex

DBI and ASRG will each provide the following lists to the other within 30 days of the execution of this Letter Agreement:

   a.  sources at banks or other 2nd lien sellers or traders with contact information,
   b.  pool buyers of 2nd liens and contact information,
   c.  vendors and contact information, and
   d.  list of brokers in the 2nd lien space and contact information.

### 12. Data

In Paragraph 1 of that certain letter agreement, dated March 30, 2009, between ASRG and DBI, DBI is required to maintain in current working order (subject to normal wear and tear), and to provide ASRG and its employees with full access to, DBI's facilities located at 30 Wall Street, New York, New York 10005, and all of DBI's software, computer systems, data records and other material assets currently owned or leased by DBI and primarily used for purposes of performing servicing responsibilities with respect to residential mortgage loans.

For purposes of clarification, DBI shall continue to be subject to and comply with the foregoing requirements; it being clearly understood that the foregoing provisions of this Letter Agreement in no way limit the scope of or otherwise affect the aforementioned letter agreement.

In addition, the parties agree that:

   a.  No later than 30 days after the execution of this Letter Agreement, ASRG and DBI agree to provide one another complete data tapes (including, but not limited data related to credit reports, bankruptcy analysis, title information, BPO's, etc)

## CONFIDENTIAL

# Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC, Dreambuilder Investments, LLC and the other parties hereto

and due diligence data of all pools of loans evaluated by them on behalf of the Fund including, but not limited to, those pools that were (i) evaluated but not bid on, (ii) evaluated and bid on but not purchased and (iii) evaluated and purchased. All information shall be provided in SQL compatible formats.

b.  Further, DBI shall maintain the "Portal" and ensure that the data is timely and accurate.  ASRG shall maintain DBI's access to FICS.

## 13. Collateral

The release or transfer of collateral owned by ASRG shall be subject to the approval of ASRG.

No later than thirty days after the execution of this letter DBI will provide a report to ASRG, including all executed contracts, detailing the transfer of collateral into or out of the accounts associated with the Fund or DBI/ASG Coinvestor Fund I, II or III.

## 13. Non Disparagement

Each of DBI, DBI Fund Holdings, Peter Andrews and Gregory Palmer on the one hand and ASGMI, William S. Buchanan and Rick O'Brien on the other hand agree that neither it nor he, as the case may be, shall, directly or indirectly, disparage the other parties or their affiliates or any of their respective direct or indirect equity holders, affiliates, directors, managers, officers, members, employees, agents or representatives, or any of their financial records or operations, or any of their products or practices, either orally or in writing.

14. Each party hereby represents and warrants to the other that, as of the date hereof, (i) it is validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) it has all requisite power and authority to execute, deliver and perform its obligations under this Letter Agreement and (iii) its performance of the Letter Agreement shall not constitute a violation of any judgment, order, or decree or applicable law.

15. Nothing contained herein shall be deemed to cause this Letter Agreement to create an agency, partnership, or joint venture between the parties (except as it relates to Advisors). Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between Advisors, ASGMI and DBI.

16. THIS LETTER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

CONFIDENTIAL

## Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC, Dreambuilder Investments, LLC and the other parties hereto

17. This Letter Agreement (together with the other agreements referred to herein or affected hereby) shall constitute the entire agreement between the parties regarding the matters contemplated hereby and any prior understanding or representation of any kind with respect to the matters contemplated hereby preceding the date of this Letter Agreement shall be superseded hereby to the extent it is inconsistent with the express terms of this Letter Agreement. Except as expressly provided herein, the terms and provisions of each of the other agreements referred to in this Letter Agreement shall remain in full force and effect and shall be binding on each of the parties hereto.

18. Any modification of this Letter Agreement or additional obligation assumed by any party in connection with this Letter Agreement shall be binding only if evidenced in writing signed by each party or an authorized representative of each party.

19. The failure of any party to this Letter Agreement to insist upon the performance of any of the terms and conditions of this Letter, or the waiver of any breach of any of the terms and conditions of this Letter, shall not be construed as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

20. This Letter Agreement shall bind and inure to the benefit of and be enforceable by Advisors, ASGMI, DBI, DBI Fund Holdings and the other parties hereto and their respective successors. This Letter Agreement shall not be assigned, pledged or hypothecated by any party without the prior written consent of the other party. Each party intends that this Agreement shall not benefit, or create any rights or cause of action in or on behalf of, any person or entity other than Advisors, ASGMI, DBI, DBI Fund Holdings and the other parties hereto and their respective successors.

21. This Letter Agreement may be executed in multiple counterparts, all of which taken together shall constitute one single Agreement between the parties. A signature on a copy of this Letter Agreement received by either party by facsimile or portable document format (PDF) is binding upon the other party as an original. The parties shall treat a photocopy of such facsimile as a duplicate original. If this Letter Agreement is executed in counterparts, no signatory hereto shall be bound until all parties hereto have duly executed or caused to be dully executed a counterpart of this Letter Agreement.

(Signature Page Immediately Follows)

## CONFIDENTIAL

## Separation Agreement
### between
### DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,
### Dreambuilder Investments, LLC and the other parties hereto

The undersigned have executed this Letter Agreement as of the date first written above

**DBI/ASG Advisors, LP**
By: American Servicing Group, Inc.
Its General Partner

William S. Buchanan
Vice-President

Accepted and Agreed to as of the date
first set forth above.

**ASG Mortgage Investors,**

**LLC**
By

William S. Buchanan
Vice-President

**Dreambuilder Investment, LLC**
By

Gregory Palmer
President

**DBI Fund Holdings, LLC**
By

Gregory Palmer
President

Confidential                      Page 10                      Confidential
                                                               ASRG00115

## CONFIDENTIAL

### Separation Agreement
**between**
**DBI/ASG Advisors, LP, ASG Mortgage Investors, LLC,**
**Dreambuilder Investments, LLC and the other parties hereto**

_____
Gregory Palmer

_____
Peter Andrews

_____
William S. Buchanan

_____
Rick O'Brien

CONFIDENTIAL

## EXHIBIT A-1
### Form of Indemnity

**Indemnification as a SELLER:**

Seller will indemnify and hold harmless Buyer and its affiliates and each of their respective officers, directors, employees, partners, members, shareholders, agents and representatives (collectively, the "Buyer Indemnified Parties") from and against any loss, claim, liability, damage, cost or expense, or diminution of value, whether or not involving a third-party claim including, without limitation, reasonable fees and disbursements of counsel, incurred by any of the Buyer Indemnified Parties based upon (a) any breach by Seller of any representation, warranty, covenant or agreement contained in this Agreement (regardless of any knowledge qualifications) or in any document delivered in connection herewith, (b) any conduct, action, or inaction of Seller or its predecessors in interest occurring, arising or related to the period on or prior to the Closing Date (whether known or unknown on the Closing Date) or any circumstances related to the ownership or recovery of the Mortgage Loans occurring, arising or related to the period on or prior to the Closing Date (whether known or unknown on the Closing Date) or (c) any conduct, action or inaction of the Interim Servicer which is in breach of any representation, warranty, covenant or agreement contained in this Agreement (provided that such breach was not a result of the Interim Servicer's compliance with written instructions provided by the Buyer during the Interim Servicing Period).

**Indemnification as a BUYER:**

Purchaser shall indemnify, defend and hold harmless Seller and its Representatives from and against any and all costs, damages, disbursements, obligations, penalties, liabilities, losses, expenses, assessments, judgments, settlements or deficiencies (including any interest, penalties, investigation, legal, accounting and other costs and expenses reasonably incurred in the investigation, collection, prosecution and defense of any Action and amounts paid in settlement) actually paid or incurred by Seller and/or its Representatives relating to or arising out of the ownership or servicing of the Loan after the Closing Date, including the Interim Services. Purchaser shall reimburse such Person for all reasonable costs and expenses as they are incurred in investigating, preparing, pursuing or defending any such Action, claim, investigation or proceeding. Purchaser shall promptly notify Seller if a claim is made by a third party with respect to this Agreement or any Loan that may result in any such liability, loss or obligation to Seller or its Representatives and Purchaser shall assume (with the prior Written consent of Seller, not to be unreasonably withheld) the defense of such claim and pay all expenses in connection therewith, including counsel fees, promptly pay, discharge and satisfy any judgment or decree that may be entered against Seller and/or its Representatives in respect of such claim and follow any reasonable Written instructions received from the Seller in connection with such claim. Notwithstanding anything in this Subsection 4.7(e) to the contrary, however, Purchaser shall not be required to indemnify any Person against any damages that shall have resulted from the gross negligence or willful misconduct of such Person or any other Person involved at the Seller's behest in the provision of the Interim Services.

CONFIDENTIAL

## GUARANTEE

For value received, DBI/DBI Residential, LLC ("Guarantor") hereby unconditionally guarantees the full and prompt payment and performance by Dreambuilder Investments, LLC ("Obligor") of any and all losses, costs, expenses, claims, damages, liabilities, obligations and undertakings to {insert name} (individually and collectively the "Beneficiary") under and in connection with that certain Mortgage Loan Purchase and Sale Agreement dated as of {insert date} by and between Obligor and Beneficiary arising from, related to or in connection with any and all actions or inactions of Obligor or any designee of Obligor in any way related to the sale, transfer or ownership of the Mortgage Loans or the servicing, maintenance or ownership of the Mortgage Loans following the Servicing Transfer Date (the "Guaranteed Obligations"). Capitalized terms used but not delivered herein shall have the meanings set forth in the Mortgage Loan Purchase and Sale Agreement.

Guarantor hereby waives any requirement that the Beneficiary take legal action against Obligor before enforcing this guarantee; agrees that its obligations hereunder shall be unconditional, irrespective of the dissolution, liquidation, reorganization or other change regarding the Obligor or the Obligor seeking protection, or having a case or proceeding commenced against it, under any law for the protection of debtors or creditors; waives diligence, presentment, demand for payment or performance, protest of notice or other formality of any kind whatsoever; waives filing of claims with any court in case of the insolvency, reorganization or bankruptcy of the Obligor; and any delay by the Beneficiary in exercising any of its rights hereunder. Guarantor covenants that this guarantee will not be discharged except by full and final payment and performance to the Beneficiary of all Guaranteed Obligations incurred while it is effective and agrees this guarantee shall continue to be effective or be reinstated (as the case may be) if at any time all or part of any payment or interest thereon or other performance by Obligor is avoided or must otherwise be restored by the Beneficiary. Guarantor hereby further consents to any renewal or modification of any Guaranteed Obligation or any extension of the time within which such is to be performed and to any other indulgences whether before or after the date of this Guarantee. The Guarantor hereby makes the following representations and warranties to the Beneficiary:

    (a) It is duly organized and validly existing under the law of the jurisdiction of its incorporation and is in good standing;

    (b) It has the power to execute, deliver and perform its obligations under this Guarantee, and it has taken all necessary action to authorize such execution, delivery and performance;

    (c) Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets; and

## CONFIDENTIAL

(d) Its obligations under this Guarantee constitute its legal, valid and binding obligation, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law).

This Guarantee is a continuing guarantee on the part of the Guarantor and shall inure to the benefit of any successor of the Beneficiary and be binding on any successor or assignee of Guarantor and shall be governed by and construed in accordance with the laws of the State of New York without giving effect to its conflict of laws provisions.

GUARANTOR:

DBI Residential, LLC

By:_____

Name:_____

Title:_____

CONFIDENTIAL

# EXHIBIT I

Individual Discharge   Page 1 of 2

Desc Ch 11

| Information to identify the case: | | |
|---|---|---|
| Debtor 1 | **Stephen Clifton Dreher** | Social Security number or ITIN  xxx-xx-5442 |
| | First Name   Middle Name   Last Name | EIN  __-_____ |
| Debtor 2 (Spouse, if filing) | **Melinda Lee Dreher** | Social Security number or ITIN  xxx-xx-1343 |
| | First Name   Middle Name   Last Name | EIN  __-_____ |
| United States Bankruptcy Court   District of Idaho | | |
| Case number:   10-21037-TLM | | |

## Order of Discharge

12/15

**IT IS ORDERED:** A discharge under 11 U.S.C. § 1141(d)(5) is granted to:

Stephen Clifton Dreher
aka Steve Dreher

Melinda Lee Dreher

<u>2/27/18</u>

**By the court:** <u>Terry L Myers</u>
United States Bankruptcy Judge

---

### Explanation of Bankruptcy Discharge in an Individual Chapter 11 Case

This order does not close or dismiss the case.

**Creditors cannot collect discharged debts**
This order means that no one may make any attempt to collect a discharged debt from the debtors personally. For example, creditors cannot sue, garnish wages, assert a deficiency, or otherwise try to collect from the debtors personally on discharged debts. Creditors cannot contact the debtors by mail, phone, or otherwise in any attempt to collect the debt personally. Creditors who violate this order can be required to pay debtors damages and attorney's fees.

However, a creditor with a lien may enforce a claim against the debtors' property subject to that lien unless the lien was avoided or eliminated. For example, a creditor may have the right to foreclose a home mortgage or repossess an automobile.

This order does not prevent debtors from paying any debt voluntarily. 11 U.S.C. § 524(f).

**Most debts are discharged**
Most debts are covered by the discharge, but not all. Generally, a discharge removes the debtors' personal liability for debts provided for by the chapter 11 plan.

In a case involving community property: Special rules protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.

**Some debts are not discharged**
Examples of debts that are not discharged are:

- ◆ debts that are domestic support obligations;

- ◆ debts for most student loans;

- ◆ debts for most taxes;

- ◆ debts that the bankruptcy court has decided or will decide are not discharged in this bankruptcy case;

  **For more information, see page 2 >**

Form 3180RI   **Individual Chapter 11 Discharge**   page 1

Exhibit D
1 of 4

♦ debts for most fines, penalties, forfeitures, or criminal restitution obligations;

♦ some debts which the debtors did not properly list;

♦ debts for certain types of loans owed to pension, profit sharing, stock bonus, or retirement plans; and

♦ debts for death or personal injury caused by operating a vehicle while intoxicated.

In addition, this discharge does not stop creditors from collecting from anyone else who is also liable on the debt, such as an insurance company or a person who cosigned or guaranteed a loan.

> **This information is only a general summary of an individual chapter 11 discharge; some exceptions exist. Because the law is complicated, you should consult an attorney to determine the exact effect of the discharge in this case.**

Exhibit D
2 of 4

11 Individual Discharge: Notice Recipients    Page 1 of 2
**Notice Recipients**

District/Off: 0976-2              User: arutter              Date Created: 2/27/2018
Case: 10-21037-TLM               Form ID: 3180RI            Total: 108

**Recipients submitted to the BNC (Bankruptcy Noticing Center) without an address:**
cr      Wells Fargo Auto Finance
acc     Bernard Turk
cr      Bank of New York Mellon

                                                                                      TOTAL: 3

**Recipients of Notice of Electronic Filing:**
tr      US Trustee          ustp.region18.bs.ecf@usdoj.gov
aty     David E Eash        davide@feltmanewing.com
aty     David Wayne Newman  ustp.region18.bs.ecf@usdoj.gov
aty     Forrest R Goodrum   fgoodrum@mgslegal.com
aty     Gary W Dyer         gary.w.dyer@usdoj.gov
aty     James K Miersma     jbarrett@mccarthyholthus.com
aty     Kelly Greene McConnell  litigation@givenspursley.com
aty     Kevin C Braley      kbraley@hollandhart.com
aty     Kirk Sterling Cheney  kscheney@hollandhart.com
aty     Lisa McMahon-Myhran  lmcmahon@robinsontait.com
aty     Patrick John Geile  pgeile@foleyfreeman.com
aty     Robin M. Long       Robin@kam13trustee.com
aty     Timothy S Callender  tcallender@ameriben.com

                                                                                      TOTAL: 13

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
db        Stephen Clifton Dreher    PO Box 400      Worley, ID 83876
jdb       Melinda Lee Dreher        PO Box 400      Worley, ID 83876
aty       David Eash      Ewing Anderson      2101 Lakewood Dr #236      Coeur d Alene, ID 83814
cr        Recovery Management Systems Corporation for Capital Recovery      25 SE 2nd Avenue, Suite 1120      Miami, Fl. 33131
cr        The Bank of New York Mellon      Routh Crabtree Olsen, PS      Mark Moburg      13555 SE 36th St      Suite 300      Bellevue, WA 98006
app       Peak Appraisal Service, LLC      1018 S Tanglewood Rd      Post Falls, ID
cr        Deutsche Bank National Trust Company      Routh Crabtree Olsen, P.S.      c/o Lance E. Olsen      13555 SE 36th St.      Suite 300      Bellevue, WA 98006
app       Gregory Wasik      Los Angeles Valuation Group      1154 N Sycamore Ave      Suite 11      Los Angeles, CA 90038
cr        Quantum3 Group LLC as agent for      Galaxy Portfolios LLC      PO Box 788      Kirkland, WA 98083-0788
cr        Select Portfolio Servicing, Inc.      3815 South West Temple      Salt Lake City, UT 84115
cr        Ocwen Loan Servicing, LLC      c/o Robinson Tait, P.S.      710 Second Avenue, Suite 710      Seattle, WA 98104
cr        Real Time Resolutions, Inc.      1349 Empire Central Drive, Suite #150      PO Box 36655      Dallas, TX 75247-4029
cr        Bank of America, N.A.      c/o Givens Pursley LLP      601 W Bannock St      PO Box 2720      Boise, ID 83701
aty       Daniel L Rottinghaus      Berding & Weil, LLP      3240 Stone Valley Rd      Alamo, CA
aty       Iain A Macdonald      Macdonald & Associates      221 Sansome Street      Third Floor      San Francisco, CA 94104
aty       Paul W Windust      Berding & Weil, LLP      3240 Stone Valley Rd      Alamo, CA
ust       Carey A Tompkins      US Trustee      920 West Riverside Ave, Suite 593      Spokane, WA 99201
ust       jfiles1 Office of the U.S. Trustee      Office of the U.S. Trustee      405 E. 8th Avenue      Suite 1100      Eugene, OR 97401
ust       US Trustee      Washington Group Central Plaza      720 Park Blvd, Ste 220      Boise, ID 83712
3631436   ADT Security Systems, Inc      PO Box 371490      Pittsburgh, PA 15250
3631437   AFNI, Inc      PO Box 3517      Bloomington, IL 61702-3517
3631435   Acs/st Ed Ln Mkg Corp      501 Bleecker St      Utica, NY 13501
3631438   Allied Collection Svcs      7120 Hayvenhurst Ave Ste      Van Nuys, CA 91406
3715515   American Express Centurion Bank      c o Becket and Lee LLP      POB 3001      Malvern, PA 19355-0701
3631439   Amex      c/o Beckett Lee      PO Box 3001      Malvern, PA 19355
3631440   Bac Home Loans Servici      450 American St      Simi Valley, CA 93065
3631443   Bank of America      PO Box 15726      Wilmington, DE 19886
3631441   Bank of America      PO Box 787      Post Falls, ID 83877 0787
3631442   Bank of America      c/o Bronson Cawley Bergman      415 Lawrence Bell Drive      Williamsville, NY 14221
4430548   Bank of New York Mellon, f/k/a The Bank      Serviced by Select Portfolio Servicing,      3815 South West Temple      Salt Lake City, UT 84115
3631444   Bishop, White Marshall. P.      Attorneys at Law      720 Olive Way Ste 1301      Seattle, WA 98101-1801
3631445   Cdi Affiliated Service      PO Box 4068      Boise, ID 83711

Exhibit D
3 of 4

| | | | |
|---|---|---|---|
| 3631446 | Creditors Financial Group | PO Box 440290 | Aurora, CO 80044 |
| 3940971 | Deutsche Bank National Trust Company | 13555 SE 36th St., Suite 300 | Bellevue. WA 98006 |
| 4028773 | Deutsche Bank National Trust Company | 13555 SE 36th St.,Suite 300. | Bellevue. WA 98006. |
| 3652357 | Deutsche Bank National Trust Company | c/o McCarthy & Holthus. LLP | 19735 10th Ave NE. Suite N200 Poulsbo. WA 98370 |
| 3639862 | Discover Bank | Dfs Services LLC | PO Box 3025 New Albany, OH 43054--3025 |
| 3631448 | Discover Card | PO Box 3008 | New Albany. OH 43054 |
| 3631449 | Discover Card | PO Box 30395 | Salt Lake City. UT 84130 |
| 3631447 | Discover Card | PO Box 6103 | Carol Stream, IL 60197 |
| 3631450 | Discover Fin | Attention: Bankruptcy Department | Po Box 3025 New Albany, OH 43054 |
| 3631451 | Doolittle Law | PO Box 9385 | Boise, ID 83707 |
| 3631454 | ER Solutions Inc | PO Box 9004 | Renton. WA 98057 |
| 3631452 | Enhanced Recovery Corp | 8014 Bayberry Rd | Jacksonville, FL 32256--7412 |
| 3631453 | Equinox Financial Management | PO Box 455 | Park Ridge, IL 60068 |
| 3685959 | Green Tree Servicing LLC | 7360 S. Kyrene Rd | Recovery Dept T120 Tempe, AZ 85283 |
| 3631455 | Hughes Network | c/o NCO Financial Services | PO Box 15243 Wilmington. DE 19850 |
| 3631456 | IC Systems, Inc | PO Box 64380 | Saint Paul. MN 55164 |
| 3631460 | IndyMac Mortgage Services | PO Box 4045 | Kalamazoo, MI 49003 |
| 3631457 | Indymac Bank | Attn:Bankruptcy | Po Box 4045 Kalamazoo, MI 49003 |
| 3631458 | Indymac Bank | Attn:Bankruptcy | Po Box 4045 Kalamazoo, MI 49003 |
| 3631459 | Indymac Federal Bank | Home Loan Servicing | 6900 Beatrice Drive Kalamazoo, MI 49009 |
| 3631461 | Kootenai County Treasurer | PO Box 6700 | Coeur D Alene, ID 83816 |
| 3631462 | Mortgage Electronic Reg Sys | c/o ReContrust Company | 1800 Tapo Canyon Rd. Simi Valley, CA 93063 |
| 3633776 | NORDSTROM fsb | POB 6566 | ENGLEWOOD CO 80155 |
| 3631463 | National City | PO Box 5570 | Cleveland. OH 44101 |
| 3631465 | National City | 116 Allegheny Center Mall | Pittsburgh. PA 15212 |
| 3631464 | National City | Retail Direct Inbound | 400 W. Crosstown Pkwy Kalamazoo, MI 49001 |
| 3631466 | National Enterprise Systems | 29125 Solon road | Solon. OH 44139--3442 |
| 3631467 | Nordstrom Bank | PO Box 6587 | Englewood, CO 80155 |
| 3631468 | Nordstrom Bank | PO Box 79137 | Phoenix. AZ 85062 |
| 3631469 | Nordstrom FSB | Attention: Bankruptcy Department | Po Box 6566 Englewood, CO 80155 |
| 4431768 | Ocwen Loan Servicing, LLC | Attn: Bankruptcy Department | P.O. Box 24605 West Palm Beach. FL 33416--4605 |
| 3631470 | One West Bank Group, LLC | c/o Faslo Solutions, LLC | PO Box 202166 Dallas. TX 75320 |
| 3944805 | OneWest Bank, FSB | P.O. Box 829009 | Dallas, TX 75382 |
| 3631472 | PNC Bank | PO Box 5570 | Brecksville. OH 44101 |
| 3631471 | Penn Credit Corporation | PO Box 988 | Harrisburg. PA 17108 |
| 3965593 | Quantum3 Group LLC as agent for | Galaxy Portfolios LLC | PO Box 788 Kirkland. WA 98083--0788 |
| 3631475 | RGS Financial | PO Box 852039 | Richardson, TX 75085 |
| 4432730 | Real Time Resolutions. Inc. | 1349 Empire Central Drive, Suite #150 | PO Box 36655 Dallas, Texas 75247--4029 |
| 3631473 | Recontrust Company | 2380 Performance Drive | CA6--914--01--94 Richardson. TX 75082 |
| 3661651 | Recovery Management Systems Corporation | 25 S.E. 2nd Avenue, Suite 1120 | Miami. FL 33131--1605 |
| 3631474 | Regional Trustee Services Co | 616 First Ave #500 | Seattle, WA 98104 |
| 3631476 | Sheryl Johnson | c/o Merchant Realty | PO Box 3842 Cerritos, CA 90703--3842 |
| 3727566 | THE BANK OF NEW YORK MELLON | 400 National Way | Mail Stop: CA6--919--01--23 Simi Valley. CA 93065 |
| 3738460 | THE BANK OF NEW YORK MELLON | 400 National Way | Mail Stop: CA6--919--01--23 Simi Valley. CA 93065 |
| 3631477 | Tate Kirlin Associates | 2810 Southampton Road | Philadelphia, PA 19154 |
| 3631478 | The CBE Group. Inc | PO Box 2594 | Waterloo. IA 50704 |
| 3631479 | Union Bank Trust | Po Box 82535 | Lincoln. NE 68501 |
| 3631480 | Usa Servicing Company | Attn: Bankruptcy Unit | Po Box 9400 Wilkes Barre. PA 18773 |
| 3650130 | Valley Empire Collection | 11707 E Montgomery | Spokane WA 99206 |
| 3631481 | Verizon | c/o AFNI Inc | 1310 Martin Luther King Drive Bloomington, IL 61702 |
| 3631482 | Verizon Communications--RPC | 11313 N Sepulveda | Mission Hills. CA 91345 |
| 3631483 | Verizon Northwest | PO Box 9688 | Mission Hills. CA 91346 |
| 3631484 | Verizon Northwest | PO Box 9688 | Mission Hills. CA 91346 |
| 3707341 | Verizon Wireless | PO BOX 3397 | Bloomington, IL 61702 |
| 3631485 | Verizon Wireless | PO Box 9622 | Mission Hills. CA 91346 |
| 3631486 | Vly Emp Coll | 11707 E Montgomery | Spokane. WA 99206 |
| 3647621 | Wells Fargo Auto Finance | 13675 Technology Dr. Bldg C, 2nd Floor | Eden Prairie. MN 55344 |
| 3631487 | West Asset Purchasing | 101 Convention Center St | Las Vegas, NV 89109 |
| 3707343 | West Asset Purchasing, LLC | c/o B-Line, LLC | MS 550 PO Box 91121 Seattle, WA 98111--9221 |
| 3631488 | Wffinancial | Po Box 7648 | Boise, ID 83707 |

TOTAL: 92

Exhibit D 4 of 4

# EXHIBIT J

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


STEPHEN AND MELINDA DREHER,        )
                                   )
            Plaintiffs,            )
                                   )
      vs.                          )  Case No.
                                   )  2:18-cv-07827-MWF-FFM
PNC BANK N.A., a Pennsylvania )
Corporation, successor by          )
merger to/with National City       )
Bank; DREAMBUILDER                 )
INVESTMENTS, LLC, A New York       )
limited liability company;         )
AMERICAN SERVICING AND             )
RECOVERY GROUP, LLC, a Texas       )
limited liability company; and)
DOES 1-50,                         )
                                   )
            Defendants.            )
_____)


VIDEOCONFERENCE DEPOSITION OF PETER JOSEPH ANDREWS

VOLUME I

Taken on Thursday, January 13, 2022, at 9:35 a.m.


REPORTED BY:

NICOLE JOHNSON

CSR No. 13030

1   nonresponsive to your questions, but I can tell you

2   generally what the relationships were.

3          But then if you're asking me about specific LLCs

4   or specific entities, I would not be the person to ask

5   those questions to.  And again, I'm happy to try to answer

6   them, but I just don't want to give you -- mislead you in

7   terms of, you know, my knowledge.

8       Q.   Okay.  That's very good.  We do not want you to

9   give us any incorrect information.

10      A.   Okay.  I went on a tangent.  Do you feel like,

11  Helen, I gave you the answer that you asked?  Or do you

12  want me to repeat my answer?

13      Q.   I think whatever answer is your best answer and

14  your honest answer, that's really what we expect or what I

15  expect.

16      A.   Yeah.  So generally speaking, DBI and ASG were

17  joint venture partners to buy assets.  My understanding or

18  belief is, to the best of my recollection, that DBI/ASG

19  Mortgage Acquisition Fund I, LP, was used in -- as part of

20  that partnership.

21      Q.   Okay.  Now, in terms of Dreambuilder's role with

22  respect to this purchase agreement between PNC and ASRG,

23  can you just explain to me what Dreambuilder's role was?

24      A.   Dreambuilder handled all of the acquisition

25  aspects in terms of negotiations.  And then also handled a

30

1   large part of the operations.  So the front office side of

2   it -- you know, again, the acquisition part of it was

3   primarily handled by Dreambuilder Investments.  The

4   operations part of it was a mix of responsibilities

5   between Dreambuilder and ASRG and then also various

6   vendors.

7           And then the funding aspect of it was primarily

8   handled by ASRG or ASG, with DBI, you know, providing some

9   of the funds, but the minority of the funds.

10      **Q.    So did Dreambuilder have authority from ASRG to,**

11  **you know, acquire the loans for ASRG from PNC?**

12      A.    Yes.  That's what you're seeing with Greg's

13  signature and also seeing with the guarantor from the ASG

14  side.

15      **Q.    Okay.  So did Dreambuilder negotiate the price**

16  **of the sale?  Did it -- I'm sorry.  Did it negotiate the**

17  **price of the sale?**

18      A.    It did.

19      **Q.    Did it negotiate logistical aspects, like**

20  **execution of assignments and mailing of notices of sale?**

21      A.    It would have negotiated the contracts, which

22  would have specified those logistical requirements.  The

23  execution of those requirements may or may not have been

24  handled by DBI.  It would have -- you know, depending on

25  the execution, it would have been handled by ASRG, DBI, or

31



1    one of its vendors.

2        Q.    Okay.  Do you have any documentation showing

3    that ASRG authorized Dreambuilder to negotiate the sale of

4    the loan from PNC to ASRG?

5        A.    It's in front of you.  I mean, the signed -- I'm

6    confused by the question.  Right?  So the signing of the

7    documents, DBI -- the documents were signed by Greg

8    Palmer, Rick O'Brien.  So they're the principals of both

9    DBI and ASRG.

10       Q.    So then within this negotiation of the purchase

11   contract between ASRG and PNC, Dreambuilder had authority

12   to communicate with PNC on behalf of ASRG?

13       A.    Correct.  That was its primary function as far

14   as the joint venture, was the acquisition requirement --

15   or the handling of the acquisition aspects of any

16   nonperforming mortgage purchases.

17       Q.    So did Dreambuilder have authority from ASRG to

18   also communicate with PNC and negotiate the preparation of

19   goodbye letters?

20       A.    Again, now you're moving into the area of the

21   business that I wasn't directly involved in.  The answer

22   to the question of authority was DBI and ASRG were joint

23   venture operating partners.  So there wasn't -- you know,

24   the question of authority was laid out in the joint

25   venture itself.  And DBI then had authority to handle the

1    PNC Dreher 000277.  And it talks about -- actually, I have

2    the wrong page, I apologize.

3         I'm going to page PNC Dreher 000282.  And you'll

4    see in -- this is supposed to be addressing the execution

5    of the assignments in sub ii.

6    A.   I see it.

7    Q.   It would be section 2.2, B, little ii.  And it

8    says, "No later than 45 calendar days after the closing

9    date, seller shall deliver to purchaser any assignments of

10   mortgage to blank."  So in essence, what I represented to

11   you was that this agreement requires the assignments to be

12   prepared in blank.  Like you testified, you have no reason

13   to dispute that what the agreement says is what the

14   obligations were.

15        So without, you know, prolonging this more than

16   necessary, I'll also represent to you that the ASRG and

17   U.S. Bank agreement requires also the preparation of blank

18   assignments.

19        So in terms of preparation of assignments --

20   now, you may not know, and that's okay, but I'm going to

21   ask nonetheless, and you can just tell me.

22        Is it your understanding that, in these bulk

23   loan sale transactions, the assignments are generally

24   executed in blank?

25   A.   Yeah.  So two things before I answer that.  I

51

1    want to just point out that that little ii also states

2    that -- it says, "... to blank provided that, in the event

3    a recorder's office does not accept such assignment of

4    mortgage solely due to its form, upon transmission of such

5    rejected assignment of mortgage to seller, seller shall

6    promptly resubmit an assignment of mortgage to purchaser."

7          So what that effectively is saying is that if

8    for some reason the assignment's form is not acceptable to

9    the county recorder, then the seller -- in this case,

10   PNC -- would basically re-create the assignment.  I don't

11   know if that happened in this case, but I just want to

12   make sure that there is -- you know, to make sure that we

13   have a complete understanding of how the assignments were

14   handled.

15   Q.    Okay.

16   A.    As far as your specific question -- was that

17   industry practice or what have you -- at the time, 2010,

18   it was.  That subsequently has changed.  Assignment of

19   mornings were regularly transferred to blank and, you

20   know, I don't know exactly when, but at some point that

21   became something that was not --

22          (Technical difficulties.)

23   A.    So what I was saying is that -- so industry

24   practice was assignment of mortgages to blank was

25   something that was regularly done.  Somewhere along the

52

1    line when the county recorder's offices started to change

2    their policies, that changed.

3            My recollection during 2010 was that it was not

4    atypical for transactions to be done this way.  It wasn't

5    the only way transactions were done, but it's not

6    surprising to see that the contract says assignments of

7    mortgage to blank.  That's not unusual.

8        Q.   Okay.  So just to clarify, your testimony is

9    clear, but it's not too clear -- I think maybe it's

10   because you froze -- in terms of time frame.

11       A.   Sure.

12       Q.   So are you saying -- I think this is what I

13   heard you say, but just please confirm -- that in 2010,

14   when the Dreher loan and other pool of loans were sold

15   from PNC to ASRG, it was the industry practice for the

16   assignments of mortgage to be prepared in blank; is that

17   correct?

18       A.   What I'm saying specifically is that that wasn't

19   unusual.  I would say -- you know, I just don't want to

20   get caught up in the terminology of industry practice, but

21   it was a standard practice.  The two standards ways you

22   would typically -- or three, I would say -- is you would

23   either do an assignment of mortgage to blank, you would do

24   an assignment of mortgage to a specific entity, or you

25   would do an assignment of mortgage via MERS.  And those

53



1   were my recollection and understanding of the industry

2   practice in 2010.

3          So the way that these assignments were

4   transferred is not in any way unusual or surprising.

5          **Q.   Okay.  Very good.  So as you saw, the purchase**

6   **agreement between PNC and ASRG requires PNC to prepare**

7   **blank assignments of mortgage.  Do you have any reason to**

8   **dispute that the assignment of mortgage that PNC prepared**

9   **for these loans were not in blank?**

10         A.   No, I would -- as I said to you previously,

11   typically, unless there was something unusual that

12   happened, the way that the contract laid out the transfer

13   process was what was typically followed, you know, 80 to

14   90 percent of the time with, you know, some exceptions.

15   Every one of these transactions had exceptions to them.

16   But the vast majority of loans would have been transferred

17   with assignments to blank.  Because that's what the

18   contract stipulated to.

19         **Q.   Now, in terms of the agreement between ASRG and**

20   **PNC for the sale of the loans, do you have any reason to**

21   **believe that Dreambuilder instructed PNC not to prepare**

22   **blank assignments?**

23         A.   No.  And again, unless there was an exception,

24   there would be no reason for us to instruct them to do

25   otherwise.

54

# EXHIBIT K

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

STEPHEN AND MELINDA DREHER,        )
                                   )
                Plaintiff,         )
                                   )
                                   )
           VS.                     ) Case No.:
                                   ) 2:18-cv-07827-MWF-FFM
                                   )
PNC BANK, N.C., a Pennsylvania     )
corporation, et al.,               )
                                   )
                Defendant.         )
_____)

DEPOSITION OF

PETER JOSEPH ANDREWS

CONDUCTED VIA VIDEOCONFERENCE

Wednesday, January 19, 2022

REPORTED BY:
Kyle Miller
CSR No. 13282

161

1     A.    I don't, sir.  I can tell you that I haven't

2   really been actively trading.  So if I had to guess, it

3   was in -- sometime before 2017.  So why don't we say, if

4   I had to guess, between 2015 and 2017 would be my best

10:40:21   5   recollection.

6         Q.    Okay.  And did that have anything to do --

7   **did the change in practice have anything to do with**

8   **title companies?**

9         A.    I don't know, sir.  I think, if anything, it

10:40:41   10   had to do with the recorders' offices more than title

11   companies.  But I don't -- I don't have a real good

12   sense of the reason as to why that change in practice

13   was.  I do know around that time there just began to be

14   a lot of concern around chain of ownership.  And so I

10:41:04   15   think people just started to be more concerned about

16   making sure that chain of ownership was being

17   transferred, you know, in very kind of -- with a very

18   higher degree of clarity, for lack of a better term.

19         Q.    Right.

10:41:26   20         **And you said in the 2010 era the assignments**

21   **were either transferred in blank, the specific entity**

22   **was written into the assignment, or it was transferred**

23   **through MERS.**

24         **Do you remember that?**

10:41:45   25         A.    I do recall that, yes.  And that is correct.

1    And as I testified to you previously, I have no reason

2    to question the validity of that document.  And that

3    would give you the time frame of when it was sent.

4         Q.   Okay.  Thank you.

12:16:38  5         And then, also, Mr. Andrews, last week we

6    reviewed the -- like you said, the documents showing

7    that Mr. Palmer, on behalf of DBI, requested that RMG

8    record the -- assign the deed of trust for the Dreher

9    loan.

12:16:57  10        Do you recall that?

11        A.   I do recall, yes.

12        Q.   Okay.  Well, do you have any knowledge as to

13   whether PNC was involved with the recordation of the

14   assignment of the deed of trust for the Dreher loan?

12:17:09  15        A.   If I understand your question, are you asking

16   me, was PNC involved in the recordation of RMG's

17   recording of the assignment?  Is that your question?

18        Q.   Right.

19             To your knowledge, are you aware of whether

12:17:22  20   PNC was involved with RMG's recordation of the

21   assignment of deed of trust in 2017?

22        A.   Yeah.  By that point, if the -- if the deed

23   of trust was recorded in 2017 -- and it sounds like

24   that's what you're saying.  So I guess I'd answer the

12:17:40  25   question two ways.  One, I don't have any recollection

217

1  or knowledge that PNC was involved.  Right?  I have no

2  memory of that whatsoever.

3         And then two, by this point we, DBI -- you

4  know, and when I say that, you know, I'm using the term

5  loosely of all the various entities -- didn't have a lot

6  of involvement with PNC by that point.  There would be

7  periodic involvement in terms of -- from portfolio

8  administration standpoint.  But it's unlikely, in my

9  opinion, that PNC would have been involved in the

10  recordation of the assignment.  That would have been

11  something that would have been handled by the portfolio

12  administration team, you know, run by Greg and by RMG.

13         I don't think -- I don't see any reason why

14  PNC would be involved unless there was a problem with

15  recording the assignment and RMG had to go back to PNC

16  to get some -- you know, a new document or things like

17  that.  That does happen periodically.  I have no

18  knowledge of that happening in this particular case.

19     **Q.   Okay.  Now, during the last deposition, we**

20  **also reviewed the sale agreement from ASRG to U.S. Bank.**

21  **And I think we discussed that during that transaction**

22  **Green Tree was servicing the pool of loans including the**

23  **Dreher loan.**

24         **Did Dreambuilder have any communications with**

25  **Green Tree with respect to the Dreher loan?**

218

# EXHIBIT L



**CONFIDENTIAL**

**EXECUTION VERSION**

## "NON-PERFORMING" LOAN PURCHASE AND INTERIM SERVICING AGREEMENT

Between

**PNC BANK, NATIONAL ASSOCIATION,**
Seller and Interim Servicer
and

**AMERICAN SERVICING AND RECOVERY GROUP, LLC,**
Purchaser

Dated as of July 30, 2010

"Non-Performing" Loans

**PNC Dreher 000273**



CONFIDENTIAL

## TABLE OF CONTENTS

Page

### ARTICLE 1
### DEFINITIONS

| Section 1.1 | Certain Definitions | 1 |
| Section 1.2 | Other Terms | 5 |

### ARTICLE 2
### SALE AND CONVEYANCE OF LOANS.

| Section 2.1 | Sale and Conveyance of Loans; Payment of Aggregate Purchase Price | 6 |
| Section 2.2 | Closing and Subsequent Deliveries; Post-Closing Adjustment | 6 |
| Section 2.3 | Recordation of Assignments of Mortgage | 7 |
| Section 2.4 | Representations and Warranties for a Loan | 7 |
| Section 2.5 | Remedy for Breach of Loan Representation and Warranty | 9 |
| Section 2.6 | Record Retention | 11 |

### ARTICLE 3
### REPRESENTATIONS AND WARRANTIES AS TO EACH PARTY.

| Section 3.1 | Representations and Warranties as to Seller | 12 |
| Section 3.2 | Representations and Warranties as to Purchaser | 13 |

### ARTICLE 4
### INTERIM SERVICING.

| Section 4.1 | General | 14 |
| Section 4.2 | Appointment | 14 |
| Section 4.3 | Interim Services | 14 |
| Section 4.4 | Reimbursement of Out-of-Pocket Expenses | 16 |
| Section 4.5 | Withdrawals from Custodial Account | 16 |
| Section 4.6 | Reporting | 17 |
| Section 4.7 | Transfer of Servicing; Limitation of Liability; Indemnification | 17 |
| Section 4.8 | Confidential Information | 19 |

### ARTICLE 5
### MISCELLANEOUS.

| Section 5.1 | Notices | 20 |
| Section 5.2 | Severability | 21 |
| Section 5.3 | Governing Law; Waiver Of Trial By Jury | 21 |
| Section 5.4 | Jurisdiction | 21 |
| Section 5.5 | Successors and Assigns | 21 |
| Section 5.6 | Waivers | 22 |
| Section 5.7 | Exhibits and Schedules | 22 |
| Section 5.8 | General Interpretive Principles | 22 |
| Section 5.9 | Reproduction of Documents | 22 |
| Section 5.10 | No Third Party Beneficiary | 22 |
| Section 5.11 | Further Agreements | 23 |

i

PNC Dreher 000274

**CONFIDENTIAL**

| Section 5.12 | Entire Agreement | 23 |
| Section 5.13 | Amendment | 23 |
| Section 5.14 | Effect of Headings | 23 |
| Section 5.15 | Media Releases | 23 |
| Section 5.16 | Relationship of Parties | 23 |
| Section 5.17 | Expenses | 23 |
| Section 5.18 | Tax Treatment | 23 |
| Section 5.19 | Counterparts | 23 |

## EXHIBITS

EXHIBIT A-Form Of Assignment And Conveyance ................................................. A-1

EXHIBIT B-Form Of Lost Note Affidavit ............................................................... B-1

## SCHEDULES

SCHEDULE A Closing Loan Schedule ................................................................ SA-1

SCHEDULE B Purchaser's And Seller's Relationship Managers ............................ SB-1

SCHEDULE C Data Fields ............................................................................... SC-1

SCHEDULE 5.1-Addresses Of The Parties Pursuant To Subsection 5.1 (*Notices*) .............. S5.5-1

**PNC Dreher 000275**



## "NON-PERFORMING" LOAN PURCHASE
## AND INTERIM SERVICING AGREEMENT

This "NON-PERFORMING" LOAN PURCHASE AND INTERIM SERVICING AGREEMENT (this "**Agreement**") dated as of July 30, 2010 is made by and between PNC BANK, NATIONAL ASSOCIATION, a national banking association ("**Seller**" and "**Interim Servicer**") and AMERICAN SERVICING AND RECOVERY GROUP, LLC, a limited liability company organized under the laws of the State of Delaware ("**Purchaser**" and "**Successor Servicer**"). Seller and Purchaser are sometimes referred to herein together as the "**Parties**" and each as a "**Party**".

### RECITALS

A.      Seller is the owner of the non-performing loans (each, a "Loan" and collectively, the "Loans") identified on the Closing Loan Schedule (as defined below).

B.      Seller desires to sell to Purchaser and Purchaser desires to purchase from Seller its rights, title and interests in the Loans, including the Servicing Rights (as defined below) under the express terms, provisions, conditions and limitations as set forth in this Agreement (the "Transaction").

C.      The Purchaser desires to retain the Seller as servicer of such Loans during the Interim Servicing Period (as defined below).

**NOW, THEREFORE**, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1

### DEFINITIONS

Section 1.1      Certain Definitions.   In addition to the other capitalized terms specifically defined herein, for the purposes of this Agreement, the following capitalized terms shall mean the following:

(a)      **Action**.  Any claim, action, suit, proceeding or investigation by or before any Governmental Authority.

(b)      **Aggregate Purchase Price**.  The sum of each Purchase Price for all of the Loans.

(c)      **Affiliate**.  With respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management

**PNC Dreher 000276**



and policies of such Person. whether through the ownership of voting securities. by contract or otherwise.

       (d)    ***Assignment of Mortgage.***  An assignment of a Mortgage. notice of transfer or equivalent instrument in recordable form, which, when completed with the name and other information identifying the assignee. will reflect the transfer of the Mortgage to the assignee named therein.

       (e)    ***Borrower.***  The obligor(s) of a Loan.

       (f)    ***Business Day.***  Any day other than (1) a Saturday or Sunday or (2) a day on which banking and savings and loan institutions in the State of Ohio or the State of New York are authorized or obligated by law or executive order to be closed.

       (g)    ***Charge-off Date.***  The date Seller charged-off the Loan. as reflected on Seller's servicing system.

       (h)    ***Charge-off Date Balance.***  As to a Loan, an amount equal to the sum of the following. as reflected on Seller's servicing system as of the Charge-off Date for the Loan: (A) unpaid principal balance. plus (B) accrued unpaid interest, plus (iii) accrued unpaid fees charged to the Loan.

       (i)    ***Closing.***  The consummation of the sale of the Loans by Seller to Purchaser as provided in this Agreement. which shall occur contemporaneously with the execution of this Agreement subject to the terms hereof.

       (j)    ***Closing Date.***  The date of this Agreement.

       (k)    ***Closing Loan Schedule.***  The schedule, attached hereto as <u>Schedule A</u>, that identifies each Loan and its corresponding (i) Purchase Price Percentage, (ii) Cut-Off Date Balance. (iii) Purchase Price, (iv) the Charge-off Date, (v) the Charge-off Date Balance, (F) the unpaid principal balance at the Charge-off date, (vi) the accrued but unpaid interest at the Charge-off Date, (vii) any unpaid fees at the Charge-off Date. (viii) the date of the last payment posted on Seller's RMS system, (ix) the sum of all payments posted to the Loan from the Charge-off Date to the Cut-Off Date, and (x) priority.

       (l)    ***Collateral Loan File.***  A file that contains: (i) either the original Mortgage or an imaged copy of the Mortgage. certified by Seller to be a true and complete copy of the original Mortgage and (ii) either the original Note or a Lost Note Affidavit and an imaged copy of the Note certified by Seller to be a true and complete copy of the original Note. The original or imaged copy of the Note shall be endorsed. including on an allonge, to "blank", without recourse.

       (m)    ***Confidential Information***  All information relating to the Transaction, (whether in written. oral or graphic form, electronically stored or otherwise) that is confidential or otherwise not generally available to the public to the extent related to the terms of this Agreement, including Customer Information, except to the extent (i) in the public domain through no fault of a receiving Party or its Representatives in breach of this Agreement, (ii) later

PNC Dreher 000277



lawfully acquired by the receiving Party or its Affiliates or Representatives from sources other than the disclosing Party or its Affiliates, or (iii) the disclosing Party agrees in advance in writing does not constitute Confidential Information.

(n)     ***Custodial Account***.   The deposit account or accounts, which may be interest bearing, created and maintained by Interim Servicer with the Qualified Depository, into which Interim Servicer deposits Custodial Funds collected and received by the Interim Servicer for a Loan as contemplated by <u>Subsection 4.3</u> below (*Interim Services*).

(o)     ***Custodial Funds***.   As to a Loan, the sum of (i) any and all payments of (A) principal and interest (including any balloon payment) for the Loan, (B) any and all awards, compensation and settlements in respect of the taking of all or a part of the Mortgage Property of the Loan, each of which is collected by Interim Servicer and deposited into the Custodial Account during the Interim Servicing Period for the Loan and (ii) any interest earned on the deposits described in clause (i) of this definition.

(p)     ***Customer Information***.   Any and all personal information relating to a Borrower, including addresses, telephone numbers, e-mail addresses, credit scores and social security numbers, and all nonpublic personal information related to a Borrower and protected by applicable federal or state privacy laws and regulations, including the Gramm-Leach Bliley Act and its implementing regulations.

(q)     ***Cut-off Date***.   July 29, 2010.

(r)     ***Cut-off Date Balance***.   As to a Loan, an amount equal to the following, as reflected on Seller's servicing system as of the Cut-off Date for the Loan:   (i) the Charge-off Balance for the Loan <u>minus</u> (ii) the sum of all payments posted to the Loan from the Charge-off Date to the Cut-off Date.

(s)     ***Governmental Authority***.   Any federal, state, local or foreign government (including any political or other subdivision or judicial, legislative, executive or administrative branch, agency, commission, authority or other body of any of the foregoing).

(t)     ***Guidelines***.   Collectively, the Interagency Guidelines Establishing Standards for Safeguarding Customer Information published in final form on February 1, 2001, 66 Fed. Reg. 8616, and the rules promulgated thereunder, as amended from time to time the Interagency Guidance on Response Programs for Unauthorized Access to Customer Information and Customer Notice issued in March 2005.

(u)     ***Interim Servicing File***.   The information of a Loan (whether in physical form or System Records) in Interim Servicer's actual possession that documents the Interim Servicing of the Loans during the related Interim Servicing Period.

(v)     ***Interim Servicing Period***.   A period commencing on the Closing Date expiring on the Servicing Transfer Date.

(w)     ***Loan File***.   The following: (i) electronic images evidencing the origination of the Loan and the servicing notes relating to the Loan for the period prior to the

**PNC Dreher 000278**



Closing Date, that does not include the Loan's payment history, and (ii) to the extent in the Seller's actual possession in its warehouse location in Miamisburg, Ohio as of the Closing Date, documents evidencing the origination of the Loan.

(x)     ***Lost Note Affidavit***.  With respect to any Loan as to which the original Note is not in the Seller's actual possession on the Closing Date, an affidavit from the Seller in the form of Exhibit B attached hereto, certifying that the original Note cannot be located, together with an imaged copy of the related Note.

(y)     ***Mortgage***.  A mortgage, deed of trust, deed to secure debt, trust deed or other instrument creating a first or junior lien on real property including any riders, addenda, assumption agreements, or modifications relating thereto.

(z)     ***Mortgaged Property***.  The underlying real property securing a Note pursuant to the related Mortgage.

(aa)     ***Note***.  The note, credit agreement or other evidence of the indebtedness of a Borrower, including any riders, addenda, assumption agreements, or modifications relating thereto.

(bb)     ***Person***.  Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

(cc)     ***Purchase Price***.  With respect to each Loan, the product of (i) the unpaid principal balance of the Loan at the Cut-off Date, multiplied by (ii) the Purchase Price Percentage for the Loan.

(dd)     ***Purchase Price Percentage***.  With respect to each Loan, the amount specified as the "***Purchase Price Percentage***" in the Closing Loan Schedule.

(ee)     ***Qualified Depository***.  PNC Bank, National Association, a national banking association.

(ff)     ***Relationship Manager***.  A Person designated by either the Purchaser or Seller as a Relationship Manager on Schedule C attached to this Agreement who will provide or receive notification, as the context so requires, of any action described in Subsection 4.3 (*Interim Services*) on behalf of either the Purchaser or the Seller with respect to the interim servicing of the Loan during the Interim Servicing Period.

(gg)     ***Representative***.  With respect to a Party hereto, such Party's officer, director, employee, accountant, counsel, consultant, advisor, representative or agent.

(hh)     ***Repurchase Price***.  With respect to a Repurchased Loan, an amount equal to the Purchase Price for the Loan less any payments of principal received with respect to such Loan by the Purchaser since the Cut-Off Date and any unpaid Interim Servicer costs and expenses with respect to such Loan.

4

PNC Dreher 000279



(ii) **Repurchased Loan.** A Loan subject to be purchased pursuant to <u>Subsection 2.5</u> (Remedy for Breach of Loan Representation and Warranty).

(jj) **Servicing Rights.** All rights to service a Loan.

(kk) **Servicing Transfer Date.** September 1, 2010.

(ll) **System Records.** The accounting information, reports, records, statements and data of a Loan regularly maintained by Interim Servicer during the Interim Servicing Period for the Loan, on electronic information and accounting systems or electronic storage media, separately specifying or accounting for the Loan.

(mm) **Written or Writing.** Unless another method of transmission is required by this Agreement, a communication that is transmitted by electronic mail, overnight courier, or U.S. Mail to the Person identified in the applicable section of this Agreement; <u>provided, however,</u> that any Written communication from or to a Relationship Manager under this Agreement shall be transmitted by facsimile or electronic mail.

Section 1.2    <u>Other Terms.</u> The following terms shall have the meanings defined in the Section indicated:

| | |
|---|---|
| Aggregate Purchase Price Exception Threshold | Subsection 2.2(c) |
| Agreement | Preamble |
| Collateral Loan File Deficiency | Subsection 2.2(c) |
| Collateral Loan File Deficiency Cure Period | Subsection 2.2(c) |
| Collateral Loan File Deficiency Notice | Subsection 2.2(c) |
| Cure Period | Subsection 2.5(b)(v) |
| Discovered Cut-off Date Balance | Subsection 2.2(d)(i) |
| Dispute Resolution Period | Subsection 2.2(d)(iii) |
| General Enforceability Exceptions | Subsection 3.1(b) |
| Interim Servicer | Preamble |
| Interim Services | Subsection 4.3 |
| Loan | Recital A |
| Party or Parties | Preamble |
| Purchase Price Adjustment | Subsection 2.2(d)(i) |
| Purchase Price Adjustment Schedule | Subsection 2.2(d)(ii) |
| Purchase Price Exception Threshold | Subsection 2.2(d)(i) |
| Purchaser | Preamble |
| Repurchase Claim | Subsection 2.5(b)(i) |
| Repurchase Claim Review Period | Subsection 2.5(b)(ii) |
| Repurchase Date | Subsection 2.5(c)(i) |
| Repurchase Loan File | Subsection 2.5(c)(ii) |
| Repurchase Objection Notice | Subsection 2.5(b)(ii) |
| Repurchase Period | Subsection 2.4(c) |
| Review Period | Subsection 2.2(d)(ii) |
| Seller | Preamble |
| Seller's Objection Notice | Subsection 2.2(d)(ii) |
| Successor Servicer | Preamble |
| Transaction | Recital B |

**PNC Dreher 000280**



## ARTICLE 2

### SALE AND CONVEYANCE OF LOANS.

Section 2.1 <u>Sale and Conveyance of Loans; Payment of Aggregate Purchase Price</u>. Subject to the terms hereof, (a) the Seller hereby sells, conveys and transfers to Purchaser, without recourse (except as otherwise provided in this Agreement) on a servicing-released basis (except for the Interim Servicing Period as provided herein), and Purchaser hereby purchases from Seller, with respect to each Loan, all of Seller's right, title and interest in, to and under (i) the Note, (ii) the Mortgage, (iii) any flood insurance policy for the Loan, (iv) the Collateral Loan File, (v) the Loan File, (vi) the Servicing Rights (other than the right to perform the Interim Services), (vii) all insurance proceeds related to the Loan and liquidation proceeds arising after the Cut-Off Date with respect to the Mortgaged Property, (viii) all payments of principal and interest received after the Cut-Off Date, (ix) all fees or other amounts owing under the Loan received after the Cut-Off Date, and (x) the Interim Servicing File, and (b) Purchaser hereby assumes and agrees to perform and discharge any and all obligations of Seller with respect to each Loan arising on or after the Closing Date. Purchaser acknowledges and agrees that Seller makes no representation or warranty, express or implied, as to any Loan, each of which is sold on an "AS IS" basis without recourse and with all faults, without any obligation on the part of Seller except as expressly provided in Subsection 2.4 (*Representations and Warranties for a Loan*).

 Notwithstanding anything herein to the contrary, in no event shall the conveyance include any Loans which were discharged in bankruptcy prior to the Closing and any such Loans shall not be sold or transferred to the Purchaser. Seller shall immediately notify the Purchaser upon becoming aware that any such Loan was included on the Closing Loan Schedule. Any such Loans shall be removed from the Closing Loan Schedule and the Aggregate Purchase Price shall be reduced by the Purchase Price attributable to any such Loans.

Section 2.2 <u>Closing and Subsequent Deliveries; Post-Closing Adjustment.</u>

 (a) <u>Closing Deliveries</u>. Purchaser acknowledges delivery of the following on the Closing Date:

 (i) The Assignment and Conveyance of the Loans in the form of <u>Exhibit A</u> attached hereto;

 (ii) The Closing Loan Schedule;

 (iii) Purchaser shall pay to Seller the Aggregate Purchase Price for the Loans as provided in <u>Subsection 2.1</u> above (*Sale and Conveyance of Loans; Payment of Aggregate Purchase Price*).

PNC Dreher 000281



(b)     Post-Closing Deliveries.  Seller shall deliver to Purchaser the following on the date(s) set forth in this Subsection:

(i)     Seller shall deliver to Purchaser, by overnight courier, the Collateral Loan Files and Loan Files (A) for each Loan identified as "high" priority on the Closing Loan Schedule, no later than thirty (30) calendar days after the Closing Date, and (B) for all other Loans, no later than sixty (60) calendar days after the Closing Date. Notwithstanding the foregoing, the Interim Servicer may keep a copy of the Collateral Loan Files, or any portion thereof, during the Interim Servicing Period, and provided further, that after the Interim Servicing Period, Seller shall destroy any copy of the Collateral Loan File or Loan File, provided that it may maintain an imaged copy of documents required to be maintained by law; and

(ii)     No later than forty-five (45) calendar days after the Closing Date, Seller shall deliver to Purchaser any Assignments of Mortgage, to "blank" provided that, in the event that a recorder's office does not accept such Assignment of Mortgage solely due to its form, upon transmission of such rejected Assignment of Mortgage to Seller, Seller shall promptly resubmit an Assignment of Mortgage to Purchaser.

(c)     Exclusive Remedy for Collateral Loan File Deficiency.  In the event that Seller fails to deliver the Collateral Loan File for the Loan within the time period provided in Subsection 2.2(b)(i) above (*Post-Closing Deliveries*), Purchaser must promptly notify Seller in Writing (such failure, a "***Collateral Loan File Deficiency***" and such notice, a "***Collateral Loan File Deficiency Notice***").  Seller shall have the right to cure such Collateral Loan File Deficiency by providing the original or imaged copy, or, with respect to a Collateral Loan File Deficiency that is a missing original or imaged copy of the Mortgage, by providing Written notice of the Mortgage's recording information (Recorder's Office, Deed Book Volume and Page or Instrument Number), as applicable, within thirty (30) days after receipt of such Collateral Loan File Deficiency Notice, which period may be extended at the sole option of Purchaser, as long as Seller is diligently pursuing cure (the "***Collateral Loan File Deficiency Cure Period***").  If Seller provides the related document or recording information for a Mortgage within the Collateral File Deficiency Cure Period, the related Loan shall not be subject to repurchase pursuant to the Collateral Loan File Deficiency.  If Seller is unable to cure the Collateral Loan File Deficiency by providing the related document within the Collateral Loan File Deficiency Cure Period, the Loan shall be deemed a "Repurchased Loan", whereupon the provisions of Subsection 2.5(c) below (*Repurchase Closing Procedures*) shall apply.  Purchaser shall not be able to assert any remedy for the Collateral Loan File Deficiency after the expiration of ninety (90) days after the date the Collateral Loan Files are delivered to Purchaser.  Notwithstanding any contrary provision in this Agreement, Purchaser acknowledges and agrees that the only remedy it shall have for a Collateral Loan File Deficiency shall be pursuant to this Subsection 2.2(c).

(d)     Post-Closing Purchase Price Adjustment.

(i)     Adjustments to Purchase Price.

PNC Dreher 000282



(ii) <u>Review</u>. At ninety (90) and one hundred eighty days (180) days after the Servicing Transfer Date, Purchaser will provide to Seller, in the manner provided in <u>Subsection 5.1</u> (*Notices*) a schedule setting forth the following information for each Loan where Purchaser claims a Purchase Price Adjustment, as applicable: (A) the Purchase Price, (B) the Discovered Cut-off Date Balance, (C) the basis and reasonable detail for the Discovered Cut-off Date Balance and (D) Purchase Price Adjustment, together with documentation supporting Purchaser's claim to a Purchase Price Adjustment (the *"Purchase Price Adjustment Schedule"*). Unless a Loan is on a Purchase Price Adjustment Schedule, its Purchase Price will be deemed to be binding on the Parties hereto and shall be deemed to be final. Seller shall have a fifteen (15) day period following receipt of the Purchase Price Adjustment Schedule (the *"Review Period"*) to review such schedule and to request additional documentation reasonably required to complete its review. Purchaser shall promptly provide such additional documentation. Unless Seller gives Purchaser a Written objection setting forth the reasons for Seller's claim that the Purchase Price Adjustment for a Loan is not warranted (the *"Seller's Objection Notice"*) within the Review Period, Seller will remit the Purchase Price Adjustment to Purchaser within thirty (30) days. In no event shall Purchaser claim a Purchase Price Adjustment after one hundred and eighty (180) days following the Servicing Transfer Date.

(iii) <u>Disputes; Exclusive Remedy</u>. If Seller provides a Seller's Objection Notice, Purchaser and Seller will work in good faith to reconcile their differences within twenty (20) days after Purchaser's receipt of Seller's Objection Notice (the *"Dispute Resolution Period"*). If Seller agrees to any Purchase Price Adjustment, it will remit said Purchase Price Adjustment within thirty (30) days after the conclusion of the Dispute Resolution Period. If Seller and Purchaser are unable to reach resolution within the Dispute Resolution Period, then Purchaser and Seller agree to submit the items remaining in dispute for resolution to arbitration by a mutually acceptable arbitrator with a nationally recognized arbitration organization. The arbitration decision will be rendered in writing. The Parties agree to accept the arbitrator's decision as final and binding on the Parties. The Parties agree that the venue of the arbitration shall be in New York, New York. Purchaser acknowledges and agrees that this <u>Subsection 2.2(d)</u> shall be the exclusive remedy with respect to any claim arising out of or relating to the Cut-off Date Balance or the Purchase Price for a Loan.

Section 2.3 <u>Recordation of Assignments of Mortgage</u>. Within sixty (60) days of the Closing Date, Purchaser shall complete and submit each Assignment of Mortgage related to a secured lien provided by Seller to the proper recording authority to be recorded. Purchaser shall bear any and all costs for recording any individual Assignment of Mortgage for a Loan. Seller shall prepare and deliver the notice of transfer to the Borrower in compliance with the Helping Families Save Their Homes Act of 2009, at Purchaser's cost.

PNC Dreher 000283

**Section 2.4**    Representations and Warranties for a Loan.

(a)    Seller hereby represents and warrants to Purchaser as of the Closing Date that Seller is the sole owner of the Loan, including the Servicing Rights, and the related Note, Mortgage, Loan File and Servicing Rights are not assigned or pledged to any Person, and Seller has good and marketable title to the Loan free and clear of any and all liens, claims, encumbrances, participation interests, equities, pledges, charges, mortgages or security interests of any Person not a Party to this Agreement.

(b)    No action has been served on and is pending against Seller with respect to the origination or servicing of the Loan.

(c)    If the loan is a home equity line of credit, Seller has properly notified borrower of the suspension of credit.

(d)    AS-IS.  Purchaser acknowledges that except for the representations and warranties of Seller set forth in Subsection 2.4(a) above, all Loans sold to Purchaser under this Agreement are sold and transferred without recourse, and neither Seller nor any other Person makes any other express or implied representation or warranty on behalf of Seller or any of its Affiliates with respect to a Loan, and (b) each Loan is being purchased by the Purchaser on an "AS-IS" and "WITH ALL FAULTS" basis.  The representations and warranties made in Subsection 2.4(a) above with respect to each Loan are in lieu of all other representations and warranties Seller might have given Purchaser, including as to collectability, enforceability, value of collateral, ability of any obligor to repay, condition, fitness for any particular purpose, whether express or implied or by operation of law, by any person, including the Seller or any of its employees, directors, officers, agents or contractors.  The Seller expressly disclaims any warranty, guaranty or representation, oral or written, past or present, express or implied, concerning the Loans, the Loan File or the underlying collateral except as set forth in Subsection 2.4(a) above.  Purchaser acknowledges that all other warranties that any Seller or anyone purporting to represent any Seller gave or might have given, or which might be provided or implied by applicable law or commercial practice, with respect to the individual Loans are hereby expressly excluded. Purchaser acknowledges that neither the Seller nor any other Person will have or be subject to any liability or obligation to Purchaser or any other Person resulting from the distribution in written or oral communication to Purchaser, or use by Purchaser of, any information, documents, or other material made available to Purchaser in any data room, confidential information memoranda or presentations in expectation of the transactions contemplated by this Agreement except as expressly provided in this Agreement.

(e)    Survival.  Purchaser further acknowledges that the representations set forth in Subsection 2.4(a) above shall only survive the Closing relating to the subject Loan for a period of 180 calendar days following the Closing Date relating to such Loan (as to a Loan, the "***Repurchase Period***").

Section 2.5    Remedy for Breach of Loan Representation and Warranty.

(a)    Repurchase Events.  Purchaser shall have the right to require Seller to repurchase a Loan to the extent there has been a breach of a representation or warranty in

**PNC Dreher 000284**



Subsection 2.4(a) above (*Representations and Warranties For a Loan*) with respect to the Loan that materially and adversely affects the value of the Loan that has not been cured by Seller to the reasonable satisfaction of Purchaser within the relevant time period set forth in Subsection 2.5(b) below (*Procedures Relating to Repurchase Claims*) (and unless such cure period is extended pursuant to Subsection 2.5(b)(v) below); provided, however, if the breach is of a nature that cannot be cured no cure period shall be required or provided for hereunder. Purchaser shall not be entitled to assert any repurchase claim pursuant to this Subsection 2.5 after the expiration of the Repurchase Period; provided, however, that if, on or prior to the expiration of the Repurchase Period, a Repurchase Claim shall have been delivered by Purchaser to Seller in accordance with Subsection 2.5(b) below (*Procedures Relating to Repurchase Claims*) for such Loan, Purchaser shall continue to have the right to cause Seller to cure or repurchase the Loan until the Repurchase Claim has been satisfied or otherwise resolved as provided in this Subsection 2.5.

      (b)    Procedures Relating to Repurchase Claims.

      (i)    In order for Purchaser to be entitled to any repurchase provided for under this Subsection 2.5, Purchaser must notify Seller in writing (a "**Repurchase Claim**") within thirty (30) days of its discovery of the breach giving rise to the Repurchase Claim. The Repurchase Claim shall specify in reasonable detail the basis for the Repurchase Claim and include copies of any relevant notices, documents or instruments that are the basis of such Repurchase Claim.

      (ii)    The Repurchase Claim shall be subject to review by Seller for a thirty (30) day period following Seller's receipt from Purchaser of such Repurchase Claim (the "**Repurchase Claim Review Period**"). Unless Seller delivers to Purchaser a Written objection to Purchaser's determination that the Loan should be repurchased (a "**Repurchase Objection Notice**") by the end of the Repurchase Claim Review Period, the Loan shall either be cured pursuant to Subsection 2.5(b)(v) below (*Procedures Relating to Repurchase Claims*) or, if not cured or if the breach is of a nature that cannot be cured, the Loan shall be deemed a "Repurchased Loan", whereupon the provisions of Subsection 2.5(c) below (*Repurchase Closing Procedures*) shall apply.

      (iii)    If Seller timely delivers a Repurchase Objection Notice to Purchaser, for thirty (30) days after Purchaser's receipt of a Repurchase Objection Notice, the Parties shall endeavor in good faith to resolve by mutual agreement all matters included in the Repurchase Objection Notice.

      (iv)    If the Parties are unable to resolve any matter included in the Repurchase Objection Notice within such thirty (30) day period, either Party may seek to bring an action to resolve the dispute as set forth in Subsection 5.4 below (*Jurisdiction*).

      (v)    If Purchaser timely and adequately delivers a Repurchase Claim and Seller agrees a representation and warranty in Subsection 2.4(a) above (*Representations and Warranties For a Loan*) for the Loan has been breached and that such breach materially and adversely affects the value of the Loan, Seller shall have the right to cure the applicable breach within thirty (30) days after the expiration of the

**PNC Dreher 000285**



Repurchase Claim Review Period which period may be extended at the sole option of the Purchaser, as long as Seller is diligently pursuing cure (the "**Cure Period**"). If Seller cures the applicable breach within the Cure Period, the Loan shall not be subject to repurchase pursuant to the related Repurchase Claim. If Seller is unable to cure the applicable breach with the Cure Period, the Loan shall be deemed a "Repurchased Loan", whereupon the provisions of Subsection 2.5(c) below (*Repurchase Closing Procedures*) shall apply.

     (c)    Repurchase Closing Procedures.

     (i)    The closing for the repurchase of a Repurchased Loan by Seller in accordance with this Subsection 2.5 shall be consummated on a date (the "**Repurchase Date**") mutually agreeable to the Parties that is the last Business Day of the month following the month in which the Loan is finally deemed a "Repurchased Loan" pursuant to Subsection 2.5(b) above (*Procedures Relating to Repurchase Claims*).

     (ii)    On the Repurchase Date, Purchaser shall sell, convey, and transfer to Seller, on a servicing-released basis, and Seller shall purchase from Seller, with respect to the Repurchased Loan, all of Purchaser's right, title and interest, free and clear of the claims or interests of any Person claiming under the Purchaser, any related (A) Mortgage Note, (B) Mortgage, (C) any flood, hazard, title or mortgage insurance policy for the Loan, (D) Loan File, (E) Collateral Loan File, (F) Interim Servicing File, (G) all records, in physical form or electronic form, relating to the servicing of the Loan after the Servicing Transfer Date (as to items (A) through (G), the ("**Repurchase Loan File**"), (H) Servicing Rights, (I) all insurance proceeds related to the Loan and liquidation proceeds arising after the Repurchase Date with respect to the Mortgaged Property, and (J) all payments of principal, interest, fees and other amounts owing under the Loan received after the Repurchase Date. On the Repurchase Date, Seller shall assume and agree to perform and discharge any and all liabilities and obligations of Purchaser with respect to the Repurchased Loan.

     (iii)    On the Repurchase Date, (A) Seller shall pay the Repurchase Price for the Repurchased Loan by wire transfer of immediately available funds to such account as Purchaser shall designate in writing to Seller and (B) Seller and Purchaser shall execute and deliver such reasonable and appropriate documents, instruments or agreements, including any Assignment of Mortgage to Seller in recordable form, necessary to effectuate the repurchase of the Repurchased Loan. Seller shall pay all costs and expenses reasonably incurred in connection with the delivery of the Repurchase Loan File for the Repurchased Loan.

     (d)    Exclusive Remedy.  Notwithstanding any contrary provision in this Agreement, Purchaser acknowledges and agrees that the only remedy it shall have for breach of a representation or warranty in Subsection 2.4(a) above (*Representations and Warranties For a Loan*) for a Loan shall be limited to the repurchase rights under this Subsection 2.5.

Section 2.6    Record Retention. From and after the Closing Date, Purchaser shall make available to Seller for its inspection, copying and reproduction any Loan Files containing

**PNC Dreher 000286**



information provided by Seller to Purchaser prior to and including the Servicing Transfer Date to the extent such access is permitted by applicable law for any proper business purpose. Seller shall request such access in advance and shall be responsible for any copying fees.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES AS TO EACH PARTY.

Section 3.1 <u>Representations and Warranties as to Seller</u>. Seller makes the following representations and warranties with respect to Seller as of the Closing Date:

(a) <u>Organization</u>. Seller is a duly organized and validly existing national banking association established under the laws of the United States and is in good standing and has all corporate powers and all governmental licenses, authorizations, consents and approvals required to carry out its business as now conducted. Seller holds all requisite licenses, permits and/or other governmental authorizations required by law to engage in the business of servicing the Loans and selling the Loans to Purchaser in accordance with the terms of this Agreement or is exempt from such requirements as a national banking association.

(b) <u>Enforceable Agreement</u>. The execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated hereby, have been duly and validly authorized and this Agreement has been validly executed by Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement evidences the valid, binding and enforceable obligations of Seller, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditor's rights generally, general equitable principles, whether considered in equity or at law and public policy consideration limiting the enforceability of provisions of this Agreement (the "***General Enforceability Exceptions***"). All requisite corporate action has been taken by Seller to make the Agreement valid and binding upon Seller in accordance with its terms.

(c) <u>Litigation</u>. There is no Action or arbitration pending, or threatened in writing, to Seller's knowledge after reasonable due inquiry, against Seller which, if determined adversely to Seller, would materially affect its ability to perform its obligations under this Agreement.

(d) <u>No Conflict</u>. The execution and delivery of this Agreement by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's organizational documents or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Seller is a party or which may be applicable to the Seller or its assets that would reasonably be expected to materially adversely affect the performance of its obligations and duties under this Agreement.

(e) <u>No Required Consents</u>. No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement or the consummation of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the date of this

PNC Dreher 000287



Agreement or that would not materially affect its ability to perform its obligations under this Agreement.

(f)   No Broker.  Seller has not incurred any obligation, made any commitment or taken any action that might result in a claim against Purchaser or an obligation of Purchaser to pay a brokerage commission, finder's fee or similar fee or commission to a broker, finder or investment banker with respect to the sale of the Loan.

The representations and warranties of Seller in this Subsection 3.1 shall survive the related Closing Date indefinitely.

Section 3.2   Representations and Warranties as to Purchaser.  Purchaser makes the following representations and warranties with respect to Purchaser as of the Closing Date:

(a)   Organization.  Purchaser is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Delaware. Purchaser holds all requisite licenses, permits and/or other governmental authorizations required by law to purchase and hold the related Loan and to service the related Loan in accordance with the terms of this Agreement, or is not required to obtain any such license, permit or governmental authorization or is exempt from such requirements under applicable law.

(b)   Enforceable Agreement.  The execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby have been duly and validly authorized and this Agreement has been validly executed by Purchaser. Assuming due authorization, execution and delivery by Seller, this Agreement evidences the valid, binding and enforceable obligation of Purchaser, subject to General Enforceability Exceptions. All requisite corporate action has been taken by Purchaser to make this Agreement valid and binding upon Purchaser in accordance with its terms.

(c)   Litigation.  There is no Action or arbitration pending, or threatened in writing, to Purchaser's knowledge after reasonable due inquiry, against Purchaser which, if determined adversely to Purchaser, would materially affect its ability to perform its obligations under the Agreement.

(d)   No Conflict.  The execution and delivery of this Agreement by the Purchaser and the performance of and compliance with the terms of this Agreement will not violate the Purchaser's organizational documents or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Purchaser is a party or which may be applicable to the Purchaser or its assets that would reasonably be expected to materially adversely affect the performance of its obligations and duties under this Agreement.

(e)   No Required Consents.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Purchaser of, or compliance by the Purchaser with, this Agreement or the consummation of the transaction contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the date of this

**PNC Dreher 000288**



Agreement or that would not materially affect its ability to perform its obligations under this Agreement.

(f)   No Broker.   Purchaser has not incurred any obligation, made any commitment or taken any action that might result in a claim against Seller or an obligation of Seller to pay a brokerage commission, finder's fee or similar fee or commission to a broker, finder or investment banker with respect to the sale of the Loan.

The representations and warranties of Purchaser in this Subsection 3.2 shall survive the related Closing Date indefinitely.

## ARTICLE 4

## INTERIM SERVICING.

Section 4.1   General.   The Parties acknowledge and agree that as of the Closing Date, the Loans have been purchased by Purchaser and sold by Seller on a servicing-released basis and the purchase of each Loan by Purchaser includes any and all rights in the Servicing Rights relating thereto and the assumption by Purchaser as "principal" of any and all obligations relating to or arising from the Servicing Rights on and after the Closing Date.   This Agreement shall govern the respective rights and obligations of each Party with respect to the servicing of the Loans during the Interim Servicing Period for the Loan.

Section 4.2   Appointment.   During the Interim Servicing Period for a Loan, Purchaser hereby appoints Seller as "Interim Servicer", and Seller hereby accepts such appointment, to service the Loans during the related Interim Servicing Period subject to the terms and provisions of this Agreement for the Loans.   Seller in its capacity as Interim Servicer shall be deemed an independent contractor and agent of Purchaser solely in the provision of the Interim Services.

Section 4.3   Interim Services.   Subject to the terms of this Agreement, during the Interim Servicing Period for a Loan, Seller in its capacity as Interim Servicer shall perform the services set forth in this Subsection 4.3 (collectively, the "*Interim Services*"):

(a)   Loan Modifications.   Neither Interim Servicer nor any of its Representatives shall take any action to renew, modify, waive or alter the terms of the Loan (including a suspension or termination) or commence any judicial or non-judicial action to collect the Loan.   If Interim Servicer receives a Written request from the Borrower requesting a renewal, modification, waiver or alteration proposal, Interim Servicer shall notify the Purchaser's applicable Relationship Manager of the request in Writing, including a reasonable fee for Interim Servicer's efforts and out-of-pocket costs for Interim Servicer to provide documentation with respect to the Borrower's request on Purchaser's behalf.   Purchaser shall provide Written direction to the Interim Servicer's applicable Relationship Manager regarding the response to the Borrower's proposal.   Interim Servicer shall take no action regarding the Borrower's request unless directed in Writing and provided that Purchaser agrees to pay the Interim Servicer's fees and costs associated with such action, provided that, if Purchaser directs Interim Servicer in Writing to deny the Borrower's request, Interim Servicer will verbally so inform Borrower, and no fee payment shall be required.   If Purchaser agrees to pay the Interim Servicer's fee,

**PNC Dreher 000289**



Purchaser shall pay such fee within fifteen (15) days of Seller's Written request for payment to Purchaser's applicable Relationship Manager.

(b)     **Collection of Payments.**  The Servicer shall deposit any Custodial Funds for the Loan received in the Custodial Account within two (2) Business Days of receipt. Interim Servicer shall not take any action to collect any amounts.  Subject to Section 4.2 above, Purchaser shall take any action that it deems appropriate in its name and through its counsel or agent to collect past due or delinquent amounts.

(c)     **Interim Servicing File.**  Interim Servicer shall hold and maintain an Interim Servicing File for the Loan.

(d)     **Bankruptcy.**  If Interim Servicer receives a Written notice of a bankruptcy proceeding filed by or against the Borrower or involving the Mortgaged Property, the Interim Servicer shall notify Purchaser's applicable Relationship Manager in Writing including a reasonable fee for Servicer's efforts and the out-of-pocket costs for Interim Servicer to retain counsel, if required.   Purchaser shall provide Written direction to the Interim Servicer's applicable Relationship Manager regarding any action Purchaser desires to take in the bankruptcy proceeding.  Interim Servicer shall take no action with respect to the bankruptcy proceeding unless directed in Writing and provided that Purchaser agrees to pay the Interim Servicer's fees and costs.  If Purchaser agrees to pay the Interim Servicer's fees and costs, Purchaser shall pay the Interim Servicer's fee and any bills for counsel within fifteen (15) days of Seller's Written request to Purchaser's applicable Relationship Manager.

(e)     **Short Sale.**  If Interim Servicer receives a Written request to approve a short sale of the Mortgaged Property, Seller shall transmit the request in Writing to Purchaser's applicable Relationship Manager, including a reasonable fee for Interim Servicer's efforts and out-of-pocket costs for Interim Servicer to provide documentation with respect to the Borrower's request on Purchaser's behalf. Purchaser shall provide Written direction to the Interim Servicer's applicable Relationship Manager regarding the response to the Borrower's short sale proposal. Purchaser shall take no action regarding the Borrower's request unless directed in Writing provided Purchaser agrees to pay the Interim Servicer's fee and costs, provided that, if Purchaser directs Interim Servicer in Writing to deny the Borrower's short sale request, Interim Servicer will verbally so inform Borrower, and no fee payment shall be required.  If Purchaser agrees to pay the Interim Servicer's fee, Purchaser shall pay such fee within fifteen (15) days of Seller's Written request for payment to Purchaser's applicable Relationship Manager.

(f)     **Third Party Foreclosure.**  If Interim Servicer receives Written notice that a foreclosure or other Action has been commenced by the holder of a lien or by a Governmental Authority, Interim Servicer shall notify the Purchaser's applicable Relationship Manager in Writing including a reasonable fee for Interim Servicer's efforts and out-of-pocket costs for Interim Servicer to retain counsel, if required. Purchaser shall provide Written direction to the Interim Servicer's applicable Relationship Manager regarding the action Purchaser desires to take with respect to the third-party foreclosure. Interim Servicer shall take no action with respect to the third-party foreclosure unless directed in Writing and provided that Purchaser agrees to pay the Interim Servicer's fee and costs.  If Purchaser agrees to pay the Interim Servicer's fees

PNC Dreher 000290



and costs. Purchaser shall pay the Interim Servicer's fee and any bills for counsel within fifteen (15) days of Seller's Written request to Purchaser's applicable Relationship Manager.

(g)   Environmental.   If Interim Servicer receives Written notice that the Mortgaged Property securing a Loan is contaminated by hazardous or toxic substances or wastes, Interim Servicer shall promptly provide such notice or information it receives to Purchaser's applicable Relationship Manager in Writing.   Interim Servicer shall not take any action surrounding the contamination.   Subject to Section 4.2 above, Purchaser shall take any action that it deems appropriate in its name and through its counsel or agent to address the contamination.

(h)   Partial Release.   If the Borrower requests a partial release of Mortgage, Interim Servicer shall give Written notice of the request to the Purchaser's Relationship Manager for Administration.   Interim Servicer shall not take any action surrounding the approval, denial or documentation of the request for partial release.   Subject to Section 4.2 above, Purchaser shall take any action that it deems appropriate in its name and through its counsel or agent to communicate to the Borrower the acceptance or denial of the partial release request and the preparation, negotiation and filing of any partial release.

(i)   Release or Satisfaction of Mortgage.   In the event of payment in full of the Loan during the related Interim Servicing Period, Interim Servicer shall notify the applicable Relationship Manager in Writing and Purchaser shall promptly prepare and record a release or satisfaction of the Mortgage, at Purchaser's sole cost and expense.   Interim Servicer shall provide Purchaser with a power of attorney if required.   Interim Servicer shall not prepare or record a release or satisfaction of Mortgage.

(j)   Notification of Sale.   Purchaser acknowledges that Interim Servicer can notify any Borrower and/or Borrower's attorney or authorized representative that (i) the Loan was sold to the Purchaser, (ii) the Successor Servicer is authorized to contact the Borrower and discuss the Loan, and (iii) that any request submitted by the Borrower to Interim Servicer, including a request for approval of a loan modification or short sale has been submitted to the Purchaser for decision.   Interim Servicer is authorized to provide Written confirmation of any of the foregoing to Borrower's attorney or authorized representative.

Section 4.4   Reimbursement of Out-of-Pocket Expenses.   Any out-of-pocket expenses for a Loan made by Interim Servicer during the Interim Servicing Period will be reimbursed by the Purchaser by no later the Servicing Transfer Date, provided Interim Servicer makes a Written request to Purchaser's applicable Relationship Manager for approval to incur such expense in advance and Purchaser provides Written approval to Interim Servicer by notifying the Interim Servicer's applicable Relationship Manager.   If the out-of-pocket expense is billed to the Seller after the Servicing Transfer Date, Seller shall submit a request to Purchaser for reimbursement with supporting documentation.   Purchaser shall reimburse such out-of-pocket expense within thirty (30) days of Seller's request for payment. Purchaser shall have no obligation to reimburse Seller or Interim Servicer for any out-of-pocket expenses incurred by either of them in connection with the Loans, other than out-of-pocket expenses incurred by Interim Servicer during the Interim Servicing Period after receiving Purchaser's prior Written consent thereto. Withdrawals from Custodial Account.   Interim Servicer may, from time to time, make

PNC Dreher 000291



withdrawals from the Custodial Account for the following purposes: (i) to withdraw funds deposited into the Custodial Account any unpaid Interim Servicer's fees and costs in error; (ii) to withdraw funds deposited into the Custodial Account in error; and (iii) to make payment on the Servicing Transfer Date to Purchaser, of the remaining amounts in the Custodial Account that relate to the Loan after withdrawals made pursuant to sub clause (i) and (ii) above.

Section 4.5    Reporting.   On the Servicing Transfer Date for a Loan, Interim Servicer shall provide to Purchaser any data as provided in Subsection 4.7(b) below (*Obligations on and after the Servicing Transfer Date*). Interim Servicer shall not be obligated to prepare or provide any other reports for a Loan.

Section 4.6    Transfer of Servicing; Limitation of Liability; Indemnification.    The Parties, (as applicable) shall take, or cause to be taken commercially reasonable efforts, at such Party's own expense, to complete the servicing transfer by the Servicing Transfer Date. The Parties (as applicable) shall take, or cause to be taken, the following actions, at its own expense, with respect to the Loan prior to the Servicing Transfer Date (or within such time as may otherwise be specified below) in order to effect the transfer of the Servicing of the Loan to Purchaser:

(a)    Obligations Prior to the Servicing Transfer Date.    The Parties (as applicable) shall take, or cause to be taken, the following actions with respect to the Loan prior to the Servicing Transfer Date (or within such time as may otherwise be specified below):

(i)    Information Protection.   Interim Servicer shall implement and maintain commercially reasonable information security measures consistent with industry standards to protect against unauthorized access to or use of Customer Information as required by the privacy provisions of the Gramm-Leach-Bliley Act of 1999, applicable state law and the Guidelines.

(ii)    Notice to Borrowers.   Purchaser shall, no later than fifteen (15) days prior to the Servicing Transfer Date, inform in writing the Borrower of a Loan of the transfer of servicing to Purchaser as the Successor Servicer. Purchaser shall bear any and all costs of such notification. Purchaser will submit the form letter to Seller for approval prior to issuing to Borrowers. Purchaser shall provide Seller with an affidavit confirming such notices were sent upon Seller's request.

(b)    Obligations on and after the Servicing Transfer Date.   The Parties agree that on and after the Servicing Transfer Date:

(i)    Information Protection.   Purchaser shall be solely responsible for the data security and confidentiality of the Customer Information relating to the Borrowers pursuant to the privacy provisions of the Gramm-Leach-Bliley Act of 1999, applicable state law and regulations applicable to Purchaser.

(ii)    Interim Servicing File.   Interim Servicer shall forward to Purchaser the Interim Servicing File for the Loan within ten (10) Business Days of the Servicing Transfer Date, provided, however, that Interim Servicer may retain an imaged copy of the Interim Servicing File to the extent, and only to the extent, required by applicable law.

**PNC Dreher 000292**



(iii)   Payments Received After the Servicing Transfer Date.   Any payments for a Loan received by Interim Servicer after the Servicing Transfer Date shall be returned to Borrower with a notice that Borrower must send payments to Purchaser. All other Loan correspondence or documentation received by Interim Servicer during the six (6) month period following the Servicing Transfer Date shall be forwarded to Purchaser's applicable Relationship Manager no later than five (5)-Business Days after receipt by Interim Servicer.

(iv)   Year-End Tax Reporting.   Interim Servicer shall be responsible for providing the Internal Revenue Service and Borrowers with all appropriate tax forms and information for transactions affecting the Loan during the period in which Interim Servicer or Seller, as the case may be, serviced the Loan.

(v)   Actions After the Servicing Transfer Date.   Purchaser agrees that it will not use or permit the use by its agents, successors or assigns of any name similar to the name of the Seller or its predecessors or assigns nor will it institute any Action in the name of Seller after the Servicing Transfer Date.

(vi)   Data File.   Within five (5) Business Days of the Servicing Transfer Date, Interim Servicer shall provide the data fields for the Loan that are set forth on Schedule C and are reflected on Interim Servicer's servicing system as of the Servicing Transfer Date in Excel format.

(c)   Litigation.   Within thirty (30) Business Days after the Purchaser's receipt of Written notification that a Loan is subject to litigation, Purchaser shall notify the clerk of the court or other appropriate official and all counsel of record that ownership of the Loans was transferred from the Seller to the Purchaser.   The Purchaser shall have its attorney file appropriate pleadings and other documents and instruments with the court or other appropriate body within such thirty (30) Business Day period, substituting Purchaser's attorney for Seller's attorney, removing the Seller as a party to the litigation and substituting the Purchaser as the real party in interest.

(d)   Bankruptcy Proceedings.   In accordance with Bankruptcy Rule 3001 and 3002, Purchaser agrees to take all actions necessary to file, within 30 Business Days after the Closing Date, (i) proofs of claims in pending bankruptcy proceedings involving any Loan for which the Seller has not already filed a proof of claim and (ii) all documents required by Rule 3001 of the Federal Rules of Bankruptcy Procedure and to take all such similar actions as may be required in any relevant jurisdiction in any pending bankruptcy or insolvency case or proceeding in such jurisdiction involving any Loan in order to evidence and assert the Purchaser's rights.

(e)   Limitation on Liability.   Neither Interim Servicer nor any of its Representatives shall be under any liability to Purchaser for any action taken or for refraining from the taking of any action in connection with providing Interim Services of a Loan during the related Interim Servicing Period, except to the extent that a court of competent jurisdiction determines that Interim Servicer's gross negligence or willful misconduct was the primary cause of any loss to Purchaser. Interim Servicer and any officer, employee or agent of Interim Servicer may rely in good faith on any Written direction (which, for the avoidance of doubt, may be in

**PNC Dreher 000293**



email form) in any form provided by any officer or employee of Purchaser or in any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. Interim Servicer shall have no obligation to appear in, prosecute or defend any Action relating to a Loan during the related Interim Servicing Period. Interim Servicer undertakes to perform only such duties as Interim Servicer as are expressly set forth in this Section 4 and no duties shall be implied or otherwise imposed upon or against Interim Servicer, and Interim Servicer shall not be liable except for the performance of such duties and obligations as are specifically set out in this Section 4.

(f)     Recoverable Damages.   NEITHER SELLER IN ITS CAPACITY AS INTERIM SERVICER NOR ANY OF SELLER'S REPRESENTATIVES SHALL BE LIABLE FOR ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR SIMILAR DAMAGES, INCLUDING ANY DAMAGES FOR LOST PROFITS OR DIMINUTION IN VALUE, EVEN IF THE SELLER OR SUCH OTHER PERSON HAS BEEN ADVISED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES.

(g)     Indemnification.   Purchaser shall indemnify, defend and hold harmless Seller and its Representatives from and against any and all costs, damages, disbursements, obligations, penalties, liabilities, losses, expenses, assessments, judgments, settlements or deficiencies (including any interest, penalties, investigation, legal, accounting and other costs and expenses reasonably incurred in the investigation, collection, prosecution and defense of any Action and amounts paid in settlement) actually paid or incurred by Seller and/or its Representatives relating to or arising out of the ownership or servicing of the Loan after the Closing Date, including the Interim Services. Purchaser shall reimburse such Person for all reasonable costs and expenses as they are incurred in investigating, preparing, pursuing or defending any such Action, claim, investigation or proceeding. Purchaser shall promptly notify Seller if a claim is made by a third party with respect to this Agreement or any Loan that may result in any such liability, loss or obligation to Seller or its Representatives and Purchaser shall assume (with the prior Written consent of Seller, not to be unreasonably withheld) the defense of such claim and pay all expenses in connection therewith, including counsel fees, promptly pay, discharge and satisfy any judgment or decree that may be entered against Seller and/or its Representatives in respect of such claim and follow any reasonable Written instructions received from the Seller in connection with such claim. Notwithstanding anything in this Subsection 4.7(e) to the contrary, however, Purchaser shall not be required to indemnify any Person against any damages that shall have resulted from the gross negligence or willful misconduct of such Person or any other Person involved at the Seller's behest in the provision of the Interim Services.

**Section 4.7**     Confidential Information.

(a)     Confidentiality with Respect to the Loan.   Interim Servicer agrees that during the Interim Servicing Period of a Loan (i) it shall hold in confidence all Confidential Information and Customer Information with the same care as it takes to preserve the confidentiality of its own similar information in the ordinary course of business, (ii) it shall use the Confidential Information and Customer Information only for the purposes of in connection with performing the related Interim Services, (iii) it shall only disclose such Confidential Information and Customer Information to its Representatives in connection with performing the

PNC Dreher 000294



related Interim Services so long as the Representatives are informed by Interim Servicer of the nature of such Confidential Information, and each Party shall be responsible for any breach of the confidentiality provisions of this Subsection 4.8(a) by its Representatives.

(b)      Confidentiality with Respect to Each Party's Business and this Agreement. Each Party agrees (i) it shall hold in confidence all Confidential Information with the same care as it takes to preserve the confidentiality of its own similar information in the ordinary course of business, (ii) it shall use such Confidential Information only for purposes related to this Agreement, (iii) it shall only disclose such Confidential Information to its Representatives involved in the purchase or servicing of the Loans so long as the Representatives are informed by such Party of the nature of such Confidential Information, and each Party shall be responsible for any breach of the confidentiality provisions of this Subsection 4.8(b) by its Representatives.

(c)      Legal Process Disclosure. If at any time Seller, including in its capacity as Interim Servicer, Purchaser or their respective Representative is required (whether by law, regulation or legal process) to disclose any Confidential Information of a Loan or the other Party's business operations, Seller or Purchaser, as applicable shall (to the extent practicable and legally permissible) (A) to promptly notify Purchaser or Interim Servicer as applicable to permit Purchaser or Interim Servicer, at such Party's expense, to seek a protective order or to take appropriate action and (B) to cooperate as reasonably requested by Purchaser or Interim Servicer, as applicable, in such Party's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be accorded such Confidential Information, but only in such Party's name and at such Party's sole cost and expense. If in the absence of a protective order, Seller, Purchaser or any of their respective Representatives is compelled as a matter of law, regulation or legal process to disclose Confidential Information of a Loan or Confidential Information with respect to either Party's business operations to a third party, Seller, Purchaser and their respective Representatives, as applicable, may disclose to the third party compelling disclosure only the part of such Confidential Information as is required by law, regulation or legal process to be disclosed.

(d)      Injunctive Relief.  In the event of any breach of this Subsection 4.8, Purchaser or Seller, as applicable will suffer irreparable harm and the total amount of monetary damages for any injury to Purchaser or Seller from any violation of this Subsection 4.8 will be impossible to calculate and will therefore be an inadequate remedy.  Accordingly, Purchaser or Seller, as applicable shall, in addition to the other rights and remedies to which Purchaser or Seller may be entitled hereunder, be entitled to temporary and permanent injunctive relief against Interim Servicer or Purchaser for any violation of this Subsection 4.8, without proof of irreparable harm.

## ARTICLE 5

## MISCELLANEOUS.

Section 5.1      Notices.  All demands, notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given upon receipt by the Party if personally delivered or sent by facsimile, e-mail, mailed by registered mail, postage prepaid or delivered by a nationally recognized overnight courier to the address set

PNC Dreher 000295



forth opposite the Party on Schedule 5.1 attached hereto, or such other address as may hereafter
be furnished to a Party in Writing by the other Party. All such notices, requests and other
communications shall be deemed received on the date of receipt by the recipient thereof if
received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of
receipt. Otherwise, any such notice, request or communication shall be deemed not to have been
received until the next succeeding Business Day in the place of receipt. Notwithstanding the
foregoing, any demand, notice, consent, waiver or communication may be given by any other
means if the Parties agree to such alternative means in Writing.

Section 5.2    Severability.  If any one or more of the covenants, agreements, provisions
or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants,
agreements, provisions or terms shall be deemed severable from the remaining covenants,
agreements, provisions or terms of this Agreement and shall in no way affect the validity or
enforceability of the other covenants, agreements, provisions or terms of this Agreement or the
rights of the Parties hereunder. If the invalidity of any part, provision, representation or warranty
of this Agreement shall deprive any Party of the economic benefit intended to be conferred by
this Agreement, the Parties shall negotiate in good faith to develop a structure the economic
effect of which is as nearly as possible the same as the economic effect of this Agreement
without regard to such invalidity.

Section 5.3    Governing Law; Waiver Of Trial By Jury.  This Agreement shall be
governed by and construed in accordance with the laws of the State of New York and the
obligations, rights and, to the extent applicable, remedies of the Parties hereunder shall be
determined in accordance with such laws without giving effect to conflict of laws principles and
except to the extent preempted by Federal law. EACH PARTY HEREBY KNOWINGLY,
VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY
HAVE TO TRIAL BY JURY IN RESPECT OR ANY LITIGATION BASED ON, OR
ARISING OUT OF, UNDER, OR IN CONNECTION HEREWITH, OR ANY COURSE OF
CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN),
OR ACTIONS OF SELLER OR PURCHASER.

Section 5.4    Jurisdiction.  Each of the Parties hereto (i) consents to submit itself to the
personal jurisdiction of the courts of the State of New York (and, with respect to claims in which
the exclusive subject matter jurisdiction of such claims is federal, any federal district court
located in the State of New York) in the event any dispute arises out of this Agreement or any of
the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or
defeat such personal jurisdiction by motion or other request for leave from such court, (iii) agrees
that it will not bring any action relating to this Agreement or any of the transactions
contemplated by this Agreement in any other court, and (iv) to the fullest extent permitted by
law, consents to service being made through the notice procedures set forth in Subsection 5.1
above (Notices).

Section 5.5    Successors and Assigns.  This Agreement shall bind and inure to the
benefit of and be enforceable by Seller and Purchaser and the respective successors and
permitted assigns of Seller and Purchaser. This Agreement may not be assigned by the
Purchaser without the prior written consent of the Seller, which consent shall not be
unreasonably withheld.

**PNC Dreher 000296**



CONFIDENTIAL

Section 5.6    Waivers.  No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the Party against whom such waiver or modification is sought to be enforced.

Section 5.7    Exhibits and Schedules.  The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof as though included in the body of this Agreement.

Section 5.8    General Interpretive Principles.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires (i) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender; (ii) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles; (iii) references herein to "Sections," "Subsections" and other subdivisions without reference to a document are to designated Sections, Subsections and other subdivisions of this Agreement; (iv) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions; (v) the words "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular provision; (vi) the term "include" or "including" shall mean without limitation by reason of enumeration; and (vii) any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws; (viii) references to a Person are also to its permitted successors and assigns; (ix) the use of "or" means "either or both" unless expressly indicated otherwise; and (x) unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars; (xi) "writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring a Party by virtue of the authorship of any of the provisions of this Agreement.

Section 5.9    Reproduction of Documents.  This Agreement and all documents relating hereto, including (i) consents, waivers and modifications which may hereafter be executed, (ii) any other documents received by a Party at a Closing, and (iii) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, microcard, miniature photographic or other similar process.  The Parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a Party in the regular course of business, and that any enlargement, facsimile, or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 5.10    No Third Party Beneficiary.  Except for Seller's Representative's rights to indemnification pursuant to Subsection 4.7(e) above (Indemnification) no Person shall be a third party beneficiary of this Agreement.

**PNC Dreher 000297**



Section 5.11    Further Agreements.  Each Party agrees to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 5.12    Entire Agreement.  This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof and constitutes the entire agreement of the Parties with respect to the subject matter.

Section 5.13    Amendment.  This Agreement may be amended from time to time by Seller and Purchaser solely by written agreement signed by Seller and Purchaser.

Section 5.14    Effect of Headings.  The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

Section 5.15    Media Releases.  Neither Seller nor Purchaser shall disclose the existence or terms of this Agreement or use any trade name, trademark, service mark, or any other information which identifies the other in Purchaser's of Seller's, as the case may be, sales, marketing, or publicity activities, including press releases, interviews with representatives of any written publication, television station or network, or radio station or network, without the prior written consent of the other Party.  Notwithstanding anything to the contrary in the foregoing, neither Party shall be restrained, after consultation with the other Party, from making such disclosure as it shall be advised by counsel is required by law or by the applicable regulations of any regulatory body or securities exchange to be made.

Section 5.16    Relationship of Parties.  Except as otherwise specifically set forth in this Agreement, this Agreement shall not be construed as authority for either Party to act for the other in any partnership or joint venture or any other capacity or to make commitments of any kind for the account of or on behalf of the other.

Section 5.17    Expenses.  Except as otherwise provided herein, each Party shall bear the costs and expenses incurred in entering into and performing this Agreement, including any legal fees.

Section 5.18    Tax Treatment.  It is the intention of the Parties that Purchaser is purchasing, and Seller is selling, the Loans and not a debt instrument of Seller or a security. Accordingly, the Parties agree to treat the transactions contemplated hereunder for federal tax purposes as a sale by Seller, and a purchase by Purchaser, of the Loans.

Section 5.19    Counterparts.  This Agreement may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

*The remainder of this page has been left intentionally blank.  Signature page follows.*

PNC Dreher 000298



**CONFIDENTIAL**

### "NON-PERFORMING" LOAN PURCHASE AND INTERIM SERVICING AGREEMENT
### SIGNATURE PAGE

**IN WITNESS WHEREOF**, Seller and Purchaser have caused their names to be signed to this "Non-Performing" Loan Purchase and Interim Servicing Agreement by their duly authorized respective officers as of the day and year first above written.

PNC BANK, NATIONAL ASSOCIATION
as Seller and Interim Servicer

By:
Name:   Peter J. McCarthy
Title:   Executive Vice President

AMERICAN SERVICING AND
RECOVERY GROUP, LLC
as Purchaser

By:
Name:   Gregory E. Palmer
Title:   Vice President

**PNC Dreher 000299**



## GUARANTEE

DBI ASG Mortgage Acquisition Fund I, LP ("***Guarantor***") irrevocably guarantees, on a joint and several basis, each and every monetary obligation of American Servicing and Recovery Group, LLC, ("***Purchaser***), and/or any of its permitted assigns, under Subsection 4.7(g) (*Indemnification*) of that certain Non-Performing Loan Purchase and Interim Servicing Agreement, dated as of July 30, 2010 by and between PNC Bank, National Association ("***Seller***") and Purchaser (the "***Agreement***"). Guarantor acknowledges that it is making this guarantee to induce Seller to enter into the Agreement and that Guarantor is making this guarantee in consideration of Seller so entering into the Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Agreement.

If Purchaser fails to pay any monetary obligation owing to Seller pursuant to Subsection 4.7(g) (*Indemnification*) of the Agreement, Guarantor agrees to pay the amount of such obligation to Seller within fifteen (15) calendar days of the Purchaser's receipt, pursuant to Subsection 5.1 (*Notices*) of Written notice of such failure and demand for payment. This is a guarantee of payment, and not of collection, and the Guarantor acknowledges and agrees that this guarantee is full and unconditional, and no release or extinguishment of Purchaser's obligations or liabilities (other than in accordance with the terms of the Agreement), whether by decree in any bankruptcy proceeding or otherwise, shall affect the continuing validity and enforceability of this guarantee, as well as any provision requiring or contemplating payment by the Guarantor.

The Guarantor hereby waives, for the benefit of Seller, to the fullest extent permitted by law, any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, except to the extent that any such defense is available to Purchaser.

The provisions of Section 5 of the Agreement are incorporated herein, *mutatis mutandis*, except that notices and other communications hereunder to the Guarantor shall be delivered to DBI/ASG Mortgage Acquisition Fund, LP, 4144 N. Central Expressway, Suite 900, Dallas, TX 75204 Attn: William S. Buchanan (with a copy to Purchaser as provided therefor in Section 5.1 (*Notices*).

**IN WITNESS WHEREOF**, Guarantor has caused its name to be signed to this Guarantee by its duly authorized respective officer as of the day and year first above written.

DBI/ASG Mortgage Acquisition Fund I, LP,
as Guarantor

By:_____
Name:
Title:

28

**PNC Dreher 000300**



**EXHIBIT A**

**FORM OF**
**ASSIGNMENT AND CONVEYANCE**

On this 2nd day of August, 2010, **PNC Bank, National Association** ("*Seller*") as the Seller under that certain Non-Performing Loan Purchase and Interim Servicing Agreement dated as of July 30, 2010 (the "*Purchase Agreement*"), does hereby sell, convey and transfer to **AMERICAN SERVICING AND RECOVERY GROUP, LLC** as Purchaser under the Purchase Agreement, without recourse, but subject to the terms of the Purchase Agreement, with respect to each Loan listed on Schedule A-1 attached hereto, all of Seller's right, title and interest in, to and under the (i) Note, (ii) Mortgage, (iii) Loan File, (iv) Collateral Loan File, (v) Servicing Rights, (vi) all insurance proceeds related to the Loan and liquidation proceeds arising after the Cut-Off Date with respect to the Mortgaged Property, (vii) all payments of principal and interest received after the Cut-Off Date, and (viii) all fees or other amounts owing under the Loan received after the Cut-Off Date, together with all obligations arising under the Loan after the Closing Date. Pursuant to the Purchase Agreement, Seller will deliver the Collateral Loan File and Loan File for such Loan to Purchaser.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

PNC BANK, NATIONAL ASSOCIATION
(Seller)

By:
     Name:   Peter McCarthy
     Title:   Executive Vice President

A-1



### SCHEDULE A-1
### TO FORM OF ASSIGNMENT AND CONVEYANCE

### LIST OF LOANS

**(To be Attached)**

**PNC Dreher 000302**



**EXHIBIT B**

**FORM OF
LOST NOTE AFFIDAVIT**

I, _____ , being duly sworn, do hereby state under oath that:

I, _____ , as the _____ (title) of PNC Bank, National Association. I am authorized to make this Affidavit on behalf of the Seller .

The Seller is the lawful owner of amounts payable under the following described note or credit agreement (the "Note"):

    Date:
    Loan No.
    Borrower(s):
    Original Principal Amount or Credit Limit.

The Seller is the lawful owner of the Note, and the Seller has not assigned or hypothecated the Note.

The original Note was not located after a thorough and diligent search.

Attached hereto is a true and correct copy of the Note, endorsed, on an allonge, "Pay to the order of _____ , without recourse".

This Affidavit is intended to be relied on by _____ .

    EXECUTED THIS _____ day of _____ .

By: _____
Name: _____
Title: _____
Date: _____

    On this _____ day of _____, _____, before me appeared _____ , to me personally known, who being duly sworn did say that she/he is the _____ of the Seller, and that said Lost Note Affidavit was signed and sealed on behalf of the institution defined in this document as the Seller, and said _____ acknowledged this instrument to be the free act and deed of said Seller.

Notary Public in and for the State of _____
My Commission expires: _____

**PNC Dreher 000303**



## SCHEDULE A

### CLOSING LOAN SCHEDULE
**(To Be Attached)**

SA-1

**PNC Dreher 000304**

REDACTED

PNC Dreher 000305



| Loan Number | (A) Purchase Price Percentage | (B) Cut off date balance | (C) Purchase Price | (D) Charge off date | (E) Charge off date balance | (F) UPB at charge off date | (G) Accrued interest at charge off date | (H) Unpaid fees at charge off date | (I) Date of last payment posted on RMS | (J) Sum of pmts post charge off | Priority |
|---|---|---|---|---|---|---|---|---|---|---|---|





REDACTED



## SCHEDULE B

### PURCHASER'S RELATIONSHIP MANAGER

| Relationship Manager: | Name and Title | Facsimile | E-Mail |
|---|---|---|---|
| | Jonathan Snyder | ██████████ | ████████@dreambuilder.net |

### SELLER'S RELATIONSHIP MANAGER

| Relationship Manager: | Name and Title | Facsimile | E-Mail |
|---|---|---|---|
| | Justin Flack | ██████████ | ██████████████ |

## REDACTED

**PNC Dreher 000307**



SCHEDULE C

DATA FIELDS
(To be Attached)

SC-1

With a copy to:

DBI ASC Mortgage Acquisition Fund, LP
4144 N. Central Expressway
Suite 900
Dallas, TX 75204
Attn: William S. Buchanan
Email: REDACTED

**REDACTED**



**SCHEDULE 5.1**

**Addresses of the Parties Pursuant to Subsection 5.1 (*Notices*)**

As to Seller and Interim Servicer:

PNC Capital Markets, LLC
340 Madison Avenue,
New York, NY 10173
Attn: Peter McCarthy
E-mail: ███████████

With a copy to:

The PNC Financial Services Group, Inc.
One PNC Plaza, 249 Fifth Avenue
Pittsburgh, PA 15222
Attn: Randal D. Shields
E-mail: ███████████

<u>As to Purchaser:</u>

American Servicing and Recovery Group,LLC
4144 N. Central Expressway
Suite 900
Dallas, TX 75204
Attn: William S. Buchanan
Email ███████████

With a copy to:

DBI/ASG Mortgage Acquisition Fund, LP
4144 N. Central Expressway
Suite 900
Dallas, TX 75204
Attn: William S. Buchanan
Email ███████████

**REDACTED**

S5.1-1

**PNC Dreher 000309**

EXHIBIT M

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3

4   STEPHEN and MELINDA DREHER,    )    CERTIFIED COPY
                                   )
5            Plaintiffs,           )
                                   )
6        vs.                       )   CASE NO. 2:18-cv-07827
                                   )
7   THE PNC FINANCIAL SERVICES     )
    GROUP, INC., a Pennsylvania    )
8   corporation, successor by      )
    merger to/with NATIONAL CITY   )
9   BANK; DREAMBUILDER             )
    INVESTMENTS, LLC, a New York   )
10  limited liability company;     )
    and DOES 1-50,                 )
11                                 )
             Defendants.           )
12  _____ )

13

14

15        DEPOSITION OF PERSON MOST KNOWLEDGEABLE OF

16                    PNC BANK, N.A.

                      THOMAS MORRIS
17
           TUESDAY, JANUARY 7, 2020, 10:15 A.M.
18
                  COSTA MESA, CALIFORNIA
19

20

21

22      Reported by Traci K. Turner, CSR No. 7123
                CLS Job No. 118343
23

24        CENTEXTLEGAL.COM - 855.CENTEXT

25

THOMAS MORRIS                                    January 07, 2020

```
 1      A.   That would be Stephen Dreher in this case we're
 2  involved with.
 3      Q.   Are you speculating it could be Stephen Dreher
 4  or is Stephen Dreher definitely one of the borrowers
 5  covered by the use of this term in that paragraph?
 6      A.    Stephen Dreher is the borrower that is involved
 7  in the transaction that caused this deposition.
 8      Q.   What is the Helping Families Save Their Homes
 9  Act of 2009?
10           MR. PAINO:   Objection; calls for a legal
11  conclusion.
12           THE WITNESS:   I'm -- I'm not familiar with that
13  act sufficiently to describe it in any more detail than
14  is described in the document itself.
15  BY MR. KENNEDY:
16      Q.   Focusing in a little more specifically, what
17  exactly -- what notice of transfer duties did PNC owe to
18  Stephen Dreher under that act with regard to the
19  purchase of his loan as evidenced in this exhibit?
20           MR. PAINO:   Objection; calls for a legal
21  conclusion.
22           THE WITNESS:   I believe we had an obligation to
23  send a, quote, "goodbye letter," close quote.
24  BY MR. KENNEDY:
25      Q.   Is that term, "goodbye letter," used in the
```

THOMAS MORRIS                                    January 07, 2020

```
 1   Helping Families Save Their Homes Act of 2009?
 2            MR. PAINO:  Objection; calls for a legal
 3   conclusion.
 4            THE WITNESS:  I do not know.
 5   BY MR. KENNEDY:
 6       Q.  Is there any specific information that's
 7   required to be in the goodbye letter under that act?
 8            MR. PAINO:  Objection; calls for a legal
 9   conclusion.
10            THE WITNESS:  I do not know.
11   BY MR. KENNEDY:
12       Q.  Let's turn back to Exhibit 1 for a second.
13   It's this document here (indicating).
14            And on the second page of that, item number 9
15   describes one of the topics of examination for today as
16   being the procedures for selling Stephen Dreher's loan,
17   number ending in 9653 to, American Servicing and
18   Recovery Group, LLC; is that correct?
19       A.  Yes.
20       Q.  And you are the person most knowledgeable at
21   PNC regarding those procedures?
22       A.  To the extent those procedures exist, yes.
23       Q.  Is one of those procedures compliance with this
24   loan purchase agreement between PNC and American
25   Servicing and Recovery Group?
```

THOMAS MORRIS                                    January 07, 2020

1           Purchaser is used here as ASRG; correct?

2      A.  That's my belief, yes.

3      Q.  And interim servicer is PNC; correct?

4      A.  Yes.

5      Q.  Do you know whether PNC did, in fact, give

6  notice to the Drehers of the sale of this loan and the

7  other topics described under this subsection?

8      A.  Only to the extent indicated in my

9  certification, yes.

10     Q.  And where exactly in your -- When you say

11  "certification," do you mean the declaration?

12     A.  Declaration, not certification, yes; thank you.

13     Q.  And what specifically were -- Which paragraph

14  were you referring to just now?

15     A.  Section 15, Post-Sale Events and mailed the

16  goodbye letter --

17     Q.  Okay.

18     A.  -- to Mr. Dreher at the Worley, Idaho, address.

19     Q.  Okay.

20          We'll get to that, but I'm going to resist the

21  temptation to jump around too much because I tend --

22  that's one of my bad habits anyway.

23     A.  Okay.

24     Q.  And I want to make sure that we have the

25  timeline of who owned and who serviced the loan when

THOMAS MORRIS                                    January 07, 2020

 1           The last page -- Sorry.

 2           Exhibit 5 is an Assignment of Deed of Trust

 3    from National City Bank to Dreambuilder Investments; am

 4    I understanding that correctly?

 5           MR. PAINO:  Objection as to form.

 6           THE WITNESS:  Yes.

 7    BY MR. KENNEDY:

 8      Q.  What was the date that this deed of --

 9    Assignment of Deed of Trust was to be executed?

10           MR. PAINO:  Objection as to form.

11           THE WITNESS:  This Assignment of Deed of Trust

12    was executed on August the 12th of 2010.

13    BY MR. KENNEDY:

14      Q.  By the summer of 2010, PNC had acquired

15    National City Bank; correct?

16      A.  Yes.

17      Q.  And under -- And by August the 12th, 2010, PNC

18    was not the owner of the loan, correct, the Dreher loan?

19      A.  Can I have that date again?

20      Q.  August 12th, 2010.

21      A.  I think we were interim servicer at that point

22    in time.

23      Q.  Correct.

24           And not the owner; correct?

25      A.  That, I believe, calls for a legal conclusion,

THOMAS MORRIS                                    January 07, 2020

1   but I would -- my conclusion -- my layperson's

2   conclusion would be yes.

3       Q.  It didn't call for a legal conclusion earlier

4   when we were going over who owned the loan when, and I

5   believe your testimony was that PNC was the owner of the

6   loan from November 6th, 2009 to July 30th, 2010.

7           Did I understand that correctly?

8       A.  That was my testimony, yes.

9       Q.  And on August 12th, 2010, ASRG was the owner of

10  the Dreher loan; correct?

11      A.  Yes.

12      Q.  Is there anything specifically in Exhibit 5,

13  this Assignment of the Deed of Trust, that indicates

14  that ASRG assigned the deed of trust to Dreambuilder

15  Investments, LLC?

16      A.  Not that I see.

17      Q.  Okay.

18          Have you seen an Assignment of Deed of Trust

19  that does specifically say ASRG assigns the deed of

20  trust to Dreambuilder Investments, LLC, at any time?

21      A.  Not that I recall.

22      Q.  Returning to your declaration, and specifically

23  on page 3 of that declaration at paragraph 12, you

24  declare that "Pursuant to DBI's instructions" -- and

25  DBI's Dreambuilder Investments, LLC; correct?

THOMAS MORRIS                                    January 07, 2020

```
 1          Those checks were sent to PNC, and PNC then
 2  transferred those funds to DBI?
 3      A.   That's correct.  That is my understanding, yes.
 4      Q.   Were those the only four payments made by the
 5  Drehers to PNC after PNC stopped being servicer of the
 6  loan in 2010?
 7      A.   Yes.
 8      Q.   Do you have any understanding why PNC suddenly
 9  starts receiving payment on this loan from the Drehers
10  in 2013?
11      A.   I would have no idea why the Drehers decided to
12  send payments to PNC.
13      Q.   Okay.
14          And do you see each of the checks -- well, the
15  checks dated April 15th, 2013 and May 15th, 2013 are
16  actually made out to PLC/National City.
17          Do you see that?
18      A.   I see that; thank you.  Good eye.
19      Q.   And I just want to make sure that I'm
20  understanding correctly.
21          Those checks, the ones made out to PLC/National
22  City, were negotiated by PNC; correct?
23      A.   Yes.
24      Q.   Okay.
25          And at the risk of inviting us both to
```

```
 1  document?
 2          MR. PAINO:  Objection; asked and answered.
 3          THE WITNESS:  No.
 4  BY MR. KENNEDY:
 5      Q.  "No," you don't know or "no," it didn't receive
 6  one?
 7      A.  You asked if I knew, so I answered "no."
 8      Q.  You don't know whether it received one?
 9      A.  I don't know.
10      Q.  Okay.
11          Would you please turn -- well, have you seen
12  other voluntary bankruptcy petitions, not regarding the
13  Drehers, during the course of your work for National
14  City and/or PNC?
15      A.  Yes.
16      Q.  You're generally familiar with the document --
17  the type of document?
18      A.  Generally, yes.
19      Q.  Okay.
20          Would you please turn to the page number -- as
21  we talked earlier that's marked in blue in the upper
22  right corner -- number 978 of this document?
23      A.  Okay.
24      Q.  And do you see where it says, "The above-named
25  Debtors hereby verify that the attached list of
```

THOMAS MORRIS                      January 07, 2020

```
 1    creditors is true and correct to the best of their

 2    knowledge"?

 3        A.  Yes.

 4        Q.  And if you -- Beginning on the next page is the

 5    list referred to; correct?

 6            MR. PAINO:  Objection; calls for speculation.

 7            THE WITNESS:  That's how I interpret it, yes.

 8    BY MR. KENNEDY:

 9        Q.  Could you go a few pages back to page

10    number 983 using the same page numbering system that we

11    talked about earlier?

12        A.  Okay.  I'm there.

13        Q.  And you see, second from the top, is listed PNC

14    Bank at P.O. Box 5570 in Brecksville, Ohio?

15        A.  Yes.

16        Q.  That was the P.O. box that you mentioned as one

17    of PNC Bank's mailing addresses that you recognized when

18    we talked about that this morning; true?

19        A.  Yes.

20            MR. PAINO:  Objection; mischaracterizes prior

21    testimony.

22    BY MR. KENNEDY:

23        Q.  Now, at the time this document was apparently

24    filed on August 5th, 2010, PNC had just sold the loan,

25    but it was still the servicer.
```

THOMAS MORRIS                                    January 07, 2020

1      And my question is, had PNC given notice to the

2  Drehers of the sale of the loan as of August 5th, 2010?

3      A.   Yes.

4      Q.   How so?

5      A.   It's based upon the evidence in my

6  certification.

7      Q.   What evidence specifically?

8      And I don't -- You know, I don't mean to be

9  tricky.  We talked about the goodbye letter earlier, but

10  I believe -- and correct me if I'm wrong -- that your

11  testimony was that the goodbye letters were sent

12  September 1st, 2010.

13      So going back to August 5th at the time this

14  petition was apparently filed, had the Drehers received

15  notice of the sale of the loan?

16      A.   Well, I would imagine that they did not.

17      Q.   Okay.

18      Your testimony earlier was that they had

19  received this goodbye letter.

20      And you agree that it's true that there was

21  definitely no notice to the Drehers prior to

22  September 1st, 2010?

23      A.   My testimony was that they were sent the

24  goodbye letter.  I don't know whether they received the

25  goodbye letter or not.

THOMAS MORRIS                          January 07, 2020

1      And on September 1st, or thereabouts, you say

2   that they were sent a goodbye letter that no one's ever

3   seen.  And even if they did get it, before that, there

4   was no notice to them; correct?

5      A.  Correct.

6      Q.  Okay.

7      Did PNC provide any notice to the bankruptcy

8   court in Idaho in the Dreher bankruptcy matter of the

9   sale of the loan?

10     A.  No.

11     Q.  Why not?

12     A.  We did not believe we had any obligation to do

13  so.

14     Q.  Okay.

15     What did you do to determine whether or not

16  there was an obligation to provide notice to the

17  bankruptcy court of the sale of the loan after having

18  been listed as a secured creditor?

19     A.  I'm drawing my testimony based upon processes

20  that are in place within the consumer-default department

21  and the oversight by our audit group and our legal group

22  to make certain that we're always in compliance with all

23  applicable laws and regulations.

24     Q.  And do you know what was involved in ensuring

25  compliance with all applicable laws and regulations in

THOMAS MORRIS                                    January 07, 2020

```
 1    BY MR. KENNEDY:
 2        Q.   Would you please turn to the second page of
 3    this document?  And do you see at the bottom where it
 4    says, "Date Prepared:  October 26th, 2010"?
 5        A.   Yes.
 6        Q.   As of October 26th, 2010, PNC was no longer the
 7    owner of this loan; correct?
 8        A.   Correct.
 9        Q.   And as of October 26, 2010, PNC was no longer
10    the servicer of this loan; correct?
11        A.   Correct.
12        Q.   Do you know who the servicer of this loan was
13    on October 26th, 2010?
14            MR. PAINO:   Objection; lacks foundation, calls
15    for speculation.
16            THE WITNESS:   No.
17    BY MR. KENNEDY:
18        Q.   After this document was filed, did PNC then
19    file anything in the bankruptcy court in the district of
20    Ohio (sic) to clarify that it was not, in fact, a
21    secured creditor of the Drehers at that time?
22        A.   In Ohio?
23        Q.   Idaho.
24        A.   Oh, Idaho; okay.
25            No.
```

THOMAS MORRIS                                    January 07, 2020

```
 1                    REPORTER'S CERTIFICATION

 2

 3        I, Traci K. Turner, Certified Shorthand Reporter,

 4   in and for the State of California, do hereby certify:

 5

 6        That the foregoing witness was by me duly sworn;

 7   that the deposition was then taken before me at the time

 8   and place herein set forth; that the testimony and

 9   proceedings were reported stenographically by me and

10   later transcript into typewriting under my direction;

11   that the foregoing is a true record of the testimony and

12   proceedings taken at that time.

13        Further, that if the foregoing pertains to the

14   original transcript of a deposition in a Federal Case,

15   before completion of the proceedings, review of the

16   transcript { X } was {  } was not required.

17        I further certify I an neither financially

18   interested in the action nor a relative or employee of

19   any attorney or party to this action.

20        IN WITNESS HEREOF, I have this date subscribed my

21   name.

22        Dated:  January 10, 2020

23                                    Traci K. Turner

24                              _____

25                                    Traci K. Turner
                                      CSR No. 7123
```

# EXHIBIT N

1   **McGLINCHEY STAFFORD**
    Brian A. Paino (SBN 251243)
2   Helen Mosothoane (SBN 254511)
    Robert J. Im (SBN 299613)
3   18201 Von Karman Avenue, Suite 350
    Irvine, California 92612
4   Telephone: (949) 381-5900
    Facsimile: (949) 271-4040
5   Email:      bpaino@mcglinchey.com
                hmosothoane@mcglinchey.com
6               rim@mcglinchey.com

7   Attorneys for *Defendant* PNC BANK, N.A., sued erroneously as THE PNC
    FINANCIAL SERVICES GROUP, INC. a Pennsylvania Corporation, successor by
8   merger to NATIONAL CITY BANK

9                    **UNITED STATES DISTRICT COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  STEPHEN and MELINDA DREHER, | Case No.: 2:18-cv-07827 |
| 12       Plaintiff, | Hon. Michael W. Fitzgerald |
| 13   v. | **DEFENDANT PNC BANK, N.A.'S RESPONSES TO PLAINTIFFS STEPHEN AND MELINDA DREHER'S INTERROGATORIES (SET ONE)** |
| 14  THE PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania Corporation, | |
| 15  successor by merger to/with NATIONAL CITY BANK; DREAMBUILDER | |
| 16  INVESTMENTS, LLC. A New York Limited Liability Company, and DOES 1- | Complaint Filed: September 7, 2018 Trial Date:    March 2, 2020 |
| 17  50, | |
| 18       Defendants. | |

19

20  **PROPOUNDING PARTY:**    Plaintiffs STEPHEN and MELINDA DREHER

21  **RESPONDING PARTY:**     Defendant PNC BANK N.A.

22  **SET NUMBER:**           ONE

23        Pursuant to Federal Rule of Civil Procedure 33, *Defendant* PNC BANK, N.A.,

24  sued erroneously as The PNC Financial Services Group, Inc., a Pennsylvania

25  Corporation, successor by merger to/with National City Bank ("PNC") provides the

26  following responses to *Plaintiffs* Stephen and Melinda Dreher's ("Plaintiffs")")

27  Interrogatories (Set One) (the "Interrogatories"):

28

## PREFATORY STATEMENT

1.    PNC's investigation and development of all facts and circumstances relating to this action is ongoing. These responses are therefore made without prejudice to, and are not a waiver of, PNC's right to introduce any evidence from any source and testimony from any witness at the trial in this action. In the event that PNC's ongoing investigation reveals that any response contained herein is either incomplete or incorrect, it will supplement its response in accordance with Federal Rule of Civil Procedure 26(e). All of the responses contained herein are otherwise made following a reasonable and diligent investigation.

2.    PNC states that it is responding to the Interrogatories as it reasonably interprets them. If Propounding Parties subsequently asserts an interpretation of any interrogatory that differs from PNC's understanding, PNC reserves its right to supplement its objections and/or responses herein.

3.    PNC states that it makes these responses solely for the purpose of, and in relation to, this action. Each response herein is made subject to all appropriate objections (including, but not limited to, objections concerning competency, relevance, materiality, propriety, and admissibility) that would require the exclusion of any information or thing at the time of trial. All such objections and grounds therefore are reserved and may be interposed at the time of trial.

4.    PNC states that, except for facts explicitly admitted herein, if any, no admission of any nature whatsoever is to be implied or inferred from these responses. The fact that PNC has responded to an interrogatory should not be taken as an admission, or a concession of the existence, of any fact set forth or assumed by such interrogatory, or that such response constitutes evidence of any fact set forth or assumed.

5.    In any instances where there is an inability to respond to a particular interrogatory, a reasonable and diligent search and reasonable inquiry has been made in an effort to respond to the interrogatory.

1        6.    PNC expressly reserves the right to supplement, clarify, revise, or correct

2    any or all of the responses contained herein in accordance with Federal Rule of Civil

3    Procedure 26(e).

4        7.    PNC states that all responses must be construed as given on the basis of its

5    present knowledge of events.

6            **RESPONSES TO INTERROGATORIES**

7    **INTERROGATORY NO. 1:**

8        Is YOUR response to each request for admission served with this interrogatory

9    an unqualified admission? If not, for each response that is not an unqualified admission:

10   (a) state the number of the request; (b) state ALL facts upon which YOU base YOUR

11   response; (c) state the name, address, and telephone number of each person who has

12   knowledge of those facts; and (d) IDENTIFY ALL DOCUMENTS and other tangible

13   things that support YOUR response and state the name, address, and telephone number

14   of the person who has each DOCUMENT or thing.

15   **RESPONSE TO INTERROGATORY NO. 1:**

16       PNC objects that the Interrogatory is vague and ambiguous, overbroad, unduly

17   burdensome and seeks information that is neither relevant to this action nor reasonably

18   calculated to lead to the discovery of admissible evidence.  PNC further objects that the

19   Interrogatory seeks information that is confidential and/or contain proprietary

20   information. PNC further objects to the Interrogatory to the extent it seeks information

21   protected by the attorney-client privilege and/or the work product doctrine.  PNC also

22   objects because the Interrogatory seeks information in Plaintiffs' possession, custody

23   and/or control or is equally available to Plaintiff.

24       Subject to and without waiving these objections, PNC responds as follows:

25       (a) <u>RFA No. 1</u>

26       (b) The subject Deed of Trust does not contain a provision requiring notice of an

27   assignment of the Deed of Trust.

28

(c) Thomas W. Morris, Officer at PNC, who may be contacted through counsel of record

(d) Deed of Trust

(a) <u>RFA No. 2</u>

(b) PNC admits that it did not give notice of the assignment of the subject Deed of Trust, however it gave notice of the transfer of servicing rights for the subject loan. The letter giving notice of the transfer of servicing of the loan was addressed to Stephen C Dreher ("Mr. Dreher") at 23210 S Cave Bay Rd., P.O. Box 400, Worley, ID 83876. Although PNC cannot locate a copy of the letter mailed to Mr. Dreher, PNC has a copy of a sample goodbye letter that would have sent to borrowers, like Mr. Dreher, whose loans were purchased and assigned under the "Non-Performing" Loan Purchase and Interim Servicing Agreement, dated July 30, 2010, between PNC and American Servicing and Recovery Group, LLC.   As a result of this agreement, the subject Deed of Trust was assigned to Dreambuilder Investments, LLC. Further, PNC has a copy of an Excel spreadsheet that would have been used to populate the goodbye letter. The spreadsheet listed Mr. Dreher, among other borrowers, and his mailing address at Worley, Idaho. The spreadsheet identified all borrowers whose loans were covered by the purchasing agreement for mailing of the goodbye letter. The goodbye letter informed borrowers of the transfer of servicing of their loan and Mr. Dreher would have been sent a similar letter informing him that DBI Fund Holdings, LLC was the new servicer on the subject loan.

(c) Thomas W. Morris, Officer at PNC, who may be contacted through counsel of record

(d) Sample goodbye letter; Spreadsheet with mailing list

(a) RFA No. 3

1     (b) PNC did not file a proof of claim in Plaintiffs' bankruptcy proceeding because

2     it did not receive notice of Plaintiffs' petition.

3     (c) Thomas W. Morris, Officer at PNC, who may be contacted through counsel

4     of record

5     (d) not applicable

6

7     (a) RFA No. 4

8     (b) PNC did not file a transfer of claim notice in Plaintiffs' bankruptcy

9     proceeding because it did not receive notice of Plaintiffs' petition.

10    (c) Thomas W. Morris, Officer at PNC, who may be contacted through counsel

11    of record

12    (d) not applicable

13

14    (a) RFA No. 5

15    (b) PNC received four (4) checks in the amount of $360.26 each between March

16    and June 2013 from Plaintiffs in connection with the subject loan. PNC cashed the

17    checks because they were made payable to PNC or National City Bank, PNC's

18    predecessor by merger, in order to reissue payment and send the payments to DBI Fund

19    Holdings, LLC, servicer of the subject loan on behalf of Dreambuilder Investments,

20    LLC, as assignee of the Deed of Trust.

21    (c) Thomas W. Morris, Officer at PNC, who may be contacted through counsel

22    of record

23    (d) General ledger

24

25    (a) RFA No. 6

26    (b) PNC received four (4) checks in the amount of $360.26 each between March

27    and June 2013 from Plaintiffs in connection with the subject loan. PNC cashed the

28    checks because they were made payable to PNC or National City Bank, PNC's

1  predecessor by merger, in order to reissue payment and send the payments to DBI Fund

2  Holdings, LLC, servicer of the subject loan on behalf of Dreambuilder Investments,

3  LLC, as assignee of the Deed of Trust.

4      (c) Thomas W. Morris, Officer at PNC, who may be contacted through counsel

5  of record

6      (d) General ledger

7

8  **INTERROGATORY NO. 2:**

9      IDENTIFY ALL PERSONS, still employed by YOU, with personal knowledge

10  RELATED TO the LOAN.

11  **RESPONSE TO INTERROGATORY NO. 2:**

12      PNC objects that the Interrogatory is overbroad, vague and ambiguous, unduly

13  burdensome and seeks information that is neither relevant to this action nor reasonably

14  calculated to lead to the discovery of admissible evidence.

15      Subject to and without waiving these objections, PNC responds that Thomas W.

16  Morris, Officer at PNC, who may be contacted through counsel of record, is the person

17  most knowledgeable regarding the subject loan and the issues in this lawsuit.

18  **INTERROGATORY NO. 3:**

19      IDENTIFY ALL PERSONS, no longer employed by YOU, with personal

20  knowledge RELATED TO the LOAN.

21  **RESPONSE TO INTERROGATORY NO. 3:**

22      PNC objects that the Interrogatory is overbroad, vague and ambiguous, unduly

23  burdensome and seeks information that is neither relevant to this action nor reasonably

24  calculated to lead to the discovery of admissible evidence.

25      Subject to and without waiving these objections, PNC responds that Thomas W.

26  Morris, Officer at PNC, who may be contacted through counsel of record, is the person

27  most knowledgeable regarding the subject loan and the issues in this lawsuit.

28

1  **INTERROGATORY NO. 4:**

2      IDENTIFY YOUR Persons Most Knowledgeable regarding the LOAN.

3  **RESPONSE TO INTERROGATORY NO. 4:**

4      PNC objects that the Interrogatory is overbroad, vague and ambiguous and seeks

5  information that is neither relevant to this action nor reasonably calculated to lead to the

6  discovery of admissible evidence.

7      Subject to and without waiving these objections, PNC responds that Thomas W.

8  Morris, Officer at PNC, who may be contacted through counsel of record, is the person

9  most knowledgeable regarding the subject loan and the issues in this lawsuit.

10  **INTERROGATORY NO. 5:**

11      IDENTIFY ALL PERSONS, still employed by YOU, with personal knowledge

12  RELATED TO the purported ASSIGNMENT to DREAMBUILDER.

13  **RESPONSE TO INTERROGATORY NO. 5:**

14      PNC objects that the Interrogatory is vague and ambiguous, overbroad, unduly

15  burdensome and seeks information that is neither relevant to this action nor reasonably

16  calculated to lead to the discovery of admissible evidence. PNC objects that the phrase

17  "purported ASSIGNMENT" is vague and ambiguous.

18      Subject to and without waiving these objections, PNC responds that Thomas W.

19  Morris, Officer at PNC, who may be contacted through counsel of record, is the person

20  most knowledgeable regarding the assignment of the subject Deed of Trust.

21  **INTERROGATORY NO. 6:**

22      IDENTIFY ALL PERSONS, no longer employed by YOU, with personal

23  knowledge RELATED TO the purported ASSIGNMENT to DREAMBUILDER.

24  **RESPONSE TO INTERROGATORY NO. 6:**

25      PNC objects that the Interrogatory is vague and ambiguous, overbroad, unduly

26  burdensome and seeks information that is neither relevant to this action nor reasonably

27  calculated to lead to the discovery of admissible evidence. PNC objects that the phrase

28  "purported ASSIGNMENT" is vague and ambiguous.

1    Subject to and without waiving these objections, PNC responds that Thomas W.

2    Morris, Officer at PNC, who may be contacted through counsel of record, is the person

3    most knowledgeable regarding the assignment of the subject Deed of Trust.

4    **INTERROGATORY NO. 7:**

5    IDENTIFY YOUR Persons Most Knowledgeable regarding the purported

6    ASSIGNMENT to DREAMBUILDER.

7    **RESPONSE TO INTERROGATORY NO. 7:**

8    PNC objects that the Interrogatory is vague and ambiguous, overbroad, and seeks

9    information that is neither relevant to this action nor reasonably calculated to lead to the

10   discovery of admissible evidence.   PNC objects that the phrase "purported

11   ASSIGNMENT" is vague and ambiguous.

12   Subject to and without waiving these objections, PNC responds that Thomas W.

13   Morris, Officer at PNC, who may be contacted through counsel of record, is the person

14   most knowledgeable regarding the assignment of the subject Deed of Trust.

15   **INTERROGATORY NO. 8:**

16   State whether YOU contend that the purported ASSIGNMENT to

17   DREAMBUILDER was valid.

18   **RESPONSE TO INTERROGATORY NO. 8:**

19   PNC objects that the Interrogatory seeks a legal conclusion. PNC further objects

20   that the Interrogatory is vague and ambiguous and seeks information that is neither

21   relevant to this action nor reasonably calculated to lead to the discovery of admissible

22   evidence.   PNC objects that the phrase "purported ASSIGNMENT" is vague and

23   ambiguous.   PNC also objects to the Interrogatory to the extent that Plaintiffs lack

24   standing to challenge the validity of an assignment. *Williams v. Bank of Am. Nat'l Ass'n*,

25   2015 U.S. Dist. LEXIS 148337,  at *12-14 (N.D. Cal. October 30, 2015) (plaintiffs

26   lacked standing to bring quiet title and cancellation of instruments claims based on

27   alleged defects in the assignment of a deed of trust).

28

1   Subject to and without waiving these objections, PNC responds that it deems the

2   assignment of the Deed of Trust to be valid and legally effective.

3   **INTERROGATORY NO. 9:**

4   If YOUR answer to Special Interrogatory No. 8 is a yes, IDENTIFY ALL

5   PERSONS with personal knowledge of ANY facts that support YOUR contention that

6   the purported ASSIGNMENT to DREAMBUILDER was valid.

7   **RESPONSE TO INTERROGATORY NO. 9:**

8   PNC objects that the Interrogatory seeks a legal conclusion. PNC further objects

9   that the Interrogatory is vague and ambiguous, burdensome and seeks information that

10   is neither relevant to this action nor reasonably calculated to lead to the discovery of

11   admissible evidence. PNC objects that the phrase "purported ASSIGNMENT" is vague

12   and ambiguous. PNC also objects to the Interrogatory to the extent that Plaintiffs lack

13   standing to challenge the validity of an assignment. *Williams v. Bank of Am. Nat'l Ass'n*,

14   2015 U.S. Dist. LEXIS 148337, at *12-14 (N.D. Cal. October 30, 2015) (plaintiffs

15   lacked standing to bring quiet title and cancellation of instruments claims based on

16   alleged defects in the assignment of a deed of trust).

17   Subject to and without waiving these objections, PNC responds: Thomas W.

18   Morris, Officer at PNC, who may be contacted through counsel of record, is the person

19   most knowledgeable regarding the assignment.

20   **INTERROGATORY NO. 10:**

21   If YOUR answer to Special Interrogatory No. 8 is a yes, describe each

22   DOCUMENT that supports YOUR contention that the purported ASSIGNMENT to

23   DREAMBUILDER was valid.

24   **RESPONSE TO INTERROGATORY NO. 10:**

25   PNC objects that the Interrogatory seeks a legal conclusion. PNC further objects

26   that the Interrogatory is vague and ambiguous and seeks information that is neither

27   relevant to this action nor reasonably calculated to lead to the discovery of admissible

28   evidence. PNC objects that the phrase "purported ASSIGNMENT" is vague and

9                                         Case No. 2:18-cv-07827

1   ambiguous.  PNC also objects to the Interrogatory to the extent that Plaintiffs lack

2   standing to challenge the validity of an assignment. *Williams v. Bank of Am. Nat'l Ass'n*,

3   2015 U.S. Dist. LEXIS 148337, at \*12-14 (N.D. Cal. October 30, 2015) (plaintiffs

4   lacked standing to bring quiet title and cancellation of instruments claims based on

5   alleged defects in the assignment of a deed of trust). Further, PNC objects that the

6   Interrogatory seeks information that is confidential and/or contain proprietary

7   information.

8       Subject to and without waiving these objections, PNC responds: the Assignment

9   of Deed of Trust executed by PNC and the "Non-Performing" Loan Purchase and

10  Interim Servicing Agreement, dated July 30, 2010.

11  **INTERROGATORY NO. 11:**

12      State whether YOU contend that Propounding Party was properly notified of the

13  purported ASSIGNMENT to DREAMBUILDER.

14  **RESPONSE TO INTERROGATORY NO. 11:**

15      PNC objects that the phrase "purported ASSIGNMENT" is vague and

16  ambiguous. PNC objects that the Interrogatory seeks a legal conclusion. PNC objects

17  that the Interrogatory is vague and ambiguous and seeks information that is neither

18  relevant to this action nor reasonably calculated to lead to the discovery of admissible

19  evidence. PNC further objects because the Interrogatory incorrectly assumes PNC was

20  obligated to give notice of the assignment.

21      Subject to and without waiving these objections, PNC refers to its response above

22  to Interrogatory No. 1 as it relates to Request for Admission No. 2.

23  **INTERROGATORY NO. 12:**

24      If YOUR answer to Special Interrogatory No. 11 is a yes, IDENTIFY ALL

25  PERSONS with personal knowledge of ANY facts that support YOUR contention that

26  Propounding Party was properly notified of the purported ASSIGNMENT to

27  DREAMBUILDER.

28

**RESPONSE TO INTERROGATORY NO. 12:**

PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC objects that the Interrogatory seeks a legal conclusion. PNC objects that the Interrogatory is vague and ambiguous, burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. PNC further objects because the Interrogatory incorrectly assumes PNC was obligated to give notice of the assignment.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 2.

**INTERROGATORY NO. 13:**

If YOUR answer to Special Interrogatory No. 11 is a yes, describe each DOCUMENT that supports YOUR contention that Propounding Party was properly notified of the purported ASSIGNMENT to DREAMBUILDER.

**RESPONSE TO INTERROGATORY NO. 13:**

PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC objects that the Interrogatory seeks a legal conclusion. PNC objects that the Interrogatory is vague and ambiguous and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. PNC further objects because the Interrogatory incorrectly assumes PNC was obligated to give notice of the assignment. Further, PNC objects that the Interrogatory seeks information that is confidential and/or contain proprietary information.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 2.

**INTERROGATORY NO. 14:**

State whether YOU received any payment from Propounding Party after the purported ASSIGNMENT to DREAMBUILDER.

PNC BANK, N.A.'S RESPONSES TO INTERROGATORIES (SET 1)
2470237.1

**RESPONSE TO INTERROGATORY NO. 14:**

PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC objects that the Interrogatory is vague and ambiguous and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 5.

**INTERROGATORY NO. 15:**

If YOUR answer to Special Interrogatory No. 14 is a no, IDENTIFY ALL PERSONS with personal knowledge of ANY facts that support YOUR contention that YOU did not receive any payment from Propounding Party after the purported ASSIGNMENT to DREAMBUILDER.

**RESPONSE TO INTERROGATORY NO. 15:**

PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC objects that the Interrogatory is vague and ambiguous, burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 5.

**INTERROGATORY NO. 16:**

If YOUR answer to Special Interrogatory No. 14 is a no, describe each DOCUMENT that supports YOUR contention that YOU did not receive any payment from Propounding Party after the purported ASSIGNMENT to DREAMBUILDER.

**RESPONSE TO INTERROGATORY NO. 16:**

PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC objects that the Interrogatory is vague and ambiguous and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 5.

**INTERROGATORY NO. 17:**

State whether YOU deposited any payment from Propounding Party after the purported ASSIGNMENT to DREAMBUILDER.

**RESPONSE TO INTERROGATORY NO. 17:**

PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC objects that the Interrogatory is vague and ambiguous and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 6.

**INTERROGATORY NO. 18:**

If YOUR answer to Special Interrogatory No. 17 is a no, IDENTIFY ALL PERSONS with personal knowledge of ANY facts that support YOUR contention that YOU did not deposit any payment from Propounding Party after the purported ASSIGNMENT to DREAMBUILDER.

**RESPONSE TO INTERROGATORY NO. 18:**

PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC objects that the Interrogatory is vague and ambiguous and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 6.

**INTERROGATORY NO. 19:**

If YOUR answer to Special Interrogatory No. 17 is a no, describe each DOCUMENT that supports YOUR contention that YOU did not deposit any payment from Propounding Party after the purported ASSIGNMENT to DREAMBUILDER.

1  **RESPONSE TO INTERROGATORY NO. 19:**

2      PNC objects that the phrase "purported ASSIGNMENT" is vague and

3  ambiguous. PNC objects that the Interrogatory is vague and ambiguous and seeks

4  information that is neither relevant to this action nor reasonably calculated to lead to the

5  discovery of admissible evidence.

6      Subject to and without waiving these objections, PNC refers to its response above

7  to Interrogatory No. 1 as it relates to Request for Admission No. 6.

8  **INTERROGATORY NO. 20:**

9      State whether YOU received notices from the BANKRUPTCY

10  PROCEEDINGS.

11  **RESPONSE TO INTERROGATORY NO. 20:**

12      PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad.

13  PNC also objects that the Interrogatory is vague and ambiguous and seeks information

14  that is neither relevant to this action nor reasonably calculated to lead to the discovery

15  of admissible evidence.

16      Subject to and without waiving these objections, PNC responds that it did not

17  receive notice of the bankruptcy proceeding filed by Plaintiffs.

18  **INTERROGATORY NO. 21:**

19      If YOUR answer to Special Interrogatory No. 20 is a yes, state whether YOU

20  contend that YOU were listed as a creditor in the BANKRUPTCY PROCEEDINGS.

21  **RESPONSE TO INTERROGATORY NO. 21:**

22      Not applicable because PNC did not respond "yes" to Interrogatory No. 20.

23  **INTERROGATORY NO. 22:**

24      If YOUR answer to Special Interrogatory No. 21 is a no, IDENTIFY ALL

25  PERSONS with personal knowledge of ANY facts that support YOUR contention that

26  YOU were not listed as a creditor in the BANKRUPTCY PROCEEDINGS.

27

28

1  **RESPONSE TO INTERROGATORY NO. 22:**

2  PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad.

3  PNC also objects that the Interrogatory is vague and ambiguous, burdensome and seeks

4  information that is neither relevant to this action nor reasonably calculated to lead to the

5  discovery of admissible evidence.

6  Subject to and without waiving these objections, and assuming the Interrogatory

7  relates to whether PNC responded "No" to Interrogatory No. 20, PNC responds that it

8  does not contend that it was not listed as a creditor by Plaintiffs under their bankruptcy

9  petition.  However, PNC responds that it did not receive notice of the bankruptcy

10 proceeding filed by Plaintiffs. Thomas W. Morris, Officer at PNC, who may be

11 contacted through counsel of record, is the person most knowledgeable regarding the

12 issues in this lawsuit.

13 **INTERROGATORY NO. 23:**

14 If YOUR answer to Special Interrogatory No. 21 is a no, describe each

15 DOCUMENT that supports YOUR contention that YOU were not listed as a creditor

16 in the BANKRUPTCY PROCEEDINGS.

17 **RESPONSE TO INTERROGATORY NO. 23:**

18 PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad.

19 PNC also objects that the Interrogatory is vague and ambiguous, burdensome and seeks

20 information that is neither relevant to this action nor reasonably calculated to lead to the

21 discovery of admissible evidence.

22 Subject to and without waiving these objections, and assuming the Interrogatory

23 relates to whether PNC responded "No" to Interrogatory No. 20, PNC responds that it

24 does not contend that it was not listed as a creditor by Plaintiffs under their bankruptcy

25 petition.  However, PNC responds that it did not receive notice of the bankruptcy

26 proceeding filed by Plaintiffs. PNC cannot identify any documents demonstrating that

27 it did not receive notice of the bankruptcy proceedings.

28

**INTERROGATORY NO. 24**:

State whether YOU filed notice in the BANKRUPTCY PROCEEDINGS of the purported ASSIGNMENT to DREAMBUILDER.

**RESPONSE TO INTERROGATORY NO. 24**:

PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad. PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC also objects that the Interrogatory seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Further, PNC objects because the Interrogatory seeks information in Plaintiffs' possession, custody and/or control or is equally available to Plaintiff.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 4.

**INTERROGATORY NO. 25**:

If YOUR answer to Special Interrogatory No. 24 is a yes, IDENTIFY ALL PERSONS with personal knowledge of ANY facts that support YOUR contention that YOU filed notice in the BANKRUPTCY PROCEEDINGS of the purported ASSIGNMENT to DREAMBUILDER.

**RESPONSE TO INTERROGATORY NO. 25**:

PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad. PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC also objects that the Interrogatory is burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Further, PNC objects because the Interrogatory seeks information in Plaintiffs' possession, custody and/or control or is equally available to Plaintiff.

Subject to and without waiving these objections, PNC refers to its response above to Interrogatory No. 1 as it relates to Request for Admission No. 4.

**PNC BANK, N.A.'S RESPONSES TO INTERROGATORIES (SET 1)**

2470237.1

1   **INTERROGATORY NO. 26:**

2       If YOUR answer to Special Interrogatory No. 24 is a yes, describe each

3   DOCUMENT that supports YOUR contention that YOU filed notice in the

4   BANKRUPTCY PROCEEDINGS of the purported ASSIGNMENT to

5   DREAMBUILDER.

6   **RESPONSE TO INTERROGATORY NO. 26:**

7       PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad.

8   PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC

9   also objects that the Interrogatory seeks information that is neither relevant to this action

10   nor reasonably calculated to lead to the discovery of admissible evidence. Further, PNC

11   objects because the Interrogatory seeks information in Plaintiffs' possession, custody

12   and/or control or is equally available to Plaintiff.

13       Subject to and without waiving these objections, PNC refers to its response above

14   to Interrogatory No. 1 as it relates to Request for Admission No. 4.

15
16   DATED: August 26, 2019        **McGLINCHEY STAFFORD**

17                         */s/ Helen Mosothoane*

18              By:_____
                BRIAN A. PAINO

19                   HELEN MOSOTHOANE
                ROBERT J. IM

20                   Attorneys for *Defendant* PNC BANK, N.A.,
                sued erroneously as THE PNC FINANCIAL

21                   SERVICES GROUP, INC. a Pennsylvania
                Corporation, successor by merger to

22                   NATIONAL CITY BANK

23
24
25
26
27
28

**PNC BANK, N.A.'S RESPONSES TO INTERROGATORIES (SET 1)**

2470237.1

## VERIFICATION

I, Thomas W. Morris, declare as follows:

1.    I have read the foregoing *Responses to Interrogatories (Set One)* (the "Responses") and know of its contents.

2.    I am employed as Officer by PNC Bank, N.A. ("PNC") and am authorized to make this verification on behalf of PNC.

3.    Based on a reasonable inquiry, I believe that the foregoing Responses are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of August, 2019, at Brecksville, OH.

_____
THOMAS W. MORRIS

PNC BANK, N.A.'S RESPONSES TO INTERROGATORIES (SET 1)

72933.1

**PROOF OF SERVICE**

1

2

3  **STATE OF CALIFORNIA** ⟩
                              ⟩  ss.
4  **COUNTY OF ORANGE** ⟩

5  I, Theresa Fontes, declare:

6  I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 18201 Von Karman Ave.,
7  Suite 350, Irvine, California 92612.

8  On August 26, 2019, I served the document(s) described as **DEFENDANT PNC BANK, N.A.'S RESPONSES TO PLAINTIFFS STEPHEN AND MELINDA**
9  **DREHER'S INTERROGATORIES (SET ONE)** as follows:

10  ☒      **BY MAIL:**  As follows:

11         ☒      **FEDERAL – I** deposited such envelope in the U.S. mail at Irvine, California, with postage thereon fully prepaid,

12

13  ☐      **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I caused said document(s) to be served by means of this Court's Electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, to the
14         parties and/or counsel who are registered CM/ECF users set forth in the service list obtained from this Court.  Pursuant to Electronic Filing Court Order, I
15         hereby certify that the above documents(s) was uploaded to the website and will be posted on the website by the close of the next business day and the
16         webmaster will give e-mail notification to all parties.

17  ☒      **FEDERAL:**  I declare that I employed in the office of a member of the State Bar of this Court at whose direction the service was made.

18

19  Executed on August 26, 2019, at Irvine, California.

20

21                                              _____
                                                Theresa Fontes
22

23

24

25

26

27

28

1443997.1

**SERVICE LIST**
**United States District Court, Central Division**
**Dreher v. The PNC Financial Services Group**
**File # 107531.0004**

Daniel L. Rottinghaus, Esq.                     Attorneys     for     STEPHEN     AND
Scott M. Mackey, Esq.                           MELINDA DREHER
Seema N. Kadaba, Esq.
BERDING & WEIL LLP
2175 N. California Blvd., Suite 500
Walnut Creek, CA 94596

# EXHIBIT O

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4

   STEPHEN AND MELINDA DREHER,        )
                                      )
5              Plaintiffs,            )
                                      )
6                                     ) Case No.
            vs.                       ) 2:18-CV-07827-MWF-FF
7                                     )
   PNC BANK NA., a Pennsylvania       )
8  Corporation, successor by merger)
   to/with National City Bank;        )
9  DREAMBUILDER INVESTMENTS, LLC,     )
   a New York limited liability       )
10 company; AMERICAN SERVICING AND )
   RECOVERY GROUP LLC, a Texas        )
11 limited liability company; and    )
   DOES 1-50,                         )
12                                    )
               Defendants.            )
13 _____)

14

15

16                   VOLUME I

17    VIDEOCONFERENCED VIDEOTAPED DEPOSITION OF

18                 STEPHEN DREHER

19             MONDAY, JUNE 22, 2020

20

21

22

23 PAGES 1 to 198

24 JOB NO.:  4133260

25 REPORTED BY TARA SANDFORD, CSR NO. 3374, RPR

                                         Page 1

```
 1    has your name and name of debtor and a note.  And the      11:17:08

 2    third field it says "name of creditor."

 3         A.    Right.

 4         Q.    Can you please read the entire line here, after

 5    name of creditor?                                           11:17:20

 6         A.    "Name of creditor (the person or other entity

 7    to whom the debtor owes money or property):"

 8         Q.    What is the answer to this field in here?

 9         A.    Blank.

10         Q.    It's blank?                                      11:17:41

11         A.    Yes.

12         Q.    So do you agree the proof of claim does not

13    identify a creditor?  The creditor --

14         A.    That portion --

15         Q.    I'm sorry.  Do you agree that -- do you agree    11:17:50

16    that the proof of claim does not identify a creditor

17    under the "name of creditor" field?

18         A.    In that field, you're correct.

19         Q.    You said in your Complaint that the proof of

20    claim listed PNC as a creditor.  Where in this document    11:18:14

21    is PNC listed as a creditor?

22              MR. HAGEN:  Objection.  Objection;

23    argumentative.  Object to the form.

24              You can answer.

25              THE WITNESS:  Down in 3, Section 3, it says,      11:18:29
```

Page 59

1    "Last four digits of any number by which creditor          11:18:34

2    identified the debtor" and it says "5533 [sic]."

3              And then it says, "Debtor may have scheduled

4    account as PNC."

5        Q.   Is it your assertion that the information in       11:19:00

6    line 3 of the proof of claim identifies PNC as a

7    creditor?

8        A.   That's my interpretation.

9        Q.   Are you a bankruptcy attorney, Mr. Dreher?

10       A.   No.                                                11:19:14

11            MR. HAGEN:   Objection; argumentative.

12   Objection; argumentative.

13       Q.   BY MS. MOSOTHOANE:   Mr. Dreher, do you remember

14   the -- the account number or the loan number that PNC

15   used when it owned the loan, the subject loan?             11:19:28

16       A.   I do not.

17       Q.   What about the identifying number here 5583

18   leads you to believe that PNC is a creditor on this

19   proof of claim?

20       A.   Nothing.                                          11:19:50

21       Q.   So your belief that PNC was a creditor under

22   this proof of claim is under Item 3A:   "Debtor may have

23   scheduled account as PNC"?

24       A.   Yes.

25       Q.   Do you believe, Mr. Dreher, that PNC asked or      11:20:13

                                                    Page 60

```
 1              (Whereupon, Exhibit 11 was marked           11:35:54

 2          for identification by the Court Reporter

 3          and attached hereto.)

 4          MS. MOSOTHOANE:  I would like to mark as

 5     Exhibit 11 the letter from Green Tree.               11:36:04

 6        Q.   I am going to share my screen, Mr. Dreher.

 7          This letter is Bates-numbered 00042.  This was

 8     part of your document production.  I'm sorry.  That's

 9     incorrect.  This was actually produced via subpoena by

10     Green Tree.                                          11:36:57

11          So this letter was addressed to you,

12     Mr. Dreher, it states in the re line "Green Tree

13     Servicing LLC (Green Tree) account number partially

14     redacted.  Creditor:  U.S. Bank National Association,

15     not in its individual capacity but solely as trustee 11:37:17

16     under the brand-new start pass-through trust agreement.

17          "Dear Valued Customer, the servicing of your

18     loan was transferred from PNC Mortgage, a division of

19     PNC Bank NA, to Green Tree on September 1, 2020 [sic].

20     We are pleased to welcome you to Green Tree."        11:37:37

21          Do you recall receiving this letter,

22     Mr. Dreher?

23        A.   No.

24        Q.   Mr. Dreher, I notice this letter was addressed

25     to your home at 546 North Highland Avenue, the subject 11:37:59
```

Page 69

```
 1    property.                                            11:38:04

 2            In October of 2010 you had a tenant living

 3    there; correct?

 4        A.   Correct.

 5        Q.   Did you ever ask your tenant to forward you any  11:38:15

 6    mail that was sent to you at this 546 North Highland

 7    Avenue address?

 8        A.   No.

 9        Q.   Do you recall, Mr. Dreher, receiving notice

10    from PNC that it was no longer servicing the subject    11:38:43

11    loan?

12        A.   That it was no longer servicing?  I don't know

13    that any notice was received from PNC saying it was no

14    longer servicing the note.

15            But I do remember getting notice from other     11:39:02

16    servicers that they were servicing the note.  So I

17    suppose you could infer that PNC was no longer servicing

18    at that point.

19        Q.   Mr. Dreher, can we go back to your Second

20    Amended Complaint on paragraph 16?                      11:39:49

21        A.   Okay.

22        Q.   You state, "On or about August 5, 2010,

23    plaintiffs filed for bankruptcy under Chapter 11 listing

24    PNC as a creditor.  On or about October 26, 2010, Green

25    Tree Servicing, LLC, hereinafter Green Tree, took over  11:40:08
```

Page 70

```
 1    STATE OF CALIFORNIA,              )

 2    COUNTY OF SANTA BARBARA.          ) ss.

 3

 4         I, TARA SANDFORD, RPR, CSR No. 3374, in and for the

 5    State of California, hereby certify:

 6         That prior to being examined, the witness named in

 7    the foregoing deposition was duly sworn by me to testify

 8    the truth, the whole truth, and nothing but the truth;

 9         That said deposition was taken down by me in

10    shorthand at the time and place therein named, and

11    thereafter reduced to typewriting under my direction,

12    and the same is a true, correct and complete transcript

13    of said proceedings;

14         That if the foregoing pertains to the original

15    transcript of an examination in a Federal Case, before

16    completion of the proceedings, review of the transcript

17    { } was   {  } was not required.

18         I further certify that I am not interested in the

19    event of the action.

20         Witness my hand this 8th day of July, 2020,

21    at Santa Barbara, California.

22

23

24         _____

25         TARA SANDFORD, CSR NO. 3374
```

                                             Page 198

# EXHIBIT P

1  **McGLINCHEY STAFFORD**
   Brian A. Paino (SBN 251243)
2  Helen Mosothoane (SBN 254511)
   Robert J. Im (SBN 299613)
3  18201 Von Karman Avenue, Suite 350
   Irvine, California 92612
4  Telephone: (949) 381-5900
   Facsimile: (949) 271-4040
5  Email:      bpaino@mcglinchey.com
                hmosothoane@mcglinchey.com
6               rim@mcglinchey.com

7  Attorneys for *Defendant* PNC BANK, N.A., sued erroneously as THE PNC
   FINANCIAL SERVICES GROUP, INC. a Pennsylvania Corporation, successor by
8  merger to NATIONAL CITY BANK

9                  **UNITED STATES DISTRICT COURT**

10                **CENTRAL DISTRICT OF CALIFORNIA**

11

12 | STEPHEN and MELINDA DREHER,          | Case No.: 2:18-cv-07827

13 |         Plaintiff,                   | Hon. Michael W. Fitzgerald

14 |     v.                               | **DEFENDANT PNC BANK, N.A.'S RESPONSES TO PLAINTIFFS**
15 | THE PNC FINANCIAL SERVICES            | **STEPHEN AND MELINDA**
   | GROUP, INC., a Pennsylvania Corporation, | **DREHER'S REQUESTS FOR**
16 | successor to/with NATIONAL            | **ADMISSIONS (SET ONE)**
   | CITY BANK; DREAMBUILDER               |
17 | INVESTMENTS, LLC. A New York          | Complaint Filed: September 7, 2018
   | Limited Liability Company, and DOES 1- | Trial Date:       March 2, 2020
18 | 50,                                   |

19 |         Defendants.                   |

20

21 **PROPOUNDING PARTY:**   Plaintiffs STEPHEN and MELINDA DREHER

22 **RESPONDING PARTY:**    Defendant PNC BANK, N.A.

23 **SET NUMBER:**          ONE

24      Pursuant to Federal Rule of Civil Procedure 36, *Defendant* PNC BANK, N.A.,

25 sued erroneously as The PNC Financial Services Group, Inc., a Pennsylvania

26 Corporation, successor by merger to/with National City Bank ("PNC") provides the

27

28

2470249.2

following responses to *Plaintiffs* Stephen and Melinda Dreher's ("Plaintiffs") Requests for Admission (Set One) (the "Requests"):

### PREFATORY STATEMENT

1.     PNC's investigation and development of all facts and circumstances relating to this action is ongoing. These responses are therefore made without prejudice to, and are not a waiver of, PNC's right to introduce any evidence from any source and testimony from any witness at the trial in this action. In the event that PNC's ongoing investigation reveals that any response contained herein is either incomplete or incorrect, it will supplement its response in accordance with Federal Rule of Civil Procedure 26(e). All of the responses contained herein are otherwise made following a reasonable and diligent investigation.

2.     PNC states that it is responding to the Requests as it reasonably interprets them. If PNC subsequently asserts an interpretation of any request that differs from PNC's understanding, PNC reserves its right to supplement its objections and/or responses herein.

3.     PNC states that it makes these responses solely for the purpose of, and in relation to, this action. Each response herein is made subject to all appropriate objections (including, but not limited to, objections concerning competency, relevance, materiality, propriety, and admissibility) that would require the exclusion of any information or thing at the time of trial. All such objections and grounds therefore are reserved and may be interposed at the time of trial.

4.     PNC states that, except for facts explicitly admitted herein, if any, no admission of any nature whatsoever is to be implied or inferred from these responses. The fact that PNC has responded to a request should not be taken as an admission, or a concession of the existence, of any fact set forth or assumed by such request, or that such response constitutes evidence of any fact set forth or assumed.

5.   In any instances where there is an inability to respond to a particular request, a reasonable and diligent search and reasonable inquiry has been made in an effort to respond to the request.

6.   PNC expressly reserves the right to supplement, clarify, revise, or correct any or all of the responses contained herein in accordance with Federal Rule of Civil Procedure 26(e).

7.   PNC states that all responses must be construed as given on the basis of its present knowledge of events.

## RESPONSES TO REQUESTS FOR GENUINENESS

### REQUEST FOR GENUINENESS NO. 1:

Admit that attached hereto as Exhibit A is a true and correct copy of the Deed of Trust RELATED TO the LOAN.

### RESPONSE TO REQUEST FOR GENUINENESS NO. 1:

Admit.

### REQUEST FOR GENUINENESS NO. 2:

Admit that attached hereto as Exhibit B is a true and correct copy of the ASSIGNMENT.

### RESPONSE TO REQUEST FOR GENUINENESS NO. 2:

PNC admits that page 2 of the document attached as Exhibit B is a copy of the assignment of the subject Deed of Trust issued by PNC on or about August 12, 2010 in favor of Dreambuilder Investments, LLC.

### REQUEST FOR GENUINENESS NO. 3:

Admit that attached hereto as Exhibit C is a true and correct copy of the Proof of Service from the BANKRUPTCY PROCEEDINGS.

### RESPONSE TO REQUEST FOR GENUINENESS NO. 3:

PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad. PNC further objects that the phrase "Proof of Service" is undefined and is vague,

1   ambiguous and misleading as it relates to the document attached as Exhibit C which

2   states, "Notice Recipients."

3          Subject to and without waiving these objections, PNC responds that the document

4   attached as Exhibit C was not created, issued or emitted by PNC and PNC therefore

5   lacks knowledge sufficient to admit or deny the genuineness of such document.

6   **REQUEST FOR GENUINENESS NO. 4:**

7          Admit that attached hereto as Exhibit D are true and correct copies of checks

8   listing YOU as recipient.

9   **RESPONSE TO REQUEST FOR GENUINENESS NO. 4:**

10          PNC objects that the request is vague and ambiguous.  Subject to and without

11   waiving this objection, PNC responds that the documents attached as Exhibit D were

12   not created, issued or emitted by PNC and PNC therefore lacks knowledge sufficient to

13   admit or deny the genuineness of the documents.

14                  **RESPONSES TO REQUESTS FOR ADMISSION**

15   **REQUEST FOR ADMISSION NO. 1:**

16          Admit that YOU were required under the Deed of Trust, attached hereto as

17   Exhibit A, to provide notice to Propounding Party of the purported ASSIGNMENT to

18   DREAMBUILDER.

19   **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

20          PNC objects that the phrase "purported ASSIGNMENT" is vague and

21   ambiguous. PNC further objects that the request is a legal conclusion.  PNC also objects

22   that the request seeks information that is neither relevant to this action nor reasonably

23   calculated to lead to the discovery of admissible evidence.  Further, PNC objects

24   because the request seeks information in Plaintiffs' possession, custody and/or control

25   or is equally available to Plaintiff.

26          Subject to and without waiving these objections, PNC denies.

27

28

                                            4                    Case No.: 2:18-CV-07827

2470249 2

1  **REQUEST FOR ADMISSION NO. 2 :**

2      Admit that YOU did not provide Propounding Party notice of the purported

3  ASSIGNMENT to DREAMBUILER, as required under the Deed of Trust, attached

4  hereto as 8 Exhibit A.

5  **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

6      PNC objects that the phrase "purported ASSIGNMENT" is vague and

7  ambiguous. PNC further objects that the request is a legal conclusion. PNC also objects

8  that the request seeks information that is neither relevant to this action nor reasonably

9  calculated to lead to the discovery of admissible evidence. PNC objects that the request

10  misstates the facts because the subject Deed of Trust does not require notice of

11  assignment of the Deed of Trust. PNC further objects because the request incorrectly

12  assumes PNC was obligated to give notice of the assignment.

13      Subject to and without waiving these objections, PNC admits that it did not give

14  notice of the assignment of the Deed of Trust, however it gave notice of the transfer of

15  servicing rights to DBI, Fund Holdings, LLC, the servicer of the subject loan for

16  Dreambuilder Investments, LLC.

17  **REQUEST FOR ADMISSION NO. 3:**

18      Admit that YOU were listed in the BANKRUPTCY PROCEEDINGS as a

19  creditor.

20  **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

21      PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad.

22  PNC further objects that the request is a legal conclusion. PNC also objects that the

23  request seeks information that is neither relevant to this action nor reasonably calculated

24  to lead to the discovery of admissible evidence. Further, PNC objects because the

25  request seeks information in Plaintiffs' possession, custody and/or control or is equally

26  available to Plaintiff.

27

28

1   Subject to and without waiving these objections, PNC admits that it was

2   identified as a creditor under Schedule D (Creditors Holding Secured Claims) of

3   Plaintiffs' bankruptcy petition. PNC denies the implication that it filed a proof of claim

4   as a creditor under Plaintiffs' bankruptcy.

5   **REQUEST FOR ADMISSION NO. 4:**

6   Admit that YOU never filed notice in the BANKRUPTCY PROCEEDINGS of

7   the purported ASSIGNMENT to DREAMBUILDER.

8   **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

9   PNC objects that the term "BANKRUPTCY PROCEEDINGS" is overbroad.

10  PNC objects that the phrase "purported ASSIGNMENT" is vague and ambiguous. PNC

11  further objects that the request is a legal conclusion. PNC also objects that the request

12  seeks information that is neither relevant to this action nor reasonably calculated to lead

13  to the discovery of admissible evidence. Further, PNC objects because the request seeks

14  information in Plaintiffs' possession, custody and/or control or is equally available to

15  Plaintiff.

16  Subject to and without waiving these objections, PNC admits that it did not file

17  a transfer of claim notice relating to the assignment of the subject Deed of Trust to

18  Dreambuilder Investments, LLC because it did not receive notice of the bankruptcy

19  proceeding filed by Plaintiffs.

20  **REQUEST FOR ADMISSION NO. 5:**

21  Admit that after the purported ASSIGNMENT to DREAMBUILDER, YOU

22  received payment from Propounding Party RELATED TO the LOAN, as indicated in

23  Exhibit D, attached hereto.

24  **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

25  PNC objects that the phrase "purported ASSIGNMENT" is vague and

26  ambiguous. PNC also objects that the request seeks information that is neither relevant

27  to this action nor reasonably calculated to lead to the discovery of admissible evidence.

28

6                           Case No.: 2:18-CV-07827

2470249.2

1    Subject to and without waiving these objections, PNC admits it received four (4)
2    checks in the amount of $360.26 each between March and June 2013 from Plaintiffs in
3    connection with the subject loan. PNC cashed the checks because they were made
4    payable to PNC or National City Bank, PNC's predecessor by merger, in order to
5    reissue payment and send the payments to DBI Fund Holdings, LLC, servicer of the
6    subject loan on behalf of Dreambuilder Investments, LLC, as assignee of the Deed of
7    Trust.

8    **REQUEST FOR ADMISSION NO. 6:**

9    Admit that after the purported ASSIGNMENT to DREAMBUILDER, YOU
10   deposited payment from Propounding Party RELATED TO the LOAN, as indicated in
11   Exhibit D, attached hereto.

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

13   PNC objects that the phrase "purported ASSIGNMENT" is vague and
14   ambiguous.  PNC further objects that the phrase "deposited payment" is vague and
15   ambiguous.  PNC also objects that the request seeks information that is neither relevant
16   to this action nor reasonably calculated to lead to the discovery of admissible evidence.

17   Subject to and without waiving these objections, PNC admits it received four (4)
18   checks in the amount of $360.26 each between March and June 2013 from Plaintiffs in
19   connection with the subject loan. PNC cashed the checks because they were made
20   payable to PNC or National City Bank, PNC's predecessor by merger, in order to

21   / / /
22   / / /
23   / / /
24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

1  reissue payment and send the payments to DBI Fund Holdings, LLC, servicer of the

2  subject loan on behalf of Dreambuilder Investments, LLC, as assignee of the Deed of

3  Trust.

4     DATED: August 26, 2019      **McGLINCHEY STAFFORD**

5

6

7  By: _/s/ Helen Mosothoane_
        BRIAN A. PAINO

8         HELEN MOSOTHOANE
        ROBERT J. IM

9         Attorneys for *Defendant* PNC BANK, N.A.,
        sued erroneously as THE PNC FINANCIAL

10        SERVICES GROUP, INC. a Pennsylvania
        Corporation, successor by merger to

11       NATIONAL CITY BANK

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PNC BANK, N.A.'S RESPONSES TO REQUESTS FOR ADMISSION (SET 1)**

2470249.2

**PROOF OF SERVICE**

1

2

3  **STATE OF CALIFORNIA**   )
                                      ) ss.
4  **COUNTY OF ORANGE**       )

5  I, Theresa Fontes, declare:

6  I am employed in the County of Orange, State of California. I am over the age of 18
   and not a party to the within action. My business address is 18201 Von Karman Ave.,
7  Suite 350, Irvine, California 92612.

8  On August 26, 2019, I served the document(s) described as **DEFENDANT PNC
   BANK, N.A.'S RESPONSES TO PLAINTIFFS STEPHEN AND MELINDA**
9  **DREHER'S REQUESTS FOR ADMISSIONS (SET ONE)** as follows:

10  ☒   **BY MAIL:** As follows:

11        ☒   **FEDERAL** – I deposited such envelope in the U.S. mail at Irvine,
           California, with postage thereon fully prepaid,
12
     ☐   **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I caused said
13        document(s) to be served by means of this Court's Electronic transmission of
           the Notice of Electronic Filing through the Court's transmission facilities, to the
14        parties and/or counsel who are registered CM/ECF users set forth in the service
           list obtained from this Court. Pursuant to Electronic Filing Court Order, I
15        hereby certify that the above documents(s) was uploaded to the website and will
           be posted on the website by the close of the next business day and the
16        webmaster will give e-mail notification to all parties.

17  ☒   **FEDERAL:** I declare that I employed in the office of a member of the State
         Bar of this Court at whose direction the service was made.
18

19  Executed on August 26, 2019, at Irvine, California.

20

21                                              _____
                                                Theresa Fontes
22

23

24

25

26

27

28

1443997.1

**SERVICE LIST**
**United States District Court, Central Division**
**Dreher v. The PNC Financial Services Group**
**File # 107531.0004**

Daniel L. Rottinghaus, Esq.              Attorneys    for    STEPHEN    AND
Scott M. Mackey, Esq.                    MELINDA DREHER
Seema N. Kadaba, Esq.
BERDING & WEIL LLP
2175 N. California Blvd., Suite 500
Walnut Creek, CA 94596

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1443997.1

# EXHIBIT Q

```
 1                UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4    STEPHEN AND MELINDA DREHER,
 5              Plaintiffs,
 6        vs.                        No.
                                     2:18-CV-07827-MWF-FF
 7    PNC BANK, N.A., A
      PENNSYLVANIA CORPORATION,
 8    SUCCESSOR BY MERGER TO/WITH
      NATIONAL CITY BANK;
 9    DREAMBUILDER INVESTMENTS,
      LLC, A NEW YORK LIMITED
10    LIABILITY COMPANY; AMERICAN
      SERVICING AND RECOVERY GROUP,
11    LLC, A TEXAS LIMITED
      LIABILITY COMPANY; AND DOES
12    1-50,
13              Defendants.
14
15    _____
16
17
18                       VIDEOTAPED
19      VIDEOCONFERENCE DEPOSITION OF MELINDA L. DREHER
20                     Worley, Idaho
21                 Friday, June 26, 2020
22
23    Reported by:
      MARIA ELLERSICK
24    CSR No. 10531
      Job No. 4133261
25    PAGES 1 - 178
```

Page 1

```
1          Q    Okay.  And is it your writing on -- to

2     the -- to the left where it says "attached"?  Is

3     that your writing as well?

4          A    Yes, it is.

5          Q    Okay.  Ms. Dreher, did you prepare this      10:00:03

6     document?

7          A    Yes.  At some point, I made a spreadsheet

8     of all of my payments to -- that concerned the

9     second for that house, yes.

10         Q    Okay.  So then this entire itemization of    10:00:21

11    payments made for the second mortgage was prepared

12    by you; correct?

13         A    Yes, yes.

14         Q    Okay.  Okay.  Thank you.  Now, you'll see

15    that the first item is dated March 15, 2013, and it   10:00:42

16    was a payment to National City.  Now, can you tell

17    me why the payment was made to National City if we

18    saw in the Proof of Claim that all payments should

19    be made to Green Tree?

20         MR. HAGEN:  Objection.  Objection.               10:00:59

21    Argumentative.  Object to the form.  Calls for a

22    legal contention.

23         You can answer to the best of your ability.

24         THE WITNESS:  Okay.  So when I was -- I was

25    instructed to start making my payment -- yeah.        10:01:26
```

Page 54

1    Okay.  So it was made to National City.  Okay.  I

2    know that I researched where to send all my

3    payments.  I don't recall this exactly specifically

4    because I did not foresee this fiasco in the future.

5    So I don't remember specifically what the                10:01:48

6    circumstances were, but I know I got credible

7    instructions to send them to National City.

8           I would never have sent them to

9    National City had I not gotten credible

10   instructions.  This was my one chance to -- this        10:02:05

11   was -- this bankruptcy was my chance to get my life

12   back in order and to keep my house and not to lose

13   everything I had worked for, and I wasn't going to

14   do anything to ruin that.

15          And so I know that I -- well, that I made        10:02:22

16   an effort to find out where all the payments were

17   supposed to go, and I know that I thought that that

18   was -- that my source telling me to send it to

19   National City was a credible source, and that's as

20   specific as I can get.  And as you can see, they did    10:02:41

21   cash the checks.

22   BY MS. MOSOTHOANE:

23      Q   Okay.  Thank you, Ms. Dreher.  Can you

24   please tell me when you said that you had some

25   credible source had instructed you to make the          10:02:51

Page 55

```
 1   payments to National City, can you please tell me

 2   who that credible source?

 3       A    No.  I just told you I can't be more

 4   specific.  I could not tell you who that credible

 5   source was, and the reason is because I did not        10:03:02

 6   foresee this fiasco with PNC that is happening right

 7   now.  Had I known about it, I would have kept much

 8   better records on everything.  But not foreseeing

 9   it, I could not.  I got the instructions to pay to

10   National City.  I paid it to National City.  They      10:03:23

11   cashed it.  They cashed them four different months

12   in a row, and so that's what happened.

13       Q    Okay.  Ms. Dreher, so just to be clear, you

14   can't tell me who the credible source is.  Is it

15   because you can't remember or because -- or because    10:03:40

16   it's privileged information?

17       A    Oh, okay.  I get it.  I should have made

18   that clear.  I cannot remember.

19       Q    Okay.  But to the best of your

20   recollection, was that credible source somebody from   10:03:55

21   National City Bank or PNC?

22       A    I cannot say for certain.  I mean, I

23   know -- I know it was a credible source, and

24   certainly, National City or PNC would be a credible

25   source, but I don't recall specifically.  I don't      10:04:15
```

Page 56

1

2

3

4    I, the undersigned, a Certified Shorthand

5 Reporter of the State of California, do hereby

6 certify:

7    That the foregoing proceedings were taken

8 before me at the time and place herein set forth;

9 that any witnesses in the foregoing proceedings,

10 prior to testifying, were placed under oath; that a

11 verbatim record of the proceedings was made by me

12 using machine shorthand which was thereafter

13 transcribed under my direction; further, that the

14 foregoing is an accurate transcription thereof.

15    I further certify that I am neither

16 financially interested in the action nor a relative

17 or employee of any attorney of any of the parties.

18    IN WITNESS WHEREOF, I have this date

19 subscribed my name.

20

21 Dated:  July 14, 2020.

22

23

24       *Maria Ellersick*

        MARIA ELLERSICK

        CSR No. 10531

25

             Page 178

# EXHIBIT R

B1 (Official Form 1)(4/10)

| United States Bankruptcy Court<br>District of Idaho | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Dreher, Stephen Clifton** | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>**Dreher, Melinda Lee** |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**AKA Steve Dreher** | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all)<br>**XXX-XX-5442** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all)<br>**XXX-XX-1343** |
| Street Address of Debtor (No. and Street, City, and State):<br>**23210 S. Cave Bay Rd**<br>**Worley, ID**          ZIP Code **83876** | Street Address of Joint Debtor (No. and Street, City, and State):<br>**23210 S. Cave Bay Rd**<br>**Worley, ID**          ZIP Code **83876** |
| County of Residence or of the Principal Place of Business:<br>**Kootenai** | County of Residence or of the Principal Place of Business:<br>**Kootenai** |
| Mailing Address of Debtor (if different from street address):<br>**PO Box  400**<br>**Worley, ID**          ZIP Code **83876** | Mailing Address of Joint Debtor (if different from street address):<br>**PO Box  400**<br>**Worley, ID**          ZIP Code **83876** |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

| Type of Debtor<br>(Form of Organization)<br>(Check one box) | Nature of Business<br>(Check one box) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box) |
|---|---|---|
| ■ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☐ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Other | ☐ Chapter 7        ☐ Chapter 15 Petition for Recognition<br>☐ Chapter 9              of a Foreign Main Proceeding<br>■ Chapter 11<br>☐ Chapter 12       ☐ Chapter 15 Petition for Recognition<br>☐ Chapter 13             of a Foreign Nonmain Proceeding |
| | Tax-Exempt Entity<br>(Check box, if applicable)<br>☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code). | Nature of Debts<br>(Check one box)<br>■ Debts are primarily consumer debts, defined in 11 U.S.C § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose"     ☐ Debts are primarily business debts |

| Filing Fee (Check one box) | Chapter 11 Debtors |
|---|---|
| ■ Full Filing Fee attached<br>☐ Filing Fee to be paid in installments (applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A<br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only) Must attach signed application for the court's consideration. See Official Form 3B | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C § 101(51D)<br>☐ Debtor is not a small business debtor as defined in 11 U.S.C § 101(51D)<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,343,300 (amount subject to adjustment on 4/01/13 and every three years thereafter).<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition<br>☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C § 1126(b). |

Statistical/Administrative Information

■ Debtor estimates that funds will be available for distribution to unsecured creditors.

☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

Estimated Number of Creditors

| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | OVER 100,000 |

Estimated Assets

| ☐ | ☐ | ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

Estimated Liabilities

| ☐ | ☐ | ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

**Page 2 of 54**

B1 (Official Form 1)(4/10)                                                                                          Page 2

| Voluntary Petition *(This page must be completed and filed in every case)* | Name of Debtor(s): **Dreher, Stephen Clifton** **Dreher, Melinda Lee** |
|---|---|

| All Prior Bankruptcy Cases Filed Within Last 8 Years (If more than two, attach additional sheet) | | |
|---|---|---|
| Location Where Filed: **- None -** | Case Number: | Date Filed: |
| Location Where Filed: | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor: **- None -** | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.) ☐ Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual whose debts are primarily consumer debts.) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. §342(b). X **/s/ David Eash**        **August 5, 2010** Signature of Attorney for Debtor(s)        (Date) **David Eash 4886** |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

■ No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

■ Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

■ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**

(Check any applicable box)

■ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**

(Check all applicable boxes)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____

(Name of landlord that obtained judgment)

_____

(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐ Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

Document   **Page 3 of 54**

B1 (Official Form 1)(4/10)                                                                                                      Page 3

| **Voluntary Petition** | Name of Debtor(s): |
| *(This page must be completed and filed in every case)* | **Dreher, Stephen Clifton** |
| | **Dreher, Melinda Lee** |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. §342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X **/s/ Stephen Clifton Dreher**
Signature of Debtor **Stephen Clifton Dreher**

X **/s/ Melinda Lee Dreher**
Signature of Joint Debtor **Melinda Lee Dreher**

Telephone Number (If not represented by attorney)

**August  5, 2010**
Date

### Signature of Attorney*

X **/s/ David Eash**
Signature of Attorney for Debtor(s)

**David Eash 4886**
Printed Name of Attorney for Debtor(s)

**Ewing Anderson P.S.**
Firm Name

**221 N Wall St.**
**Ste #500**
**Spokane, WA 99201**

Address

**(509) 838-4261**
Telephone Number

**August  5, 2010**
Date

*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11. United States Code. Certified copies of the documents required by 11 U.S.C. §1515 are attached.

☐ Pursuant to 11 U.S.C. §1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
Signature of Foreign Representative

_____
Printed Name of Foreign Representative

_____
Date

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)

_____
Address

X _____

_____
Date

Signature of Bankruptcy Petition Preparer or officer, principal, responsible person,or partner whose Social Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. §110; 18 U.S.C. §156.*

B 1D (Official Form 1, Exhibit D) (12/09)

# United States Bankruptcy Court
## District of Idaho

In re  **Stephen Clifton Dreher**
       **Melinda Lee Dreher**                                                Case No. _____

                                              _____            Chapter    |  11  |
                                                    Debtor(s)

## EXHIBIT D - INDIVIDUAL DEBTOR'S STATEMENT OF COMPLIANCE WITH CREDIT COUNSELING REQUIREMENT

**Warning: You must be able to check truthfully one of the five statements regarding credit counseling listed below. If you cannot do so, you are not eligible to file a bankruptcy case, and the court can dismiss any case you do file. If that happens, you will lose whatever filing fee you paid, and your creditors will be able to resume collection activities against you. If your case is dismissed and you file another bankruptcy case later, you may be required to pay a second filing fee and you may have to take extra steps to stop creditors' collection activities.**

*Every individual debtor must file this Exhibit D. If a joint petition is filed, each spouse must complete and file a separate Exhibit D. Check one of the five statements below and attach any documents as directed.*

■ 1. Within the 180 days **before the filing of my bankruptcy case,** I received a briefing from a credit counseling agency approved by the United States trustee or bankruptcy administrator that outlined the opportunities for available credit counseling and assisted me in performing a related budget analysis, and I have a certificate from the agency describing the services provided to me. *Attach a copy of the certificate and a copy of any debt repayment plan developed through the agency.*

☐ 2. Within the 180 days **before the filing of my bankruptcy case,** I received a briefing from a credit counseling agency approved by the United States trustee or bankruptcy administrator that outlined the opportunities for available credit counseling and assisted me in performing a related budget analysis, but I do not have a certificate from the agency describing the services provided to me. *You must file a copy of a certificate from the agency describing the services provided to you and a copy of any debt repayment plan developed through the agency no later than 14 days after your bankruptcy case is filed.*

☐ 3. I certify that I requested credit counseling services from an approved agency but was unable to obtain the services during the seven days from the time I made my request, and the following exigent circumstances merit a temporary waiver of the credit counseling requirement so I can file my bankruptcy case now. *[Summarize exigent circumstances here.]* ____

**If your certification is satisfactory to the court, you must still obtain the credit counseling briefing within the first 30 days after you file your bankruptcy petition and promptly file a certificate from the agency that provided the counseling, together with a copy of any debt management plan developed through the agency. Failure to fulfill these requirements may result in dismissal of your case. Any extension of the 30-day deadline can be granted only for cause and is limited to a maximum of 15 days. Your case may also be dismissed if the court is not satisfied with your reasons for filing your bankruptcy case without first receiving a credit counseling briefing.**

B 1D (Official Form 1, Exhibit D) (12/09) - Cont.                                                                Page 2

☐ 4. I am not required to receive a credit counseling briefing because of: *[Check the applicable statement.] [Must be accompanied by a motion for determination by the court.]*

☐ Incapacity. (Defined in 11 U.S.C. § 109(h)(4) as impaired by reason of mental illness or mental deficiency so as to be incapable of realizing and making rational decisions with respect to financial responsibilities.);

☐ Disability. (Defined in 11 U.S.C. § 109(h)(4) as physically impaired to the extent of being unable, after reasonable effort, to participate in a credit counseling briefing in person, by telephone, or through the Internet.);

☐ Active military duty in a military combat zone.

☐ 5. The United States trustee or bankruptcy administrator has determined that the credit counseling requirement of 11 U.S.C. § 109(h) does not apply in this district.

**I certify under penalty of perjury that the information provided above is true and correct.**

Signature of Debtor:     **/s/ Stephen Clifton Dreher**
                        **Stephen Clifton Dreher**

Date:     **August 5, 2010**

## United States Bankruptcy Court
### District of Idaho

In re  **Stephen Clifton Dreher**
      **Melinda Lee Dreher**

                                     Debtor(s)

Case No. _____

Chapter    **11**

## VERIFICATION OF CREDITOR MATRIX

The above-named Debtors hereby verify that the attached list of creditors is true and correct to the best of their knowledge.

Date:  **August 5, 2010**                           **/s/ Stephen Clifton Dreher**
                                           **Stephen Clifton Dreher**
                                           Signature of Debtor

Date:  **August 5, 2010**                           **/s/ Melinda Lee Dreher**
                                           **Melinda Lee Dreher**
                                           Signature of Debtor

Acs/st Ed Ln Mkg Corp
501 Bleecker St
Utica, NY 13501


ADT Security Systems, Inc
PO Box 371490
Pittsburgh, PA 15250


AFNI, Inc
PO Box 3517
Bloomington, IL 61702-3517


Allied Collection Svcs
7120 Hayvenhurst Ave Ste
Van Nuys, CA 91406


Amex
c/o Beckett  Lee
PO Box 3001
Malvern, PA 19355


Bac Home Loans Servici
450 American St
Simi Valley, CA 93065


Bank of America
12191 W Parkview
Post Falls, ID 83854


Bank of America
c/o Bronson Cawley  Bergman
415 Lawrence Bell Drive
Williamsville, NY 14221


Bank of America
PO Box 15726
Wilmington, DE 19886

Bishop, White  Marshall, P.
Attorneys at Law
720 Olive Way  Ste 1301
Seattle, WA 98101-1801


Cdi Affiliated Service
Cbp Affiliated Service
Boise, ID 83704


Creditors Financial Group
PO Box 440290
Aurora, CO 80044


Discover Card
PO Box 6103
Carol Stream, IL 60197


Discover Card
PO Box 3008
New Albany, OH 43054


Discover Card
PO Box 30395
Salt Lake City, UT 84130


Discover Fin
Attention: Bankruptcy Department
Po Box 3025
New Albany, OH 43054


Doolittle Law
PO Box 9385
Boise, ID 83707


Enhanced Recovery Corp
8014 Bayberry Rd
Jacksonville, FL 32256-7412

Equinox Financial Management
PO Box 455
Park Ridge, IL 60068


ER Solutions Inc
PO Box 9004
Renton, WA 98057


Hughes Network
c/o NCO Financial Services
PO Box 15243
Wilmington, DE 19850


IC Systems, Inc
PO Box 64380
Saint Paul, MN 55164


Indymac Bank
Attn:Bankruptcy
Po Box 4045
Kalamazoo, MI 49003


Indymac Bank
Attn:Bankruptcy
Po Box 4045
Kalamazoo, MI 49003


Indymac Federal Bank
Home Loan Servicing
6900 Beatrice Drive
Kalamazoo, MI 49009


IndyMac Mortgage Services
PO Box 4045
Kalamazoo, MI 49003


Kootenai County Treasurer
PO Box 6700
Coeur D Alene, ID 83816

54

Mortgage Electronic Reg Sys
c/o ReContrust Company
1800 Tapo Canyon Rd.
Simi Valley, CA 93063


National City
PO Box 5570
Cleveland, OH 44101


National City
Retail Direct Inbound
PO Box 3038
Kalamazoo, MI 49003


National City
116 Allegheny Center Mall
Pittsburgh, PA 15212


National Enterprise Systems
29125 Solon road
Solon, OH 44139-3442


Nordstrom Bank
PO Box 6587
Englewood, CO 80155


Nordstrom Bank
PO Box 79137
Phoenix, AZ 85062


Nordstrom FSB
Attention: Bankruptcy Department
Po Box 6566
Englewood, CO 80155


One West Bank Group, LLC
c/o Faslo Solutions, LLC
PO Box 202166
Dallas, TX 75320

Penn Credit Corporation
PO Box 988
Harrisburg, PA 17108


PNC Bank
PO Box 5570
Brecksville, OH 44101


Recontrust Company
1800 Tap Canyon Rd.
CA6-914-01-94
Louisville, CO 80028


Regional Trustee Services Co
616 First Ave #500
Seattle, WA 98104


RGS Financial
PO Box 852039
Richardson, TX 75085


Sheryl Johnson
c/o Merchant Realty
20815 Norwalk Blvd #6
Lakewood, CA 90715


Tate   Kirlin Associates
2810 Southampton Road
Philadelphia, PA 19154


The CBE Group, Inc
PO Box 2594
Waterloo, IA 50704


Union Bank   Trust
Po Box 82535
Lincoln, NE 68501

Usa Servicing Company
Attn: Bankruptcy Unit
Po Box 9400
Wilkes Barre, PA 18773


Verizon
c/c AFNI Inc
1310 Martin Luther King Drive
Bloomington, IL 61702


Verizon Communications-RPC
11313 N Sepulveda
Mission Hills, CA 91345


Verizon Northwest
PO Box 9688
Mission Hills, CA 91346


Verizon Northwest
PO Box 9688
Mission Hills, CA 91346


Verizon Wireless
PO Box 9622
Mission Hills, CA 91346


Vly Emp Coll
11707 E Montgomery
Spokane, WA 99206


West Asset Purchasing
101 Convention Center St
Las Vegas, NV 89109


Wffinancial
Po Box 7648
Boise, ID 83707

Page 1 of 2

**Information to identify the case:**

| | | | | |
|---|---|---|---|---|
| Debtor 1 | **Stephen Clifton Dreher** | | Social Security number or ITIN | xxx-xx-5442 |
| | First Name   Middle Name   Last Name | | EIN | _ _-_ _ _ _ _ _ _ |
| Debtor 2 | **Melinda Lee Dreher** | | Social Security number or ITIN | xxx-xx-1343 |
| (Spouse, if filing) | First Name   Middle Name   Last Name | | EIN | _ _-_ _ _ _ _ _ _ |

United States Bankruptcy Court   **District of Idaho**

Case number:   **10-21037-TLM**

## Order of Discharge

12/15

**IT IS ORDERED:** A discharge under 11 U.S.C. § 1141(d)(5) is granted to:

Stephen Clifton Dreher
aka Steve Dreher

Melinda Lee Dreher

<u>2/27/18</u>

**By the court:**   <u>Terry L Myers</u>
United States Bankruptcy Judge

---

### Explanation of Bankruptcy Discharge in an Individual Chapter 11 Case

This order does not close or dismiss the case.

**Creditors cannot collect discharged debts**
This order means that no one may make any attempt to collect a discharged debt from the debtors personally. For example, creditors cannot sue, garnish wages, assert a deficiency, or otherwise try to collect from the debtors personally on discharged debts. Creditors cannot contact the debtors by mail, phone, or otherwise in any attempt to collect the debt personally. Creditors who violate this order can be required to pay debtors damages and attorney's fees.

However, a creditor with a lien may enforce a claim against the debtors' property subject to that lien unless the lien was avoided or eliminated. For example, a creditor may have the right to foreclose a home mortgage or repossess an automobile.

This order does not prevent debtors from paying any debt voluntarily. 11 U.S.C. § 524(f).

**Most debts are discharged**
Most debts are covered by the discharge, but not all. Generally, a discharge removes the debtors' personal liability for debts provided for by the chapter 11 plan.

In a case involving community property: Special rules protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.

**Some debts are not discharged**
Examples of debts that are not discharged are:

- ♦ debts that are domestic support obligations;

- ♦ debts for most student loans;

- ♦ debts for most taxes;

- ♦ debts that the bankruptcy court has decided or will decide are not discharged in this bankruptcy case;

    **For more information, see page 2 >**

Form 3180RI   **Individual Chapter 11 Discharge**   page 1   Exhibit D
1 of 4

♦ debts for most fines, penalties, forfeitures, or criminal restitution obligations;

♦ some debts which the debtors did not properly list;

♦ debts for certain types of loans owed to pension, profit sharing, stock bonus, or retirement plans; and

♦ debts for death or personal injury caused by operating a vehicle while intoxicated.

In addition, this discharge does not stop creditors from collecting from anyone else who is also liable on the debt, such as an insurance company or a person who cosigned or guaranteed a loan.

**This information is only a general summary of an individual chapter 11 discharge; some exceptions exist. Because the law is complicated, you should consult an attorney to determine the exact effect of the discharge in this case.**

Exhibit D
2 of 4

## Notice Recipients

| | | |
|---|---|---|
| District/Off: 0976-2 | User: arutter | Date Created: 2/27/2018 |
| Case: 10-21037-TLM | Form ID: 3180RI | Total: 108 |

**Recipients submitted to the BNC (Bankruptcy Noticing Center) without an address:**

| | |
|---|---|
| cr | Wells Fargo Auto Finance |
| acc | Bernard Turk |
| cr | Bank of New York Mellon |

TOTAL: 3

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| tr | US Trustee | ustp.region18.bs.ecf@usdoj.gov |
| aty | David E Eash | davide@feltmanewing.com |
| aty | David Wayne Newman | ustp.region18.bs.ecf@usdoj.gov |
| aty | Forrest R Goodrum | fgoodrum@mgslegal.com |
| aty | Gary W Dyer | gary.w.dyer@usdoj.gov |
| aty | James K Miersma | jbarrett@mccarthyholthus.com |
| aty | Kelly Greene McConnell | litigation@givenspursley.com |
| aty | Kevin C Braley | kbraley@hollandhart.com |
| aty | Kirk Sterling Cheney | kscheney@hollandhart.com |
| aty | Lisa McMahon-Myhran | lmcmahon@robinsontait.com |
| aty | Patrick John Geile | pgeile@foleyfreeman.com |
| aty | Robin M. Long | Robin@kam13trustee.com |
| aty | Timothy S Callender | tcallender@ameriben.com |

TOTAL: 13

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | | |
|---|---|---|---|---|---|
| db | Stephen Clifton Dreher | PO Box 400 | Worley, ID 83876 | | |
| jdb | Melinda Lee Dreher | PO Box 400 | Worley, ID 83876 | | |
| aty | David Eash | Ewing Anderson | 2101 Lakewood Dr #236 | Coeur d Alene. ID 83814 | |
| cr | Recovery Management Systems Corporation for Capital Recovery | | 25 SE 2nd Avenue, Suite 1120 | Miami, FL 33131 | |
| cr | The Bank of New York Mellon | Routh Crabtree Olsen, PS | Mark Moburg | 13555 SE 36th St | Suite 300   Bellevue, WA 98006 |
| app | Peak Appraisal Service. LLC | 1018 S Tanglewood Rd | Post Falls, ID | | |
| cr | Deutsche Bank National Trust Company | Routh Crabtree Olsen, P.S. | c/o Lance E. Olsen | 13555 SE 36th St.   Suite 300   Bellevue. WA 98006 | |
| app | Gregory Wasik | Los Angeles Valuation Group | 1154 N Sycamore Ave | Suite 11 | Los Angeles, CA 90038 |
| cr | Quantum3 Group LLC as agent for | Galaxy Portfolios LLC | PO Box 788 | Kirkland, WA 98083-0788 | |
| cr | Select Portfolio Servicing, Inc. | 3815 South West Temple | Salt Lake City, UT 84115 | | |
| cr | Ocwen Loan Servicing, LLC | c/o Robinson Tait. P.S. | 710 Second Avenue, Suite 710 | Seattle, WA 98104 | |
| cr | Real Time Resolutions. Inc. | 1349 Empire Central Drive, Suite #150 | PO Box 36655 | Dallas. TX 75247-4029 | |
| cr | Bank of America, N.A. | c/o Givens Pursley LLP | 601 W Bannock St | PO Box 2720 | Boise, ID 83701 |
| aty | Daniel L Rottinghaus | Berding & Weil. LLP | 3240 Stone Valley Rd | Alamo, CA | |
| aty | Iain A Macdonald | Macdonald & Associates | 221 Sansome Street | Third Floor | San Francisco. CA 94104 |
| aty | Paul W Windust | Berding & Weil, LLP | 3240 Stone Valley Rd | Alamo, CA | |
| ust | Carey A Tompkins | US Trustee | 920 West Riverside Ave, Suite 593 | Spokane, WA 99201 | |
| ust | jfiles1 Office of the U.S. Trustee | Office of the U.S. Trustee | 405 E. 8th Avenue | Suite 1100   Eugene, OR 97401 | |
| ust | US Trustee | Washington Group Central Plaza | 720 Park Blvd, Ste 220 | Boise, ID 83712 | |
| 3631436 | ADT Security Systems. Inc | PO Box 371490 | Pittsburgh, PA 15250 | | |
| 3631437 | AFNI, Inc | PO Box 3517 | Bloomington, IL 61702-3517 | | |
| 3631435 | Acs/st Ed Ln Mkg Corp | 501 Bleecker St | Utica, NY 13501 | | |
| 3631438 | Allied Collection Svcs | 7120 Hayvenhurst Ave Ste | Van Nuys, CA 91406 | | |
| 3715515 | American Express Centurion Bank | c o Becket and Lee LLP | POB 3001 | Malvern, PA 19355-0701 | |
| 3631439 | Amex | c/o Beckett Lee | PO Box 3001 | Malvern, PA 19355 | |
| 3631440 | Bac Home Loans Servici | 450 American St | Simi Valley, CA 93065 | | |
| 3631443 | Bank of America | PO Box 15726 | Wilmington, DE 19886 | | |
| 3631441 | Bank of America | PO Box 787 | Post Falls. ID 83877-0787 | | |
| 3631442 | Bank of America | c/o Bronson Cawley Bergman | 415 Lawrence Bell Drive | Williamsville. NY 14221 | |
| 4430548 | Bank of New York Mellon, f/k/a The Bank | Serviced by Select Portfolio Servicing. | 3815 South West Temple | Salt Lake City, UT 84115 | |
| 3631444 | Bishop, White Marshall. P. | Attorneys at Law | 720 Olive Way Ste 1301 | Seattle, WA 98101-1801 | |
| 3631445 | Cdi Affiliated Service | PO Box 4068 | Boise, ID 83711 | | |

Exhibit D
3 of 4

## 11 Individual Discharge: Notice Recipients     Page 2 of 2

| | | | | |
|---|---|---|---|---|
| 3631446 | Creditors Financial Group | PO Box 440290 | Aurora, CO 80044 | |
| 3940971 | Deutsche Bank National Trust Company | 13555 SE 36th St., Suite 300 | Bellevue, WA 98006 | |
| 4028773 | Deutsche Bank National Trust Company | 13555 SE 36th St.,Suite 300. | Bellevue, WA 98006. | |
| 3652357 | Deutsche Bank National Trust Company | c/o McCarthy & Holthus, LLP | 19735 10th Ave NE. Suite N200 | Poulsbo, WA 98370 |
| 3639862 | Discover Bank | Dfs Services LLC | PO Box 3025 | New Albany, OH 43054-3025 |
| 3631448 | Discover Card | PO Box 3008 | New Albany, OH 43054 | |
| 3631449 | Discover Card | PO Box 30395 | Salt Lake City, UT 84130 | |
| 3631447 | Discover Card | PO Box 6103 | Carol Stream, IL 60197 | |
| 3631450 | Discover Fin | Attention: Bankruptcy Department | Po Box 3025 | New Albany, OH 43054 |
| 3631451 | Doolittle Law | PO Box 9385 | Boise, ID 83707 | |
| 3631454 | ER Solutions Inc | PO Box 9004 | Renton. WA 98057 | |
| 3631452 | Enhanced Recovery Corp | 8014 Bayberry Rd | Jacksonville, FL 32256-7412 | |
| 3631453 | Equinox Financial Management | PO Box 455 | Park Ridge, IL 60068 | |
| 3685959 | Green Tree Servicing LLC | 7360 S. Kyrene Rd | Recovery Dept T120 | Tempe, AZ 85283 |
| 3631455 | Hughes Network | c/o NCO Financial Services | PO Box 15243 | Wilmington, DE 19850 |
| 3631456 | IC Systems, Inc | PO Box 64380 | Saint Paul, MN 55164 | |
| 3631460 | IndyMac Mortgage Services | PO Box 4045 | Kalamazoo, MI 49003 | |
| 3631457 | Indymac Bank | Attn:Bankruptcy | Po Box 4045 | Kalamazoo, MI 49003 |
| 3631458 | Indymac Bank | Attn:Bankruptcy | Po Box 4045 | Kalamazoo, MI 49003 |
| 3631459 | Indymac Federal Bank | Home Loan Servicing | 6900 Beatrice Drive | Kalamazoo, MI 49009 |
| 3631461 | Kootenai County Treasurer | PO Box 6700 | Coeur D Alene, ID 83816 | |
| 3631462 | Mortgage Electronic Reg Sys | c/o ReContrust Company | 1800 Tapo Canyon Rd. | Simi Valley, CA 93063 |
| 3633776 | NORDSTROM fsb | POB 6566 | ENGLEWOOD CO 80155 | |
| 3631463 | National City | PO Box 5570 | Cleveland. OH 44101 | |
| 3631465 | National City | 116 Allegheny Center Mall | Pittsburgh, PA 15212 | |
| 3631464 | National City | Retail Direct Inbound | 400 W. Crosstown Pkwy | Kalamazoo, MI 49001 |
| 3631466 | National Enterprise Systems | 29125 Solon road | Solon, OH 44139-3442 | |
| 3631467 | Nordstrom Bank | PO Box 6587 | Englewood, CO 80155 | |
| 3631468 | Nordstrom Bank | PO Box 79137 | Phoenix. AZ 85062 | |
| 3631469 | Nordstrom FSB | Attention: Bankruptcy Department | Po Box 6566 | Englewood, CO 80155 |
| 4431768 | Ocwen Loan Servicing, LLC | Attn: Bankruptcy Department | P.O. Box 24605 | West Palm Beach, FL 33416-4605 |
| 3631470 | One West Bank Group, LLC | c/o Faslo Solutions LLC | PO Box 202166 | Dallas, TX 75320 |
| 3944805 | OneWest Bank, FSB | P.O. Box 829009 | Dallas, TX 75382 | |
| 3631472 | PNC Bank | PO Box 5570 | Brecksville, OH 44101 | |
| 3631471 | Penn Credit Corporation | PO Box 988 | Harrisburg, PA 17108 | |
| 3965593 | Quantum3 Group LLC as agent for | Galaxy Portfolios LLC | PO Box 788 | Kirkland, WA 98083-0788 |
| 3631475 | RGS Financial | PO Box 852039 | Richardson, TX 75085 | |
| 4432730 | Real Time Resolutions, Inc. | 1349 Empire Central Drive, Suite #150 | PO Box 36655 | Dallas, Texas 75247-4029 |
| 3631473 | Recontrust Company | 2380 Performance Drive | CA6-914-01-94 | Richardson. TX 75082 |
| 3661651 | Recovery Management Systems Corporation | 25 S.E. 2nd Avenue, Suite 1120 | Miami, FL 33131-1605 | |
| 3631474 | Regional Trustee Services Co | 616 First Ave #500 | Seattle, WA 98104 | |
| 3631476 | Sheryl Johnson | c/o Merchant Realty | PO Box 3842 | Cerritos. CA 90703-3842 |
| 3727566 | THE BANK OF NEW YORK MELLON | 400 National Way | Mail Stop: CA6-919-01-23 | Simi Valley. CA 93065 |
| 3738460 | THE BANK OF NEW YORK MELLON | 400 National Way | Mail Stop: CA6-919-01-23 | Simi Valley. CA 93065 |
| 3631477 | Tate Kirlin Associates | 2810 Southampton Road | Philadelphia. PA 19154 | |
| 3631478 | The CBE Group, Inc | PO Box 2594 | Waterloo, IA 50704 | |
| 3631479 | Union Bank Trust | Po Box 82535 | Lincoln, NE 68501 | |
| 3631480 | Usa Servicing Company | Attn: Bankruptcy Unit | Po Box 9400 | Wilkes Barre, PA 18773 |
| 3650130 | Valley Empire Collection | 11707 E Montgomery | Spokane WA 99206 | |
| 3631481 | Verizon | c/o AFNI Inc | 1310 Martin Luther King Drive | Bloomington, IL 61702 |
| 3631482 | Verizon Communications-RPC | 11313 N Sepulveda | Mission Hills. CA 91345 | |
| 3631483 | Verizon Northwest | PO Box 9688 | Mission Hills, CA 91346 | |
| 3631484 | Verizon Northwest | PO Box 9688 | Mission Hills, CA 91346 | |
| 3707341 | Verizon Wireless | PO BOX 3397 | Bloomington, IL 61702 | |
| 3631485 | Verizon Wireless | PO Box 9622 | Mission Hills, CA 91346 | |
| 3631486 | Vly Emp Coll | 11707 E Montgomery | Spokane. WA 99206 | |
| 3647621 | Wells Fargo Auto Finance | 13675 Technology Dr. Bldg C, 2nd Floor | Eden Prairie. MN 55344 | |
| 3631487 | West Asset Purchasing | 101 Convention Center St | Las Vegas, NV 89109 | |
| 3707343 | West Asset Purchasing, LLC | c/o B-Line, LLC | MS 550 | PO Box 91121 | Seattle, WA 98111-9221 |
| 3631488 | Wfinancial | Po Box 7648 | Boise, ID 83707 | |

TOTAL: 92

Exhibit D
4 of 4